1

2          **UNITED STATES DISTRICT COURT**

3          **EASTERN DISTRICT OF CALIFORNIA**

4

5   **YELLOWCAKE, INC.,**                      **CASE NO. 1:20-CV-0988 AWI BAM**

6                **Plaintiff**

7        **v.**                                 **ORDER ON COUNTER-DEFENDANTS'**
                                                 **MOTION TO DISMISS**
8   **HYPHY MUSIC, INC.,**

9                **Defendant**                   (Doc. No. 23)

10  _____

11  **HYPHY MUSIC, INC.,**

12               **Count-Plaintiff**

13       **v.**

14  **YELLOWCAKE, INC., COLONIZE**
    **MEDIA, INC., JOSE DAVID**
15  **HERNANDEZ, and JESUS CHAVEZ, SR.**

16               **Counter-Defendants**

17

18

19        This is a copyright dispute involving seven musical albums by the artist Los Originales De

20   San Juan.  Counter-Plaintiff Hyphy Music, Inc. ("Hyphy") brings claims against Counter-

21   Defendants Yellowcake, Inc. ("Yellowcake"), Colonize Media, Inc. ("Colonize"), Jose Hernandez

22   ("Hernandez") (collectively "YCH") and Jesus Chavez, Sr. ("Chavez") for two copyright

23   violations under the Copyright Act (17 U.S.C. § 100 et seq.) involving four of the albums and

24   associated cover art of three of the albums, and state law claims for intentional interference with

25   prospective economic advantage, intentional interference with contractual relations, unfair

26   competition, conversion, and breach of contract.  Currently before the Court is YCH's Rule

27   12(b)(6) motion to dismiss six of the seven counterclaims alleged against them.  For the reasons

28   that follow, Defendants' motion will generally be granted.

1

## RULE 12(b)(6) FRAMEWORK

2        Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the

3    plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

4    Counterclaims are subject to Rule 12(b)(6) challenges. See Seismic Reservoir 2020, Inc. v.

5    Paulsson, 785 F.3d 330, 335 (9th Cir. 2015). A dismissal under Rule 12(b)(6) may be based on

6    the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a

7    cognizable legal theory. Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015). In

8    reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken

9    as true and construed in the light most favorable to the non-moving party. Kwan v. SanMedica,

10   Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017). However, complaints that offer no more than "labels

11   and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

12   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793

13   F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that

14   contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or

15   allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

16   inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254

17   (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual

18   matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at

19   678; Mollett, 795 F.3d at 1065. "A claim has facial plausibility when the plaintiff pleads factual

20   content that allows the court to draw the reasonable inference that the defendant is liable for the

21   misconduct alleged." Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir.

22   2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts

23   that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678;

24   Somers, 729 F.3d at 960. The Ninth Circuit has distilled the following principles for Rule

25   12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or

26   counterclaim may not simply recite the elements of a cause of action, but must contain sufficient

27   allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

28   effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to

1  relief, such that it is not unfair to require the opposing party to be subjected to the expense of

2  discovery and continued litigation.  Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014).  If a

3  motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to

4  amend the pleading was made . . . ."  Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016).

5  However, leave to amend need not be granted if amendment would be futile or the plaintiff has

6  failed to cure deficiencies despite repeated opportunities.  Garmon v. County of L.A., 828 F.3d

7  837, 842 (9th Cir. 2016).

8

9  **BACKGROUND**

10      Hyphy is a record label that is in the business of producing, manufacturing, distributing,

11  exploiting, selling, and licensing sound and audiovisual recordings and associated artwork.

12  Chavez is the founder and principal of the musical group Los Originales De San Juan, a popular

13  Mexican musical group.

14      In February 2013, Hyphy entered into an oral exclusive recording agreement with Chavez

15  whereby Hyphy commissioned Chavez, for a period of five (5) years, to exclusively provide

16  services as a recording artist in the making of sound and audio-visual recordings embodied in

17  albums.  Pursuant to the agreement, Hyphy agreed to:  (1) select the musical compositions to be

18  recorded on the albums; (2) produce the musical performances on the albums; (3) direct the

19  recording and filming of musical and audiovisual performances to be embodied on the albums;

20  and (4) pay Chavez a fixed amount per album.  Chavez agreed to follow Hyphy's artistic direction,

21  perform the recordings, and grant Hyphy the non-exclusive right to utilize Chavez's likeness and

22  his group's name.  Chavez also agreed that Hyphy would be the owner of all title, right, and

23  interest in and to the tangible masters of the albums and all property rights in the musical

24  performances embodied in the tangible masters (including the copyrights and any extensions and

25  renewals of the copyrights) from the inception of the creation of each album.  Hyphy performed

26  the above services and contributed sufficient originality to the albums such that Hyphy at a

27  minimum is a co-author, co-owner, or joint owner of the copyrights in the albums for purposes of

28  the Copyright Act.  Hyphy also produced, created, and designed the album cover art for the

1  albums.  Apparently, Hyphy and Chavez created four albums (Corridos de Poca M, Desde La

2  Cantina de Mi Barrio, El Campesino, and Nuestra Historia).  <u>See</u> FAC Ex. B.  Hyphy also

3  registered copyrights in the content of the four albums and in the cover art of three albums

4  (Corridos de Poca M, Desde la Cantina de Mi Barrio, and El Campesino).  Hyphy alleges that it is

5  the exclusive copyright owner of the four albums and the albums' cover art.  <u>See</u> <u>id.</u>

6        In April 2019, Hernandez had a meeting with Chavez wherein Hernandez expressed his

7  interest in exploiting the four Los Originales' albums.  Chavez advised Hernandez that he had

8  entered into a contract with Hyphy and that Hyphy was the owner of the four albums.  Hernandez

9  intentionally misled Chavez and wrongfully told Chavez that Hyphy had no rights in the four

10  albums and that Chavez was free to sell to Hernandez's companies, Colonize and Yellowcake.

11  Hernandez offered Chavez a significant sum of money purportedly to purchase the rights to the

12  four albums and also promised to indemnify Chavez if Hyphy sought legal redress from Chavez.

13  Hernandez engaged in this conduct individually and on behalf of Colonize and Yellowcake to

14  disrupt the contractual relations between Hyphy and Chavez.  Chavez purportedly entered into an

15  agreement with Yellowcake.  In exchange for money, Chavez wrongfully transferred his

16  ownership rights in the four albums and cover art to Yellowcake, even though Chavez had no such

17  rights to grant.

18        In May or June 2019, Hyphy discovered that Yellowcake and Colonize created or caused

19  the creation of copies of the four Los Originales albums and cover art and was distributing, selling

20  and exploiting these works through online platforms such as ITunes, Amazon Music, and

21  YouTube.  The only difference between the cover art created by Hyphy and the cover art being

22  utilized by Yellowcake and Colonize was that Yellowcake and Colonize removed the Hyphy logos

23  and replaced them with Yellowcake and Colonize's respective logos.  This was done without

24  Hyphy's authorization.  Yellowcake sent correspondences to Hyphy in which Yellowcake was

25  claiming ownership of the masters and sound recordings of the seven albums.  However,

26  Yellowcake and Colonize have no direct license from Hyphy to use or exploit the seven albums

27  and cover art.

28

Yellowcake and Colonize sent fraudulent takedown notices to YouTube that falsely claimed that Hyphy had no right to post or upload the three albums and cover art. Prior to the takedown notices, Hyphy had received significant revenue from YouTube, and the YouTube uploads provided an important and lucrative marketing channel for the four albums and cover art. Now, YCH's uploads of the albums and cover art have generated substantial views and revenue on their YouTube channels. YCH's exploitation of the four albums is unlawful and a blatant violation of California law and federal copyright law.

On June 4, 2020, Yellowcake filed a copyright infringement claim against Hyphy. Hyphy procured registered copyrights for the four albums on the following dates: March 17, 2017 (El Campesino), May 9, 2018 (Desde La Cantina de Mi Barrio), April 13, 2020 (Corridos De Poca M), and August 2, 2020 (Nuestra Historia). See Defendants' Request for Judicial Notice ("RJN") (Doc. No. 29) Exs. 1, 2, 3, 4.[1] On August 19, 2020, Hyphy filed its counterclaim, and on August 28, 2020, filed the active First Amended Counterclaim ("FAC").

## COUNTER-DEFENDANTS' MOTION TO DISMISS

### I. First Cause of Action – Copyright Infringement of Sound Recordings

*Counter-Defendants' Arguments*

Yellowcake explains that in March 2019, it entered into an asset purchase agreement with Chavez whereby Yellowcake purchased the entirety of Chavez's ownership in the rights, title, and interest in the sound recordings that comprise the albums of Los Originales De San Juan. Yellowcake then complied in all respects with the provisions of the Copyright Act by registering copyrights for each of the sound recordings. Yellowcake was issued a Certificate of Registration for each copyrighted sound recording.

Yellowcake argues that Hyphy's first copyright claim fails because Hyphy cannot establish

---

[1] The RJN requests that the Court to take judicial notice of copies of registration information from the U.S. Copyright Office's Online Catalog regarding the seven albums. See Doc. No. 29. The Court takes judicial notice of these governmental records. See Fed. R. Evid. 201; Basile v. Tweneitieth Century Fox Film Corp., 678 F. App'x 576, 577 (9th Cir. 2017); Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1146 (9th Cir. 2008); Yellowcake, Inc. v. Morena Music, Inc., 2021 U.S. Dist. LEXIS 39127, *8 n.1 (E.D. Cal. Mar. 1, 2021); Kaseberg v. Conaco, LLC, 360 F.Supp.3d 1026, 1029 n.2 (S.D. Cal. 2018); Obodai v. YouTube LLC, 840 F.Supp.2d 714, 715 n.1 (S.D. N.Y. 2011).

that it has valid ownership of a copyright in the albums.  Hyphy purports to make its ownership claim by alleging an oral agreement with Chavez.  However, ownership of copyrights cannot be transferred by oral agreement.  At best, all that could arise from the oral agreement was a non-exclusive license to use the albums/sound recordings.  In the absence of a writing between Hyphy and Chavez, Chavez had the ability to transfer his ownership of the sound recordings to Yellowcake.  Because Hyphy cannot rely on the oral agreement to establish exclusive rights in the four albums, the first cause of action for infringement and the third cause of action for associated injunctive relief should be dismissed.

### *Counter-Plaintiff's Opposition*

Hyphy argues that, pursuant to Paragraph 17, the FAC alleges that Hyphy is a co-author of the four albums with Chavez.  As a co-author, Hyphy has an equal undivided interest in the whole of the works with Chavez.  This is the case regardless of whether the FAC in the alternative pleads that Hyphy was granted an oral license from Chavez.  Therefore, YCH's arguments that Hyphy does not possess a valid copyright in the sound recordings and masters, or that any claim thereto is made only by way of an oral argument with Chavez, is misplaced.  As a co-author, Hyphy may sue YCH for copyright infringement because Chavez never had the ability to grant the exclusive rights that YCH believed it had obtained.

### *Legal Standard*

"The Copyright Act affords copyright owners the 'exclusive rights' to display, perform, reproduce, or distribute copies of a copyrighted work, to authorize others to do those things, and to prepare derivative works based upon the copyrighted work."  Maloney v. T3Media, Inc., 853 F.3d 1004, 1010 (9th Cir. 2017); see 17 U.S.C. § 106.  Only the "legal or beneficial owner of an exclusive right under a copyright" has standing to sue for infringement of that right.  Righthaven LLC v. Hoehn, 716 F.3d 1166, 1169 (9th Cir. 2013).  Further, while one can own a copyright and have property rights in a work without a registration, the owner needs to register the copyright before he can sue for infringement.  See 17 U.S.C. §§ 408(a), 411(a); Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, Ltd. Liab. Co., 925 F.3d 1140, 1144 (9th Cir. 2019); Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co., 747 F.3d 673, 678 (9th Cir. 2014).  A claim for copyright

infringement has two basic elements:  (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 351 (1991); Great Minds v. Office Depot, Inc., 945 F.3d 1106, 1110 (9th Cir. 2019); Seven Arts, 733 F.3d at 1254.  "To plead ownership, [a plaintiff] must plausibly allege it owns a valid copyright registration for its works."  Malibu Textiles, Inc. v. Label Lane Int'l, Inc., 922 F.3d 946, 951 (9th Cir. 2019).

*Discussion*

Hyphy's opposition focuses on allegations in Paragraph 17 to contend that it is a co-author and therefore a joint owner of the three albums.  This is a reasonable reading of Paragraph 17.  However, the FAC also alleges an agreement between Hyphy and Chavez for the intellectual property rights in the four albums.  Further, documents from the Copyright Office indicate that Hyphy named itself as the author of the albums as an "employer" in a work for hire arrangement.  Finally, although not mentioned in the opposition, Copyright Office documents for the El Campesino album identify Hyphy as the copyright claimant through a written transfer agreement.  See RJN Ex. 4. Therefore, the opposition, the Counterclaim, and the judicially noticed documents indicate four potential theories of ownership by Hyphy.  The Court will examine each theory separately.

    1.    Oral Transfer from Chavez to Hyphy

"Copyright owners may transfer '[a]ny exclusive rights comprised in a copyright, including any subdivision of any of the rights specified in [17 U.S.C. § 106],' . . . so long as the transfer is evidenced by a signed writing."  Corbello v. Devito, 777 F.3d 1058, 1062 (9t h Cir. 2015) (citing 17 U.S.C. §§ 201(d)(2) and 204(a); see also Jules Jordan Video, Inv. v. 144942 Canada, Inc., 617 F.3d 1146, 1156 (9th Cir. 2010).  Specifically, the Copyright Act provides that a "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  "[S]ection 204 of the Copyright Act invalidates a purported transfer of ownership unless it is in writing."  Effects Assocs. v. Cohen, 908 F.2d 555, 556 (9th Cir. 1990); see Radio TV Espanola S.A. v. New World

1  Entm't Ltd., 183 F.3d 922, 926-27 (9th Cir. 1999); Konigsberg Int'l, Inc. v. Rice, 16 F.3d 355,

2  356-57 (9th Cir. 1994).

3                      a.     Ability to Raise Compliance with § 204(a)

4         The general rule in the Ninth Circuit is that a third party may not raise noncompliance with

5  17 U.S.C. § 204(a)'s writing requirement as a defense to a copyright transfer.  DRK Photo, 870

6  F.3d at 986.  Section 204(a) is "designed to resolve disputes between owners and transferees and

7  to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or

8  copyright ownership."  Jules Jordan Video, 617 F.3d at 1157; see Billy-Bob Teeth, Inc. v.

9  Novelty, Inc., 329 F.3d 586, 592 (7th Cir. 2003).  In the absence of a dispute between the

10 copyright owner and transferee, "it would be unusual and unwarranted to permit a third-party

11 infringer to invoke § 204(a) to avoid suit for copyright infringement."  Jules Jordan Video, 617

12 F.3d at 1157 (quoting Billy-Bob Teeth, 329 F.3d at 592).  "Although a third party may not raise

13 noncompliance with [§ 204(a)]'s writing requirement as a defense to a copyright transfer where

14 the parties to the transfer do not dispute it existence, a third party is not foreclosed from

15 challenging a plaintiff's ownership for purposes of standing."  DRK Photo v. McGraw-Hill Global

16 Educ. Holdings, LLC, 870 F.3d 978, 986 (9th Cir. 2017) (citing Jules Jordan Video, 617 F.3d at

17 1157 and Righthaven, 716 F.3d at 1169).  The copyright plaintiff bears the burden of establishing

18 a qualifying ownership interest in the copyright both as a substantive element of the infringement

19 claim and also as a necessary predicate for standing to bring the claim.  DRK Photo, 870 F.3d at

20 986.  The absence of standing to bring a copyright infringement claim is a jurisdictional failure.

21 Righthaven, 716 F.3d at 1172-73.

22        Here, no party has raised YCH's ability to raise § 204(a) with respect to the oral agreement

23 between Chavez and Hyphy.  Despite this failure, the Court finds that YCH's invocation of

24 § 204(a) is appropriate.  First, as DRK Photo expressly makes clear, YCH may invoke § 204(a) as

25 a challenge to standing.  Second, the express allegations in the FAC identify the only agreement

26 between Hyphy and Chavez as an oral one.  Thus, the express allegations by Hyphy plainly and

27 clearly demonstrate a failure to meet § 204(a)'s requirements.  Third, the Court does not find that

28 the general rule against third parties raising § 204(a) applies in this situation.  This is not a case in

which there is no dispute between the copyright holder and the transferee.  Chavez is a named

counter-defendant.  The single claim alleged against Chavez by Hyphy is for breach of oral

agreement based on Chavez's transfer of his rights in the four albums to Yellowcake.   Further, the

fact that Chavez entered into a written agreement with YCH for the interest in the four albums

indicates that Chavez believed that he had not transferred his ownership interests to Hyphy.  This

is contrary to Hyphy's alleged position that it held all exclusive rights by virtue of its oral

agreement with Chavez.  Thus, the counterclaim against Chavez and the nature of Chavez's

actions towards the four albums clearly demonstrate a dispute between Chavez and Hyphy.

Ultimately, the Court is faced with competing claims from two entities who claim ownership in

copyrights through a common transferee and counter-defendant who transferred the copyrights

twice.  Under these circumstances, the Court finds that it is appropriate for YCH to raise the issue

of compliance with § 204(a).

<h3 style="text-align:center">b.    Effect of § 204(a)</h3>

The Counterclaim affirmatively states that Hyphy and Chavez entered into oral recording

agreements that included the transfer to Hyphy of all intellectual property rights that Chavez had

in the four albums.  See FAC ¶ 16.  There are no allegations in the FAC that Hyphy and Chavez

entered into any kind of written agreement whatsoever.

The absence of a written agreement is a key argument made in YCH's motion, yet

Hyphy's opposition does not address the argument in terms of answering the writing requirement.

That is, Hyphy does not argue that it has a written agreement with Chavez or that a written

agreement is somehow unnecessary to effect a transfer of Chavez's copyright interests.   Instead,

the opposition regarding the first cause of action mentions the oral agreement with Chavez one

time, and only then in an attempt to recharacterize the agreement or the agreement's effect.

Specifically, after stating the legal proposition that a co-author shares an equal undivided interest

in a copyrighted work, Hyphy states:  "This is the case regardless of whether Hyphy also pleads in

the alternative that it was granted an oral license to such rights."  Doc. No. 27 at 4:20-21.

It is noteworthy that the FAC never uses the term "license" or expressly alleges any claim

or theory "in the alternative."  Nevertheless, accepting that the FAC is alleging that a license

9

exists, that does not aid Hyphy.  A non-exclusive license may be granted orally or implied from conduct.  Effects Assocs., 908 F.2d at 558.  The granting of a non-exclusive license waives the right of the copyright owner to sue the licensee for copyright infringement.  Graham v. Jones, 144 F.3d 229, 236 (2d Cir. 1998).  Critically, a "mere 'non-exclusive license' does not constitute a 'transfer of copyright ownership' and therefore cannot confer standing to assert [a copyright] infringement claim."  DRK Photo, 870 F.3d at 983; see Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1146 (9th Cir. 2008).  Therefore, even if the Court accepts Hyphy's characterization of its agreement with Chavez, the license that would be created is non-exclusive only, the license could only serve as a defense to a claim by Chavez, and it would not form an ownership interest sufficient to confer standing under the first cause of action.  The first cause of action is in no way furthered by the contention that the oral agreement created a license in the albums as between Chavez and Hyphy.  Yellowcake, Inc. v. Morena Music, Inc., 2021 U.S. Dist. LEXIS 39127, *16 (E.D. Cal. Mar. 1, 2021).

The absence of a written transfer agreement defeats both Hyphy's standing to pursue, and substantive claim of, copyright infringement based on an oral transfer of ownership between Chavez and Hyphy.  See 17 U.S.C. § 204(a); DRK Photo, 870 F.3d at 986; Righthaven, 716 F.3d at 1172; Radio TV Espanola, 183 F.3d at 926-27; Konigsberg, 16 F.3d at 356-57; Effects Assocs., 908 F.2d at 556-57.  To the extent a non-exclusive license may be involved or pled in the FAC, that non-exclusive license does not give Hyphy standing to pursue a copyright infringement claim.  DRK Photo, 870 F.3d at 983; Morena Music, 2021 U.S. Dist. LEXIS 39127 at *17.  Therefore, the first cause of action does not allege a valid or plausible ownership interest in the copyrights of the three albums based on an oral contractual transfer between Hyphy and Chavez.  Morena Music, 2021 U.S. Dist. LEXIS 39127 at *17.

### 2.   Joint Owner/Co-Author

A "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101; Aalmuhammed v. Lee, 202 F.3d 1227, 1231 (9th Cir. 2000); Ashton-Tate Corp. v. Ross, 916 F.2d 516, 520 (9th Cir. 1990).  "The authors of a joint work are co-owners of the copyright in that

work."  17 U.S.C. § 201(a); <u>Richlin v. MGM Pictures, Inc.</u>, 531 F.3d 962, 968 (9th Cir. 2008);

<u>Ashton-Tate</u>, 916 F.2d at 521.  Each author must make an "independently copyrightable

contribution," which is a contribution that "represents original expression that could stand on its

own as the subject matter of copyright."  <u>Ashton-Tate</u>, 916 F.2d at 521 (quoting P. Goldstein,

*Copyright:  Principles, Law and Practice*, § 4.2.1 p.379 (1989)); <u>see also</u> <u>Richlin</u>, 531 F.3d at 968.

That is, "to be an author, one must supply more than mere direction or ideas; one must 'translate

an idea into a fixed tangible expression entitled to copyright protection."  <u>S.O.S., Inc. v. Payday,</u>

<u>Inc.</u>, 886 F.2d 1081, 1087 (9th Cir. 1989); <u>Ashton-Tate</u>, 916 F.2d at 521.   Therefore, in the Ninth

Circuit, a "joint work" has four elements:  (1) a copyrightable work, (2) two or more authors, (3)

the authors intend for their contributions to be merged into inseparable or interdependent parts of a

unitary whole, and (4) each author made an independently copyrightable contribution to the work.

<u>Aalmuhammed</u>, 202 F.3d at 1231.  In determining whether individuals are co-authors of a joint

work, a contract that defines relationship as one of co-authors is dispositive.  <u>See</u> <u>Richlin</u>, 531

F.3d at 968; <u>Aalmuhammed</u>, 202 F.3d at 1234.  In the absence of a contract, courts consider

whether:  (1) a purported author "superintends" the work by exercising control; (2) the putative

co-authors make objective manifestations of a shared intent to be co-authors; and (3) the audience

appeal of the work turns on both contributions and the share of each in its success cannot be

appraised.  <u>Aalmuhammed</u>, 202 F.3d at 1234; <u>see also</u> <u>Richlin</u>, 531 F.3d at 968.  The first factor,

control, will often be the most important consideration.  <u>Richlin</u>, 531 F.3d at 968; <u>Aalmuhammed</u>,

202 F.3d at 1234.  Additionally, because each co-author of a "joint work" has an independent right

to use or license the copyright, a co-author cannot be liable to another co-author for infringement

of copyright, but co-authors must account to other co-authors for any profits earned from licensing

or using the copyright.  <u>See</u> <u>Ashton-Tate</u>, 916 F.2d at 522; <u>Oddo v. Ries</u>, 743 F.3d 630, 632-33

(9th Cir. 1984).  Further, unless all co-authors of a "joint work" join in granting an exclusive

license, a single co-author (acting on its own behalf) can grant only a non-exclusive license in the

copyright work because one co-author cannot limit the other co-authors' independent right to

exploit the copyright.  <u>Sybersound</u>, 517 F.3d at 1146.  However, a co-owner of a copyright is free

to transfer his ownership interest to another, as long as the transfer is only of the exclusive

copyright interests that the transferring co-owner himself possesses.  Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n, 953 F.3d 638, 645 n.2 (9th Cir. 2020).

Here, YCH does not argue that the relevant allegations in the FAC (Paragraphs 16 and 17) do not plausibly allege that the albums are joint works and that Chavez and Hyphy are co-authors. Additionally, recent Ninth Circuit authority indicates some of the requirements for a joint ownership as co-authors can at least be plausibly inferred from the Counterclaim.  In *Abs Entertainment*, the Ninth Circuit addressed the copyright claims of remastering engineers in remastered sound recordings.  See Abs Entm't v. CBS Corp., 908 F.3d 405, 410-11 (9th Cir. 2018).  As relevant here, the Ninth Circuit made a distinction between remastering engineers and recording engineers/record producers:

> Nothing in this opinion should be construed to question or limit the creative contributions of the recording engineers and/or record producers responsible for the recording session that led to the initial fixation of the sound recording. The initial producer/engineer's role is often to work in collaboration with the performing artists to make many of the creative decisions that define the overall sound of the recording as fixed, including such things as microphone choice, microphone placement, setting sound levels, equipment used, processing filters employed, tapes selected, session structure, and other similar decisions analogous to the creative choices of photographers that courts have consistently held to be original. See *United States Copyright Office and Sound Recordings as Works Made for Hire: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 106th Cong. 2nd Sess. (2000) (statement of Marybeth Peters, Register of Copyrights) ("The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording."); cf. Burrow-Giles, 111 U.S. at 60 (holding that photographs are copyrightable to the extent of the photographer's decisions with respect to costume, accessories, pose of subjects, light and shade and evoking the desired expression).

Id. at 423.  Given *Abs Entm't*'s observations regarding the contributions of record producers, and the absence of any substantive arguments against the relevant allegations of the FAC, for purposes of this motion, dismissal based on the absence of an ownership interest is inappropriate.

However, accepting the allegation of co-authorship, and thus joint ownership, of the four albums would appear to defeat Hyphy's claim of copyright infringement.  Morena Music, 2021 U.S. Dist. LEXIS 39127 at *21.  Hyphy's theory means that it was a co-owner of the copyrights in the albums with Chavez.  See id.  There is no dispute that Chavez entered into a written transfer

agreement with YCH.  See Complaint at Ex. A; FAC ¶¶ 22, 23.  Because it is clear that Hyphy

was not a party to that transfer, Chavez could not transfer exclusive rights to YCH.  See

Sybersound, 517 F.3d at 1146.  However, Chavez could transfer his ownership interest in the

albums to YCH.  See Tresona Multimedia, 953 F.3d at 645 n.2.  Therefore, the agreement between

Chavez and YCH could have transferred Chavez's interests in the album to YCH.  The ultimate

result would be that Hyphy is now a joint owner of the copyrights in the albums with YCH.  One

joint owner of a copyright cannot sue another joint owner of a copyright for copyright

infringement.  See Ashton-Tate, 916 F.2d at 522; Oddo, 743 F.3d at 632-33.  Given the current

state of the briefing before the Court, Hyphy's theory of co-authorship/joint ownership defeats its

claim of copyright infringement because the other joint owner is Yellowcake.  See id.; Morena

Music, 2021 U.S. Dist. LEXIS 39127 at *22.

>   3.   Work for Hire

A work made for hire is defined as either:

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a
collective work, as part of a motion picture or other audio visual work, as a
translation, as a supplementary work, as a compilation, as an instructional text, as a
test, as answer material for a test, or as an atlas, if the parties expressly agree in a
written instrument signed by them that the works shall be considered a work made
for hire.

17 U.S.C.  101; Hendricks & Lewis PLLC v. Clinton, 766 F.3d 991, 998 n.5 (9th Cir. 2014); Jules

Jordan Video, 617 F.3d at 1156.  With respect to the first definition, the terms "employee" and

"scope of employment" are construed according to common law agency principles.  Community

for Creative Non-Violence v. Reid, 490 U.S. 730, 740-41 (1989); U.S. Auto Parts Network, Inc. v.

Parts Geek, Ltd. Liab. Co., 692 F.3d 1009, 1015 (9th Cir. 2012); JustMed, Inc. v. Byce, 600 F.3d

1118, 1125 (9th Cir. 2010).  The central question for determining whether a person is an

"employee" is "the hiring party's right to control the manner and means by which the product is

accomplished."  Reid, 490 U.S. at 751; JustMed, 600 F.3d at 1125.  Factors that a court should

consider for determining "employee" status include:  the skill required for that occupation, the

source of the instrumentalities and tools, the location of the work, the duration of the relationship

between the parties, whether the hiring party has the right to assign additional projects to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, the hired party's role in hiring and paying assistants, whether the work is part of the regular business of the hiring party, whether the hiring party is in business, the provision of employee benefits, and the tax treatment of the hired party.  Reid, 490 U.S. at 751-52; JustMed, 600 F.3d at 1125.  An employee's "scope of employment" is determined by examining three factors:  (1) the work is of the kind the employee is employed to perform; (2) the work occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the employer.  U.S. Auto Parts, 692 F.3d at 1015.  With respect to the second definition, "[w]orks 'specially ordered or commissioned' can only be made after the execution of an express agreement between the parties."  Gladwell Gov't Servs., Inc. v. County of Marin, 265 F. App'x 624, 626 (9th Cir. 2008); Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 413 (7th Cir. 1992); Sisyphus Touring, Inc. v. TMZ Prods., 208 F.Supp.3d 1105, 1111-12 (C.D. Cal. 2016).  No specific wording need be used in order for a writing to constitute a "work for hire" agreement."  Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1141 (9th Cir. 2003).  However, if there is no written instrument at all, then the work cannot be a commissioned or specially ordered "work for hire."  Jules Jordan Video, 617 F.3d at 1155.  If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright "unless the parties have expressly agreed otherwise in a written instrument signed by them."  17 U.S.C. § 201(b); see U.S. Auto Parts, 692 F.3d at 1015.

As indicated above, there are only two ways that a work can be deemed a "work for hire." 17 U.S.C. § 101.  The FAC's allegations are insufficient to demonstrate either method.

First, there are no allegations that a written agreement exists between Chavez and Hyphy that states that the albums are commissioned works that are to be considered works for hire.  In fact, the FAC alleges that the agreement with Chavez was oral.  See Counterclaim ¶ 16.  As a result of this allegation, the albums categorically cannot be specially ordered or commissioned works for hire under § 101(2).  Jules Jordan Video, 617 F.3d at 1155; Morena Music, 2021 U.S. Dist. LEXIS 39127 at *24.

1

2   Second, with respect to "employee" status, Paragraph 16 of the Counterclaim describes the

3   relationship with Chavez.  Some aspects of Paragraph 16 may be supportive of "employee" status

4   under *Reid*, e.g. providing sound engineers and audio/visual directors, while others do not, e.g.

5   Chavez was paid a fixed rate per album for the albums.  Cf. FAC ¶ 16 with Reid, 490 U.S. at 751-

6   53.  However, neither Paragraph 16 nor the remainder of the FAC address all of the *Reid* factors.

7   Further, unlike the express allegation that Hyphy did enough to be considered a co-author, or the

8   express allegation that Chavez granted Hyphy all rights in the three albums, there are no express

9   allegations that Chavez was an employee of Hyphy.  Given who Chavez is (the founder and

10  musical principal of Los Originales De San Juan), and the limited allegations made in the FAC,

11  the Court finds it more plausible that Chavez is an independent contractor, particularly in the

12  absence of an express allegation that Chavez was an employee of Hyphy.  In the absence of an

13  actual allegation that Chavez was an employee of Hyphy, supported by sufficient factual

14  allegations that indicate employee status, there is not a sufficiently plausible indication that

15  Chavez was an employee of Hyphy who was acting int the scope of his employment for Hyphy.

16  See Morena Music, 2021 U.S. Dist. LEXIS 39127 at *26.

17          4.      Written Agreement

18          As indicated above, the copyright registration for the album/sound recording El Campesino

19  identifies the "Copyright Claimant" as "Hyphy Music, Inc., Transfer: By written agreement."

20  RJN Ex. 4.  Thus, a judicially noticed document suggests that a written agreement for a transfer of

21  the interest in El Campesino exists.  Such an agreement would fatally undercut the basis for

22  YCH's argument that no valid transfer or ownership interest exists.  However, the Court finds it

23  troubling that the written agreement was not alleged to exist in the original Counterclaim, the now

24  operative FAC, or even the opposition to this motion to dismiss.  Instead, each of these documents

25  identify the existence of an oral agreement only.  Considering the importance a written agreement

26  would have to Hyphy's claims and its defense of those claims, the failure of Hyphy to allege or

27  describe in any fashion a written agreement, and the FAC's clear factual allegation of only an oral

28  agreement, the Court cannot conclude that a written transfer agreement exists.

5.    Conclusion

The Counterclaim does not plausibly allege a valid transfer between Chavez and Hyphy, nor does the Counterclaim plausibly allege that the four albums were works for hire.  Accepting that there are sufficient plausible allegations that indicate co-authorship between Hyphy and Chavez, the allegations in the FAC and the Complaint indicate that Chavez transferred at least his ownership interests in the albums to YCH.   As a co-owner, Hyphy cannot sue YCH for copyright infringement.  Since no plausible infringement claim is stated, dismissal is appropriate.  <u>See</u> <u>Morena Music</u>, 2021 U.S. Dist. LEXIS 39127 at *26.

**II.    <u>Third Cause of Action – Injunctive Relief under the Copyright Act</u>**

The Copyright Act provides that a court "may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 501(a); <u>Flexible Lifeline sys. v. Precision Lift, Inc.</u>, 654 F.3d 989, 994 (9th Cir. 2011). The plain language of § 501(a) presupposes either a plausibly pled or an adequately proven copyright infringement claim.  This is consistent with the nature of an injunctive relief, which is not a standalone cause of action but a remedy that must be supported by a viable substantive cause of action.  <u>Morena Music</u>, 2021 U.S. Dist. LEXIS 39127 at *26-*27; <u>TYR Sport Inc. v. Warnaco Swimwear, Inc.</u>, 679 F.Supp.2d 1120, 1141 n.13 (C.D. Cal. 2009).  Dismissal of the claim for injunctive relief as a distinct cause of action is appropriate, but Hyphy is free to request injunctive relief under § 501(a) in the prayer or as part of the allegations under an infringement cause of action.  <u>Morena Music</u>, 2021 U.S. Dist. LEXIS 39127 at *26-*27.

**III.    <u>Fourth, Fifth & Sixth Causes of Action –Intentional Interference with Prospective Business Advantage, Intentional Interference with Contractual Relations, UCL, & Conversion</u>**

*Counter-Defendants' Arguments*

YCH argues that the state law claims fail because they are preempted by the Copyright Act and fail to satisfy the California statute of frauds requirement.  With respect to preemption, the

state law claims are preempted by the Copyright Act because they are equivalent to the rights protected by the Copyright Act and the albums fall within the subject matter of the Copyright Act. Each cause of action depends on a valid transfer of a copyright interest from Chavez to Hyphy.

### *Counter-Plaintiff's Opposition*

With respect to preemption, Hyphy argues that the Copyright Act does not preempt any of the state law claims. Each claim is at least partly based on YCH's wrongdoing affecting Hyphy's right to own and possess the tangible masters. Copyright law protects intangible sound recordings but does not protect the material object in which the work is embodied. The tangible embodiment of intangible rights, like the tangible masters here, are qualitatively different than what is protected by the Copyright Act. YCH cites no case in which the Copyright Act preempts a claim based on property rights in tangible embodiments like the masters. Therefore, there is no preemption.

With respect to the statute of frauds, full performance of the contract is an exception to the writing requirement. Hyphy argues that it has fully performed under the terms of the oral agreement. Therefore, the California statute of frauds requirement has been met. Additionally, YCH's reliance on 17 U.S.C. § 204(a)'s requirement for a writing is misplaced because that section only involves transfers of a copyright. That section can have no application to the masters, which are tangible property and not copyrights. Finally, Hyphy argues that each state law claim incorporates by reference allegations regarding its co-authorship of the albums. Thus, contrary to YCH's arguments, not one counterclaim relies solely on Hyphy being able to establish ownership of the copyrights at issue through a written contract.

### *Discussion*

YCH's arguments against the state law counterclaims are primarily based on either Copyright Act preemption or state law statute of frauds.

### 1.   California Statute of Frauds

YCH invokes Cal. Civ. Code § 1624(a)(1), which applies to agreements that by their terms are not to be performed within one year of making the agreement. See Cal. Civ. Code § 1624(a)(1); Zakk v. Diesel, 33 Cal.App.5th 431, 449 (2019). However, even if a contract cannot be completely performed within one year of execution, if the contract has been fully performed by

one party, the remaining promise is taken out of the statute of frauds and may be enforced by the performing party.  See Dutton v. Interstate Investment Corp., 19 Cal.2d 65, (1941); Dougherty v. California Kettleman Oil Royalties, 9 Cal.2d 58, 81 (1937); Zakk, 33 Cal.App.5th 449-54; Secrest v. Security Nat'l Morg. Loan Trust 2002-2, 167 Cal.App.4th 544, 556 (2008).

Here, the allegations in the Counterclaim generally describe the 2013 oral agreement with Chavez as being one for the completion of musical albums over a period of five years in exchange for a fixed monetary amount per album.  See Counterclaim ¶¶ 16, 17.  There are no allegations that indicate that Chavez has additional contractual promises to perform.  While there are no allegations that address the statute of frauds expressly, that is hardly surprising as the statute of frauds is an affirmative defense.  See Fed. R. Civ. P. 8(c)(1); Corbin v. Time Warner Entm't-Advance/Newhouse P'ship, 821 F.3d 1069, 1079-80 (9th Cir. 2016); Walton v. City of Red Bluff, 2 Cal.App.4th 117, 131 (1991).  Further, YCH does not address in its reply Hyphy's "full performance" argument.  In the absence of any response from YCH, and because the applicability of the statute of frauds is not apparent from the face of the counterclaims, dismissal of any state law claim based on the potential application of the statue of frauds is inappropriate.  See McCalden v. California Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990) (holding that a complaint may be dismissed on the basis of an affirmative defense if the defense clearly appears by the face of the complaint); Morena Music, 2021 U.S. Dist. LEXIS 39127 at *30; Williams v. Alhambra Sch. Dist. No. 68, 234 F.Supp.3d 971, 985 (D. Ariz. 2017) (declining to dismiss a claim where the allegations did not clearly demonstrate the applicability of the statute of frauds).

### 2.   Copyright Act Preemption

All state laws that are "equivalent to any of the exclusive rights within the general scope of copyright as specified by [§ 106] in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified in [§ 102 and § 103] . . . are governed exclusively by [the Copyright Act]."  17 U.S.C. § 301(a); see also Maloney v. T3 Media, Inc., 853 F.3d 1004, 1010 (9th Cir. 2017); Sybersound, 517 F.3d at 1150.  A two part test is used to determine whether a state law claim is preempted by § 301(a).  Maloney, 853 F.3d at 1010; Sybersound, 517 F.3d at 1150.  First, whether the subject matter of the state law claim falls

18

within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103.  Maloney, 853

F.3d at 1010; Sybersound, 517 F.3d at 1150.  Second, assuming that it does, whether the rights

asserted under the state law are equivalent to the rights contained in 17 U.S.C. § 106, which

identifies the exclusive rights of copyright holders.  Maloney, 853 F.3d at 1010; Sybersound, 517

F.3d at 1150.  Under the second prong, courts determine whether the state law claim contains an

element not shared by a copyright claim; "an element which changes the nature of the action so

that it is qualitatively different from the [copyright claim]."  Summit Mach. Tool Manufacturing.

Corp. v. Victor CNC Sys., 7 F.3d 1434, 1439-40 (9th Cir. 1993) (quotation omitted); see Laws v.

Sony Music Entm't, Inc., 448 F.3d 1134, 1143 (9th Cir. 2006); Altera Corp. v. Clear Logic, Inc.,

424 F.3d 1079, 1089 (9th 2005).  In essence, courts should "engage in a fact-specific inquiry into

the actual allegations underlying the claims at issue in the case, so as to determine whether the

'gravamen' of the state law claim asserted is the same as the rights protected by the Copyright

Act."  Crafty Prods. v. Michaels Cos., 424 F.Supp.3d 983, 995 (S.D. Cal. 2019); Idema v.

Dreamworks, Inc., 162 F.Supp.2d 1129, 1190 (C.D. Cal. 2001).

               a.       Intentional Interference with Prospective Economic Advantage ("IIPEA")

       The elements of an IIPEA claim are:  (1) the existence, between the plaintiff and some

third party, of an economic relationship that contains the probability of future economic benefit to

the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts

designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic

harm proximately caused by the defendant's action.  Roy Allan Slurry Seal, Inc. v. Am. Asphalt S.,

Inc., 2 Cal. 5th 505, 512 (2017).  The third element, a wrongful act, refers to an unlawful act that

is proscribed by a constitutional, statutory, regulatory, common law, or other determinable

standard such that it is independently wrongful of its interfering character.  Edwards v. Arthur

Anderson LLP, 44 Cal.4th 937, 944 (2008).  IIPEA claims are more inclusive than intentional

interference with contractual relations claims and do not require the existence of a valid contract.

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1159 (2003).

       The Counterclaim alleges that Hyphy was in an economic relationship with YouTube that

would have resulted in economic benefit through uploading and commercially exploiting the

1   albums and cover art (advertisements would be placed in the videos which would generate

2   revenue).  See Counterclaim ¶ 56.  Yellowcake and Colonize knew about Hyphy's economic

3   relationship with YouTube and intended to disrupt it.  Yellowcake and Colonize sent fraudulent

4   DMCA takedown notices[2] to YouTube, knowing that the notices would likely interfere with the

5   economic relationship between Hyphy and YouTube.  See id. at ¶ 57.  The relationship was

6   disrupted as YouTube agreed to clock Hyphy's video postings and to cease paying advertising

7   revenues to Hyphy for the videos embodying the albums and cover art.  See id. at ¶ 58.  This

8   disruption caused economic loss and harm to Hyphy.  See id.

9        First, the albums are sound recordings and thus, are entitled to copyright protection.  See

10   17 U.S.C. § 102(a)(7); Morena Music, 2021 U.S. Dist. LEXIS 39127 at *33.  Further, the albums'

11   respective cover art appears to be the subject of registered copyrights as visual material.  See FAC

12   Ex. B (listing Copyright registrations numbers); cf. Morena Music, 2021 U.S. Dist. LEXIS 39127

13   at *33 (finding cover art for sound recording was the subject of a registered copyright).[3]  The

14   registration indicates that the cover art is "artwork and photograph for digital sound recordings."

15   The Copyright Office permits registration of cover art as an associated image of sound recordings.

16   EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 96-97 (2d Cir. 2016); Morena

17   Music, 2021 U.S. Dist. LEXIS 39127 at *33 (citing *EMI Christian*).  Therefore, the cover art is

18   also subject to copyright protection.

19        Second, the IIPEA claim is based on Yellowcake and Colonize utilizing § 512 of the

20   DMCA/Copyright Act to enforce what they believe to be their exclusive rights in the albums and

21   cover art.  This led to YouTube prohibiting Hyphy from using YouTube's platform in connection

22   with videos involving the albums and cover art.  In other words, Yellowcake and Colonize

23

24   [2] "DMCA" refers to the Digital Millennium Copyright Act, and the takedown procedures of the DMCA are found at
     17 U.S.C. § 512(c).  See Vernor v. Autodesk, Inc., 621 F.3d 1102, 1105 & n.3 (9th Cir. 2010).

25

26   [3] The FAC lists the copyrights in the cover art for three albums that are at issue.  See FAC Ex. B.  However, the Court
     was unable to locate these registrations on the Copyright Office website.  In the absence of any challenges by YCH,
     the Court will assume that Hyphy has simply made typographical errors while attempting to convey the cover art

27   registration numbers.  Nevertheless, Hyphy is expected to review the registration information provided and make
     appropriate corrections in any amended counterclaims.  If Hyphy has no registrations in the cover art, then Hyphy

28   must correct the FAC by dropping all allegations of registered cover art.  Pursuing infringement claims based on non-
     existent registrations (as opposed to incorrectly entered existing registration numbers) is sanctionable.

1  interfered with Hyphy's ability to exploit the albums by reproducing, distributing, displaying,

2  and/or performing the albums through YouTube.  Hyphy's allegations call into question who has

3  the ability to decide whether and how to display, copy, or make available the albums.  This is

4  conduct within the ambit of § 106.  See 17 U.S.C. § 106; Morena Music, 2021 U.S. Dist. LEXIS

5  39127 at *34; McGowan, 2020 U.S. Dist. LEXIS 229408 at *39-*40; Hoff, 2019 U.S. Dist.

6  LEXIS 140343 at *17-*18; Worth, 5 F.Supp.2d at 822-23.

7       Hyphy argues that its IIPEA claim is qualitatively different because it includes allegations

8  that Yellowcake and Colonize interfered with Hyphy's right to possess and exploit the tangible

9  masters of the albums.  The Court agrees with Hyphy that claims based on the tangible masters of

10  the sound recordings, as opposed to the copyrighted albums, would be qualitatively different from

11  a copyright infringement claim.  However, the allegations under the IIPEA claim do not

12  reasonably indicate that the tangible masters have any relevance.

13       It is unknown how the tangible masters could have been affected by the § 512 takedown

14  notices and YouTube's corresponding decision to not permit Hyphy to post *videos* on YouTube.

15  To the Court's understanding, the tangible masters are not videos, they are sound/audio

16  recordings.  If anything, the videos being posted on YouTube would appear to be some form of

17  copy of the masters, not the tangible masters themselves.  Without additional allegations, it is

18  unreasonable to infer that the tangible masters form the basis of any IIPEA claim as alleged in the

19  Counterclaim.  See Seven Arts, 733 F.3d at 1254; Morena Music, 2021 U.S. Dist. LEXIS 39127 at

20  *35.

21       In sum, because Hyphy's IIPEA claim as pled is preempted by the Copyright Act,

22  dismissal is appropriate.  See Morena Music, 2021 U.S. Dist. LEXIS 39127 at *35; Crafty Prods.,

23  424 F.Supp.3d at 995-96; Idema, 162 F.Supp.2d at 1193.

24                b.    Intentional Interference with Contractual Relations ("IICR")

25       The elements of a cause of action for IICR are: (1) a valid contract between the plaintiff

26  and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional

27  acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or

28  disruption of the contractual relationship; and (5) resulting damage.  Quelimane Co. v. Stewart

1  Title Guaranty Co., 19 Cal.4th 26, 55 (1998);  Ghazarian v. Magellan Health, Inc., 53 Cal.App.5th

2  171, 191 (2020).  "To state a claim for disruption of a contractual relation, the plaintiff need not

3  show the defendant induced an actual or inevitable breach of the contract.  It is sufficient to show

4  the defendant's conduct made the plaintiff's performance, and inferentially enjoyment, under the

5  contract more burdensome or costly."  Ghazarian, 53 Cal.App.5th at 191 (quoting Golden West

6  Baseball Co. v. City of Anaheim, 25 Cal.App.4th 11, 51 (1994)).

7          The Counterclaim alleges that Hernandez met with Chavez and expressed interest in

8  exploiting the albums.  See Counterclaim ¶ 62.  Although Chavez advised Hernandez that Hyphy

9  owned the albums, Hernandez intentionally misled Chavez by telling Chavez that Hyphy had no

10  rights in the albums.  See id. at ¶ 63.  Hernandez offered to Chavez significant money for

11  Chavez's rights in the albums and further induced Chavez to ignore his contractual obligations

12  through an offer to indemnify Chavez in the event Hyphy brought suit.  See id.  As a result,

13  Chavez entered into an agreement with Yellowcake for the transfer of his ownership and rights in

14  the albums and cover art even though Chavez had no such rights to grant.  See id. at ¶ 64.  This

15  interference with Hyphy's agreement with Chavez caused Hyphy harm.  See id. at ¶ 65.

16                          (1)      Preemption

17          First, the albums and cover art are protected by the copyrights.  See 17 U.S.C. § 102(a);

18  EMI Christian Music, 844 F.3d at 96-97; Morena Music, 2021 U.S. Dist. LEXIS 39127 at *37;

19  FAC Ex. B.

20          Second, the allegations in essence complain that YCH induced Chavez to sell rights in the

21  albums that he did not have, presumably because Chavez had already transferred all of his rights

22  to Hyphy.  See Counterclaim ¶¶ 16, 17, 62, 63, 64.  In other words, the contract that was allegedly

23  breached involved the ownership of the albums and cover art.  These allegations do not identify or

24  involve any of the rights listed in § 106.  Section 106 of the Copyright Act grants exclusive rights

25  to a copyright holder to reproduce, prepare derivative works, distribute, perform, and display the

26  copyrighted work.  See 17 U.S.C. § 106; Maloney, 853 F.3d at 1010; Morena Music, 2021 U.S.

27  Dist. LEXIS 39127 at *37.  Because Hyphy's IICR claim is qualitatively different from a

28  copyright infringement claim because none of the rights listed in § 106 are the subject of the IICR

1   claim.  Dismissal of this claim on the basis of preemption is inappropriate.  See Morena Music,

2   2021 U.S. Dist. LEXIS 39127 at *37.

3               (2)    Pleading Deficiency[4]

4        "Section 204(a) not only bars copyright infringement actions but also breach of contract

5   claims based on oral agreements."  Valente-Kritzer Video v. Pinckney, 881 F.2d 772, 774 (9th Cir.

6   1989); Morena Music, 2021 U.S. Dist. LEXIS 39127 at *39; Johnson v. Altamirano, 418

7   F.Supp.3d 530, 556 (S.D. Cal. 2019).  Here, Hyphy's IICR claim is based on YCH inducing

8   Chavez to transfer his copyright interests to YCH, even though those transfers were the subject of

9   an oral agreement between Chavez and Hyphy.  Therefore, in order for YCH's conduct in

10  inducing the transfer of copyrights from Chavez to YCH to be wrongful, a valid contract between

11  Hyphy and Chavez for the transfer of those copyrights is an essential element of Hyphy's IICR

12  claim.  See Morena Music, 2021 U.S. Dist. LEXIS 39127 at *39; Johnson, 418 F.Supp.3d at 555-

13  56; Quelimane, 19 Cal.4th at 55.  However, as explained above, § 204(a) operates to invalidate the

14  oral contract between Hyphy and Chavez to the extent that the oral contract included the transfer

15  of copyright ownership in the albums.[5]  See Valente-Kritzer Video, 881 F.2d at 774; Morena

16  Music, 2021 U.S. Dist. LEXIS 39127 at *39; Johnson, 418 F.Supp.3d at 556.  That is, through

17  operation of § 204(a), there is no valid contract between Chavez and Hyphy for the transfer of

18  Chavez's copyright interests in the albums.  See Morena Music, 2021 U.S. Dist. LEXIS 39127 at

19  *39; Johnson, 418 F.Supp.3d at 555-56.  Therefore, any IICR claim based on the purported

20  transfer of Chavez's ownership of the copyrights in the four albums fails because Hyphy cannot

21  establish the first essential element of an IICR claim.  See id.; Bed, Bath & Beyond of La Jolla,

22  Inc. v. La Jolla Village Square Venture Partners, 52 Cal.App.4th 867, 879 (1997); A-Mark Coin

23  Co. v. General Mills, Inc., 148 Cal.App.3d 312, 322 (1983).  Dismissal of the IICR claim is

24  _____

25  [4] YCH's motion did not argue that the IICR cause of action was not plausibly pled.  However, the pleading deficiency
    identified in this section necessarily follows from the Court's analysis of the first cause of action.  Because a failure to

26  state a claim can be raised even at trial, see Fed. R. Civ. P. 12(h)(2), and because the deficiency is fatal to part of the
    IICR cause of action, the Court addresses the matter sua sponte at this time.  See Omar v. Sea Land Service, Inc., 813
    F.2d 986, 991 (9th Cir. 1987).

27
    [5] YCH did not move to dismiss the second cause of action for copyright infringement based on the three albums'

28  cover art.  Therefore, the analysis in this section and ultimate dismissal does not apply to issues surrounding the cover
    art.

appropriate to the extent that the claim is based on ownership interests or the transfer thereof in the four albums.  See Valente-Kritzer Video, 881 F.2d at 774; Morena Music, 2021 U.S. Dist. LEXIS 39127 at *40; Johnson, 418 F.Supp.3d at 556; Bed, Bath & Beyond, 52 Cal.App.4th at 879; A-Mark Coin Co., 148 Cal.App.3d at 322.

<h4>c.    UCL</h4>

The UCL broadly proscribes the use of any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code. § 17200; Beaver v. Tarsadia Hotels, 816 F.3d 1170, 1177 (9th Cir. 2016).  "The UCL operates as a three-pronged statute:  'Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'"  Beaver, 816 F.3d at 1177 (citation omitted).  The UCL's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL," and "virtually any law or regulation — federal or state, statutory or common law — can serve as a predicate . . . ."  Candelore v. Tinder, Inc., 19 Cal.App.5th 1138, 1155 (2018).  When the underlying legal claim that supports a UCL cause fails, however, "so too will the [the] derivative UCL claim."  AMN Healthcare, Inc. v. Aya Healthcare Services, Inc., 28 Cal.App.5th 923, 950 (2018).  "A business practice is 'fraudulent" under the UCL if members of the public are likely to be deceived."  Davis v. HSBC Bank, 691 F.3d 1152, 1169 (9th Cir. 2012); Puentes v. Wells Fargo Home Morg., Inc., 160 Cal.App.4th 638, 645 (2008).  Unless a particular disadvantaged or vulnerable group is targeted, whether conduct is "fraudulent" is judged by the effect the conduct would have on a reasonable consumer.  Puentes, 160 Cal.App.4th at 645.  Finally, California law with respect to "unfair" conduct is currently "in flux."  Hodsdon v. Mars, Inc., 891 F.3d 857, 866 (9th Cir. 2018).  Conduct is "unfair" either when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition," or when it 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Id.

The Counterclaim alleges that Yellowcake and Colonize are reproducing and performing, or benefitting financially from, aiding, encouraging, enabling, inducing causing, materially

1  contributing to, or otherwise facilitating the reproduction and performance of Hyphy's statutory

2  and common law rights in the albums and cover art and have engaged in common law

3  misappropriation.  See Counterclaim ¶ 68.  Hernandez also induced Chavez to breach his

4  agreement with Hyphy in order to obtain rights which Chavez had no right to give.  See id.  The

5  Counterclaim alleges that this conduct is unfair and constitutes unfair, unlawful, or deceptive

6  practices under Cal. Bus. & Prof. Code § 17200.  See id. at ¶ 68.

(1)      Yellowcake and Colonize

8  First, as discussed above, the albums and cover art are protected by the copyright act.  See

9  17 U.S.C. § 102; Morena Music, 2021 U.S. Dist. LEXIS 39127 at *41; EMI Christian Music, 844

10  F.3d at 96-97.

11  Second, the conduct alleged in Paragraph 68 involves reproducing and performing the

12  albums and cover art and engaging in common law misappropriation.  Reproducing and

13  performing are actions that are expressly listed as exclusive rights in § 106.  See 17 U.S.C. § 106;

14  Maloney, 853 F.3d at 1010.

15  Common law misappropriation is covered under the umbrella of unfair competition and is

16  "normally invoked in an effort to protect something of value not otherwise covered by patent or

17  copyright law, trade secret law, breach of confidential relationship, or some other form of unfair

18  competition."  City Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 842 (9th Cir.

19  2004).  The elements of a California common law misappropriation claim are:  (1) the plaintiff

20  made a substantial investment of time, effort and money into creating the thing misappropriated

21  such that the court can characterize that "thing" as a kind of property right; (2) the defendant

22  appropriated the "thing" at little or no cost, such that the court can characterize defendant's actions

23  as "reaping where it has not sown;" and (3) the defendant injured plaintiff by the misappropriation.

24  Hollywood Screentest of Am., Inc. v. NBC Universal, Inc., 151 Cal. App. 4th 631, 650 (2007).

25  The only "things" that are identified as "misappropriated" are the albums and cover art, see

26  Counterclaim ¶ 68, both of which are protected by the Copyright Act.  Further, the only alleged

27  conduct that could readily be considered appropriation are the acts of reproducing, displaying, and

28  performing, all of which are exclusive rights that belong to a copyright owner under § 106.

25

Hyphy's opposition generally argues that the involvement of the tangible masters makes all of its claims qualitatively different from an infringement claim.  The term "tangible masters" is not used under this cause of action, but the term does appear in Paragraph 16.  Paragraph 67 of the UCL claim incorporates by reference all of the prior 66 paragraphs, including paragraphs that make up five other causes of action.  See Counterclaim ¶ 67.  This is an improper shotgun pleading technique that does not give proper notice to either YCH or the Court that the tangible masters are intended to play a role in the UCL claim.[6]  See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1321-23 (11th Cir. 2015); Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F.Supp.3d 1207, 1234 n.14 (E.D. Cal. 2018).  Further, apart from the notice concerns, it is unclear how the tangible masters truly fit within the conduct alleged under the UCL and particularly Paragraph 68 given the other allegation involving the involvement of digital mediums such as YouTube.  That is, it is unclear how tangible masters can play by utilized through YouTube.  Therefore, Hyphy's reliance on the tangible masters does not reasonably fit within the allegations actually made within the FAC and the claim as pled is implausible.

Because the Court finds that the acts of reproducing, performing, and "misappropriating" are actions covered by § 106, the UCL claims against Yellowcake and Colonize are preempted by the Copyright Act.  See Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1213 (9th Cir. 1998); Media.net Adver. FZ-LLC v. NetSeer, Inc., 156 F.Supp.3d 1052, 1074-75 (N.D. Cal. 2016).

### (2)    Hernandez

The Counterclaim alleges that Hernandez induced Chavez to breach his agreement with Hyphy.  No other conduct by Hernandez is expressly identified under the UCL claim.  See Counterclaim ¶¶ 68-71.

### (A)    Preemption

Inducing a breach of contract by facilitating a transfer of copyrighted works does not encompass any exclusive right under § 106.  See Morena Music, 2021 U.S. Dist. LEXIS 39127 at

---

[6] For any cause of action, not just the IIPEA claim, if prior paragraphs are intended to support that cause of action, then Hyphy should incorporate by reference only those specific paragraphs, e.g. "paragraphs 14 through 17, 27, 38 and 42 are hereby incorporates by reference."  The wholesale incorporation by reference of all prior paragraphs, when not all prior paragraphs are relevant and intended to support a cause of action, is improper.  Weiland, 792 F.3d at 1321-23; Deerpoint Grp., 345 F.Supp.3d at 1234 n.14.

1  *44.  Therefore, the UCL claim against Hernandez is qualitatively different from a copyright

2  infringement claim and not preempted by § 301.  See id.

3  (B)  Pleading Defect[7]

4  Inducing a breach of contract is part of an IICR claim, specifically it is one of two ways to

5  satisfy the third element of that cause of action.  As discussed above, through operation of

6  § 204(a), there is no valid oral contract between Hyphy and Chavez for the transfer of a copyright

7  in the albums.  See Valente-Kritzer Video, 881 F.2d at 774; Johnson, 418 F.Supp.3d at 556.

8  Without a valid contract, no breach can be induced.  See Morena Music, 2021 U.S. Dist. LEXIS

9  39127 at *44; Johnson, 418 F.Supp.3d at 556; Bed, Bath & Beyond, 52 Cal.App.4th at 879; A-

10  Mark Coin Co., 148 Cal.App.3d at 322.  In other words, Hernandez did not and could not induce

11  Chavez to breach a valid oral agreement for the transfer of copyrights in the four albums.  Without

12  inducement, there is no wrongful conduct that could be considered "unfair," "fraudulent," or

13  "unlawful."  Thus, because there is no plausible or viable claim, dismissal of any UCL claim that

14  relates to the seven albums or transfer thereof is proper.[8]  See Morena Music, 2021 U.S. Dist.

15  LEXIS 39127 at *44-*45; AMN Healthcare, 28 Cal.App.5th at 950.

16  d.  Conversion

17  Conversion is "an act of willful interference with a chattel, done without lawful

18  justification, by which any person thereto is deprived of use and possession."  De Vries v.

19  Brumback, 53 Cal.2d 643, 647 (1960).  Stated differently, conversion is "the wrongful exercise of

20  dominion over the property of another."  Lee v. Hanley, 61 Cal.4th 1225, 1240 (2015); Hester v.

21  Public Storage, 49 Cal.App.5th 668, 680 (2020).  The elements of conversion are:  (1) the

22  plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a

23  wrongful act or disposition of property rights; and (3) damages.  Lee, 61 Cal.4th at 1240; Hester,

24  49 Cal.App.5th at 680.  To establish conversion, a plaintiff must show an actual and substantial

25  

26  [7] Like the IICR claim, YCH's motion did not argue that the UCL cause of action was not plausibly pled.  However, the pleading deficiency identified in this section necessarily follows from the Court's analysis of the first cause of action and the IICR claim.  Because the deficiency is fatal to part of the UCL claim, the Court addresses the matter

27  sua sponte at this time.  See Omar, 813 F.2d at 991.

28  [8] Because YCH does not address any issues surrounding the cover art, the analysis of this subsection is limited to actions involving the three albums.

1  interference with his ownership or right to posses the property.  Zaslow v. Kroenert, 29 Cal.2d

2  541, 550-51 (1946).  The measure of damages for a conversion claim is the full value of the

3  property converted.  General Security Servs. Corp. v. County of Fresno, 815 F.Supp.2d 1123,

4  1143 (E.D. Cal. 2011); Intel Corp. v. Hamidi, 30 Cal.4th 1342, 1350 (2003): Irwin v. McDowell,

5  91 Cal. 119, 122 (1891).

6      The Counterclaim in relevant part alleges that Hyphy owns the tangible master recordings

7  for the three albums and that Yellowcake intentionally interfered with Hyphy's ownership in that

8  property by exercising dominion over the masters, exploiting the masters, claiming ownership in

9  the masters, and interfering with Hyphy's ability to commercially exploit the masters.  See

10  Counterclaim ¶¶ 73, 74.

11      The Ninth Circuit has recognized that claims for the conversion of tangible property

12  involve actions different from those proscribed in the copyright laws and thus, are not preempted.

13  Oddo, 743 F.2d at 635.  "While conversion is generally immune from preemption because it

14  involves tangible property, conversion actions seeking only damages for reproduction of the

15  property – not return of tangible property – are preempted by the Copyright Act."  Doody v.

16  Penguin Group (USA), Inc., 673 F.Supp.2d 1144, 1164-65 (D. Haw. 2009); Marketing Info.

17  Masters, Inc. v. Board of Trs. of Cal. St. Univ. Sys., 552 F.Supp.2d 1088, 1098 (S.D. Cal. 2008);

18  Firoozye v. Earthlink Network, 153 F.Supp.2d 1115, 1130 (N.D. Cal. 2001).

19      Hyphy's invocation of the tangible masters, as opposed to the albums/sound recordings

20  embodied within the masters which are subject to copyright protection, see 17 U.S.C. § 102(a)(7),

21  is clearly an attempt to fit this claim within Oddo.  However, the Court is not satisfied that Hyphy

22  has alleged a viable claim, either in terms of Oddo or pleading the elements of conversion.

23      First, the FAC nowhere requests the return of the tangible masters.  Instead, Hyphy alleged

24  that it was harmed according to proof.  This is indicative of a preempted copyright claim.  Morena

25  Music, 2021 U.S. Dist. LEXIS 39127 at *46; Doody, 673 F.Supp.2d at 1164-65.

26      Second, the Court understands that Hyphy is alleging that Yellowcake "exploited" the

27  masters by reproducing them and making them available on platforms such as YouTube.  The

28  Court takes this to mean copying and distributing or displaying them through YouTube.

1    Otherwise, it is unclear how tangible masters can be utilized through YouTube or other digital and

2    on-line mediums since, to the Court's knowledge, the tangible masters are not videos.  Similarly,

3    the Court understands that Hyphy was attempting to exploit the masters in the same way as

4    Yellowcake, but Yellowcake interfered through takedown notices and threats of litigation.

5           Hyphy's allegations regarding exploiting the tangible masters on digital platforms like

6    YouTube seem like a copyright infringement claim.  Section 106 grants "copyright owners the

7    'exclusive rights' to display, perform, reproduce, or distribute copies of a copyrighted work, to

8    authorize others to do those things, and to prepare derivative works based upon the copyrighted

9    work." Maloney, 853 F.3d at 1010.  The only difference between the conversion cause of action

10   and copyright infringement appears to be that the tangible masters are the "works" at issue.

11   Hyphy appears to be treating the tangible masters the same as or interchangeably with the

12   copyrighted albums.  Without additional allegations that adequately distinguish between the

13   tangible masters and the copyrighted albums, as well as clarification of how the tangible masters,

14   as opposed to the copyrighted albums, were being "exploited" on digital platforms like YouTube,

15   the Court cannot find that Hyphy has affectively pled around § 301 preemption with respect to

16   "exploitation" of the masters.  See Morena Music, 2021 U.S. Dist. LEXIS 39127 at *46.

17          Third, and relatedly, it is unclear what exactly Hyphy means by the allegation of

18   "exercising dominion."  While it is possible to read this as an allegation that Yellowcake

19   physically possessed Hyphy's masters, that is not what is expressly alleged, nor do the

20   circumstances surrounding this case reasonably indicate that Yellowcake took physical possession

21   of, or took any actions directly against, Hyphy's tangible masters.  Additional allegations are

22   necessary to explain how exactly Yellowcake "exercised dominion" over the tangible masters.

23          Fourth, it is unclear how Yellowcake claimed ownership of the tangible masters (or how

24   merely claiming ownership in general) constitutes such a substantial interference with the tangible

25   masters that Yellowcake would be required to pay Hyphy the full value of the tangible masters.

26   Additional allegations are necessary because the allegations in the Counterclaim do not reasonably

27   suggest that Yellowcake somehow took the tangible masters or actually interfered with the

28   tangible masters.  Instead, it appears that Hyphy is attempting to rebrand an infringement claim

1 into a conversion claim by relying on the tangible masters instead of the copyrighted albums.

2        Finally, interfering with Hyphy's ability to commercially exploit the tangible masters does

3 not appear to be an act of conversion.  Such interference does not affect either actual ownership of

4 the tangible masters or Hyphy's right to possess the tangible masters.  The ability to commercially

5 exploit the masters is perhaps a benefit of ownership, but it is not the same as ownership and also

6 would not appear to justify the full value of the tangible masters as damages.

7        In sum, because the factual allegations do not plausibly indicate that Yellowcake converted

8 the physical/tangible masters, and because the allegations do not sufficiently remove the

9 conversion claim from § 301 preemption, dismissal of the conversion claim is appropriate.

10

11 **IV.**     **Conclusion**

12        YCH has moved to dismiss all claims, except for the second cause of action for copyright

13 infringement involving the cover art and the eighth cause of action against Chavez.

14        With respect to the first cause of action, a valid ownership interest has not been pled.  First,

15 the agreement to transfer between Chavez and Hyphy that is pled in the FAC is an oral agreement

16 and thus, invalid under § 204(a).  This defect cannot be remedied, so the dismissal of any

17 infringement claim based on a transfer of copyrights through the oral agreement will be without

18 leave to amend.  Second, the co-author/joint owner theory does not yield a plausible claim because

19 the pleadings indicate that the joint owners of the copyright in the four albums would be Hyphy

20 and Yellowcake, and joint owners may not sue each other for copyright infringement.  Dismissal

21 of this infringement claim will be with leave to amend.  However, Hyphy must be able to explain

22 why Yellowcake is not a joint owner of the copyrights in the albums.  Third, the allegations

23 categorically show that the albums were not works for hire as specially commissioned works.  The

24 allegations are also insufficient to show that the albums were a work for hire based on Chavez

25 being an employee who was acting within the scope of his employment for Hyphy when the

26 albums were created.  Because it is not clear that amendment of this employee work for hire

27 theory would be futile, dismissal will be with leave to amend.  Finally, while no pleading or

28 opposition identifies a written agreement, judicially noticed documents identify a written

agreement for the transfer of Chavez's interest in the El Campesino album to Hyphy.  Because it is unclear that granting leave to add such a theory would be futile, Hyphy will be permitted to amend their first counterclaim to include a written agreement for the transfer of the El Campesino album.

With respect to the third cause of action, a preliminary injunction is not a cause of action, it is a remedy.  Therefore, dismissal of the request as a standalone cause of action is appropriate.

With respect to the IIPEA cause of action, that claim as pled is preempted by the Copyright Act.  However, because it is not entirely clear that amendment would be futile with respect to a claim based on the tangible masters, dismissal will be with leave to amend to add such a claim.

With respect to the IICR claim, YCH has not adequately shown that this cause of action is preempted by the Copyright Act.  However, application of § 204(a) invalidates any oral contract for the transfer of Chavez's copyrights in the albums to Hyphy.  Without a valid contract, there is no plausible IIRC claim.  Therefore, dismissal of the IIRC claim to the extent that it is based on an oral contract for the transfer of copyrights in the albums between Chavez and Hyphy will be without leave to amend.  However, because it is unclear whether a written contract exists for the transfer of El Campesino from Chavez to Hyphy, dismissal of the IIRC claim will be with leave to amend with respect to the El Campesino album and only to the extent that a written transfer agreement actually exists and is alleged in an amended counterclaim.

With respect to the UCL cause of action, the claims against Yellowcake and Colonize are preempted by the Copyright Act.  With respect to Hernandez, while the Copyright Act does not preempt the UCL claim, no plausible UCL claim based on Hernandez inducing Chavez to transfer his interests in the copyrights of the albums can be stated because of application of § 204(a).  Therefore, dismissal of the UCL claim against Hernandez to the extent that it is based on inducing a breach of the oral contract for the transfer of copyrights in the three albums between Chavez and Hyphy will be without leave to amend.  However, because it is unclear whether a written contract exists for the transfer of El Campesino from Chavez to Hyphy, dismissal of the UCL claim will be with leave to amend with respect to the El Campesino album and only to the extent that a written transfer agreement actually exists and is alleged in an amended counterclaim.

With respect to the conversion cause of action, no plausible claim is alleged.  Additional

allegations are necessary to clarify what actions Yellowcake took with respect to the tangible masters that would rise to the level of conversion and justify the full value of the tangible masters as damages.  Further, the allegations in the Complaint suggest that Hyphy is attempting to artfully plead a copyright infringement claim as a conversion claim, and thus avoiding preemption, by focusing on the tangible masters instead of the copyrighted albums.  Thus, the claim appears to be preempted.  However, because it is not clear that amendment would be futile, dismissal will be with leave to amend.

## V.      Validity of Hyhphy's Copyright Registrations in the Four Albums

The Copyright Act in relevant part provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with [the Copyright Act]."  17 U.S.C. § 411(a). While this section does not impose a precondition to copyright protection, it does expressly prohibit "copyright owners from bringing infringement actions without first properly registering their work."  Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 959 F.3d 1194, 1197 (9th Cir. 2020); see also Alaska Stock, 747 F.3d at 678.

The Ninth Circuit has explained that, "once a defendant alleges that (1) a plaintiff's certificate of registration contains inaccurate information; (2) 'the inaccurate information was included on the application for copyright registration'; and (3) the inaccurate information was included on the application 'with knowledge that it was inaccurate,' a district court is then required to submit a request to the Register of Copyrights 'to advise the court whether the inaccurate information, if known, would have caused [it] to refuse registration.'"  Unicolors, 959 F.3d at 1197 (quoting 17 U.S.C. § 411(b)(1)-(2)).  Courts may "not consider in the first instance whether the Register of Copyrights would have refused registration due to the inclusion of known inaccuracies in a registration application."  Id.  Additionally, "inadvertent mistakes on registration certificates do not invalidate a copyright and thus do not bar infringement actions, unless . . . the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office by making the misstatement."  Jules Jordan Video, 617 F.3d at 1156 (quoting

1  Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1145 (9th Cir. 2003)); see also

2  Gold Value, 925 F.3d at 1146.  If it is determined that a registration contains inaccurate

3  information, and that the inaccurate information was included in the registration application with

4  knowledge that the information was incorrect, and that the inaccurate information would have

5  caused the Copyright Office to refuse registration, then a district court may declare the registration

6  invalid.  See Gold Value, 925 F.3d at 1148; see also Unicolors, 959 F.3d at 1200.

7          Here, the work for hire theory and written agreement theory for Hyphy's ownership

8  interest in the albums was brought to the Court's attention by YCH through judicially noticed

9  documents from the U.S. Copyright Office's Public Catalog website, i.e. the registration

10  information for the four albums.  The registration information indicates that Hyphy is the author of

11  three of the albums as an "employer for hire," see RJN Exs. 1, 2, 3, and for one album through a

12  written transfer.  See RJN Ex. 4.  Neither Chavez nor Yellowcake are mentioned on the

13  registration for the three work for hire albums, but Chavez is mentioned as an "author" on the

14  "transfer agreement" album.  See RJN Exs. 1, 2, 3, 4.  YCH argues that absence of an allegation of

15  a written agreement or reliance on a written agreement in the opposition makes the work for

16  hire/"employer for hire" and "written transfer" status of Hyphy false.  YCH argues that Hyphy had

17  knowledge that these two copyright theories of ownership were false, and also knew of

18  Yellowcake's registration in the Nuestra Historia album at the time that Hyphy filed for its

19  registration in that album.  YCH contends that because Hyphy knew of the falsity of its

20  representations to the Copyright Office, and because the Copyright Office would not have granted

21  registration with knowledge of the true information, Hyphy's registrations are invalid.

22          After review, the Court agrees that the judicially noticed registration information is

23  inconsistent with the FAC.  The FAC does not claim an ownership interest in any of the albums

24  through either a work for hire or written transfer theory.  Instead, the FAC attempts to claim

25  ownership through either an oral transfer agreement with Chavez or as a co-author/joint owner.

26  The FAC therefore indicates that the registrations contain incorrect information in terms of

27  authorship and basis for copyright interest.  Further, YCH is clearly alleging that Hyphy knew that

28  it was submitting false information to the Copyright Office as part of the registration application.

Under *Unicolors*, these allegations and the judicially noticed documents are sufficient to put the validity of Hyphy's copyright registrations at issue.

At this point, however, noting that the validity of the registrations is as far as the Court will go. First, no inquiry has been sent to the Copyright Office regarding inaccurate information. As *Unicolors* expressly states, this Court cannot invalidate a copyright until it receives word from the Copyright Office regarding what effect the known inaccuracy would have had on the registration decision. See id. at 1197. Therefore, invalidating the registrations at this point is clearly improper. See id. Second, and more fundamentally, YCH's arguments have been made for the first time as part of a reply. Hyphy has not had an opportunity to explain what was actually submitted in its application to the Copyright Office, explain the inconsistency between the FAC and the registration information, address the issue of knowledge or inadvertence, or otherwise respond to YCH's allegations.[9]

Under these circumstances, the Court will order the parties to submit additional briefing. Hyphy will be permitted to respond to the challenges to the validity of its registrations. Of particular import, Hyphy should attempt to explain the apparent inaccuracies in the registration information and explain what information was presented as part of its registration application. The Court will then permit YCH to reply to Hyphy's supplemental response. If, after reviewing the supplemental information, the Court is satisfied that there is inaccurate information that is part of the registrations and that was included in the applications to the Copyright Office, the Court will send an inquiry as required by § 411/*Unicolors* to determine how the Copyright Office would have reacted. However, once the Court receives the response of the Copyright Office, and depending on the response, the Court will not invalidate the registration until the issue of Hyphy's knowledge/inadvertence has been decided.

The issue of the registrations' validity is not one that should delay proceedings further. Assuming that the Court sends an inquiry to the Copyright Office, that inquiry will not affect the second or eighth causes of action. Further, even if Hyphy files an amended counterclaim and

---

[9] Relatedly, while the submissions at this time suggest knowledge by Hyphy, the issue of knowledge has not been litigated or decided.

1  continues to pursue an infringement claim with respect to any of the albums, it seems unlikely that

2  the issue of knowledge or inadvertence will be able to be decided before either a summary

3  judgment motion or a trial.  Therefore, the pre-trial and scheduling process will not be stayed

4  pending either receipt of the supplemental briefing or a possible response from the Copyright

5  Office.

6

7  **<ins>ORDER</ins>**

8      Accordingly, IT IS HEREBY ORDERED that:

9  1.    Counter-Defendants' Rule 12(b)(6) motion to dismiss is GRANTED in part as follows:

10      a.    The first cause of action for copyright infringement based on an oral transfer

11          agreement between Chavez and Hyphy is DISMISSED without leave to amend;

12      b.    The first cause of action for copyright infringement based on a work for hire

13          through a special order or commission is DISMISSED without leave to amend;

14      c.    The first cause of action for copyright infringement based on a co-author/joint

15          owner, work for hire through an employer-employee relationship, or written

16          transfer agreement is DISMISSED with leave to amend;

17      d.    The third cause of action for preliminary injunction is DISMISSED without

18          prejudice as this is a remedy and not a cause of action;[10]

19      e.    The fourth cause of action for intentional interference with prospective economic

20          advantage is DISMISSED and leave to amend is granted only with respect to a

21          claim based on the tangible masters;

22      f.    The fifth cause of action for intentional interference with contractual relations to

23          the extent that it is based on an oral contract involving the transfer of copyrights in

24          the three albums is DISMISSED without leave to amend, but leave to amend is

25          GRANTED with respect to alleging a claim based on a written transfer from

26          Chavez to Hyphy in the album El Campesino;

27

---

28  [10] To be clear, Hyphy is free to request a preliminary injunction under the Copyright Act either in its Prayer for Relief or as part of the allegations under a copyright infringement cause of action.

g. The sixth cause of action for Cal. Bus. & Prof. Code § 17200 UCL against Yellowcake and Colonize is DISMISSED without leave to amend as preempted;

h. The sixth cause of action for Cal. Bus. & Prof. Code § 17200 UCL against Hernandez based on inducement to breach an oral agreement relating to copyright ownership in the albums is DISMISSED without leave to amend, but leave to amend is GRANTED with respect to alleging a claim based on a written transfer from Chavez to Hyphy in the album El Campesino; and

i. The seventh cause of action for conversion based on actions directed against the tangible masters is DISMISSED with leave to amend;

2. Within twenty-one (21) days of service of this order, Hyphy may file an amended counterclaim that is consistent with the analysis of this order;

3. If Hyphy fails to timely file an amended Counterclaim, leave to amend shall be automatically withdrawn without further notice, and Defendants shall file an answer to the Counterclaim within twenty-eight (28) days of service of this order;

4. Within fourteen (14) days of service of this order, Hyphy shall file supplemental briefing, as discussed above, that addresses and responds to the arguments made in the Counter-defendants' reply brief concerning the validity of Hyphy's copyright registrations in the four albums; and

5. Within seven (7) days of service of Hyphy's supplemental briefing, Counter-defendants shall file a response.

IT IS SO ORDERED.

Dated:   July 20, 2021   _____

SENIOR  DISTRICT  JUDGE