# EXHIBIT "G"

JOSE MARTINEZ - JULY 26, 2022 13

Q And did you review any documents in preparation for your deposition today?

A Yes. I did. The claim filed by Hyphy Music against Yellowcake and also the notice of the deposition.

Q And can you describe to me the nature of -- and for purposes of this deposition, I'm going to refer to typing Hyphy Music, Inc., as Hyphy. Just, could you describe to me generally the nature of Hyphy's business?

MR. BEGAKIS: Objection. Vague as to nature.

MR. BERMAN: If you understand my question, you can answer, Mr. Martinez.

THE WITNESS: Okay. The Hyphy Music, Inc., incorporation focuses on primarily acquiring music rights, both sound recordings and compositions, mostly purchase rights, but in some instances we do produce our own rights. We provide a consideration, in other words, we exchange money for the services rendered, and so that is essentially the -- the scope of our work. We are in the business of acquiring rights.

BY MR. BERMAN:

Q Okay. And then once you acquire those rights, do you exploit those rights in any way, such as selling copies of the sound recordings or synchronization,

REMOTE LEGAL COURT REPORTING 646-461-3400

JOSE MARTINEZ - JULY 26, 2022 14

things like that?

A We physically record it and manufactured CD's up until, roughly, 2016. And beginning in 2010, we also started engaging in the digital era. So yes, we do exploit our copyrights, and prior in the physical distribution, now in digital distribution.

Q All right. Just to be clear, so you testified that Hyphy was incorporated in 2014; is that correct?

A Correct. It was a sole proprietorship beginning in 2010 up to 2014.

Q And can you just give me a brief synopsis of your education?

A I graduated from University of Fresno State or Cal State Fresno, went into teaching; so my background is an educator.

Q Okay. And when did you graduate from college?

A 1998.

Q And your first job out of college was teaching related?

A Somewhat, because I did work at a school campus, but it was primarily as a -- as a soccer coach, then I entered the classroom.

Q When was your first involvement in the music industry?

MR. BEGAKIS: Objection. Vague as to

REMOTE LEGAL COURT REPORTING 646-461-3400

JOSE MARTINEZ - JULY 26, 2022 15

involvement.

MR. BERMAN: If you understand, you can answer.

THE WITNESS: Selling music, roughly since 1991, recording music because I used to be part of a band, roughly in 2000. And as far as getting into the business side of things where you actually own the copyrights, 2010.

BY MR. BERMAN:

Q And so just to clarify, so in or about 2010, you as a sole proprietor, started Hyphy Music and started to acquire music copyrights; is that accurate?

A Correct.

Q Okay. What prompted you to start doing that kind of business in 2010?

A I have been part of a music band roughly from 2000 to 2006, and I continued to also retail music on the side at local flea markets. Seeing the fact that there was a great deal of business opportunity, not only in retail but also on actually becoming the copyright holder, four years after we disbanded the 2006 band, we -- we, meaning myself and another colleague, began looking into the possibility of recording artists and acquiring rights.

Q Was there ever any other shareholders of Hyphy

REMOTE LEGAL COURT REPORTING 646-461-3400

JOSE MARTINEZ - JULY 26, 2022 16

other than yourself?

A Not at this time.

Q In in the past, was there ever any other shareholders at Hyphy?

A No.

Q And approximately how many releases has Hyphy released between 2010 and the present?

MR. BEGAKIS: Objection. Vague as to releases.

BY MR. BERMAN:

Q Do you know what I mean by releases, Mr. Martinez?

A Yes. It's -- I can answer -- I can best answer it in this way. We currently hold roughly about 6000 copyrights, productions, albums. So at minimum, 6000 releases.

Q And just to clarify from the record, some of those releases, you as Hyphy recorded those releases, and some you acquired after they were recorded; is that accurate?

A Correct. Correct.

Q Okay. And are you familiar with the -- with the terminology A&R or artists and repertoire, as commonly used in the music industry?

A Somewhat.

REMOTE LEGAL COURT REPORTING 646-461-3400

particular case, no needed agreement was -- well, no written agreement was needed.

BY MR. BERMAN:

Q Thank you. We'll come back to that. We're definitely going to explore those issues. Thank you, Mr. Martinez.

There's -- I'm sorry. Throughout its history, has Hyphy used any third-party music distributors in connection with its business?

A The whole time since we've been in the digital distribution era, yes, we have.

Q And what are the names of the distributors that Hyphy has worked with in the digital distribution realm?

A The one that pertains to this particular matter is The Orchard Enterprises.

Q And other than in this particular matter, and just generally in Hyphy's history, has Hyphy ever had any sort of agreement with any other digital distributor?

A Yes. Dashco (phonetic).

Q Anybody -- any other companies other than Dashco and The Orchard?

A When we first started, I guess you can call it a service provider, TuneCore, but it was extremely

minimal.

Q And can you, just, give me a, then, a brief history of Hyphy's relationship with the three distributors, starting with who was the first distributor and -- to the current distributor?

A If you actually want to pinpoint the first distributor, it was one of the defendants, David Hernandez. At that time, we started a distribution deal in which he took our content and distribute it. At that time, we dismissed him because of inaccurate record keeping and also the fact that he was definitely not a trustworthy individual.

We moved on to TuneCore, after that we moved on to Dashco, where Mr. Hernandez had also left a very bad taste with Mr. Vanpatterson (phonetic), which had some content that was still ours and still being distributed by David Hernandez.

We since then moved into The Orchard Enterprises.

Q Okay. So when did you terminate your relationship with Mr. Hernandez? By you, I'm referring to Hyphy.

A 2010.

Q And then when did Hyphy terminate its relationship with TuneCore?

A I believe there's still some content still being distributed. It might have -- might have been, like, six albums that were initially distributed, which I don't think we ever removed.

Q And when did Hyphy terminate its relationship with Dashco?

A We didn't. We initially engaged in a global settlement per se, in which we simply asked that anything that Mr. David Hernandez was still exploiting that belonged to us be transferred over to us, and we will remain working with Dashco on a separate account.

Q So is Hyphy still working with Dashco as you just testified?

A Yes. But we are not giving them any new productions. They essentially have kept an old catalog that we acquired and purchased, and it was already being distributed by them. So, yes. The relationship is still ongoing.

Q And then -- and then -- and when did Hyphy start its relationship with The Orchard?

A 2012. And they've been our primary distributor since then.

Q Does Hyphy enter into any contractual relationships with any artist whereby the artist receives an artist royalty of any sort?

A They do when they entered into a 360 agreement. Most of the time we offer them a complete buyout, including artistic royalties.

Q And when you say 360, you're referring to the common music industry practice of an agreement that includes not just sound recordings, but any music publishing rights; is that accurate?

A That is accurate, and that is the agreement that we typically include artistic royalties payable to the artist.

Q And does Hyphy use any royalty accounting software to determine how much artist royalties are due to an artist under any particular agreement?

A We have not had any agreements that have termed out in terms of us owing artistic royalties. So we have the accounting set up, but we have not used it.

Q Does Hyphy have an in-house bookkeeper?

A Yes. We do.

Q And what is the bookkeeper's name?

A Jason Tarvin.

Q Can you spell the last name for the record, please?

A T-A-R-V, as in Victor, I-N.

Q And how long has Mr. Tarvin been employed by Hyphy?



Q Understood. I just want to be -- just to be clear for the record, other than allegedly recording -- sound recordings on behalf of Hyphy, none of the band members were expected to perform any other services for Hyphy, correct?

MR. BEGAKIS: Objection. Vague as to services. Objection to the extent it misstates the witnesses prior testimony. Objection to the extent it calls for legal conclusion.

MR. BERMAN: Over your counsel's objection, you could answer.

THE WITNESS: They were expected to provide the services under a recording agreement under a record label. Again, we were the official record label at the time, so some of those services did include recording. At the same time, we did ask them to provide themselves -- or become available for pictures so that we can provide -- publish images.

BY MR. BERMAN:

Q Okay. So you expected them to participate in helping promote the albums; is that accurate?

A Yes. Because we invested a considerable amount of money and time on promotional campaigns.

Q So other than promoting the albums, none of the band members were expected to perform any other

REMOTE LEGAL
COURT REPORTING

services for Hyphy, correct?

A No. We are not an agent of lack performances, so no.

Q And they weren't supposed to do anything related to calling distributors regarding sales or doing creative development for other artists or any other services related to the business of Hyphy, correct?

A Not obligated or expected. From time to time we did ask them if they would be available for a feature with some of the other artists, and they had every right to decline or accept.

Q Okay. But generally what you're talking about is creative services, correct?

A Correct --

MR. BEGAKIS: Object. Vague as to creative services.

BY MR. BERMAN:

Q So when you discussed potentially entering into a business arrangement with the band in the summer of 2013, other than yourself and the band members -- or withdrawn.

When you had the conversation with Mr. Chavez in the summer of 2013 at his home regarding potentially the band releasing albums through Hyphy, who was present during that conversation?

A It was his family. I know for sure it was his wife or ex-wife, Myrna, I don't know the status of their marriage. Chuy Chavez was in the premises, Junior, and there was another individual that was either a roommate or a friend that was just hanging out, but there was another male individual that kept coming in and out of the room.

Q Do you recall that person's name?

A No. It might have -- it might -- I mean, by the looks of his age, it might have been his dad.

Q And just to be clear, for the record, when you say Chuy Chavez, you're referring to Jesus Chavez, correct? It's a nickname.

A Junior. They were both present. Senior and Junior were both present.

Q I'm just -- I'm just trying to clarify for the record. When you use the name Chuy, Chuy is a nickname for Jose Chavez, correct?

A I don't know if his first name is Jose or not, but it's Jesus Chavez, Jr.

Q You're referring to a Chuy.

A Yeah. Chuy is Jesus Chavez, Jr.

Q Okay. So it's -- just to be clear then, it's a nickname for Jose Chavez, Jr.?

A Yes, sir.

Q Okay. That's all. Just want to make sure. Now Hyphy eventually released seven albums by the band, correct?

A It was -- to my knowledge it was five that were turning to six because the last one, which was the live recording, was split into two.

Q Okay. So just to be clear for the record, Hyphy released an album by the band called Amigos y Contrarios, correct?

A Correct. That was the first album.

Q And then there was this another album called -- again, my Apologies with my Spanish -- Corridos de Poca M?

A Yes.

Q All right. And then there was another album, Des de la Cantina de Mi Barrio?

A Yes.

Q And that was a live album, correct?

A Correct. It was one of the split albums. Yes.

Q And then Hyphy released an album by the band called El Campesino?

A Yes.

Q Okay. And then Hyphy released an album called Chuy Chavez y Sus Amigos?

A That was an over -- I guess an overlap from the distribution we have with Chuy Chavez, Jr. prior to the 2013 agreement.

Q Nonetheless, that was an album that was being sold and distributed by Hyphy, correct?

A But it was not an official album under this particular term. It was an album that was issued by Chuy Chavez, Jr. under a prior agreement, distribution not only in Walmart but also digital distribution.

Q And was that agreement in writing or oral?

A It was oral, and your colleague, Mr. Griffin, is well aware of the fact that he tried to sue us on the fact that we didn't have a written agreement. And we did show him that there was still a huge outstanding debt, and so they chose to drop the case.

Q Do you have any documents or correspondence regarding the terms of Hyphy's release of this album with Mr. Chavez, Jr.?

MR. BEGAKIS: Objection. Vague.

THE WITNESS: I'm sorry. Can you rephrase the question?

BY MR. BERMAN:

Q Do you have any documents in writing that reflect the nature of the terms of Hyphy's release of the Chuy Chavez y Sus Amigo release with Chuy Chavez,

Jr.?

MR. BEGAKIS: Same objections.

THE WITNESS: The documents that existed are the payouts to Mr. Chavez, Jr. And the fact that we didn't have a written agreement, it transferred into a verbal license, which, again, the complaint was withdrawn due to the fact there was still a huge outstanding debt. And I want to believe that that's the reason why we're here today.

BY MR. BERMAN:

Q When you say complaint, what are you referring?

A Say that again.

Q You just testified that there was a complaint that was withdrawn; what exactly are you referring to?

A It was a complaint filed by Mr. Thomas Griffin on behalf of Chuy Chavez, Jr. alleging that we had, without consent or authorization, release his works. Which again, you can't possibly be infringing if you do have consent and authorization on a huge payout. So it was -- it was essentially withdrawn to a verbal license. When we showed them that we there were still a huge outstanding debt that we had not been recouped, the case was dropped.

Q When you said it -- was the case withdrawn or

was the case settled?

A I want to say withdrawn. Maybe that's not a legal term, but I know that essentially everybody shook hands and walked away.

Q Was there any written agreement connection with the ending of the lawsuit?

A Mr. Thomas Griffin would be able to answer that.

Q Well, I'm asking you if you have any independent recollection as to whether or not any sort of settlement agreement was entered into in connection with that lawsuit?

MR. BEGAKIS: Objection. Objection. Argumentative and to the extent it calls for speculation.

MR. BERMAN: Over your counsel's objection, you can answer.

THE WITNESS: What I can verify for a fact is that there's still an outstanding balance that has not been recouped.

BY MR. BERMAN:

Q That's not my question. My question is whether or not there was a written settlement agreement entered into in connection with the lawsuit that you were referring to previously.

A I don't remember signing anything. Whether the attorneys took action on that course, I'm unaware of it.

Q And when you say that there was an advanced recoup, is it your belief that an outstanding unrecouped advance would be a prohibition on the transfer of title to a sound recording?

MR. BEGAKIS: Objection. Calls for a legal conclusion.

MR. BERMAN: I'm asking for his understanding. And over your client's objection, you could answer.

MR. BEGAKIS: Same objection. Regardless of whether you want the understanding, I'm objecting on the fact that it's calling for legal conclusion.

MR. BERMAN: You can answer, Mr. Martinez.

THE WITNESS: My understanding is that a verbal license may not be revoked if it hasn't been fully recouped, and that is the circumstances with Mr. Chuy Chavez, Jr.

BY MR. BERMAN:

Q Okay. And what is the basis for your understanding that that's --

A What is the what? I'm sorry.

Q What's your basis for your understanding that a license cannot be revoked because of unrecouped advance?

MR. BEGAKIS: Objection. Vague as to basis. Same objection to the extent it continues to seek a legal conclusion, and object to the extent that it calls for attorney-client privilege information. If the client -- if the witness can respond without disclosing the contents of conversations with attorneys regarding this matter, then the witness can so respond.

MR. BERMAN: Over your client's -- your counsel's objection, you could answer.

THE WITNESS: The basis of my understanding is the fact that Mr. Griffin withdrew the complaint when he realized he had to pay us in order to regain those rights.

BY MR. BERMAN:

Q Okay. What's your basis for believing that Hyphy had to be paid to regain those rights as you just testified?

MR. BEGAKIS: Objection. Asked and answered.

MR. BERMAN: Over your counsel's objection, you can answer.

THE WITNESS: We purchased something that

wasn't purchased back, and so if it hasn't been paid back, we still technically can hold on to it.

BY MR. BERMAN:

Q What's the basis for that belief, Mr. Martinez?

MR. BEGAKIS: Objection. Asked and answered and calls for a legal conclusion.

THE WITNESS: I'm using -- I mean, I'm using again the basis that Mr. Griffin again withdrew that based on the fact that there was a debt that needed to be paid before Mr. Chavez, Jr. could regain control of his rights.

BY MR. BERMAN:

Q Okay. I'll ask one more time. And what's your basis for that understanding? Is it based on advice from counsel or something else?

MR. BEGAKIS: Objection. Argumentative, vague, asked and answered. If the witness -- and the witness has provided an answer. So the witness can provide that answer again to a question that's been asked and answered.

MR. BERMAN: You can answer.

THE WITNESS: My answer remains the same.

MR. BERMAN: Move to strike as non-responsive.

BY MR. BERMAN:

Q Do you have any documents in your possession or in Hyphy's possession whatsoever that reflect the terms of Hyphy's alleged acquisition of the album Chuy Chavez y Sus Amigos?

A Check stubs that were paid out to Mr. Chavez, Jr.

Q Anything other than check stubs?

A No.

MR. BERMAN: Okay. I'm going to call for the preservation and production of the check stubs that Mr. Martinez was just referring to.

MR. BEGAKIS: You can propound them in a separate document request, and we'll respond to that request timely.

MR. BERMAN: Okay.

BY MR. BERMAN:

Q And Hyphy also released an album by the band titled Naci Con Suerte de Rey, otherwise, I believe called Mariachi; is that correct?

A Correct. Yeah. That's correct.

Q And lastly, Hyphy also released an album by the band called Nuestra Historia, which was also a live album, correct?

A Correct. So you should sum up to six.

Q My understanding is that it's seven. There was a recording of a live performance that was then split into two albums; is that what you're trying to explain to me?

A It was five productions. The fifth one was split into two, so it became number six.

Q Well we have Amigos -- well, okay. Are you -- you're not -- you're not including the Chuy Chavez y Sus Amigos; is that right?

A That was not part of this term, it was part of the prior deal with Chuy Chavez, Jr.

Q Okay. But nonetheless, that was still an album that was being distributed at some point by Hyphy, correct?

MR. BEGAKIS: Objection. Outside of the scope of this deposition.

MR. BERMAN: Or your client's objection, you can answer.

THE WITNESS: Through the consent of Chuy Chavez, Jr.

BY MR. BERMAN:

Q Okay. So the answer is yes, Hyphy was, at some point, distributing the Chuy Chavez y Sus Amigos album, correct?

MR. BEGAKIS: Objection. Outside of the





MR. BEGAKIS: What category are we talking about?

MR. BERMAN: John, are you directing him -- what you're doing is wholly inappropriate, and it's on the record.

Are you directing your client not to answer my question?

MR. BEGAKIS: On the record, Counsel, my understanding is (indiscernible - simultaneous speech) --

MR. BERMAN: Are you directing your client not to answer my question as to whether or not Hyphy Music has ever distributed the album Chuy Chavez y Sus Amigos?

MR. BEGAKIS: On the -- on the record -- on the record, my understanding is that question is not covered under a category of Exhibit A. If you can point to me where it is, then I will allow my client to answer. If you cannot, then is outside the scope of this deposition; I'm instructing my client not to answer.

MR. BERMAN: Okay --

MR. BEGAKIS: So point it out to me.

MR. BERMAN: We'll move on you. You just -- okay.

MR. BEGAKIS: You have every opportunity to point out --

MR. BERMAN: You're completely interfering with my deposition. We're going to be back (indiscernible - simultaneous speech) --

MR. BEGAKIS: You have every right to point out to me how this is a category of this deposition.

MR. BERMAN: It's your license, John.

MR. BEGAKIS: That sounded to me like a threat of a bar action in -- as a way of gaining leverage in litigation, which sounds to me like an actionable bar action --

MR. BERMAN: The record speaks for itself. We'll be back in front of the magistrate.

MR. BEGAKIS: Okay. You can -- you've got all the time in the world. You've got -- you've got six hours and -- you've got 5 hours and 55 minutes to point out for me how that's a category of this deposition. Point it out to me.

MR. BERMAN: No. I'm not going to. You can hang yourself. That's fine.

MR. BEGAKIS: Okay.

(Pause.)

MR. BERMAN: Now --

MR. BEGAKIS: Hold on. I'm looking at category 10, and I see that the album is listed there, so I've done your job for you, Counsel. And I will -- and I will allow my client to answer because it's within the categories, which I've objected to any questions outside of those categories.

So Mr. Martinez, you can answer as to Chuy Chavez y Sus Amigos because it's identified in category number 10.

Mr. Berman, that's the category that I was asking you to point out to me as a courtesy, which you wouldn't do.

MR. BERMAN: No. Nice backtrack.

You could answer.

THE WITNESS: The album was distributed with consent of Chuy Chavez, Jr.

BY MR. BERMAN:

Q Okay. So the answer is, yes, Hyphy Music has distributed the album Chuy Chavez y Sus Amigos, correct?

A With the consent of Chuy Chavez, Jr.

Q So now, with the exception of that album and the two live -- I'm going to refer to them as the live albums, which is Desde La Cantina de Mi Barrio and Nuestra Historia. The other remaining albums we just discussed were all recorded in a recording studio,

correct?

A Correct. Correct.

Q Okay. And Mr. Hector Rosales was the recording engineer for those albums, correct?

A For Corridos de Poca M, for El Campesino, and part of Amigos y Contrarios. The ones he did not record Naci Con Suerte de Rey with mariachi.

Q Who was the recording engineer on that album according to you?

A Chuy Chavez brought it from Mexico. He said it was his longtime dream to be able to release a full mariachi album with some of his greatest hits, which included Naci Con Suerte de Rey. And he put the price and he said, "Give me the money, and I'll go take care of it, and I'll bring you the album."

Q So the answer is you don't know who the recording engineer was?

A It was recorded in Mexico --

MR. BEGAKIS: Objection. Objection. Objection. Argumentative. Misstates the witnesses prior testimony.

BY MR. BERMAN:

Q Mr. Martinez, do you know who the recording engineer was for the album Naci Con Suerte de Rey, Mariachi?



A No. I don't. It was delivered to us already recorded.

MR. BEGAKIS: Mr. Martinez, it's been about an hour. How are you feeling about a break?

THE WITNESS: Oh, I'm good.

MR. BEGAKIS: You're good?

THE WITNESS: I'm good.

MR. BEGAKIS: Okay.

BY MR. BERMAN:

Q Now, is it your testimony that Hyphy had paid -- withdrawn.

With recording the albums recorded by Mr. Rosales, is it your testimony that Hyphy had paid Mr. Rosales directly for his services or did Hyphy pay the band who then paid Mr. Rosales?

A Both.

Q Okay. So for the album Amigos y Contrarios, did Hyphy pay Rosales directly or did the band pay?

A I don't recall specific albums, specific payments, but you will -- you should have the documents that were submitted in prior documents request. You will see check stubs, and there is check stubs -- if not one, there's several checks made out to Hector Rosales, that was the money paid directly to him.

Q And would you agree with me, sir, that it's

common practice for a record label to pay the recording cost for artists that it has contractual relationships with?

MR. BEGAKIS: Objection to the extent it seeks an expert opinion and calls for speculation.

MR. BERMAN: Over your client -- your counsel's objection, you can answer.

THE WITNESS: I don't know the common practice, but I can tell you our practice. Our practice is a complete buyout. When Chuy Chavez, Jr. says, "I want $30,000 for this production," on a complete buyout, that is all inclusive. Sound recording expenses, pictures, promotion, everything. Artistic growth is our way; it's a complete buyout.

BY MR. BERMAN:

Q Was Amigos y Contrarios distributed -- or withdrawn.

What distributors -- withdrawn.

What third-party distributors distributed the album Amigos y Contrarios for Hyphy?

A All of the albums in question were distributed by The Orchard Enterprises.

Q Were physical CD's for any of these albums ever sold by Hyphy?

A Yes. For Amigos y Contrarios. Actually, for

all of them at the request of Mr. Chavez, because again, he needed them for his shows.

Q How many copies -- how many physical copies of each album did Hyphy sell?

A Printed about 2000 of each copy, issued about 1000 of those copies to the band, kept about 1000 in inventory.

Q How does Hyphy distribute physical copies of the albums that are releasing?

A We don't anymore, but at that time it was essentially flea markets.

Q Did Hyphy use a third-party distributor to distribute the physical CD's?

A Morena music and Disco's Linda or Discoteca Linda.

Q Other than distribution of physical CD's, has Hyphy had any other sort of business dealings with Morena Music?

A No.

Q Approximately how many albums has Morena distributed physical CD's through Morena Music?

MR. BEGAKIS: Objection. Outside the scope of this deposition.

MR. BERMAN: Over your client -- your counsel's objection, you can answer.

THE WITNESS: The six albums from Los Originales de San Juan and roughly about another 49 to 50 albums of a Hyphy product.

BY MR. BERMAN:

Q Does Hyphy still have any sort of business relationship with Morena Music?

A No --

MR. BEGAKIS: Objection. Vague as to business -- objection. Vague as to business relationship. Outside of the scope of this deposition.

MR. BERMAN: Over your client's objection, you can answer.

MR. BEGAKIS: You mean your attorney's objection, Counsel.

MR. BERMAN: Sorry. Thank you. Thank you for correcting me.

THE WITNESS: No. The only relationship we had was the physical distribution in which we swapped and sell to each other.

BY MR. BERMAN:

Q And when's the last time Hyphy had any sort of business dealings with Morena Music?

A Roughly --

MR. BEGAKIS: Objection. Vague as to business -- objection. Vague as to business dealings

JOSE MARTINEZ - JULY 26, 2022 65

and outside the scope of this deposition.

MR. BERMAN: Over your client's objection, you could answer.

MR. BEGAKIS: You mean your attorney's objection, Counsel.

MR. BERMAN: Thank you. I was up very late. I apologize.

Over your attorney's objection, you can --

THE WITNESS: Roughly about 2019.

BY MR. BERMAN:

Q How much did Hyphy earn from the sale of the physical copies of each of the albums?

A We took a net loss. Because again, we issue 50 percent of our inventory to the band.

Q How much did you sell each copy wholesale for?

A $2.00.

Q What was your -- withdrawn.

Why did you determine to sell the CD's for $2.00 a piece?

A Physical CD Market Has crashed. At that point, it was hard to sell CD.

Q And you claim that the album El Campesino was released by Hyphy on May 31, 2016, correct?

A I don't have my notes in front of me, but on

REMOTE LEGAL COURT REPORTING
646-461-3400

JOSE MARTINEZ - JULY 26, 2022 66

or about. Correct.

(Pause.)

MR. BERMAN: Ms. Reporter, we could please mark this document as Plaintiff's Exhibit A?

(Exhibit A marked for identification.)

THE DIGITAL REPORTER: Okay. Exhibit A is marked.

MR. BERMAN: Mr. Martinez, I'm just going to ask you to take a look at the document that's been marked as Plaintiff's Exhibit A. And just scroll through it, and just let me know if you've seen this document before.

THE WITNESS: Yes. I have.

BY MR. BERMAN:

Q And this is your signature on page 15 of 16?

A Yes. It is.

Q And do you recall reading these responses prior to signing the verification?

A Yes.

Q And do you believe the responses contained therein to be true and correct?

A Yes.

Q So I'm just going to direct your attention. Interrogatory Number 2. I'm just going to read it into the record. "If the answer --

REMOTE LEGAL COURT REPORTING
646-461-3400

JOSE MARTINEZ - JULY 26, 2022 67

MR. BEGAKIS: Objection. The document -- objection. The document speaks for itself.

MR. BERMAN: It does, but it's related to my question, so I'm going to.

MR. BEGAKIS: I'm still -- I'm still permitted to object on the basis that the document speaks for itself.

MR. BERMAN: Okay.

"If the answer to the foregoing interrogatory is in the affirmative, identify: (i) the name of the artist in each sound recording exploited; (ii) the title of each sound recording exploited; (iii) the date of each exploitation; (iv) the nature of such exploitation; (v) the identity of any third parties involved in each such exploitation, (including, but not limited to, any digital service providers such as Amazon Music, Spotify, Apple Music, iTunes, and YouTube.com, and in parentheses YouTube; (vi) the gross amount of revenue generated from each such exploitation; (vii) the name of every party that received any revenue generated by each such exploitation; and (viii) the amount of revenue received by each such party."

BY MR. BERMAN:

Q So referring to respond -- your response Number 4 regarding the dates of release. So it says El

REMOTE LEGAL COURT REPORTING
646-461-3400

JOSE MARTINEZ - JULY 26, 2022 68

Campesino, 5/31/16. So it's your belief that this was the release date of the El Campesino album?

A Yes.

Q And then next to it, it says Des de la Cantina de Mi Barrio; and you believe the release date was March 24, 2017; is that correct?

A Correct.

Q And then the next album released on Nuestra -- released by Hyphy, Nuestra Historia en Vivo on March 31, 2017, correct?

A Correct.

Q And then the album Corridos de Poca M was released by Hyphy on February 24, 2015, correct?

A Correct.

Q And then Amigos y Contrarios was released by Hyphy on February 21, 2013, correct?

A Correct.

Q And then in response to Number 5 it says, "El Campesino via CD and digital transmission through all available Digital Service Providers, DSP's." Was El Campesino distributed by The Orchard to the best of your recollection?

A Yes. All of these albums have been distributed by The Orchard.

Q Were they distributed through any other retail

REMOTE LEGAL COURT REPORTING
646-461-3400

channels other than through The Orchard?

A The order covers all retail DSP's.

Q Okay. What about YouTube? Did The Orchard collect all YouTube revenue on behalf of Hyphy?

A Yes. It's all inclusive.

Q So referring to Subsection 7 of the answer to Interrogatory Number 2 which asks the gross amount of revenue generated from each such exploitation. And so you responded, "Approximately $15,000 to $20,000 per album for each of the three studio album." So which of the three studio albums are you referring to?

A Amigos y Contrarios, Corridos de Poca M, and El Campesino.

Q Okay. And "$15,000 to $20,000 for -- collectively for both live albums." And which albums are referring to when you say the live albums.

A Nuestra Historia and Des de la Cantina de Mi Barrio.

Q And how did you determine this $15,000 to $20,000 number for the albums referred to in in Answer 7?

A Taking a rough estimate from the accounting that we receive. Those accounting reports were eventually verified through your subpoena of The

Orchard. So you should have actual numbers.

Q Okay. So just to be clear for the record, what you looked at were accounting reports that Hyphy received from The Orchard?

A Correct. And we estimated far more than what we actually received.

MR. BERMAN: I'm going to call for the preservation and production of the documents that you had looked at the time that you determined the number set forth in the answer to this interrogatory.

MR. BEGAKIS: You can propound those requests as an independent request for production, and will respond to them per code.

THE WITNESS: They were actually already provided. They were provided on a prior request, and then you were not happy with them, so you subpoenaed The Orchard and you got actuals.

MR. BERMAN: So to the extent that --

MR. BEGAKIS: So to the extent that you serve us a request for production of document and it has not already been responded to with documents provided already, we will respond to it per code.

MR. BERMAN: Okay. Great.

BY MR. BERMAN:

Q And did Hyphy ever receive any sort of

accounting statements from Morena regarding the sale of physical CD's?

A No.

Q Did Hyphy does -- withdrawn.

Does Hyphy have any documentation in its possession whatsoever that memorializes the sale of physical CD's of the band albums to Morena?

A No. Because they were primarily in exchange for product on a $2.00 credit basis.

Q Okay. So is cash ever exchanged for the sale of any of the band CD's to Morena?

A We paid in cash and we paid it by check. We were issued invoices because we were always upside down. Their product was $4.25, our product was $2.00.

MR. BERMAN: All right. I call for the preservation and production of any of the invoices that you're referring to.

MR. BEGAKIS: And to the extent that you want to serve a discovery request for production, we will respond to it per code.

(Pause.)

Just want to go through some documents that I'm going to mark. So why don't we just break for, like, 5 minutes?

THE DIGITAL REPORTER: Okay. Do you want

me to close this exhibit out?

MR. BERMAN: I'll do it.

THE DIGITAL REPORTER: Okay. Is everyone okay with going off the record for five minutes?

MR. BEGAKIS: Sure.

THE DIGITAL REPORTER: All right. It is 2:28 p.m. Eastern Time, and we are going off the record.

(Off the record.)

THE DIGITAL REPORTER: It is 2:34 p.m. and we are back on the record.

BY MR. BERMAN:

Q Mr. Martinez, do you know an individual named Jesus Ramirez?

A Yes.

Q And how do you know Mr. Ramirez?

A He's an independent contractor for us. He does sound recording, sound engineering, sound production.

Q Okay. And he never performed on any of the band albums; is that correct?

A No. He did not.

Q And is it accurate to say that you claim that he performed some recording services in connection with the two live albums, Des de la Cantina de Mi Barrio and Nuestra Historia?

A He was the Omar Rosales of those two live albums. He was the recording and production engineer.

Q Okay. Now, is it accurate to say that you're claiming that Hyphy Music is a co-author on those two live albums by virtue of a work for hire relationship between Hyphy and Mr. Ramirez?

A Before I answer that question, how can I get where I can see you? I feel like I'm talking to myself.

MR. BERMAN: Do you -- do you not see me?

THE WITNESS: No. I don't --

MR. BEGAKIS: It's possible that it's because of the exhibit arrangement.

THE WITNESS: Yeah.

THE DIGITAL REPORTER: Oh, do you see the exhibit, Mr. Martinez?

THE WITNESS: Yeah. Please. I can see your faces.

THE DIGITAL REPORTER: So what are you seeing right now?

THE WITNESS: Just myself.

THE DIGITAL REPORTER: Oh. You don't see the exhibit or anything?

THE WITNESS: I see the exhibit on the left side, but I see myself on most of the screen.

THE DIGITAL REPORTER: Okay. Try to --

on the bottom of your screen, there's an exhibits tab. I think you might have it open, so click on that and it should go away --

THE WITNESS: Okay. There we go. Okay. Thank you. Okay.

THE DIGITAL REPORTER: You're welcome.

THE WITNESS: Sorry. Can you ask the question again?

MR. BERMAN: Could you please read back the question, Ms. Reporter?

THE DIGITAL REPORTER: Yes. Let me pull it up. One second.

(Pause.)

THE DIGITAL REPORTER: Sorry. One moment I'm just finding it.

(Pause.)

THE DIGITAL REPORTER: I'm so sorry one moment.

(Playback as requested.)

THE WITNESS: It's hard to understand the question. It'd be best if you re-ask it, Counsel.

BY MR. BERMAN:

Q Okay. Hyphy's claiming to be a co-author on four of the albums by the band that we discussed, correct?

A Yes.

Q That would be Corridos De Poca M, Des de la Cantina de Mi Barrio, El Campesino, and Nuestra Historia, correct?

A Correct.

Q In your own words, what is the basis for Hyphy's claim to co-ownership of those albums?

MR. BEGAKIS: Objection to the extent it seeks legal conclusion. Vague as to basis. Objection to the extent it seeks expert testimony and to the extent it requires the witness to disclose attorney-client privilege communications.

MR. BERMAN: Over those objections, you can answer.

THE WITNESS: Let's talk about the live recordings. On that particular aspect, Jesus Ramirez, the sound engineer, assigned as an independent contractor all rights and the production thereof that live recording. As a matter of fact, after speaking to Mr. Omar Rosales, he made the statement that someone from Yellowcake attempted to harass him into signing a false affidavit giving him credit for that recording.

Mr. Rosales never touched that recording. That recording was done on site, and it was done at Aldo's Nightclub under the direction of Jesus Ramirez.

Further, then his input, after the raw files were delivered to the studio for mixing, we found out that most of the drunk band members did not perform well because there was obviously a live recording and a very festive atmosphere in which Hyphy Music had proposed the celebration of their anniversary -- from the very beginnings of their, I guess, music history, which started in Fresno, California at that precise nightclub.

So we arranged for cameras, we arranged for specific songs, we arranged for an MC, we arranged for a specific dialogue to be stated at a specific time. There was essentially a script of the production. It was a short film, in essence. The characters that were invited -- and I say characters were -- because some of those characters are sung about and some of these corridos. So some of these are these superheroes that are made out by these corridos that Originales de San Juan had performed throughout the years.

And when we took the files, we realized that everybody had too much fun and none of the recordings were actually clean enough to release out to the public. So we had Javier Lisandro redo the whole baseline, because at that time it was performed by a deceased musician now, who was definitely not on his game.



Q Okay. So the answer is there are no documents, correct?

MR. BEGAKIS: Objection. Misstates the witnesses prior testimony.

MR. BERMAN: Over your client -- your counsel's objection, you could answer.

THE WITNESS: Misleading question. I can't answer.

MR. BERMAN: Okay. Move the strike as nonresponsive.

BY MR. BERMAN:

Q Does Hyphy have any documents in its possession. To reflect any understanding between the band members and Hyphy Music that Hyphy Music would be a co-author of the two live albums?

MR. BEGAKIS: Objection. Vague.

MR. BERMAN: Over your counsel's objection, you can answer.

THE WITNESS: The receipt of purchases -- the checks received by Mr. Chavez on behalf of the band members; those are the documents I can provide you with.

BY MR. BERMAN:

Q Okay. So other than the checks that you just referred to, to the best of your knowledge, Hyphy is not in possession of any other documents that reflects any

understanding between any of the band members and Hyphy Music that the band members and Hyphy Music would be co-authors of the live albums, correct?

MR. BEGAKIS: Objection. Vague, argumentative, counsel should lower his voice and calm down a little bit when he's asking these questions. And to the extent that it hasn't been asked and answered, the witness can answer.

MR. BERMAN: Over your counsel's misleading objection, you could answer.

THE WITNESS: The mutual understanding was not put in writing. I suspect you are asking me to fabricate an answer that is not true and correct.

BY MR. BERMAN:

Q So as we sit here today, Hyphy is not in possession of any documents that specifically refer to any understanding between the band and Hyphy Music that Hyphy would be a co-author of the live albums, correct?

MR. BEGAKIS: Objection. Asked like five times, and answered like five times, and argumentative.

MR. BERMAN: Over your counsel's objection, you could answer.

MR. BEGAKIS: To the extent that you've got a new answer to provide, Mr. Martinez.

THE WITNESS: I don't.

BY MR. BERMAN:

Q Okay. So now with regards to the remaining two albums --

A There should be three.

Q Well, I'm talking about now -- well, specifically regarding the remaining two albums for which Hyphy has claimed -- or registered a copyright registration and connection with, and that would be Corridos de Poca and El campesino, correct?

A Yes. Correct.

Q Okay. Now, is it your position that Hyphy is it co-author of Corridos de Poco M and El Campesino?

A Yes.

Q What is the basis for your belief?

MR. BEGAKIS: Objection. Vague as to basis. Calls for a legal conclusion. Calls for expert testimony.

MR. BERMAN: Over your counsel's objection, you can answer.

THE WITNESS: Corridos de Poca M was a mutual arrange production in which we allowed Chuy Chavez, Sr. to record roughly about seven corridos in which he got paid for roughly about $10,000 per each song. We objected to the recording of that. In exchange for that, he said, "You get to choose three

songs of your liking."

I said, "One of them needs to be a hit or somewhat of a radio pitch that we can promote." So we took it upon ourselves, specifically me, to work in conjunction with Domingo Torres to come up with something that would be commercial so that we can exploit the album to the best of our ability and not just have a bunch of junk personalized corridos that Mr. Chavez wanted to record. He provided a list of roughly 17 tracks that he wanted to record. We minimized that to 7. And if you listen to it or any expert can listen to them, they are just a piece of crap.

The rest of the album was essentially produced by us in conjunction with Domingo Torres and Omar Rosales. One key point that everyone needs to understand here is Mr. Chavez, Sr. only shows up to the recording when all the music production has already been done to lay down his vocals. He does not direct the ban. He does not direct any musical arrangements. That is all done by Domingo Torres. And in this instance, it was done by Domingo Torres in conjunction with Omar Rosales and myself.

BY MR. BERMAN:

Q Mr. Martinez, isn't it a record label's job to help choose and decide what songs are going to go on an



album?

MR. BEGAKIS: Objection. Calls for expert opinion, seeks and calls for testimony that -- calls for speculation.

MR. BERMAN: Over your counsel's objection, you can answer.

THE WITNESS: We do far more than just that, counselor.

MR. BERMAN: I'm sorry. Could you repeat your answer?

THE WITNESS: We do far more than just that.

BY MR. BERMAN:

Q Is it part of -- in your experience, Mr. Martinez, isn't it a record label's job to choose what songs go on an album?

MR. BEGAKIS: Objection. Calls for speculation. Calls for expert testimony, and you can answer.

Mr. Berman, you don't need to say, "Over counsel's objection," every single time. The witness knows to answer at this point. We've been going for two hours.

MR. BERMAN: As long as he understands, it's fine by me.

You can answer.

THE WITNESS: I would accept the fact that it is -- it is a minimum minimal responsibility or expectation of a record label to choose and decide which songs are going to be released and recorded. But it is not the minimal or expectation -- responsibility or expectation of a record company to be engaged in the actual production, which is again what we did. Because Mr. Chavez is not a musician, he is simply a lead vocal that goes in at the end of the finished product and lays out his vocals. So we can't get from point A to point B without Hyphy Music's involvement, Mr. Torres's involvement, and Mr. Omar Rosales' involvement.

And that is not the responsibility of a record label. In this case, we became engaged, which is why I answered we did far more than what you're asking.

BY MR. BERMAN:

Q Mr. Domingo Torres did not play any instruments on the recording of Corridos de Poca M or El Campesino, correct?

A He has always recorded every live -- every studio album. As a matter of fact, one of the fallouts we had with Jesus Chavez, Sr. was that in the absence of Domingo Torres, because he had open heart surgery, we would not be recording, and he wanted to continue to

record with a substitute, and I objected to that. Therefore, none of the albums ever were released under our term without Domingo Torres being present.

MR. BERMAN: Okay. Move to strike as non-responsive.

BY MR. BERMAN:

Q Again, isn't it true that Mr. Torres did not play or perform on the recording of either Corridos de Poca M or El Campesino?

MR. BEGAKIS: Objection. Vague. Objection. Vague as to perform and asked and answered, argumentative.

MR. BERMAN: You can answer.

THE WITNESS: I believe your statement to be false.

BY MR. BERMAN:

Q Okay. What's false about my statement?

A You're saying that he did not play, and I believe that to be false.

Q Okay. What exactly did Mr. Torres play on what album, and what did he play?

MR. BEGAKIS: Objection. Vague as to play.

THE WITNESS: He performed the accordion on all studio albums during our term.

BY MR. BERMAN:

Q Okay. Now, do you have any documents in your possession that would evidence any understanding between any of the band members and Hyphy Music that Hyphy Music would be a co-author of the albums Corridos de Poca M or El Campesino?

MR. BEGAKIS: Objection. Vague. Calls for legal conclusion.

MR. BERMAN: You could answer.

THE WITNESS: The true story that I recited over and over to you, in which there was a mutual understanding of the arrangement in which they were conceding their rights in exchange for a complete buyout was not put in writing.

BY MR. BERMAN:

Q Has Hyphy Music ever filed copyright registrations for sound recordings that it believes it's owned in the U.S. Copyright Office?

A Yes.

Q Approximately how many copyright registrations has Hyphy Music registered over the years?

A Registered on our behalf, roughly about 129; transferred or recorded as an assignment of rights from previous copyrights, roughly about 4400.

Q So when you talk about previously assigned --



you the honest truth.
Q Okay. And do you have any evidence in your possession to reflect that this conversation between Mr. Chavez and Mr. Hernandez occurred in April of 2019?
A He showed me a picture, which I'm assuming if you dig into it, you can probably still find it. He showed me a picture of them hanging out together in Mexico, and he said that's where the whole conversation occurred initially, and then they followed up with the conversation here in the United States.
Q So other than what Mr. Chavez allegedly told you, do you have any documents that reflect that there was a conversation with, essentially, this substance between Mr. Chavez and Mr. Hernandez in April 2009?
A I don't have any -- I don't have any --
MR. BEGAKIS: Objection. Objection. Objection. Vague and asked and answered.
MR. BERMAN: You can answer.
THE WITNESS: I would like to add that I don't have any documents for this conversation, but I do have witnesses to this conversation, and they were the individuals at the office that day. And I also have their hand testimony they had also heard about this particular conversation.
BY MR. BERMAN:

Q Okay. Now, I'm not asking about the conversation that you had with Mr. Chavez. I'm now asking you about the conversation allegedly between Mr. Chavez and Mr. Hernandez reference in paragraph 21 of the amended counterclaim, okay?
A Yes. There's -- there's third-party witnesses that have advised us that they were aware of that alleged conversation.
Q Okay. Who are those alleged witnesses? Who?
A Pedro Chavez, which is his brother of Jesus Chavez, and then Jorge Garcia, which is either a relative or someone that grew up as a relative with them.
Q Do you have the contact information for these two individuals?
A I want to say I provided that in our witness list. If not, I'm sure that our attorney can provide that to you.
MR. BERMAN: I'm going to leave a blank in the transcript and to the extent not already provided, I'm going to ask that be provided.
BY MR. BERMAN:
Q Now, these individuals told you that they were present at this April 2019 conversation between Mr. Chavez and Mr. Hernandez?

A What they told me was that they were aware of the conversation. Whether or not they were present, that I do not know. Pedro Chavez, for example, here in my office he said, like, "I talked to Chuy and he said, yeah, this is all David's bullshit." He induced him into basically taking additional money knowing that he had already sold these rights. That was the conversation stated by Pedro Chavez.
Jorge Garcia on the same situation here in my office stated the same thing, "Jesus Chavez, Sr. does not have an issue with you. This whole thing got out of hand. He was misled and misadvised by David Hernandez who told him that he would take care of any bullshit that would arise from this action," which is reselling rights, which by the way, Jesus Chavez, Sr. is not the only rights holder of the masters in question. He's just a mere contributor. He's only a vocalist, he doesn't execute any instruments. He doesn't do anything else other than just sing.
MR. BERMAN: That's quite a statement there.
Move to strike as nonresponsive.
MR. BEGAKIS: Move to strike.
MR. BERMAN: He just sings.
THE WITNESS: He stopped playing the bajo

sexto years ago because he can't play an instrument; he's a singer. He brings no contribution whatsoever to the musical production of things.
BY MR. BERMAN:
Q On paragraph 22 of the document in front of you, the first amended counterclaim, it states, "Counter-defendant Hernandez intentionally and willfully misled Counter-defendant Chavez when he wrongfully and mistakenly told him that Counterclaimant had no rights to the Los Originales albums and was free to sell the subject works to Hernandez's companies, Yellowcake and Colonize, and offered Chavez a significant sum of money to purportedly purchased the rights in the Los Originales albums. Counter-defendant further induced counter-defendant Chavez to ignore his contractual obligations to Counterclaimant by promising to indemnify Chavez in the event Counterclaimant sought legal redress from Chavez. Counter-defendant Hernandez engaged in this conduct, both individually and in his capacity as a principal of Counter-defendants Yellowcake and Colonize, in an effort to disrupt the contractual relations between Counterclaimant and Counter-defendant Chavez."
See where it says that?
A Yes, sir.
Q Now, how do you know that David Hernandez

A Yes.
Q And would you say that you have some knowledge of the sound recording process?
A Yes.
Q Okay. So then would you agree with me, sir, based on your prior experience, that a digital sound recording could basically be copied an infinite amount of times without suffering any degradation and sound quality?
MR. BEGAKIS: Same objections.
THE WITNESS: I believe that the most important piece of the sound recording is the actual master, which holds all the stamps, all the individual tracks. From there, you can -- you can modify that, and, yes, create endless numbers of copies off of the mother master.
BY MR. BERMAN:
Q Do you have any documents or any -- withdrawn.
Do you have any documents in writing that would memorialize any agreement or understanding between Hyphy and the band that Hyphy would own any master recordings as you just described them of the albums?
MR. BEGAKIS: Objection. Objection. Asked and answered.
MR. BERMAN: Definitely not. But you

could answer.
THE WITNESS: I have a general and precise understanding of everyone involved as a contributor, that that was the situation. It was not written, however, the agreement still exists. That was everyone's mutual understanding that Hyphy was to be the owner under a buyout clause, which the band demanded a certain amount of money in exchange for their rights.
And we have the check stubs to support it. Every single dollar was issued to the band in exchange for the rights.
BY MR. BERMAN:
Q Did you ever send any sort of correspondence to Yellowcake demanding the return of any alleged master recordings of the album?
A No. But we'd like them back.
Q Well, you don't own them, so you're not entitled to them.
MR. BEGAKIS: Objection. Argumentative, badgering the witness. Stick with your BS move to strike statements that mean absolutely nothing, Counsel.
BY MR. BERMAN:
Q Who created the artwork for the four albums that were -- or for the albums that were -- withdrawn.
A Marcelino Mendoza.

Q Sorry. I'll come back. I'm going to show you a document that was previously marked as Plaintiff's Exhibit A.
A Yes.
Q Sorry. Here. And ask you to take a look at interrogatory Number 16 and your response. Let me know when you're finished.
A My response, correct?
Q You done looking at it? You've read interrogatory Number 16 and your response?
A Yes. I'm done.
Q Okay. So is it accurate to say that in your response you identify a Marcelino Mendoza as an independent contractor who created the cover art for the five albums?
A Correct.
Q Okay. And then he was an employee from 2017 to 2018?
A Yeah. He was an employee. He was also a contractor. I want to say it's stated there. Yeah. It is.
Q When was he -- when was Mr. Mendoza last employed by Hyphy?
A Towards the end of, I want to say, 2019.
Q And what were the circumstances of the

termination of his employment?
A He was asked to -- I don't know the best way to phrase it, but he was asked to deliver an artist we were selling to Dell Records, another record label. And during the transfer of ownership of the artist's rights, he had a conversation with the record label CEO in which the record label assumed that he was the owner of Hyphy Music and offered him employment on the condition that he would bring all Hyphy Music assets over to Dell.
Obviously, that didn't pan out for either side, so that was the end of his employment here.
Q Okay. And did you pay Mr. Mendoza a salary or hourly when he was an employee?
A Both. He had hourly rates during the time he was an employee, and he had a contractor fee during the time he was an independent contractor.
Q What was his hourly wage when he was an employee?
A I want to say somewhere between 21 and 24 hours -- $24.00 an hour, and I'm estimating.
Q What was Mr. Mendoza ever issued a W2 by Hyphy?
A That would be something Christopher can answer.
MR. BERMAN: To the extent that there

marked as Defendant's (sic) Exhibit D, and I'm just going to identify for the record that this is Defendant's document production; it's been Bates stamped -- at least the first -- page Hyphy000001 and sequentially thereafter. And I'm asking you to look at the first page.

THE WITNESS: I see it.

BY MR. BERMAN:

Q And have you seen this document before?
A Yes.
Q And what do you understand it to be?
A Registration of our cover art.
Q And that would be for the album most Los Originales de San Juan, En Vivo Desde La Cantina, correct?
A That is correct.
Q And I'm asking you to look at the top left where it says date, and it says May 1, 2020.
A Yes.
Q You see that?
A Yes.
Q And is -- do you believe that to be the registration date?
A Correct.
Q Okay. And then I'm going to ask you to look

at the next page Bates stamped Hyphy2. And it says Los Originales de San Juan, El Campesino album cover; you see that?
A Yes.
Q And have you seen this document before?
A Yes.
Q And what do you understand it to be?
A Registration of our cover art for El Campesino.
Q And this cover art was registered on May 4, 2020, correct?
A Correct.
Q And moving to the next page marked Hyphy3. It says Los Originales de San Juan, Corridos de Poca M album cover. Have you seen this document before?
A Yes.
Q And what do you understand it to be?
A Registration over cover art for Corridos de Poca M.
Q And see where it says registration date at the top, it says May 3, 2020, correct?
A Correct.
Q And you believe that date to be accurate?
A Yes.
Q And moving to the next document, Hyphy4, says

Los Originales de San Juan, Amigos y Contrarios album cover. Do you see that?
A Yes.
Q And have you seen this document before?
A Correct.
Q And what do you understand it to be?
A Registration for Los Amigos y Contrarios cover art.
Q You see the top where it says registration date?
A Yes.
Q It says May 4, 2020.
A Yes.
Q Do you believe that date to be accurate?
A Yes.
Q I'm moving to the next page marked Hyphy5. It says Chuy Chavez, Naci Con Suerte de Rey album cover.
A Correct.
Q See that?
A Yes.
Q And have you seen this document before?
A Yes.
Q And what do you understand it to be?
A Registration for the cover art for Naci Con Suerte de Rey.

Q And you see where it says registration date May 4, 2020?
A Correct.
Q Do you believe that date to be accurate?
A Yes.
Q Moving on to Defendants -- I'm sorry -- the document marked as Hyphy6 and 7 -- actually 6, 7, and 8.
A Yes.
Q Have you seen this document before?
A It looks like something I've seen. Yes.
Q And what do you understand it to be?
A Let me glance at it. It looks like we are omitting to the fact that we own the logo on Los Originales artwork.
Q Sorry. At the bottom it says, "Material excluded from this claim: Hyphy Music does not own the "Los Originales de San Juan" logo," correct?
A Correct.
Q To the best of your knowledge, who owns that logo?
A The band.
Q Does Hyphy have any written authorization or license from the band to use or continue to use the Los Originales de San Juan logo in connection with the sale of any of the albums?



Q You testified that during prior litigation regarding the Chuy Chavez y Sus Amigos album.

A No. Chuy Chavez, Jr. --

MR. BEGAKIS: Objection. Objection. Objection (indiscernible - simultaneous speech) --

MR. BERMAN: Mr. Begakis, stop testifying for your client --

MR. BEGAKIS: Mr. Martinez, let me get my objection --

MR. BERMAN: Stop testifying for your client --

MR. BEGAKIS: Mr. Martinez -- Mr. Martinez --

MR. BERMAN: Stop interfering with my deposition (indiscernible - simultaneous speech) --

MR. BEGAKIS: Let me get my objections. He keeps -- he keeps asking unrelated questions, so let me get my objection on the record, Mr. Martinez, please.

Before you answer, just give it a minute, let me -- let me assert my proper objections to this -- these nonsensical unrelated questions, and then I'll either instruct you to answer if it's within the scope of this deposition, or not answer because it's not within the scope of this deposition.

So now, Mr. Berman, ask your question

again.

BY MR. BERMAN:

Q Mr. Martinez, isn't it true that the Chuy Chavez y Sus Amigos album was not part of this settlement agreement marked as Exhibit E?

MR. BEGAKIS: You could answer that.

THE WITNESS: Nobody ever alleged that, and you just said that I testified to such thing, and I did not.

BY MR. BERMAN:

Q Did you not testify that that album, Chuy Chavez y Sus Amigos was subject to a prior litigation?

Q No. I -- no --

MR. BEGAKIS: Objection. Objection. Objection. Misstates the witnesses prior testimony --

MR. BERMAN: State your objection, and then let your client answer.

MR. BERMAN: Now you could answer --

MR. BEGAKIS: Objection. Misstates the witnesses prior testimony. You can answer, Mr. Martinez.

THE WITNESS: My testimony was that this particular litigation that we are reviewing right now encompassed Chuy Chavez, Jr., nothing to do with Chuy Chavez y Sus Amigos. They are totally different works.

Chuy Chavez, Jr. filed this motion on behalf -- or Yellowcake filed this motion on behalf of Chuy Chavez, Jr. alleging that we didn't have any rights when we provided every piece of evidence showing that we have purchased these rights from Chuy, Jr. In the absence of a written agreement, it transfer into a verbal license in which Yellowcake and Chuy Chavez, Jr. were still in debt because we have not recouped.

That is what I testified. Nothing to do with Chuy Chavez y Sus Amigos. Chuy Chavez y Sus Amigos was an album that was issued by Chuy Chavez, Jr., under which he never filed a complaint, under which he never had any issue with us exploiting that content because, frankly, it was a piece of crap work because it was a bunch of little kids singing songs trying to impress Chuy Chavez, Sr., that's why it's Chuy Chavez y Sus Amigos and his friends.

So you're misinterpreting my statement, counselor. What I said was Chuy Chavez, Jr. entered into a settlement under which he could not explain or justify how he did not give us permission -- how -- how in the hell we ever infringed on his rights. This is what the settlement is all about. Nothing to do with this other album you're discussing.

MR. BERMAN: I don't understand your

answer, but that's fine. I'll move on.

BY MR. BERMAN:

Q Mr. Martinez --

MR. BEGAKIS: Unbelievable.

BY MR. BERMAN:

Q So just to be clear, so it's your position that Mr. Chavez, Sr. had no right to transfer ownership of the album Chuy Chavez y Sus Amigos because it's your position that Hyphy Music had not recouped alleged advances and expenses related to that album? Is that what you're trying to say?

A That's what I'm asserting, and that is the truth.

Q Okay. Now, do you have -- what -- okay. What -- again, what's your basis for that -- for your belief that that's true?

MR. BEGAKIS: Objection. Vague, calls for legal conclusion, calls for an expert opinion.

MR. BERMAN: I asked the basis of his belief --

MR. BEGAKIS: Yeah. And to the extent --

MR. BERMAN: That doesn't require an expert --

MR. BEGAKIS: -- that you can answer a vague question that's clearly trying to extract a legal

