# EXHIBIT "I"

```
                                                Page 50
 1   BY MR. BEGAKIS:
 2       Q   Mr. Hernandez, you do know that you are under
 3   oath, correct?
 4       A   Absolutely.
 5           MR. BERMAN:  Objection.  Argumentative.  Asked
 6   and answered.
 7   BY MR. BEGAKIS:
 8       Q   When did you start Colonize Media?
 9       A   I believe around 2016.
10       Q   I've actually got one more question about
11   La Sema and Yellowcake.
12           You never told Jose Hernandez (sic) that you
13   thought the artists that Yellowcake -- or that Hyphy
14   represented were dumb and wouldn't understand the
15   royalty numbers?
16           MR. BERMAN:  Objection.  Irrelevant.  Lacks
17   foundation.  Assumes a fact not in evidence.
18   Mischaracterization.  Vague.  Misleading.
19           And you can answer.
20           THE WITNESS:  Jose Hernandez?
21           Hold on.  I'm confused.  So I would tell myself
22   that?
23   BY MR. BEGAKIS:
24       Q   I apologize.
25           You never told Jose Martinez that artists
```

```
                                                Page 51
 1   represented by Hyphy Music were dumb and wouldn't
 2   understand the royalty numbers?
 3           MR. BERMAN:  Objection.
 4           Please note my prior objections, Ms. Reporter.
 5   Same objection.
 6           THE WITNESS:  That is absolutely not true.  I
 7   would never stoop myself to the level of Mr. Martinez.
 8   BY MR. BEGAKIS:
 9       Q   When you started Colonize Media, did you have
10   any partners?
11       A   Mr. Berger.
12       Q   Okay.  So when you formed the company from the
13   beginning, Mr. Berger was your partner?
14       A   I think so.
15       Q   How did that -- what did -- what kind of
16   conversation did you have with Mr. Berger about starting
17   a company with him?
18           MR. BERMAN:  Objection.  Vague.  And also
19   assumes a fact not in evidence and lack of foundation.
20           THE WITNESS:  I can't recall exactly details.
21   But at the time, Mr. Berger and I had created a really
22   good rapport and he helped a lot.  I -- so it just came
23   natural, I guess.
24           He -- he was helping me way too much, and I
25   needed more help.  So he was a natural person and -- to
```

```
                                                Page 52
 1   be my partner.  And he -- I'm glad that he also has been
 2   helping me, and I'm glad I picked him as a partner.
 3   BY MR. BEGAKIS:
 4       Q   Where did the name Colonize Media come from?
 5           MR. BERMAN:  Objection.  Irrelevant.
 6           You can answer.
 7           THE WITNESS:  So I was trying to trademark
 8   DH1 Media.  And we hired a law firm out of San Francisco
 9   to help us create the trademark.
10           However, when we did the global due diligence
11   for the trademark, it turned out that there was another
12   company with a similar name and similar classifications
13   as the trademark that we wanted to create.  So I got the
14   bad news that we had to change the name from DH1 Media
15   to any other name.
16           So after tons of research, days of looking for
17   thousands of names, just looking and looking -- at the
18   time, Mr. Berger, again, he was involved and we're
19   friends, and we just looked for thousands of names.
20   Nothing was available.
21           And then one day, I was watching a -- I believe
22   it was either a YouTube video or documentary about Elon
23   Musk.  And I believe this is when Falcon 9, I think, was
24   being created or was already created.  And he was
25   talking about colonizing Mars and colonizing space.  And
```

```
                                                Page 53
 1   I thought, wow, Colonize Media, colonizing your digital
 2   space, Colonize, you know.
 3           So I thought that could be a good name, but,
 4   for sure, it must be taken.  But I went to GoDaddy.  I
 5   checked if Colonize Media.com was taken, and it wasn't.
 6           I purchased it right away.  I messaged Mr. -- I
 7   think I messaged or called Mr. Berger, told him about
 8   the name, and we pushed it on to our legal counsel, and
 9   they did the research.
10           It turns out that nobody had the name and we
11   could trade-market it with it just so.  And that's how
12   it became Colonize Media.
13       Q   Did you have any investors when you started
14   Colonize Media?
15       A   No.
16       Q   What was your initial cap -- initial capital
17   contribution to the company?
18           MR. BERMAN:  Objection.  Lacks of foundation.
19   Assumes a fact not in evidence.  Irrelevant.
20           THE WITNESS:  I can't recall.  I don't
21   remember.
22   BY MR. BEGAKIS:
23       Q   You don't remember how much money you put into
24   the company bank account?
25       A   No, I don't.
```

```
                                                Page 74
 1        MR. BERMAN:  Objection.  Assumes a fact not in
 2   evidence.  Misleading.  Vague.
 3        THE WITNESS:  Not that I recall.
 4   BY MR. BEGAKIS:
 5        Q    Who is Isaias Gonzalez; and Isaias is spelled
 6   I-s-a-i-a-s?
 7        A    The only Isaias Gonzalez I know of, it's a
 8   gentleman who owns a record label.  I think it's called
 9   Discos Arpeggio.
10        Q    Did you do any business with Discos Arpeggio?
11        A    No.
12        Q    Did you do any business with Mr. Gonzalez
13   individually?
14        A    No.
15        Q    Do you owe Mr. Gonzalez any money?
16        A    No.
17        MR. BERMAN:  Objection.  Irrelevant.  Asked and
18   answered.  Misleading.  Mischaracterization.  Assumes a
19   fact not in evidence.  Lack of foundation.
20   BY MR. BEGAKIS:
21        Q    Has Mr. Gonzalez made any complaint, formal or
22   informal, that you owe him money?
23        MR. BERMAN:  Objection.  Vague.  Irrelevant.
24   Lack of foundation.  Assumes a fact not in evidence.
25   Mischaracterization.  Misleading.  Asked and answered.

                                                Page 75
 1   Argumentative.
 2        You can answer.
 3        THE WITNESS:  Not that I know.
 4   BY MR. BEGAKIS:
 5        Q    Are you aware that all these individuals I just
 6   listed are prepared to testify under oath that you owe
 7   them money?
 8        MR. BERMAN:  Objection.  Argumentative.  Lack
 9   of foundation.  Assumes a fact not in evidence.
10   Mischaracterization.  Misleading.  Speculative.
11   Argumentative.  Asked and answered.  Compound question.
12        You can answer.
13        THE WITNESS:  I absolutely do not know that,
14   and I don't believe that they would.
15   BY MR. BEGAKIS:
16        Q    Okay.  Well, we'll see about that.
17        MR. BERMAN:  Objection.  Argumentative.
18        I'm going to ask you, Mr. Begakis, to stop
19   making comments to my client.  You're clearly trying to
20   intimidate him on the record, and it's inappropriate.
21   BY MR. BEGAKIS:
22        Q    Do you consider Mr. Berger a friend?
23        A    Absolutely.
24        Q    Is he a good business partner?
25        A    He's a great --

                                                Page 76
 1        MR. BERMAN:  Objection to form.
 2        But you can answer.
 3        THE WITNESS:  He's a very good business
 4   partner.
 5   BY MR. BEGAKIS:
 6        Q    How often would you say you and Mr. Berger talk
 7   about Yellowcake business?
 8        MR. BERMAN:  Objection to form.  Relevancy.
 9        But you can answer.
10        THE WITNESS:  Whenever it's relevant, not --
11   BY MR. BEGAKIS:
12        Q    Say, once a week, twice a week, five times a
13   week?
14        A    Depending on what we're doing at the time.  I
15   wouldn't be able to tell you.
16        Q    How often do you talk about Colonize business
17   with him?
18        A    Every now and then, whenever it's relevant.
19        Q    What's Yellowcake's contractual relationship
20   with Colonize?
21        A    We have a distribution agreement.
22        Q    Okay.  What are the terms of that distribution
23   agreement, generally?
24        MR. BERMAN:  Objection.  Note my objection.
25   Vague and lacks foundation and irrelevant.

                                                Page 77
 1        THE WITNESS:  There's a term, I know that.  And
 2   we do distribution and monetization.  We distribute to
 3   all platforms on behalf of Yellowcake.
 4   BY MR. BEGAKIS:
 5        Q    Okay.  For purposes of this deposition, would
 6   you understand if I refer to this as an
 7   administration -- administrator agreement?
 8        A    Yes.
 9        Q    Or an admin agreement?
10        A    An admin agreement, yeah, I think you could
11   call it that.
12        Q    Is that an accurate description of what it is,
13   essentially an admin agreement?
14        MR. BERMAN:  Objection to form.  Vague.
15        THE WITNESS:  Did you say adamant or admin?
16   BY MR. BEGAKIS:
17        Q    Admin.
18        A    I believe so, yes.
19        Q    ==So Colonize is basically the admin company for==
20   ==Yellowcake, right?==
21        A    ==The distributor, yes.==
22        Q    Okay.  What type of royalty does Colonize
23   receive to distribute Yellowcake's music?
24        MR. BERMAN:  Objection.  Relevancy.  Lacks
25   foundation.  Assumes a fact not in evidence.
```

Page 78

1  Irrelevant.  Misleading and a compound question.
2         But you can answer.
3         THE WITNESS:  I think it's a zero.  Like, you
4  mean, like, how much money Colonize makes from
5  Yellowcake?
6  BY MR. BEGAKIS:
7     Q    How much money does Colonize receive to
8  distribute -- when Colonize distributes music and
9  receives funds from the distribution of that music, what
10 percentage does Colonize take?
11        MR. BERMAN:  Objection.  Vague.  Lack of
12 foundation.  Assumes a fact not in evidence.
13 Misleading.  Asked and answered.
14        But you can answer.
15        THE WITNESS:  Zero, I think.
16 BY MR. BEGAKIS:
17    Q    Does Colonize Media receive any funds at all
18 under that agreement?
19    A    Under that agreement?
20        MR. BERMAN:  Objection to form.  Vague.  Asked
21 and answered.
22        But you can answer.
23        THE WITNESS:  Under that agreement?
24        I think, no.
25 ///

Page 79

1  BY MR. BEGAKIS:
2     Q    Does it receive funds under any other agreement
3  from Yellowcake?
4         MR. BERMAN:  Objection.  Relevancy.
5         THE WITNESS:  No, I don't think so.
6  BY MR. BEGAKIS:
7     Q    Does Colonize receive any funds at all
8  whatsoever from Yellowcake?
9         MR. BERMAN:  Objection.  Asked and answered.
10 Relevancy.
11        THE WITNESS:  I don't think so, no.
12 BY MR. BEGAKIS:
13    Q    So you -- so Colonize distributes Yellowcake's
14 music for free?
15        MR. BERMAN:  Objection.  Asked and answered.
16 Argumentative and -- sorry -- irrelevant.
17        THE WITNESS:  As I mentioned before, yeah, zero
18 percent.
19 BY MR. BEGAKIS:
20    Q    Okay.  Does it receive anything of value, money
21 or otherwise, to distribute Yellowcake's music?
22        MR. BERMAN:  Objection.  Vague.  Compound
23 question.  Irrelevant.  Asked and answered.
24        But you can answer.
25        THE WITNESS:  Can you define what would be

Page 80

1  considered, "anything of value"?
2  BY MR. BEGAKIS:
3     Q    Anything of value, like, say, a gardener, or
4  office rent, or paper in the copier, anything of value?
5         MR. BERMAN:  Relevant -- relevancy.  Vague.
6  Asked and answered.
7         You can answer.
8         THE WITNESS:  Yeah, I think so.
9  BY MR. BEGAKIS:
10    Q    What does it receive?
11        MR. BERMAN:  Objection.  Relevancy.
12        THE WITNESS:  I don't think we receive anything
13 of value.  I think we get some stuff of value, like,
14 Yellowcake bears, like, HR and certain other things.
15 BY MR. BEGAKIS:
16    Q    What other things?
17    A    I think, like, gardener, building; I think
18 those are some of the things.  I'm not absolutely sure.
19 I'm not -- I don't pay those bills.  I don't take care
20 of that.
21    Q    So Mr. Berger lets you use his office that he
22 owns, in exchange for distributing his music for free?
23        MR. BERMAN:  Objection.  Relevancy.  Lack of
24 foundation.  Assumes a fact not in evidence.
25 Mischaracterization.  Misleading.  Asked and answered.

Page 81

1         THE WITNESS:  That is not what I said, and I'm
2  not sure how to even answer that.
3         I don't understand the question.
4  BY MR. BEGAKIS:
5     Q    Do you think it's a good deal for Colonize to
6  distribute Yellowcake music for free and not receive
7  anything else of value, other than an HR person and
8  gardener?
9         MR. BERMAN:  Objection.  Argumentative.
10 Irrelevant.  Asked and answered.
11        THE WITNESS:  Is that a question, or you're
12 making comments?
13 BY MR. BEGAKIS:
14    Q    No, it's a question.
15        Do you think it's a good deal?
16        MR. BERMAN:  Objection.  Argumentative.  Vague.
17 Asked and answered.
18        THE WITNESS:  Yeah, it is a great deal.
19 BY MR. BEGAKIS:
20    Q    Why?
21        MR. BERMAN:  Objection.  Irrelevant.
22 Argumentative.  Asked and answered.
23        THE WITNESS:  I think it is a great deal.
24 BY MR. BEGAKIS:
25    Q    Why?

```
                                        Page 106
 1  remember exactly how I got these particular assets.
 2  BY MR. BEGAKIS:
 3      Q    What type of metadata does the software you use
 4  track?
 5      A    Um...
 6           MR. BERMAN:  Objection.  Well, lack of
 7  foundation.  Assumes a fact not in evidence.
 8           You can answer.
 9           THE WITNESS:  Whatever we input into the
10  software.  So if we input the name -- the album name,
11  artist name, ISRC, UPC, so it tracks analytics, once
12  they come back from the DSP.
13  BY MR. BEGAKIS:
14      Q    Okay.  Does the software track information,
15  like, who logs on to the software every day?
16      A    Um, at an account level, yes.
17      Q    Okay.  So if I wanted to look at the software's
18  metadata and see who logged onto it on the day that the
19  music at issue in this case was uploaded, I would be
20  able to find that out?
21      A    I'm not sure in this particular -- I'm not
22  sure, because the software -- I think we were still in
23  beta.
24           So I think who logged in and who logged out was
25  added later on.  I wouldn't be able to tell you.  I
```

```
                                        Page 107
 1  would have to circle back on that.
 2      Q    Okay.  We'll leave a space open in the
 3  deposition for you to provide that information.
 4  Requested Information:
 5  _____
 6  _____
 7  _____
 8  _____.
 9  BY MR. BEGAKIS:
10      Q    Under the version of the software now -- I'm
11  not talking about the beta version, but under the
12  version of the software now -- would it track a sound
13  recording asset that's been uploaded to the software but
14  is still pending before it's been distributed to the
15  DSPs?
16           MR. BERMAN:  Objection to the form.  Vague.
17           You can answer, if you understand.
18           THE WITNESS:  The version, as it stands today,
19  on August 17, 2022, I believe, yes, as it stands today,
20  going forward.
21  BY MR. BEGAKIS:
22      Q    When did that version come into existence and
23  begin to be used by Colonize?
24      A    I don't have the exact date.
25      Q    Who were the individuals in your office who
```

```
                                        Page 108
 1  developed the software?
 2      A    So between Matt Davis in the office -- yeah,
 3  Matt Davis, Jeremy Paulson.  I did some work on it as
 4  well.
 5      Q    But who did the coding?  Who wrote the coding?
 6           MR. BERMAN:  Objection to form.  Vague.
 7           THE WITNESS:  It was either between Josh and
 8  Matt, I believe.
 9  BY MR. BEGAKIS:
10      Q    Okay.  What other sort of user behavior does
11  the software now track?
12      A    Well, just those basics we mentioned, like,
13  log-in; who logged in, who logged out.  Yeah, uploads.
14      Q    When files have been uploaded, when they've
15  been distributed?
16      A    That, we can track IP address, et cetera.
17      Q    Okay.  Is there a name for the software?
18      A    No, no, there isn't.
19      Q    Has it been licensed to anybody else?
20      A    No.
21      Q    Has it been sold to anybody else?
22      A    No, not that I remember, at least.
23      Q    Okay.  Who paid for the software to be
24  developed?
25      A    Colonize did.
```

```
                                        Page 109
 1      Q    How many employees does Colonize Media have?
 2      A    I don't know.  I think around -- could be
 3  around 15, I believe, at this point, at this moment.
 4  I'm not sure.
 5      Q    When you testified earlier that Yellowcake
 6  handles HR, that's what they handle, the employment of
 7  these individuals who work for Colonize?
 8      A    Yes.
 9           MR. BERMAN:  Objection to form.
10           THE WITNESS:  I believe so.
11  BY MR. BEGAKIS:
12      Q    Okay.  What type of due diligence do you do
13  generally, before you upload an asset and distribute it?
14           MR. BERMAN:  Objection to form.  Lacks of
15  foundation.  Assumes a fact not in evidence.
16  Mischaracterization.  Misleading.  Vague.  Speculative
17  and argumentative.
18           THE WITNESS:  Um, can you please be more
19  specific as to either me, the individual, or Colonize,
20  or what -- who -- what due diligence?
21  BY MR. BEGAKIS:
22      Q    Well, okay, you're here in your capacity as the
23  person most knowledgeable for Colonize, so that's the
24  specificity there.  I'll be more specific with the due
25  diligence.
```

Page 114

1   So are you aware of what Mr. Berger testified
2   yesterday?
3       You were in the deposition yesterday. You
4   testified that you viewed that deposition. So I'm
5   asking you, are you aware that Mr. Berger testified
6   yesterday that he directed you to review copyright
7   records of works that Yellowcake owned?
8       MR. BERMAN: Objection. Vague, as the witness
9   testified he does not understand the question. It's a
10  compound question. Mischaracterizes prior testimony
11  from another deposition, to which this individual is not
12  the deponent. Lacks of foundation. Assumes a fact not
13  in evidence.
14  BY MR. BEGAKIS:
15  Q   And by the way -- and by the way,
16  Mr. Hernandez, we can bring you back for your individual
17  deposition, too. You can play this game with me, but
18  I'm just asking you a question, which you are free to
19  answer. And I'm going to stay on it until I get an
20  answer to it, as to what you were directed to do to
21  research copyright records. So I'm just asking a
22  question about what you viewed yesterday.
23      Are you aware that Mr. Berger directed --
24  testified yesterday that he would direct you to conduct
25  a search of copyright records for any Yellowcake works?

Page 115

1       MR. BERMAN: Once again, I'm going to ask you
2   not to make threatening statements directly to the
3   witness, my client. I'm going to ask you to stop.
4       And once again, your question has been asked
5   and answered. It's vague. It's a compound question.
6   It mischaracterizes prior testimony in another
7   deposition. It lacks foundation and assumes facts not
8   in evidence.
9   BY MR. BEGAKIS:
10  Q   You can answer, Mr. Hernandez.
11  A   I'll answer to the best of my ability, based on
12  this question. I feel like it's a mixed-up question.
13      In general, for Yellowcake, when there is some
14  sort of due diligence for any acquisitions having
15  nothing to do with Colonize Media, and depending on the
16  context and in the situation, we, myself, am asked to go
17  to the -- to do some research on the copyrights, yes.
18  Q   Okay. And I see where this is going, so I'm
19  going to break this down for you.
20      Are you an employee of Yellowcake?
21  A   No.
22  Q   Are you an employee of Colonize Media?
23  A   Yes.
24  Q   Are you an employee of any other companies that
25  Mr. Berger owns?

Page 116

1   A   No.
2   Q   So any work that you did to research artists on
3   behalf of Yellowcake would be rendered by you
4   individually?
5   A   No.
6   Q   Who would it be rendered by?
7   A   I don't -- I don't understand your question.
8   Q   Would you be rendering -- if Yellowcake asked
9   you to do research on an artist, would you be rendering
10  those services as an employee, in your capacity as an
11  employee for Colonize?
12      MR. BERMAN: Objection. Vague. Compound
13  question. Lacks foundation. Assumes a fact not in
14  evidence.
15      But you can answer, if you understand.
16      THE WITNESS: I believe -- I think so.
17  BY MR. BEGAKIS:
18  Q   Okay. Great.
19      So then everything that I ask today, with
20  respect to anything that you have done to research
21  artists on behalf of Yellowcake, was done as an employee
22  of Colonize.
23      And so you are here today as a PMK for
24  Colonize, and you can answer those questions, correct?
25      MR. BERMAN: No, no. Objection. Okay.

Page 117

1   Mischaracterizes testimony. Argumentative. Lacks
2   foundation. Assumes a fact not in evidence.
3   Misleading. And asked and answered.
4       You can clarify your answer, Mr. Hernandez. Go
5   ahead.
6       THE WITNESS: You're definitely
7   mischaracterizing what I'm saying, because at the time
8   when this happened, I was a co-owner of Yellowcake. So
9   your question is confusing as to where I was, what
10  capacity I was, at the time.
11      At the time, I was a co-owner of Yellowcake.
12  So for this particular case, we're talking about this
13  sound recording. I did it under the capacity of a
14  co-owner of Yellowcake.
15  BY MR. BEGAKIS:
16  Q   Are you -- are you expecting that today you are
17  going to testify that you are not prepared to answer any
18  questions regarding anything that you did in your
19  capacity as a co-owner of Yellowcake? Is that the plan?
20      MR. BERMAN: Objection. Argumentative.
21      MR. BEGAKIS: Because I'll just stop now and
22  we'll re-notice this deposition for another day, if
23  that's the spin.
24      MR. BERMAN: You're testifying for him and
25  being argumentative and badgering him at this point.

Page 114

1  So are you aware of what Mr. Berger testified
2  yesterday?
3      You were in the deposition yesterday. You
4  testified that you viewed that deposition. So I'm
5  asking you, are you aware that Mr. Berger testified
6  yesterday that he directed you to review copyright
7  records of works that Yellowcake owned?
8      MR. BERMAN: Objection. Vague, as the witness
9  testified he does not understand the question. It's a
10 compound question. Mischaracterizes prior testimony
11 from another deposition, to which this individual is not
12 the deponent. Lacks of foundation. Assumes a fact not
13 in evidence.
14 BY MR. BEGAKIS:
15   Q   And by the way -- and by the way,
16 Mr. Hernandez, we can bring you back for your individual
17 deposition, too. You can play this game with me, but
18 I'm just asking you a question, which you are free to
19 answer. And I'm going to stay on it until I get an
20 answer to it, as to what you were directed to do to
21 research copyright records. So I'm just asking a
22 question about what you viewed yesterday.
23      Are you aware that Mr. Berger directed --
24 testified yesterday that he would direct you to conduct
25 a search of copyright records for any Yellowcake works?

Page 115

1      MR. BERMAN: Once again, I'm going to ask you
2  not to make threatening statements directly to the
3  witness, my client. I'm going to ask you to stop.
4      And once again, your question has been asked
5  and answered. It's vague. It's a compound question.
6  It mischaracterizes prior testimony in another
7  deposition. It lacks foundation and assumes facts not
8  in evidence.
9  BY MR. BEGAKIS:
10   Q   You can answer, Mr. Hernandez.
11   A   I'll answer to the best of my ability, based on
12 this question. I feel like it's a mixed-up question.
13      In general, for Yellowcake, when there is some
14 sort of due diligence for any acquisitions having
15 nothing to do with Colonize Media, and depending on the
16 context and in the situation, we, myself, am asked to go
17 to the -- to do some research on the copyrights, yes.
18   Q   Okay. And I see where this is going, so I'm
19 going to break this down for you.
20      Are you an employee of Yellowcake?
21   A   No.
22   Q   Are you an employee of Colonize Media?
23   A   Yes.
24   Q   Are you an employee of any other companies that
25 Mr. Berger owns?

Page 116

1   A   No.
2   Q   So any work that you did to research artists on
3  behalf of Yellowcake would be rendered by you
4  individually?
5   A   No.
6   Q   Who would it be rendered by?
7   A   I don't -- I don't understand your question.
8   Q   Would you be rendering -- if Yellowcake asked
9  you to do research on an artist, would you be rendering
10 those services as an employee, in your capacity as an
11 employee for Colonize?
12      MR. BERMAN: Objection. Vague. Compound
13 question. Lacks foundation. Assumes a fact not in
14 evidence.
15      But you can answer, if you understand.
16      THE WITNESS: I believe -- I think so.
17 BY MR. BEGAKIS:
18   Q   Okay. Great.
19      So then everything that I ask today, with
20 respect to anything that you have done to research
21 artists on behalf of Yellowcake, was done as an employee
22 of Colonize.
23      And so you are here today as a PMK for
24 Colonize, and you can answer those questions, correct?
25      MR. BERMAN: No, no. Objection. Okay.

Page 117

1  Mischaracterizes testimony. Argumentative. Lacks
2  foundation. Assumes a fact not in evidence.
3  Misleading. And asked and answered.
4      You can clarify your answer, Mr. Hernandez. Go
5  ahead.
6      THE WITNESS: You're definitely
7  mischaracterizing what I'm saying, because at the time
8  when this happened, I was a co-owner of Yellowcake. So
9  your question is confusing as to where I was, what
10 capacity I was, at the time.
11     At the time, I was a co-owner of Yellowcake.
12 So for this particular case, we're talking about this
13 sound recording. I did it under the capacity of a
14 co-owner of Yellowcake.
15 BY MR. BEGAKIS:
16   Q   Are you -- are you expecting that today you are
17 going to testify that you are not prepared to answer any
18 questions regarding anything that you did in your
19 capacity as a co-owner of Yellowcake? Is that the plan?
20      MR. BERMAN: Objection. Argumentative.
21      MR. BEGAKIS: Because I'll just stop now and
22 we'll re-notice this deposition for another day, if
23 that's the spin.
24      MR. BERMAN: You're testifying for him and
25 being argumentative and badgering him at this point.

Page 146

```
 1   Q   Okay.  And you said, we're going -- how about
 2   if we buy those rights from you?
 3       MR. BERMAN:  Objection.  Mischaracterizes the
 4   testimony.  Vague.
 5       But you can answer.
 6       THE WITNESS:  Not only just in conversation.
 7   As the relationship developed, and we were very
 8   satisfied with the work, you know, just in conversation,
 9   said, hey -- I might have said, hey, would you like to
10   sell your assets.
11       And they -- obviously, they were, like, yeah,
12   we would like to.
13       And we came to terms and we did it.
14   BY MR. BEGAKIS:
15   Q   What were the terms?
16   A   That we would buy the initial albums for X
17   amount of money.  I can't remember.
18   Q   If I said 400,000, would that refresh your
19   recollection?
20   A   No, not at all.
21       MR. BERMAN:  Objection.  Lacks foundation.
22   Assumes a fact not in evidence.  There's no document in
23   front of the witness.
24       THE WITNESS:  No, those initial albums were
25   definitely not purchased for that amount.
```

Page 147

```
 1   I can't recall, but it seems like a really high
 2   amount.
 3   BY MR. BEGAKIS:
 4   Q   More than a hundred thousand?
 5   A   Could have been.  I'm not a hundred percent
 6   sure.
 7   Q   More than 200,000?
 8   A   I'm not sure.
 9   Q   So possibly between a hundred thousand and
10   400,000?
11       MR. BERMAN:  Objection.  Asked and answered.
12   Lacks foundation.  Assuming a fact not in evidence.
13   Misleading.
14       THE WITNESS:  I'm honestly not sure.  I
15   don't -- I haven't seen the document in forever, but I
16   don't know.
17   BY MR. BEGAKIS:
18   Q   Okay.  So you purchased those initial albums.
19       When did you then have a conversation, in your
20   capacity as a co-owner of Yellowcake, about purchasing
21   the album at issue in this case?
22   A   So to my understanding Chavez, Sr., just like
23   Chavez, Jr., did, had an oral agreement with -- but in
24   this case, Mr. Chavez, Sr., had an oral agreement with
25   other parties in the distribution of his albums, with
```

Page 148

```
 1   the main intent of selling physical copies in WalMarts
 2   and swap meets.
 3   Q   That doesn't answer my question.  That's not
 4   the question I asked.
 5       I asked, when did you have a conversation,
 6   first have a conversation, with Chavez, Sr., about
 7   distributing the rights at issue in this case?
 8       MR. BERMAN:  Objection.
 9       Hold on.
10       Objection to form.
11       And can you please read back the question,
12   actually.
13       (The question was read as follows:)
14       "Q  I asked, when did you have a
15           conversation, first have a conversation,
16           with Chavez, Sr., about distributing the
17           rights at issue in this case?"
18       MR. BERMAN:  I'm just trying to clarify for the
19   record, when you say "distributing," are you asking in
20   context of Colonize or --
21       MR. BEGAKIS:  I'll withdraw the question.  I'll
22   withdraw the question.
23   BY MR. BEGAKIS:
24   Q   In your capacity as a co-owner of Yellowcake at
25   the time, when did you first discuss with Chavez, Sr.,
```

Page 149

```
 1   about purchasing the rights and the works at issue in
 2   this case?
 3   A   I don't remember the exact date.
 4   Q   Year?
 5   A   It could have been 2018.
 6   Q   Okay.  How many conversations with Chavez, Sr.,
 7   did you have about purchasing the rights to the works at
 8   issue in this case?
 9   A   I'm not sure how many conversations we had.
10   Q   An approximate?
11   A   I couldn't tell --
12       MR. BERMAN:  Asked and answered.  Calls for
13   speculation.
14       THE WITNESS:  I couldn't tell you, because we
15   were also friends.  So I -- I was -- we hung out a few
16   times.
17   BY MR. BEGAKIS:
18   Q   Okay.  Can you estimate?  Less than 10
19   conversations?
20   A   Possibly, possibly less than 10.
21       Specifically about acquiring the assets?
22   Q   Yeah, specifically about acquiring the assets
23   and potentially discussing the terms of that
24   arrangement, less than five conversations?
25   A   Probably be safer if it's less than 10, I
```

Page 210

1  past hour?
2     A    No.
3     Q    There's nobody in the room?
4     A    No.
5     Q    Are you capable of moving your camera so you
6  can confirm that for me?
7     A    Sure.
8          Want me to do a 360?
9     Q    Please.
10    A    Okay.  If my computer gets disconnected, I
11 apologize.
12         All right.  If I keep turning right, I might
13 disconnect something.
14         Is that fine?
15    Q    That's fine.
16    A    How about here, spin it the other way around.
17    Q    Has that been the case for the last hour that
18 we've been talking?
19    A    Yes.
20    Q    Okay.
21         MR. BERMAN:  I just want to clarify for the
22 record that Mr. Hernandez actually turned his computer
23 around, 360 around the room, and there's nobody in the
24 room with him.
25 ///

Page 211

1  BY MR. BEGAKIS:
2     Q    All right.  So when you received the stems from
3  Mr. Rosales and/or some other place, who uploaded them
4  into the software?
5     A    We don't upload stems.  We upload final .wav
6  files.
7     Q    Okay.  If Mr. Rosales sent you stems, how would
8  you get from stems to a final .wav file?
9     A    You wouldn't, unless it was in there.  I don't
10 recall if we got final .wav files from a thumb drive or
11 hard drive or from CDs, yeah.
12    Q    So you had -- so you would have had to have
13 received the final .wav file from somebody via a hard
14 drive, a thumb drive, or a CD, in order to upload these
15 works into your system, correct?
16    A    Yes.
17    Q    When that happened, assuming that it did, who
18 was the one who would have uploaded those final .wav
19 files into the software?
20    A    I think the final ones were me.  If I didn't
21 upload everything, it could have been somebody else
22 under my instruction in the office.  But I think I
23 uploaded those as .wav files.
24    Q    ==Did you have images for those albums at the==
25 ==time that you uploaded the .wav files?==

Page 212

1     A    ==At the time, there were images.  But if I==
2  ==recall, Mr. Berger didn't want anything to do with Hyphy==
3  ==Music's artwork or anything, because there was some==
4  ==recordings or some artworks with the Hyphy Music logo.==
5  ==And he specifically requested that we created brand-new==
6  ==artworks for those.==
7     Q    So did you upload the .wav files and the new
8  artwork at the same time?
9     A    I don't recall.  The .wav files might have been
10 sitting in our system for a while.  We could have
11 sent -- we could have done some -- a number of things.
12 But as I recall right now, they could have just been
13 sitting there.
14    Q    Do you know if the version of the software at
15 the time this happened would tell me how long the .wav
16 files were sitting in the system before you provided
17 artwork?
18    A    No.
19    Q    That's convenient.
20         MR. BERMAN:  Objection.  Improper statement to
21 the witness.
22 BY MR. BEGAKIS:
23    Q    All right.  So when you uploaded these .wav
24 files through your software, did you receive a strike
25 from any of the DSPs?

Page 213

1     A    No, we have not received any strikes in
2  connection -- in connection with any of these works.
3     Q    I apologize.  I'm probably using the wrong
4  term.
5          Did you receive any notification from the DSP
6  that these works were already in existence on their
7  platform?
8     A    I believe we got something from YouTube.
9     Q    And that would be what you would call a
10 conflict, right?
11    A    A conflict, yes.
12    Q    Okay.  So you received a conflict from YouTube?
13    A    Yes.
14    Q    Okay.  And that would have been because the
15 works were already on YouTube, correct?
16    A    Because there were probably duplicate sound
17 recordings on YouTube.
18    Q    Okay.  But it wasn't -- I'm trying to make sure
19 it wasn't the other way around.
20         It was, you guys uploaded these works and then
21 received a conflict because those works already were
22 online?
23    A    It's not that we received -- like, us
24 receiving.  They just popped.  Like, there's a
25 notification that there's conflicts.