# EXHIBIT "J"

Page 25

EASTERN DISTRICT OF CALIFORNIA

 1      Yeah. Just general information on how it's
 2   going to be.
 3      Q   Did these attorneys ask you questions and ask
 4   you what your response might be?
 5      A   No. They just ask -- well, they give us
 6   examples of questions that might be brought up.
 7      Q   Did they ask you your understanding of the
 8   litigation between Hyphy music and Yellowcake, Inc.?
 9      A   I don't remember if they asked me that
10   question.
11      Q   How did you first learn that you were to
12   appear for a deposition today?
13      A   Well, the -- from here. From the Hyphy
14   office. They told us that we're supposed to have this
15   deposition -- well, a month ago, but we've been working.
16   So you know, we finally got some time off to do it.
17      Q   Okay. And Mr. Martinez is the one who told
18   you about your deposition?
19      A   Yes.
20      Q   Okay. And where were you when you first
21   learned about the deposition?
22      A   Where was I? I don't remember. We've been
23   traveling a lot.
24      Q   Did you speak to Mr. Martinez over the phone
25   about your -- when you first learned about your

Page 26

EASTERN DISTRICT OF CALIFORNIA

 1   deposition?
 2      A   No. I believe we came into the office to talk
 3   about some other business or recordings that we want to
 4   do. And that's when they told us.
 5      Q   Okay. And Mr. Torres was with you at the time
 6   you first learned of your deposition from Mr. Martinez?
 7      A   Yes.
 8      Q   And that's Mr. Domingo Torres that you're
 9   referring to, correct?
10      A   Yes.
11      Q   And are you being paid anything by Mr.
12   Martinez for appearing at your deposition today?
13      A   No. Nope.
14      Q   Have you received anything of value from
15   either Mr. Martinez or Hyphy Music, Inc. in exchange for
16   your appearance at your deposition today?
17      A   No. Have you ever received any money from
18   Hyphy Music, Inc.?
19      A   No.
20      Q   All right. Have you ever received any money
21   from Mr. Martinez?
22      A   No.
23      Q   Have you ever received anything of value from
24   Hyphy Music, Inc.?
25      A   No.

Page 27

EASTERN DISTRICT OF CALIFORNIA

 1      Q   Have you ever received anything of value from
 2   Mr. Martinez?
 3      A   No.
 4      Q   Other than Mr. Martinez, did you discuss the
 5   deposition with Mr. Torres?
 6      A   Yeah. We talked about it, obviously.
 7      Q   And what did you discuss with Mr. Torres?
 8      A   What potential questions that might be brought
 9   up.
10      Q   And what are the some of the potential
11   questions you thought might be brought up?
12      A   Well, like, you know, if they ask you if
13   you're a employee or a business owner and obviously,
14   we're business partners.
15      Q   Who are business partners?
16      A   Me, Domingo, Jesus Chavez.
17      Q   Is there a written partnership agreement
18   between you, Mr. Dominguez, and Jesus Chavez?
19      A   Yeah. We had a verbal agreement and -- since
20   the beginning, since the get go, since the band started.
21   I mean -- and ever since we started filing taxes, that's
22   how we filed them, as a partnership.
23      Q   Okay. My question to you, sir, was have you
24   ever -- was there ever a written partnership agreement
25   between yourself, Mr. Torres and Mr. Chavez that you

Page 28

EASTERN DISTRICT OF CALIFORNIA

 1   just referred to?
 2      A   No.
 3      Q   So what's your Social Security number?
 4      A   XXX-XX-8018.
 5      Q   You testified just a moment ago that you
 6   believe you're a partner with Jesus Chavez, Sr. Is that
 7   correct?
 8      A   That I believe?
 9          MR. BEGAKIS: Objection -- objection to
10   the extent it misstates the witness's prior testimony.
11          MR. BERMAN: Over his objection, you can
12   answer.
13          THE WITNESS: Well, I don't believe that
14   we're partners. I know we are partners, because that's
15   how we always been working. That's how it's always
16   been. That's how we filed taxes. And taxes get signed
17   by each of us.
18   BY MR. BERMAN:
19      Q   Okay. How do you -- when did you first come
20   to meet Jesus Chavez, Sr.?
21      A   1992.
22      Q   And what were the circumstances surrounding
23   that first meeting?
24      A   Well, at first he asked -- they didn't have
25   a -- they needed a drummer. And he asked me if I could

Page 141

EASTERN DISTRICT OF CALIFORNIA

1  answered.
2          MR. LITTLEWOOD: That hasn't been asked,
3  John.
4          MR. BEGAKIS: The question was who
5  prepared his taxes? And he said Mr. Mendoza.
6          MR. LITTLEWOOD: Now he's asking
7  specifically about which years.
8          MR. BEGAKIS: Well it's presumed from
9  asking -- that he -- who his preparer -- that he's
10 asking about all the years --
11         MR. BERMAN: Over your objection, he can
12 answer. So what's the answer?
13         THE WITNESS: Yes.
14 BY MR. BERMAN:
15    Q   And is he -- are you intending for him to
16 prepare your 2021/2022 tax -- personal taxes?
17    A   Is he? Did he -- is he doing them? Yes. He
18 did them already.
19    Q   Okay. I'm going to call for the preservation
20 and production of your personal tax returns from the
21 years 2020 -- I'm sorry, to the present. And did you
22 ever receive any K1s?
23    A   I'm not a CPA, so I don't know what K1 means.
24    Q   All right. I'm going to call for the
25 preservation and production of any schedules related to

Page 142

EASTERN DISTRICT OF CALIFORNIA

1  those tax returns, including any K1s.
2          MR. BERMAN: And with that, Mr. Begakis,
3  I'm finished and you can ask all the questions that you
4  want.
5          MR. BEGAKIS: Wow, that's amazing.
6          THE WITNESS: So you're saying that you
7  require my taxes?
8          MR. BERMAN: Yep. I'm calling for the
9  preservation and production of your tax returns that I
10 asked for. And I'm going to be serving you with a
11 follow-up subpoena.
12         THE WITNESS: So --
13         MR. BEGAKIS: Mr. Vargas. Mr. Vargas,
14 I've got about fifteen minutes --
15         MR. BERMAN: Do not direct the witness.
16         THE WITNESS: Why do I -- why do I need
17 to show my taxes when Trump didn't? So I don't get it.
18 Does he have special rights?
19         MR. BERMAN: You put -- you've testified
20 to facts that have put your tax returns into play and
21 made them relevant to this litigation.
22             EXAMINATION
23 BY MR. BEGAKIS:
24    Q   Okay. Mr. Vargas, was the band established as
25 a legal entity?

Page 143

EASTERN DISTRICT OF CALIFORNIA

1     A   As a what?
2     Q   As a legal entity?
3          MR. LITTLEWOOD: Objection. Calls for
4  legal conclusion. Vague and ambiguous.
5          THE WITNESS: Can you explain that?
6  BY MR. BEGAKIS:
7     Q   You stated that it was a partnership, was it
8  an unincorporated partnership, or was it some other type
9  of legal entity?
10    A   It's unincorporated, it was all --
11         MR. LITTLEWOOD: Calls for legal
12 conclusion.
13 BY MR. BEGAKIS:
14    Q   Did you consider yourself a co-owner in the
15 band?
16    A   Yes.
17    Q   As a co-owner, do you believe you co-owned all
18 of the works that the band created when they -- when
19 they initially created those works?
20    A   Yes.
21    Q   Did you ever sign anything in writing saying
22 that you didn't jointly own any of the works that the
23 band created?
24    A   No, I did not.
25    Q   As a co-owner, do you believe you were

Page 144

EASTERN DISTRICT OF CALIFORNIA

1  entitled to an equal share of any profits that the band
2  generated?
3     A   Yes.
4     Q   How were band decisions supposed to be made?
5     A   Band decisions is supposed to be made with all
6  of the members included. You know, especially major
7  decisions of selling albums out.
8     Q   Did you all agree, all of the members of the
9  band, to enter into an agreement with Hyphy for Hyphy to
10 acquire the works at issue in this case?
11    A   Yes.
12    Q   At the time Hyphy entered into an agreement
13 with the band to acquire works at -- the works at issue
14 in this case, were you aware of the terms of that
15 agreement?
16    A   Yes.
17    Q   Did you understand Hyphys ownership of the
18 works to be exclusive?
19    A   Yeah. Yes.
20    Q   So if you later became unhappy with the deal
21 that you did as a band with Hyphy, do you believe you
22 could have renegotiated that deal?
23    A   Well, the deal was done. I mean, if I didn't
24 like it, well, then I wouldn't negotiate anymore albums
25 with them.