**ALTVIEW LAW GROUP, LLP**
JOHN M. BEGAKIS (SBN 278681)
john@altviewlawgroup.com
12100 Wilshire Blvd., Suite 800
Los Angeles, California 90025
Telephone: (310) 230-5580
Facsimile: (562) 275-8954

**SHERMAN LAW GROUP, LLP**
RICHARD LLOYD SHERMAN (SBN 106597)
richard@shermanlawgroup.com
9454 Wilshire Blvd., Suite 850
Beverly Hills, California 90212
Telephone: (310) 246-0321
Facsimile: (310) 246-0305

*Attorneys for Defendant/Counterclaimant* HYPHY MUSIC, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YELLOWCAKE, INC., California corporation,<br><br>      Plaintiff,<br><br>      v.<br><br>HYPHY MUSIC, INC.,<br><br>      Defendant. | **Case No.: 1:20-cv-00988-JLT-BAM**<br><br>[Assigned to the Hon. Jennifer L. Thurston]<br><br>**HYPHY MUSIC, INC.'S OPPOSITION TO YELLOWCAKE, INC. AND COLONIZE MEDIA, INC.'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| HYPHY MUSIC, INC.,<br><br>      Counterclaimant,<br><br>      v.<br><br>YELLOWCAKE, INC.; COLONIZE MEDIA, INC; JOSE DAVID HERNANDEZ; and JESUS CHAVEZ SR,<br><br>      Counter-Defendants. | Date:  September 29, 2023<br>Time: 9:00 a.m.<br>Dept.: Courtroom 4 (7th Floor)<br>     2500 Tulare Street<br>     Fresno, CA 93721<br>Judge: Hon. Jennifer L. Thurston |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 1

II.   HYPHY'S SUMMARY OF FACTS .................................................. 2

    A.   Hyphy's Agreement With The Group To Record The Albums ....................... 2

    B.   Counter-Defendants' Surreptitious "Acquisition" Of The Albums And Infringement Of The Album Artwork ................................................. 5

III.  YELLOWCAKE IS NOT THE ALBUMS' SOLE OWNER ........................... 6

    A.   Counter-Defendants Have Not Met Their Burden Of Proof As To Yellowcake's Purported Ownership Of The Albums ................................ 6

        1.   Chavez Was Never The Sole Owner Of The Albums .................................. 6

        2.   Chavez's Bandmates Were Co-Authors, And Thus Co-Owners ................... 7

    B.   Hyphy Is Also A Co-Author, And Thus Co-Owner ..................................... 10

    C.   Counter-Defendants' Arguments In Response To Hyphy's Various Co-Authorship Claims Are Without Merit ................................................. 11

        1.   Hyphy's Contributions Rise To The Level Of Co-Authorship .................. 12

        2.   Counter-Defendants Have Failed To Successfully Dispute Flores And Vargas' Co-Authorship And Co-Ownership Claims ........................... 13

        3.   Hyphy Has Never "Admitted" That Chavez Was The Sole Author Of The Albums .................................................................................. 14

        4.   The Assignments Are Valid ................................................. 16

        5.   Registration Of Copyrights, Without More, Is Insufficient To Prove Yellowcake's Ownership Of The Albums ................................ 17

IV.   YELLOWCAKE DOES NOT HAVE A TENABLE CLAIM FOR COPYRIGHT INFRINGEMENT .................................................. 17

    A.   Hyphy Did Not Infringe The Albums Because Hyphy Possesses An Ownership Interest Therein ................................................. 18

    B.   Even If Hyphy Does Not Possess An Ownership Interest, Hyphy Still Did Not Infringe The Albums Because Hyphy Possesses An Irrevocable Implied License To Exploit The Albums ................................................. 19

    C.   Yellowcake Has No Provable Damages ................................................. 20

V.    COUNTER-DEFENDANTS INFRINGED HYPHY'S COPYRIGHTS .......... 22

VI.   CONCLUSION ................................................................................. 25

HYPHY MUSIC'S OPPOSITION TO YELLOWCAKE AND COLONIZE
MEDIA'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION

# **TABLE OF AUTHORITIES**

**CASES**

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000) .........................................9, 14

*Abs Entm't v. CBS Corp.*, 908 F.3d 405 (9th Cir. 2018)...........................................10

*Ashton-Tate Corp. v. Ross*, 916 F.2d 516 (9th Cir. 1990)...................................10, 18

*Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) ..............................19

*Bastidas v. Good Samaritan Hosp.*, 2017 WL 1345604 (2017, N.D. Cal.) .............20

*Childress v. Taylor*, 945 F.2d 500 (2nd Cir. 1991) ....................................................7

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)...........................19

*Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008)....20

*I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) ...................................................19

*Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803 (9th Cir. 2019) .............20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)................................................20

*Oddo v. Ries*, 743 F.3d 630 (9th Cir. 1984) .......................................................10, 18

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir.2004) ....................22

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989)...............................12, 13

*Silvers v. Sony Pictures Entm't*, 402 F.3d 881 (9th Cir. 2005) ................................18

*Stillwater Ltd. v. Basilotta*, 2020 U.S. Dist. LEXIS 137746..............................12, 13

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F. 3d 1255 (9th Cir. 2011) .........17

*Yellowcake, Inc. v. Morena Music, Inc.*, 522 F. Supp. 3d 747 (E.D. Cal. 2021) ......11

**STATUTES**

17 U.S.C. § 101 .........................................................................................................7

HYPHY MUSIC'S OPPOSITION TO YELLOWCAKE AND COLONIZE
MEDIA'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION

17 U.S.C. § 501(b) .................................................................................... 18

17 U.S.C. § 504(b) ................................................................................ 21, 22

17 U.S.C. § 504(c) .................................................................................... 20

FRCP 56(c)(2) .......................................................................................... 15

Rule 26(a)(1)(A)(iii) ................................................................................. 20

Rule 37(c)(1) ............................................................................................ 20

**OTHER AUTHORITIES**

*Copyright Circular* 56A, *Copyright Registration of Musical Compositions and Sound Recordings* ........................................................................ 9

**TREATISES**

3–10 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §10.02[B][5] (2008)...................................................................................................... 19

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant/Counterclaimant Hyphy Music, Inc. ("***Hyphy***") hereby opposes the Motion for Summary Judgment (the "***Motion***") filed on or about July 14, 2023 by Plaintiff Yellowcake, Inc. ("***Yellowcake***") and Counter-Defendants Yellowcake and Colonize Media, Inc. ("***Colonize***") (collectively, "***Counter-Defendants***"), on the following grounds.

## I.    INTRODUCTION

The instant case concerns a classic example of a "copyright troll" attempting to exploit the "letter of the law" to obtain an anti-competitive advantage over a competing music distributor. What Yellowcake failed to account for, however, was Hyphy's willingness to defend itself and its claim to the copyrighted works at issue. As the Court will see, Yellowcake has no claim to such works.

Beginning in or about 2013, Hyphy embarked on what would be, for several years, an amicable working relationship with the Spanish-language musical group Los Originales De San Juan (the "***Group***"). The Group was at all relevant times comprised of lead singer Counter-Defendant Jesus Chavez, Sr. ("***Chavez***"), accordion player Domingo Torres Flores ("***Flores***") and drummer Alfonso Vargas ("***Vargas***"). Together, Hyphy and the Group co-created three (3) studio and two (2) live musical albums, which Hyphy then distributed.

In or about March 2019, however, Chavez was approached by Counter-Defendant Jose David Hernandez ("***Hernandez***"), who had unlawfully obtained insider information about Hyphy's business and relationship with Chavez, with a scheme to profit off of Hyphy. Through his companies Yellowcake and Colonize, Hernandez would (a) enter into an "Asset Purchase Agreement" purportedly buying rights to the relevant albums from Chavez, but without alerting Hyphy, or any of the other members of the Group; (b) distribute newly-released, pirated versions of the relevant albums over the internet via various digital service providers ("***DSPs***"); and

(c) then sue Hyphy for "copyright infringement," on the basis that Hyphy was "competing" with Counter-Defendants' pirated versions.

As is common with copyright trolls and the frivolous claims they bring, however, Yellowcake's lawsuit makes little sense legally. Most importantly, Yellowcake failed to acquire sufficient rights in the relevant albums to give them standing to sue Hyphy for copyright infringement. Furthermore, Hyphy is a co-owner, or, at a minimum, licensee of the relevant albums, based on its principal's creative contributions to the relevant albums, and its acquisition of Flores and Vargas' rights therein, and Yellowcake therefore cannot sue Hyphy. Perhaps most tellingly, Yellowcake has no coherent claim for damages, having failed to even disclose any calculation of damages via an Initial Disclosure statement.

Put simply, this is nothing more than a "stick up" by Yellowcake, and this Court should therefore dispose of the Motion, on the basis that substantial facts exist to undercut Yellowcake's claim to ownership of the albums at issue here.

## II. HYPHY'S SUMMARY OF FACTS

### A. Hyphy's Agreement With The Group To Record The Albums

Hyphy is a record label in the business of collaborating with recording artists to produce, distribute, and otherwise exploit sound and audiovisual recordings, coupled with artwork. Separate Statement in Opposition ("***SSIO***") Nos. ¶¶ 1, 39, 80. Chavez is the lead singer of the Group. SSIO Nos. ¶¶ 2, 40, 81. The Group operates as a co-equal partnership comprised of Chavez and band members Flores and Vargas. SSIO Nos. ¶¶ 3, 41, 82.

In or about February 2013, Hyphy and the Group began working together to co-create various sound recordings to be embodied on multiple albums, which the parties orally agreed were to be owned by Hyphy (the "***Agreement***"). SSIO Nos. ¶¶ 4, 42, 83. The albums created pursuant to the Agreement were entitled (1) "Amigos y Contrarios"; (2) "Corridos de Poca M"; (3) "El Campesino"; (4) "Desde La Cantina de Mi Barrio (En Vivo)"; and (5) "Nuestra Historia (En Vivo)"

2

(collectively, the "***Los Originales Albums***" or "***Albums***"). SSIO Nos. ¶¶ 5, 43, 84. One of the other two albums identified in Yellowcake's Complaint, entitled "Chuy Chavez y Sus Amigos," has no connection to this dispute and wasn't even recorded by Chavez. SSIO Nos. ¶¶ 6, 44, 85.

Though the Agreement was not initially memorialized in writing, Flores and Vargas understood that it existed. SSIO Nos. ¶¶ 7, 45, 86. Such co-equal members of the Group also intended that all rights in and to their recording services rendered pursuant to the Agreement be conveyed to Hyphy. *Id.* Flores and Vargas also later confirmed their belief and intent to convey all rights to Hyphy by executing enforceable Copyright Assignment Agreements on or about March 22, 2022 (collectively, the "***Assignments***"). SSIO Nos. ¶¶ 8, 46, 87.

Unlike larger record labels, however, Hyphy closely collaborated with the Group to create the Albums, including as follows:

- For the first three (of five) of the Los Originales Albums, Hyphy:
  - helped determine the "theme" and overall creative direction of each Album;
  - crucially selected the songs to be included in each Album;
  - selected the recording studio, and paid for all costs associated with the recording of each Album;
  - hired the sound engineer;
  - paid the Group a substantial amount to record the Albums; and
  - oversaw and generally supervised the recording and production of each Album. SSIO Nos. ¶¶ 9-15, 47-53, 88-94.
- For the final two (of five) Albums (which are each comprised of recordings from one previous live performance by the Group), Hyphy also:
  - selected and paid for the venue of the live performance;
  - selected the songs to be performed at the live performance (which were recorded and subsequently include in the Albums);

o directly employed, supervised, and directed the services of the sound engineer and videographer who each recorded the audio and video of the live performance, respectively;

o wrote a script for the history of the Group as presented as part of the Group's live performance, and hired an "MC"/commentator who narrated the script; and

o re-recorded portions of the guitarist's contributions to the live performance afterwards, using a new guitarist selected, hired and paid for by Hyphy. SSIO Nos. ¶¶16-20, 54-58, 95-99.

It should also be noted here that Flores and Vargas were plainly joint authors of the Albums, for at least the following reasons:

• Flores and Vargas were equally involved in all activities of the Band, which existed as an unincorporated partnership in which all Band members were joint owners, participants and contributors;

• Flores and Vargas were equally credited on all Albums in which each of them made contributions; and

• Flores and Vargas shared equally in all profits of the Band, and were granted equal access to inspect all records related to the Band's receipt of all such profits. SSIO Nos. ¶¶ 21-23, 59-61, 100-102.

Indeed, Flores and Vargas's co-equal status in the Group is how the Group is known to the public. For example, none of the individual members of the Group – including Chavez – are individually identified on the Group's "biography" page located at the website <https://www.AllMusic.com> (the "Website"). Furthermore, the Group's "credits" page on the Website indicates that the credited "Artist" on all albums produced by the Group is "Los Originales De San Juan." SSIO Nos. ¶¶ 24, 62, 103.

In addition to its original creative contributions to the production, recording and overall creation of the Los Originales Albums, Hyphy also designed and created the artwork featured on the cover of each Album (the "***Album Artwork***"). SSIO

4

Nos. ¶¶ 25, 63, 104. Hyphy released the Albums, with the Album Artwork, for distribution through all available digital service providers (the "**DSPs**") between 2013 and 2017. SSIO Nos. ¶¶26, 64, 105. Thereafter, Hyphy obtained copyright registrations for all Album Artwork. SSIO Nos. ¶¶ 27, 65, 106.

### B.   Counter-Defendants' Surreptitious "Acquisition" Of The Albums And Infringement Of The Album Artwork

Yellowcake is a competing record label and distributor of sound recordings, utilizing Colonize as its "distribution arm" to release and exploit rights that Yellowcake acquires. SSIO Nos. ¶¶ 28, 66, 107. Hernandez is a co-owner of both Yellowcake and Colonize. SSIO Nos. ¶¶ 29, 67, 108. In that position, Hernandez has admitted that both corporations have operated – and continue to operate – as a single economic entity, with common ownership, business operations, office space, staff, and many other resources. SSIO Nos. ¶¶ 30, 68, 109.

In or about March 2019, Hernandez approached Chavez about selling the Los Originales Albums to Yellowcake. SSIO Nos. ¶¶ 31, 69, 110. Hernandez had previously worked with Hyphy and had secretly gained valuable information on Hyphy's business and relationship with Chavez. SSIO Nos. ¶¶ 32, 70, 111. Hernandez thus knew that Hyphy only had an oral agreement with the Group, and approached and convinced Chavez, without Hyphy or the rest of the Group's knowledge, to assign the Albums to Yellowcake in exchange for payment of $500,000. SSIO Nos. ¶¶ 33, 71, 112.

Chavez and Yellowcake attempted to codify their purported agreement via an "Asset Purchase and Assignment Agreement" executed on or about March 21, 2019 (the "**Asset Purchase Agreement**"). SSIO Nos. ¶¶ 34, 72, 113. In Section 13.e. thereof, Chavez represented and warranted to Yellowcake that Chavez was "the only owner of" the Albums, and at the time of sale possessed "good and marketable title" thereto. SSIO Nos. ¶¶ 35, 73, 114. However, Chavez never obtained signed written agreements from Flores, Vargas or Hyphy acquiring each party's respective

5

contributions to, and rights in, the Albums and sound recordings embodied thereon. SSIO Nos. ¶¶ 36, 74, 115.

### III.   YELLOWCAKE IS NOT THE ALBUMS' SOLE OWNER

Counter-Defendants' Motion hinges on the false premises that (a) "Chavez has always owned all intellectual property produced by the Group including all copyrights in its sound records" (Motion at 2:6-8), and that (b) "Yellowcake is the sole owner of the Albums" because Yellowcake purportedly purchased rights "from Chavez" (*see*, Motion at 8:4). Counter-Defendants' claims are, however, devoid of any factual or legal basis, and their Motion fails from the very outset for that reason.

### A.   Counter-Defendants Have Not Met Their Burden Of Proof As To Yellowcake's Purported Ownership Of The Albums

#### 1.   Chavez Was Never The Sole Owner Of The Albums

Counter-Defendants' factual averment that Chavez "owned all intellectual property" prior to Yellowcake's purported acquisition of the Albums necessarily serves as the foundation for their entire Motion, and, yet, Counter-Defendants have not provided *any evidence* in their moving papers that support this proposition. Instead, they cite only to a Declaration filed on March 29, 2021 in support of their then-pending Motion to Dismiss (Dkt. 46-2) (the "***Chavez Declaration***"), and rely on a mere two paragraphs therefrom. *See*, Counter-Defendants' Statement of Undisputed Facts ("***Counter-Defendants' UFF***"), No. 3. Cited paragraphs 3 and 4 from the Chavez Declaration, however, merely contain Chavez's assertions that he was the "founder and principal" of the Group, which he claims to have founded "in approximately 1987."

Such statements do not, in and of themselves, support Counter-Defendants' critical claim that Yellowcake solely owned the Albums by way of Chavez's prior ownership. As set forth below, Flores and Vargas were both co-owners of all rights in the Albums from the outset, and they never transferred their rights to Chavez.

HYPHY MUSIC'S OPPOSITION TO YELLOWCAKE AND COLONIZE
MEDIA'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION

1

2

Hyphy, via its involvement in the production of each Albums, also has a claim to co-ownership thereof.

3

2.    Chavez's Bandmates Were Co-Authors, And Thus Co-Owners

4

5

6

7

8

9

10

11

12

Because Counter-Defendants have not presented a complete factual picture to the Court, the Motion, at a minimum, fails to take into account, *or even simply address*, the copyrightable contributions to the Albums provided by Flores and Vargas. Chavez was not, and could not be, anything more than a co-author of the Albums because he had bandmates. In fact, based on musical contributions alone, Flores and Vargas contributed *more* to the creation of the Albums than Chavez (who only sang) because they performed the accordion and drums, which are musical elements that are critical to the particular genre of music at issue (especially the accordion). SSIO Nos. ¶¶ 37, 75, 116.

13

14

15

16

17

18

19

20

21

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. However, the legislative history of such definition has actually set forth two alternative criteria for joint works – one focusing on the act of collaboration and the other on the parties' intent. *Childress v. Taylor*, 945 F.2d 500, 505 (2nd Cir. 1991) ("[I]t is hard to imagine activity that would constitute meaningful 'collaboration' unaccompanied by the requisite intent on the part of both participants that their contributions be merged into a unitary whole…").

22

23

24

25

26

27

28

Here, Chavez, Flores and Vargas's "collaboration" is well established by virtue of their equal ownership and control of the Group, their equal crediting as members of "Los Orignales de San Juan," and their creative contributions to the Albums, all as set forth above. Furthermore, Hyphy has submitted declarations from Flores and Vargas both as part of this Opposition and as part of Hyphy's own Motion for Summary Judgment, which establish that, at all relevant times, Chavez, Flores and Vargas intended that Flores and Vargas would be co-authors in the

7

Albums. *See*, Dkt. Nos. 78-17, 78-18. Vargas and Flores's testimony (which is, as of the filing of this Opposition, undisputed[1]) is that the Group operated as a co-equal partnership, in which all members equally owned all works created thereby. *See id*.

There is also no evidence before this Court (because none exists) to indicate that Flores or Vargas ever transferred any interest in and to their creative contributions to the Albums to Chavez at any time for any reason. Instead, the evidence is clear that Chavez repeatedly acknowledged Flores and Vargas' valuable contributions to the Albums. Such contributions were so valuable, in fact, that Chavez paid Flores royalties for his "[y]ears working for the band," and paid Vargas following Chavez's re-sale of the Works to Yellowcake because "[Vargas] was a good musician…" SSIO Nos. ¶¶ 38, 76, 117.

Counter-Defendants' Motion asserts, in conclusory fashion, that there were not "any other co-owners of the Copyrighted sound recordings in the albums besides Chavez…" Motion at 2:24-26. However, the Motion only relies on paragraphs 8 through 19 of Chavez's Declaration for this proposition. For at least the following three (3) reasons, this citation is unreliable.

***First***, the Chavez Declaration (a) does not attach any evidence or reference any specific facts in support of its critical contention, and (b) *does not even mention Flores or Vargas*. Instead, the Chavez Declaration focuses on Chavez's relationship with Hyphy, and his (non-expert) opinion that Morena was not a co-owner. How Chavez and Counter-Defendants believe such a contention can be well taken without any supporting evidence remains a mystery to Hyphy, but, nevertheless, nothing in the Chavez Declaration can or does "defeat" Vargas and/or Flores's respective ownership interests in the Albums.

///

---

1 Chavez faces significant credibility issues regarding the presentment of any testimony as to Vargas and Flores' creative contributions to the Albums. Chavez received $500,000 from Yellowcake on the representation that he is the only owner of rights in the Albums, and he therefore has every motivation to be untruthful about his contributions, and the contributions of those who did not receive any such payment.

**Second**, in the absence of any written agreements among the Group members setting forth differing ownership interests (as is the case here), it is legally meritless for only one member of a band to claim sole authorship of the *sound recordings* in dispute. The reason is simple: it is well established that the "authors" of any sound recording are its performers and producers. *See, e.g.*, *Copyright Circular* 56A, *Copyright Registration of Musical Compositions and Sound Recordings* ("The author of a sound recording is the performer(s) featured in the recording"). As such, and in the absence of any work-for-hire agreement, **there can be no "single author" of a sound recording that contains multiple performers**.

Counter-Defendants may attempt to argue that, under *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000), the Court should rely on Yellowcake's conclusory attempts to portray Chavez as the Albums' "mastermind." But besides being a factual contention that Flores and Vargas dispute (and which is contradicted by each member of the Group's equal crediting as "Los Originales de San Juan"), this argument ignores key language from *Aalmuhammed* setting forth that when evaluating joint authorship claims, the Court must consider whether the "audience appeal of the work turns on both contributions and 'the share of each in its success cannot be appraised.'" *Id.* at 1234.

As argued above, Chavez may have been the lead singer, but the genre of music that the Group performs makes the instrumentation of the recordings (i.e., Chavez and Flores' contributions via the accordion and drums), rather than any vocals contributed by Chavez, a major factor in their appeal. *See*, SSIO Nos. 31, 63, 99. *Aalmuhammed* thus favors Flores and Vargas's interest.

**Three**, paragraph 10 of the Chavez Declaration appears to concede that other individuals were involved with the Albums when Chavez asserts therein that "the only other person involved with the recording of the Albums other than the Band was an independent audio engineer…who the Band engaged to record the Albums." Dkt. No. 46-2, ¶ 10 (emphasis added). In other words, *even Chavez* cannot stylize

9

himself as the Group's sole genius, having already conceded that the Albums were the work of a band, not some solo artist.

In sum, while Counter-Defendants attempt to dismissively marginalize Vargas and Flores as mere "backing musicians," such a characterization (a) ignores the nature of the "Los Originales de San Juan" credit that *all* Group members equally possessed, (b) has no bearing on the scope of their creative contributions to the Albums, which evidence alone is dispositive; and (c) is not even consistent with Chavez's own characterization of Vargas and Flores' contributions to the Albums.

## B. Hyphy Is Also A Co-Author, And Thus Co-Owner

Hyphy itself also was and is a co-author of the Albums, given the nature of the services Hyphy rendered as a producer on the Albums. As noted by the Court in its July 20, 2021 Order, co-authors cannot be liable to other co-authors for infringement. *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990); *Oddo v. Ries*, 743 F.3d 630, 632-33 (9th Cir. 1984). Hyphy is a co-author of the Albums for two indisputable reasons.

*First*, Hyphy contributed more than a modicum of creativity to the creation of the Albums, as the Court itself previously recognized. The Ninth Circuit in *Abs Entm't v. CBS Corp.*, 908 F.3d 405, 410-11 (9th Cir. 2018) recently held that a music producer's work is a copyrightable contribution as follows:

> "The initial [producer's] role is often to work in collaboration with the performing artists to make many of the creative decision that define the overall sound of the recording…including such things as microphone choice, microphone placement, setting sound levels, equipment used, processing filters employed, tapes selected, session structure, and other similar decision analogous to the creative choices of photographers" can be original and copyrightable.

*Abs Entm't v. CBS Corp.*, 908 F.3d at 410-11 (internal citations omitted).

10

In this case, Hyphy provided the creative direction for each of the Albums, selected the songs to be included in each, paid for the recording studio or venue where each Album was recorded, hired the sound engineer who recorded all of the Albums, and even hired a guitarist to re-record portions of certain Albums. As the Court pointed out in the sister case of *Yellowcake v. Morena Music, Inc.*, "in the absence of a contract, courts consider whether (1) a purported author superintends the work by exercising control; (2) the putative co-authors make objective manifestations of a shared intent to be co-authors; and (3) the audience appeal of the work turns on both contributions and the share of each in its success cannot be appraised. The first factor, control, will often be the most important consideration." *Yellowcake, Inc. v. Morena Music, Inc.*, 522 F. Supp. 3d 747, 763 (E.D. Cal. 2021).

Not only did Hyphy make copyrightable contributions to the Albums, Hyphy was also the party that "superintended" the work – overseeing the work of the sound engineer and the entire production of the Albums. Moreover, with respect to the live Albums, Hyphy decided to re-record the original guitarist's contributions, oversaw those alterations to the sound recording, and paid all of the expenses in connection therewith. Hyphy was thus plainly a joint author, and a crucial one.

***Second***, even if Hyphy did not contribute enough creatively to the creation of one or more of the Albums, Hyphy became a co-owner when it acquired all of Flores and Vargas' respective interests in their creative contributions thereto. Because Flores and Vargas never conveyed any rights in their contributions to Chavez or Yellowcake, Flores and Vargas have been in possession of their own rights this entire time. Therefore, those rights were available to be, and have been, acquired by Hyphy via the Assignments.

## C. <u>Counter-Defendants' Arguments In Response To Hyphy's Various Co-Authorship Claims Are Without Merit</u>

Counter-Defendants make the following five (5) arguments in support of their claim that Yellowcake is the exclusive owner of the Albums: (1) there was no "oral"

11

work-for-hire agreement with Chavez; (2) Hyphy's contributions did not rise to the level necessary for it to be a co-author; (3) Flores and Vargas' lack of authorship in the Albums is somehow not in dispute; (4) Flores and Vargas' respective assignments of rights to Hyphy are ineffective, and therefore irrelevant, because of Flores and Vargas' lack of authorship in the Albums; and (5) Yellowcake's Copyright registrations are somehow dispositive.

As Counter-Defendants acknowledge, the Court has already ruled on Hyphy's claims to the Albums on the basis of oral work-for-hire agreement(s), and this issue is therefore no longer in dispute in this case. Their remaining arguments are, however, without merit, as explained *in seriatim* below.

### 1. Hyphy's Contributions Rise To The Level Of Co-Authorship

Counter-Defendants aver that Hyphy did not make sufficient creative contributions to the Albums to establish co-authorship thereof, but come to this conclusion via the dismissive, factually inaccurate claim that Hyphy only "marketed the [A]lbums and provided the typical functions of a record label and record distributor." Motion at 13:27-14:1. Such a claim, however, does not represent the full extent of Hyphy's claim to co-authorship of the Albums.

Counter-Defendants base their assertion regarding the nature and extent of Hyphy's contributions not on any admission in discovery, but on the allegations set forth in Hyphy's First Amended Counterclaims. However, such allegations clearly show that Hyphy "select[ed] the musical compositions, commission[ed] and direct[ed] engineers and directors **and/or provid[ed] the services itself, directing the recording and filming of the musical and audio visual performances** to be embodied on the Los Originales Albums…" Dkt. 15 at ¶ 17 (emphasis added). As therefore alleged, Hyphy's contributions were creative and significant, and they establish that Hyphy (not Chavez) "superintended" creation of the Albums.

Counter-Defendants cite to both *Stillwater Ltd. v. Basilotta*, 2020 U.S. Dist. LEXIS 137746 and *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989)

12

for the proposition that merely providing "direction" is somehow not enough to qualify as a creative contribution. But such cases are easily distinguishable.

The unpublished decision in _Stillwater_ resulted from the wholly distinct factual scenario of a label claiming a copyright interest merely from having "financed, approved, marketed, and distributed" the relevant copyrighted work. Here, Hyphy actually conceived of the theme of each Album, selected specific songs to be included, and determined the song arrangement of each Album, all of which significantly influenced how each Album would be presented to (and subsequently perceived and interpreted by) the audience. These contributions were more than "activities of a record label" that the _Stillwater_ court found insufficient.

_S.O.S., Inc._ is also not even remotely on point. Such case concerned computer programmers and the contributions one would expect therefrom, rather than a musical group and producer, and the unique creative dynamic that can exist between them in the creation of an album. Hyphy did not just provide "direction" – it worked closely with Chavez, Flores and Vargas to create Albums that reflected the authorship of each of them.

　　　　2.　Counter-Defendants Have Failed To Successfully Dispute Flores And Vargas' Co-Authorship And Co-Ownership Claims

Instead of presenting testimony from Chavez disputing Flores or Vargas' respective contributions (which, at most, would only create a question of fact), Counter-Defendants attempt to claim that Chavez's sole ownership of the Albums is somehow proven by Hyphy allegedly not producing "any objective evidence…that there was an understanding that Vargas and Flores were coauthors…with Chavez" and by Vargas and Flores not seeking federal registration in their contributions to the Albums. But the law does not require all joint authors in a work to affirmatively obtain their own registrations to be co-authors. Furthermore, the parties' "understanding" is not dispositive—it is equally critical whether Flores and Vargas made significant contributions to each Album's overall appeal (and the only

13

evidence before the Court on this point is that they did make significant contributions). *See* <u>Aalmuhammed v. Lee</u>, 202 F.3d 1227, 1234 (9th Cir. 2000).

Perhaps more importantly, "objective evidence" of co-authorship <u>has</u> been provided. Chavez has admitted that the Group is an unincorporated partnership, in which no partnership paperwork exists to establish that Flores and Vargas are anything other than co-equal, co-controlling members. All of the members of the Group – including Flores, Vargas and (most tellingly) Chavez himself – are equally credited as "Los Originales De San Juan." Furthermore, Flores and Vargas contributed enough to the creation of the Albums that even Chavez admitted such contributions deserved compensation.

Counter-Defendants' argument also ignores a crucial point: Yellowcake is asking this Court to retroactively declare that Flores and Vargas were never co-authors of the Albums (at significant damage to their reputations), even though they are not parties to this case. This Court has no jurisdiction to do so, however, because Flores and Vargas are not parties to this action.

In sum, Counter-Defendants have simply "missed a step." They contend that Yellowcake conducted sufficient due diligence by searching copyright records for registrations by outside third parties, but they failed to require the execution of session agreements or other similar documentation showing that everyone who ever worked on the Albums gave Chavez the express, written right to solely own such Albums and all creative contributions thereto. No such documentation was produced in discovery because no such documentation exists, and Yellowcake therefore has no possibility of prevailing on this issue, either as part of this Motion or at trial.

3.    <u>Hyphy Has Never "Admitted" That Chavez Was The Sole Author Of The Albums</u>

In the hopes of distracting the Court from the glaring holes in their own case, Counter-Defendants also claim that Hyphy "admitted" to Chavez's sole ownership

of the Albums in various pleadings and in discovery. Of course, none of these alleged "admissions" are, in reality, actual admissions of fact, as explained below.

Counter-Defendants' claim that Hyphy "admitted" to Chavez's sole ownership because Hyphy alleged that it entered into an oral recording agreement "with Jesus Chavez," fails for the following two (2) reasons. FAC at ¶ 16. ***First***, alleging that Hyphy contracted with Chavez for the Albums does not, in and of itself, constitute an express admission that Chavez was the sole owner of such Albums – only that Hyphy preferred to communicate through Chavez in working with the Group. ***Second***, Yellowcake cannot rely only on *allegations* from Hyphy's Counterclaims to contend that an argument is free of any triable issues of fact – it must rely on material that would be admissible *in evidence*. *See* FRCP 56(c)(2).

Counter-Defendants also claim that Hyphy "admitted" to Chavez's sole ownership because Hyphy's owner, Jose Martinez, submitted a declaration, at one point, claiming that Hyphy "commissioned Jesus Chavez to provide services" and "agreed to…pay Chavez a fixed amount, in exchange for Chavez's agreement to…perform and record…" Dkt. 45-1, ¶ 2. Nothing in such statements, however, constitutes an express admission that Chavez definitively owned all rights in the Albums. Rather, Mr. Martinez's statements further support Hyphy's position that their dealings with Chavez were actually dealings with the Group through Chavez.

Finally, Yellowcake claims that Hyphy "admitted" to Chavez's sole ownership via its supplemental response to Interrogatory Nos. 5, 6, 9 and 10. Motion at 14:1-2. But, in all such responses, Hyphy indicates that it commissioned the Albums from Chavez and Flores (whose full name is "Domingo Torres Flores" and is sometimes referred to in this dispute as "Torres"). By identifying Flores in the same breath as Chavez, such responses therefore cannot possibly constitute an admission that Chavez was the sole owner of the Albums.

Counter-Defendants also contend that the above-identified "admissions" were "corroborated" by Hector Rosales, the studio engineer who recorded the Albums

and – under pressure from Counter-Defendant Hernandez – signed a declaration supporting such contention. Dkt. 46-1. At most, Mr. Rosales's testimony creates a question of fact, as such testimony is contradicted by Vargas and Flores. Moreover, Mr. Rosales' statements amount to improper legal opinions made by someone who is neither a lawyer, nor an expert whose opinions can be treated as fact.

### 4. The Assignments Are Valid

Yellowcake also attempts to attack the credibility of the Assignments between Morena, Flores and Vargas, but this is also nothing more than a distraction having no bearing on the real legal question at issue: whether Flores and Vargas owned rights in the Albums that Chavez could not assign without their consent.

Just because Flores and Vargas didn't learn about this dispute until after it had commenced does not mean that they did not each possess an interest in the Albums that could be assigned, to address their mistaken belief that such rights had already been assigned. Similarly, just because Flores and Vargas chose to rely on the representations of others as to the contents of the Assignments rather than reading such documentation themselves (just as they relied on Chavez's representations when he negotiated with Morena on behalf of the Group) does not mean that such Assignments are invalid and fail to convey Flores and Vargas' respective rights in the Albums. And, just because disputes common to many musical groups have arisen between Chavez, Flores and Vargas does not mean that Flores and Vargas have somehow testified falsely to any matter, or that they did not actually have an interest in the Albums that they could lawfully assign to Hyphy.

Finally, the fact that Flores and Vargas executed the Assignments for one dollar does not mean that they did not each have an interest in the Albums that could be assigned to Hyphy. To the contrary, payment to each of them of only one dollar is reflective of the fact that Hyphy had already provided the Group with valuable consideration for the Albums under the original oral recording agreement. Yellowcake does not bother trying to argue that payment of one dollar constitutes

16

insufficient consideration for the Assignments because it is legally sufficient, and the Court should view such payment not as proof that no Assignment took place but, rather, as proof that an agreement with the Group for Hyphy to acquire rights in the Albums upon there recordation did, in fact, previously existed.

5. Registration Of Copyrights, Without More, Is Insufficient To Prove Yellowcake's Ownership Of The Albums

Counter-Defendants also claim – falsely – that Yellowcake is the "undisputed owner" of the Albums because, after the transfer from Chavez, it "complied with all requirements set forth by the Copyright Act…by registering copyrights for each Album" and "Hyphy did not file a counterclaim for declaratory judgment contesting the registrations…" Motion at 10:18-20. Of course, obtaining a copyright registration does not grant a registrant "undisputable" ownership rights that can only be rebutted through the filing of a counterclaim for declaratory relief. Rather, a registration creates a *rebuttable* "presumption" only, and "an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F. 3d 1255, 1257 (9th Cir. 2011).

That is exactly the case here. Counter-Defendants claim ownership by way of an assignment of rights from Chavez only, and Hyphy has offered evidence rebutting this position via multiple legal theories. Such a simplistic claim, which belies even the most basic understanding of how copyright ownership claims are litigated, should not be consider, as it of no value to the Court in ruling on this case.

## IV. YELLOWCAKE DOES NOT HAVE A TENABLE CLAIM FOR COPYRIGHT INFRINGEMENT

With the foregoing established, Hyphy will now address each of Counter-Defendants' remaining arguments in their Motion.

///

///

17

A.    **Hyphy Did Not Infringe The Albums Because Hyphy Possesses An Ownership Interest Therein**

The Motion begins by wrongly asserting that Hyphy infringed upon Counter-Defendants' rights because Hyphy was "still selling the Albums" after Yellowcake had entered into the Asset Purchase Agreement with Chavez and obtained Certificates of Registration for each Album. *See*, Motion at 11:5-9. But, as discussed above, this argument ignores the fatal flaw with their entire case: the Asset Purchase Agreement only transferred certain rights to Yellowcake that Chavez alone possessed. Chavez did not possess any rights of any other members of the Group, such as Flores and Vargas, or any other third parties, such as Defendants.

Critically, all of the co-owners in a copyright must join in transferring all of their collective rights therein for the transferee to receive ***exclusive rights*** in the copyright. <u>Sybersound</u>, 517 F.3d at 1146; 17 U.S.C. § 501(b) (conferring standing only to the legal or beneficial owner of an exclusive right" who "is entitled…to institute an action for any infringement…while he or she is the owner of it"); *see also*, <u>Silvers v. Sony Pictures Entm't</u>, 402 F.3d 881, 887 (9th Cir. 2005) (a transfer of copyright ownership may be effectuated but can still result in exclusive rights in such copyright being owned separately). Accordingly, Yellowcake lacks exclusive ownership of the Albums, and, therefore, lacks standing to bring its claim for Copyright infringement against Hyphy.

In addition to not possessing exclusive rights in the Albums, Yellowcake cannot sue Hyphy because *Hyphy itself* is also a co-author and co-owner in the Albums. As discussed above, this is the case by virtue of Hyphy's co-authorship of the Albums, and acquisition of Flores and Vargas' rights therein via execution of the Assignments. As noted by the Court in its July 20, 2021 Order, co-authors cannot be liable to other co-authors for infringement. <u>Ashton-Tate Corp. v. Ross</u>, 916 F.2d 516, 522 (9th Cir. 1990); *Oddo v. Ries*, 743 F.3d 630, 632-33 (9th Cir. 1984).

///

**B.** ***Even If* Hyphy Does Not Possess An Ownership Interest, Hyphy Still Did Not Infringe The Albums Because Hyphy Possesses An Irrevocable Implied License To Exploit The Albums**

Even assuming *arguendo* that the Assignments can somehow be disregarded, Hyphy still possessed, at a minimum, an irrevocable implied non-exclusive license from the outset of the Agreement, and at all relevant times thereafter, to exploit the Albums. *See*, *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). An implied license is granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (*citing Effects*, 908 F.2d at 558-59). Here, Hyphy requested that the Group create the Albums (and Hyphy superintended their creation), and the Group thus delivered the Albums to Hyphy at its request with the knowledge and intention that Hyphy would copy and distribute them. A non-exclusive license was thus created.

Furthermore, because Hyphy provided valuable consideration to the Group (which is undisputed), the non-exclusive license is irrevocable. *See*, *e.g.*, *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008) (after finding that a plaintiff suing for infringement had granted a non-exclusive license to a defendant, the 9th Circuit further held that the nonexclusive license was backed by consideration and therefore irrevocable), *citing, inter alia*, 3–10 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §10.02[B][5] (2008)("[A] nonexclusive license supported by consideration is a contract"). And, neither Yellowcake nor Hernandez have ever been in a position to cancel this non-exclusive license to Hyphy because Flores and Vargas also had input in the granting and revocation thereof, by virtue of their respective interests in the Albums. Simply put: Flores and Vargas are not parties to this case, and this Court therefore cannot rescind, negate or rule upon the legitimacy of any license granted by them.

### C. Yellowcake Has No Provable Damages

Yellowcake also cannot maintain a Copyright infringement claim against Hyphy because Yellowcake is not entitled to recover any damages thereon. It is axiomatic that there can be no legal claim for relief in the absence of damages. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). While Yellowcake fails to assert a right to, and therefore waives the ability to claim, statutory damages or attorneys' fees under 17 U.S.C. § 504(c), even actual damages are not awardable. This is because Yellowcake (a) failed to disclose the basis for, or a computation of, any damage claim in its Initial Disclosures, or otherwise; and (b) failed to produce any evidence in discovery of actual damages incurred.

"Rule…26(a)(1)(A)(iii) requires the disclosure of 'a computation of each category of damages claimed by the disclosing party – who must also make available…the documents or other evidentiary material…on which each computation is based…,' regardless of whether the opposing party requests [it]." *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 821 (9th Cir. 2019). "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008).

In accordance with Rule 37(c)(1), the Ninth Circuit has forbidden plaintiffs who fail to make substantive disclosures under Rule 26(a)(1)(A)(iii) from offering a damage case at trial. For example, in *Ingenco*, 921 F.3d at 821, the Ninth Circuit upheld the exclusion of damages when a plaintiff's initial disclosures "were never supplemented" and such plaintiff "never disclosed any damages information related to statutory claims," even though the plaintiff's Rule 30(b)(6) designee arguably provided the information. In *Bastidas v. Good Samaritan Hosp.*, 2017 WL 1345604 (2017, N.D. Cal.), the Court even granted a motion to exclude damage calculations submitted after the discovery cut-off date regarding "financial losses that plaintiff

HYPHY MUSIC'S OPPOSITION TO YELLOWCAKE AND COLONIZE
MEDIA'S MOTION FOR SUMMARY JUDGMENT / ADJUDICATION

claims to have suffered" because the plaintiff "failed to turn over each computation until the last minute."

Here, Counter-Defendants entirely failed to serve any Initial Disclosures, and the discovery cut-off date has come and gone. SSIO Nos. ¶¶ 76, 118. Yellowcake thus failed to identify any damages beyond the mere categories of damages set out in the Complaint. SSIO Nos. ¶¶ 77, 119. Counter-Defendants had an obligation under Rule 26 to quantify their damages, but never did, and Yellowcake therefore cannot present a case for actual damages at trial now.

In their Motion, Counter-Defendants attempt to claim for the first time that Yellowcake is somehow entitled to Hyphy's profits. Yellowcake, however, never sought this type of damages in the Complaint or non-existent Initial Disclosures, and Hyphy would be plainly prejudiced now if Yellowcake were allowed to seek damages on any theory it failed to allege or disclose.

Counter-Defendants attempt to "cure" these failures through a surprising bit of sophistry. Namely, they argue that their "actual damages" are "Defendants' profits" – but this argument ignores the plain language of Section 504(b) stating that these are two entirely distinct "buckets" of damage (and thus should be plead separately). Specifically, Section 504(b) states that the owner of a copyright is entitled to "the actual damages suffered by him…**and** any profits of the infringer that are not attributable to infringement **and are not taken into account in computing the actual damages**." 17 U.S.C. § 504(b) (emphasis added.)

Put more bluntly, Yellowcake cannot wave its hands and say *"actual damages, Defendants' profits, same thing"*; the law recognizes these as distinct and separate theories of recovery. Counter-Defendants did not treat them distinctly, and, in fact, never even mentioned lost profits until filing their Motion. Counter-Defendants cannot change their mind long after discovery cut-off because they were not diligent earlier.

///

21

Finally, *even if* the Court permits Counter-Defendants to present a calculation of damages they have never previously disclosed until now, the calculation they put forth is hardly a calculation at all, and its use is not supported by the law of the Ninth Circuit. Counter-Defendants claim that they need only offer evidence of Hyphy's gross revenues associated with the alleged infringing activity to establish damages. This position, however, fails to acknowledge that Hyphy is also entitled to present its "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

As the 9th Circuit in *Polar Bear Prods., Inc. v. Timex Corp.* stated, Section 504(b) "creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir.2004). Upon deduction of Hyphy's costs to create and market the Albums, however, the Court will find that no "profits" exists (and are therefore owed to Yellowcake), even if Hyphy is liable for copyright infringement (which it is not). As set forth in the Declaration of Jesus Chavez, Hyphy incurred approximately $124,700 in verifiable costs, but only generated approximately $104,131 in verifiable revenue – establishing that Hyphy has taken a loss of $20,569 on the Albums. SSIO Nos. ¶¶ 79, 120.

Accordingly, Counter-Defendants have no claim for actual or statutory damages upon which they can base a cause of action for Copyright infringement.

**V.     COUNTER-DEFENDANTS INFRINGED HYPHY'S COPYRIGHTS**

Counter-Defendants also move for summary adjudication of Hyphy's remaining counterclaims asserted against them. However, Counter-Defendants' arguments appear to be a direct response to the arguments Hyphy has presented in its own, already-filed, Motion for Summary Judgment. Thus, Hyphy expressly

incorporates herein by this reference Hyphy's Motion for Summary Judgment, and also addresses such arguments as follows.

**First**, Counter-Defendants make various technical arguments in an attempt to exclude Hyphy's evidence of infringement – including that Hyphy's evidence "lacks foundation." However, Hyphy *has* established in its Motion for Summary Judgment exactly how the evidence was obtained, and why it constitutes verifiable proof that Counter-Defendants uploaded the Albums with Hyphy's copyrighted Album Artwork. Counter-Defendants also claim that the evidence is inadmissible because it was "not produced pursuant to a valid subpoena or accompanied by a business records certification," but Counter-Defendants provide no authority for the suggestion that documentary evidence can never be admissible unless it is produced via a subpoena.

**Second**, Counter-Defendants claim that Hyphy's evidence of infringement "do[es] not reference either Yellowcake or Colonize anywhere." This claim, however, ignores Hyphy's detailed explanation of how Yellowcake's UPC numbers **definitively prove** Counter-Defendants' distribution of the Albums with Hyphy's Album Artwork. *Counter-Defendants don't even address the UPC numbers at all*, or the expert testimony presented by Hyphy to establish exactly how such numbers prove Yellowcake's involvement. Counter-Defendants' strategy therefore seems to be: ignore Hyphy's technical evidence and argument proving infringement, in the hopes that the Court might overlook the same and take Counter-Defendants at their word when they insist, without more, that they've done nothing wrong.

**Third**, Counter-Defendants argue that "Hyphy and nonparty Morena have essentially committed a fraud on this Court" through their introduction of the UPC evidence. In making such argument, Counter-Defendants rely on a single e-mail from an unrelated third party who they claim was "one of Daddy Kool Records'

digital distributors"[2]. Notwithstanding the fact that *this* email lacks foundation and, more importantly, was never produced via Initial Disclosures or through discovery (as is apparently Counter-Defendants' habit), this argument is utterly baseless for the following reasons.

First of all, and most importantly, in the e-mail, the alleged "distributor" was shown three UPC numbers (821691353127, 821691351628, and 821691350324) and asked who distributed the Albums for *those* numbers. However, those UPC numbers are **not** the same UPC numbers at issue in this case and identified in Hyphy's Motion. The Motion makes clear that the UPC numbers proving Yellowcake's infringement are **758381471406**, **758381471420**, and **758381471413**.

In other words, if any party is attempting to perpetrate a fraud upon this Court, it is Counter-Defendants, by referencing inapplicable UPC Codes in an obvious, bad-faith attempt to mislead this Court.

Additionally, Counter-Defendants are essentially accusing Morena Music (a non-party) of somehow distributing Hyphy's music and then trying to conceal a relationship between them without any evidence for such a baseless conspiracy theory. In response, Hyphy has therefore obtained a Declaration from Eduardo Leon, the principal of Morena Music, who flatly denies every accusation Counter-Defendants have improperly and untowardly lobbed at Morena Music. SSIO No. ¶ 122. At the risk of stating the obvious, it must also be pointed out that Hyphy and non-party Morena Music are <u>competitors</u>, who have **no** working relationship, other than that both have been targeted by the copyright trolls at Yellowcake. SSIO No. ¶ 123.

---

2 Hyphy also notes that Counter-Defendants have introduced this email into the record in the same way as Hyphy's evidence of infringement, which Counter-Defendants' ironically insist is inadmissible because it has not been "authenticated" and was not "produced pursuant to a valid subpoena or accompanied by a business records certification…" *See* Motion at 23:5-13.

This failed smear campaign by Counter-Defendants, however, only shows the power of UPC numbers,[3] and the reason why Counter-Defendants *have to* pretend such numbers don't exist in mounting a defense against of their own infringement: the UPC numbers allow Hyphy to definitively connect Counter-Defendants to Hyphy's evidence of the Albums being distributed with Hyphy's Album Covers.

Lastly, Counter-Defendants' specious claim of fraud on the Court fatally relies on the completely uncorroborated, self-serving declarations of Counter-Defendants' principals, Kevin Berger and Jose David Hernandez. Mr. Berger's Declaration is particularly incredible, given that he appears to miraculously remember very specific, and conveniently favorable, details regarding Counter-Defendants' distribution practices that he failed to remember during his deposition *as the person most knowledgeable for Yellowcake*. Similarly, Mr. Hernandez has already lied under oath by claiming that Counter-Defendants would never distribute the Albums with Hyphy's Album Artwork, even though Hyphy has proven that they have. SSIO No. ¶ 124.

Accordingly, Counter-Defendants' Motion should not be granted as to Hyphy's relevant Counterclaims because a genuine dispute of facts exists.

## VI. <u>CONCLUSION</u>

Based on the foregoing, Hyphy respectfully requests that Counter-Defendants' Motion be denied in its entirety.

DATED: August 15, 2023        **ALTVIEW LAW GROUP, LLP**

By: _____
JOHN M. BEGAKIS
*Attorneys for Defendant/Counterclaimant*
HYPHY MUSIC, INC., a California
corporation

---

3 On this point, Hyphy's expert even referred to UPC numbers as "digital social security numbers for products. SSIO No. ¶ 121.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing electronically filed document has been served via a "Notice of Electronic Filing" automatically generated by the CM/ECF System and sent by e-mail to all attorneys in the case who are registered as CM/ECF users and have consented to electronic service pursuant to L.R. 5-3.3.

Dated: August 15, 2023                    By:   /s/ John Begakis
                                                John M. Begakis