1  **ALTVIEW LAW GROUP, LLP**
   JOHN M. BEGAKIS (SBN 278681)
2  john@altviewlawgroup.com
   12100 Wilshire Blvd., Suite 800
3  Los Angeles, California 90025
   Telephone: (310) 230-5580
4  Facsimile: (562) 275-8954

5  **SHERMAN LAW GROUP, LLP**
   RICHARD LLOYD SHERMAN (SBN 106597)
6  richard@shermanlawgroup.com
   9454 Wilshire Blvd., Suite 850
7  Beverly Hills, California 90212
   Telephone: (310) 246-0321
8  Facsimile: (310) 246-0305

9
   *Attorneys for Defendant/Counterclaimant* HYPHY MUSIC, INC.
10

11                UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14 YELLOWCAKE, INC., California corporation, | **Case No.: 1:20-cv-00988-JLT-BAM** |
| 15            Plaintiff, | [Assigned to the Hon. Jennifer L. Thurston] |
| 16      v. | **DECLARATION OF JOHN BEGAKIS IN SUPPORT OF HYPHY MUSIC INC.'S OPPOSITION TO JESUS CHAVEZ, SR.'S MOTION FOR SUMMARY JUDGMENT** |
| 17 HYPHY MUSIC, INC., | |
| 18            Defendant. | |
| 19 | |
| 20 HYPHY MUSIC, INC., | Date:  September 29, 2023 |
| 21 | Time: 9:00 a.m. |
|           Counterclaimant, | Dept.: Courtroom 4 (7th Floor) |
| 22      v. |        2500 Tulare Street |
| 23 YELLOWCAKE, INC.; COLONIZE |        Fresno, CA 93721 |
| 24 MEDIA, INC; JOSE DAVID HERNANDEZ; and JESUS | Judge: Hon. Jennifer L. Thurston |
| 25 CHAVEZ SR, | |
| 26           Counter-Defendants. | |
| 27 | |
| 28 | |

DECLARATION OF JOHN BEGAKIS

## DECLARATION OF JOHN BEGAKIS

I, John Begakis, declare and state as follows:

1.      I am an attorney duly licensed to practice law in the State of California and before this Court. I am a founding partner at AltView Law Group, LLP and co-counsel for Defendant/Counterclaimant Hyphy Music, Inc. ("***Hyphy***"). I hereby submit this declaration in support of Hyphy's Opposition to the Motion for Summary Judgment (the "***Motion***") filed by Counter-Defendant Jesus Chavez, Sr. ("***Chavez***") filed concurrently herewith. I know all of the following facts of my own personal knowledge and, if called upon and sworn as a witness, could and would competently testify thereto.

2.      On or about July 16, 2020, Plaintiff Yellowcake Inc. ("***Yellowcake***") filed its operative Complaint against Hyphy. On or about August 28, 2020, Hyphy filed its operative First Amended Counterclaim against Yellowcake and fellow Counter-Defendants Colonize Media, Inc. ("***Colonize***"), Jose David Hernandez ("***Hernandez***"), and Chavez (collectively, "***Counter-Defendants***").

3.      To the best of my knowledge and based on a diligent search of all documents in my possession, custody and/or control, neither I, nor anyone in my office, has ever been served with, or otherwise received, any Initial Disclosures from Yellowcake or any of the other Counter-Defendants at any time since the commencement of this dispute.

4.      On or about February 11, 2022, Yellowcake served responses to Hyphy's First Set of Interrogatories, which included a verification (the "***Yellowcake Interrogatory Responses***"). Notably, the Yellowcake Interrogatory Responses include the following:

### INTERROGATORY NO. 1:

State all facts regarding YOUR belief that YOU are the sole owner of all right, title, and interest in and to the COPYRIGHTED WORKS.

*///*

**RESPONSE TO INTERROGATORY NO. 1:**

Subject to and without waiving any General Objections, Plaintiff/Counterdefendant is the sole owner of all right, title, and interest in and to the COPYRIGHTED WORKS by virtue of the Asset Purchase Agreement dated March 21, 2019, between Yellowcake and Jesus Chavez, Sr., and the related copyright registrations.

A true and correct copy of the Yellowcake Interrogatory Responses are attached hereto as **Exhibit "D"** and incorporated herein by this reference.

5.      On or about February 11, 2022, Yellowcake served responses to Hyphy's First Set of Requests for Production of Documents, which included a verification (the "***Yellowcake Responses to Requests for Production***"). Notably, the Yellowcake Responses to Requests for Production include the following:

**REQUEST NO. 1:**

All DOCUMENTS evidencing YOUR exclusive ownership of all right, title, and interest in and to the COPYRIGHTED WORKS

**RESPONSE TO REQUEST NO. 1:**

Plaintiff/Counterdefendant objects to this request on the grounds that such documents are publicly available to the Defendant/Counterclaimant. Notwithstanding Plaintiff/Counterdefendant's general and specific objections, all relevant documents in Plaintiff/Counterdefendant's possession, custody and control are annexed hereto and Bates stamped PLF000001-PLF000051.

True and correct copies of the Yellowcake Responses to Requests for Production, and the relevant documents produced therewith, are attached hereto as **Exhibit "E"** and incorporated herein by this reference.

6.      On or about July 26, 2022, Counter-Defendants took the deposition of Jose Martinez as the "Person Most Knowledgeable" for Hyphy (the "***Martinez Depo***"). During that deposition, Mr. Martinez testified to: (a) the business of Hyphy and the albums at issue that Hyphy commissioned (13:6-14:6, 44:7-23, 44:24-9,

DECLARATION OF JOHN BEGAKIS

51:22-25, 154:11-155:25); (b) Hernandez's prior work with Hyphy (26:2-12); (c) Hyphy's close collaboration with the Group (59:21-60:7, 61:10-16, 75:6-76:25, 83:11-84:22, 84:24-85:8, 85:14-86:16); (d) Hyphy's creation of the Album Artwork and distribution thereof along with the Albums (44:7-23; 51:18-25; 67:24-68:24, 67:24-69:5, 127:12-21, 133:9-136:5); and (e) the limited value (if any) of Chavez's contributions to the music the Group creates (111:24-112:3). True and correct copies of the portions of the Martinez Depo evidencing such testimony, located at (page:line) 13:6-14:6, 26:2-12, 44:7-23, 44:24-9, 51:18-25, 51:22-25, 59:21-60:7, 61:10-16, 67:24-68:24, 67:24-69:5, 75:6-76:25, 83:11-84:22, 84:24-85:8, 85:14-86:16, 111:24-112:3, 127:12-21, 133:9-136:5, and 154:11-155:25 of the deposition transcript, are attached hereto as **Exhibit "F"** and incorporated herein by this reference.

7.     On or about August 16, 2022, Hyphy took the deposition of Kevin Berger as the "Person Most Knowledgeable" for Yellowcake (the "***Berger Depo***"). During that deposition, Mr. Berger testified to the relationship between Yellowcake and Colonize. True and correct copies of the portions of the Berger Depo evidencing such testimony, located at (page:line) 91:19-23 of the deposition transcript, are attached hereto as **Exhibit "G"** and incorporated herein by this reference.

8.     On or about August 17, 2022, Hyphy took the first volume of the deposition of Jose David Hernandez ("***Hernandez Depo I***"). During that deposition, Hernandez testified to (a) the relationship between Yellowcake and Colonize (77:19-21); (b) the ownership of Yellowcake and Colonize (51:9-11, 116:18-117:14); (c) the operation of Yellowcake and Colonize as one single economic entity (80:3-20); (d) Counter-Defendants' acquisition and distribution of the albums at issue in this dispute (148:24-149:5 and 107:4-20); and (e) Counter-Defendants' desire not to have "anything to do with Hyphy Music's artwork." True and correct copies of the portions of Hernandez Depo I evidencing such testimony, located at (page:line) 51:9-11, 77:19-21, 80:3-20, 107:4-20, 116:18-117:14, 148:24-149:5 and

DECLARATION OF JOHN BEGAKIS

211:24-212:6 of the deposition transcript, are attached hereto as **Exhibit "H"** and incorporated herein by this reference.

9.     On or about December 6, 2022, Counter-Defendants took the deposition of Alfonso Vargas (the "***Vargas Depo***"). During that deposition, Vargas testified to the Group's status as a co-equal partnership in which all members were also joint owners and authors of the relevant albums based on their contributions to the creation thereof. True and correct copies of the portions of the Vargas Depo evidencing such testimony, located at (page:line) 17:16-19, 27:17-22, 143:7-10, 143:14-16, 143:17-20, 143:25-144:3, and 144:4-7 of the deposition transcript, are attached hereto as **Exhibit "I"** and incorporated herein by this reference.

10.     On or about December 7, 2022, Counter-Defendants took the deposition of Domingo Torres Flores (the "***Flores Depo***"). During that deposition, Flores testified to the Group's status as a co-equal partnership in which all members were also joint owners and authors of the relevant albums based on their contributions to the creation thereof. True and correct copies of the portions of the Flores Depo evidencing such testimony, located at (page:line) 47:15-25, 48:19-23, 82:13-15, 82:22-83:2, 83:4-13, 85:25-86:11, and 86:13-21 of the deposition transcript, are attached hereto as **Exhibit "J"** and incorporated herein by this reference.

11.     On or about December 14, 2022, Hyphy took the first volume of the deposition of Jesus Chavez Sr. ("***Chavez Depo I***"). During that deposition, Chavez testified to (a) his role in the Group (25:13-14); (b) the Group's status as a co-equal partnership between all the members (18:16-19:3; 20:8-16; 21:16-19); and (c) the Group's recording of the relevant albums pursuant to their agreement with Hyphy (34:7-11). True and correct copies of the portions of Chavez Depo I evidencing such testimony, located at (page:line) 18:16-19:3, 20:8-16, 21:16-19, 25:13-14 and 34:7-11 of the deposition transcript, are attached hereto as **Exhibit "K"** and incorporated herein by this reference.

DECLARATION OF JOHN BEGAKIS

12.     On or about January 9, 2023, Hyphy took the second volume of the deposition of Jesus Chavez Sr. ("***Chavez Depo II***"). During that deposition, Chavez testified to (a) his role in the Group (16:22-17:5); (b) the Group's recording of the relevant albums pursuant to their agreement with Hyphy (19:14-17, 32:16-20, 35:12-21); (c) the Group's status as a co-equal partnership in which all members were also joint authors of the relevant albums based on their contributions to the creation thereof (20:20-21:16, 26:13-20, 31:8-16, 33:18-34:1, 38:8-18, 41:13-42:2); and (d) Hernandez's efforts to purchase rights in the relevant albums from Chavez (77:13-17, 79:7-9, 79:17-80:2, 80:5-13, 81:7-16). True and correct copies of the portions of Chavez Depo I evidencing such testimony, located at (page:line) 16:22-17:5, 19:14-17, 20:20-21:16, 26:13-20, 31:8-16, 32:16-20, 33:18-34:1, 35:12-21, 38:8-18, 41:13-42:2, 77:13-17, 79:7-9, 79:17-80:2, 80:5-13, 81:7-16 and 88:25-89:9 of the deposition transcript, are attached hereto as **Exhibit "L"** and incorporated herein by this reference.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on August 15, 2023, at Los Angeles, California.

JOHN BEGAKIS

DECLARATION OF JOHN BEGAKIS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing electronically filed document has been served via a "Notice of Electronic Filing" automatically generated by the CM/ECF System and sent by e-mail to all attorneys in the case who are registered as CM/ECF users and have consented to electronic service pursuant to L.R. 5-3.3.

Dated: August 15, 2023             By: _ /s/ John Begakis _____
                                          John M. Begakis

# EXHIBIT "D"

**HEFNER, STARK & MAROIS, LLP**
Thomas P. Griffin, Jr., Esq. (SBN 155133)
   tgriffin@hsmlaw.com
2150 River Plaza Drive, Suite 450
Sacramento, CA  95833
Telephone: 916.925.6620
Facsimile: 916.925.1127

**ABRAMS FENSTERMAN, LLP**
Seth L. Berman, Esq. (*admitted pro hac vice*)
   sberman@abramslaw.com
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Telephone: 516.328.2300
Facsimile: 516.328.6638

Attorneys for Plaintiff YELLOWCAKE, INC.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| YELLOWCAKE, INC., a California corporation,<br><br>           Plaintiff,<br><br>    v.<br><br>HYPHY MUSIC, INC.,<br><br>           Defendant. | **Case No.: 1:20-CV-00988-DAD-BAM**<br><br>**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/ COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/ COUNTERDEFENDANT YELLOWCAKE, INC.** |

*(Left margin, vertical text):* ABRAMS FENSTERMAN, LLP / 3 Dakota Drive, Suite 300 / Lake Success, NY 11042 / Phone: (516) 328-2300 / Fax: (516) 328-6638

1

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE
TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF
INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT
YELLOWCAKE, INC.**

HYPHY MUSIC, INC.,                    )
                                      )
                Counterclaimant,      )
                                      )
        v.                            )
                                      )
YELLOWCAKE, INC., COLONIZE            )
MEDIA, INC., JOSE DAVID               )
HERNANDEZ, JESUS CHAVES, SR.,         )
                                      )
                Counterdefendants.    )

Plaintiff/Counterdefendant Yellowcake, Inc. ("Plaintiff/Counterdefendant") through its attorneys Abrams Fensterman, LLP, and local counsel, Hefner Stark & Marois, LLP, and in accordance with Federal Rules of Civil Procedure 26 and 33, hereby submit the following objections and responses to the First Set of Interrogatories to Plaintiff/Counterdefendant Yellowcake, Inc (the "Interrogatories") propounded by Defendant/Counterclaimant Hyphy Music, Inc. ("Defendant/Counterclaimant"). Plaintiff/Counterdefendant reserves the right to supplement, amend, or correct these responses and any documents or responses produced as part of these disclosures.

# I.

## PRELIMINARY STATEMENT

Plaintiff/Counterdefendant has not, at this time, fully completed its discovery and investigation in this action. All information contained herein is based solely upon such information and evidence as is presently available and known to Plaintiff/Counterdefendant upon information and belief at this time. Further discovery, investigation, research and analysis may supply additional facts, and meaning to currently known information. Plaintiff/Counterdefendant reserves the right to amend any and all responses herein as additional facts are ascertained, legal research is completed, and analysis is undertaken.

/ / /

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

The responses herein are made in a good faith effort to supply as much information as is presently known to Plaintiff/Counterdefendant.

## II.

## GENERAL OBJECTIONS

In addition to the objections stated in the specific responses to the Interrogatories, the following objections (the "General Objections") apply to all of the Interrogatories. The following General Objections are hereby incorporated by reference into the individual responses to the Interrogatories, and have the same force and effect as if fully set forth in the responses to the Interrogatories. Defendant/Counterclaimant objects as follows:

1.        Plaintiff/Counterdefendant objects to the Interrogatories to the extent that they seek information that is not relevant to the subject matter of this proceeding or is not reasonably calculated to lead to the discovery of admissible evidence.

2.        Plaintiff/Counterdefendant objects to the Interrogatories as improper and unduly burdensome to the extent that they purport to impose upon Plaintiff/Counterdefendant any obligations or requirements broader than those set forth in the Federal Rules of Civil Procedure or rules otherwise applicable to this matter.

3.        Plaintiff/Counterdefendant objects to the Interrogatories to the extent that they call for information that is a matter of public record or otherwise routinely available to all parties.

4.        Plaintiff/Counterdefendant objects to the Interrogatories to the extent that they are duplicative or designed to harass.

5.        Plaintiff/Counterdefendant objects to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the work product doctrine, or any other privilege or immunity from discovery. Any inadvertent disclosure of any such privileged information shall not constitute a waiver of any applicable privilege or any other ground for objecting to discovery with respect to such privileged information.

3

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

6. Plaintiff/Counterdefendant objects to the Interrogatories to the extent that they seek information regarding documents or materials that are not in Plaintiff/Counterdefendant' possession, custody, or control.

7. Plaintiff/Counterdefendant objects to the Interrogatories to the extent that they state a legal conclusion, or assume or appear to assume that any fact, event, or assumption is true. By responding to any such Interrogatory, Plaintiff/Counterdefendant does not concede the correctness of any such conclusion or assumption.

8. Plaintiff/Counterdefendant objects to the Interrogatories on the ground that they are unduly burdensome and premature in light of the fact that Plaintiff/Counterdefendant is still conducting discovery and that many of the facts are already known by Defendant/Counterclaimant. Plaintiff/Counterdefendant has made a good faith effort to respond to each Interrogatory in a timely manner. Plaintiff/Counterdefendant's responses herein are necessarily based solely on the information that is available to Plaintiff/Counterdefendant on the date of these responses. Plaintiff/Counterdefendant's investigation is ongoing, and Plaintiff/Counterdefendant reserves the right to amend, supplement, or withdraw any response or objection to the Interrogatories as it deems necessary or appropriate in light of information or knowledge obtained as discovery progresses in this action.

9. In responding to the Interrogatories, Plaintiff/Counterdefendant does not concede that any of the information provided is relevant or material to the subject matter of this litigation or reasonably calculated to lead to the discovery of admissible evidence. Plaintiff/Counterdefendant reserves the right to object to the admissibility at trial of any of the information produced in response to the Interrogatories.

**III.**

**SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES**

INTERROGATORY NO. 1:

State all facts regarding YOUR belief that YOU are the sole owner of all right, title, and interest in and to the COPYRIGHTED WORKS.

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

**RESPONSE TO INTERROGATORY NO. 1**:

Subject to and without waiving any General Objections, Plaintiff/ Counterdefendant is the sole owner of all right, title, and interest in and to the COPYRIGHTED WORKS by virtue of the Asset Purchase Agreement dated March 21, 2019, between Yellowcake and Jesus Chavez, Sr., and the related copyright registrations.

INTERROGATORY NO. 2:

State all facts regarding YOUR purported acquisition of all right, title, and interest in and to the COPYRIGHTED WORKS from CHAVEZ.

**RESPONSE TO INTERROGATORY NO. 2**:

Subject to and without waiving any General Objections, Plaintiff/ Counterdefendant is the sole owner of all right, title, and interest in and to the COPYRIGHTED WORKS by virtue of the Asset Purchase Agreement dated March 21, 2019, between Yellowcake and Jesus Chavez, Sr., and the related copyright registrations.

INTERROGATORY NO. 3:

State all facts regarding each and every conversation CHAVEZ had with anyone for YOU regarding YOUR purported acquisition of all right, title, and interest in and to the COPYRIGHTED WORKS.

**RESPONSE TO INTERROGATORY NO. 3**:

Plaintiff/Counterdefendant objects to this Interrogatory for the reasons set forth in the General Objections and on the grounds that it is overly broad, unduly burdensome and vague.

INTERROGATORY NO. 4:

State all facts regarding each and every conversation between or among anyone who works for YOU regarding YOUR purported acquisition of all right, title, and interest in and to the COPYRIGHTED WORKS.

/ / /

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

1

**RESPONSE TO INTERROGATORY NO. 4**:

2
3
4

Plaintiff/Counterdefendant objects to this Interrogatory for the reasons set forth in the General Objections and on the grounds that it is overly broad, unduly burdensome and vague.

5

INTERROGATORY NO. 5:

6
7

State all of the terms of YOUR purported agreement with CHAVEZ to transfer all right, title, and interested in and to the COPYRIGHTED WORKS to YOU.

8

**RESPONSE TO INTERROGATORY NO. 5**:

9
10
11
12
13
14
15

Plaintiff/Counterdefendant objects to this interrogatory as overbroad and unduly burdensome to the extent it calls for Plaintiff/Counterdefendant to reproduce, in narrative answer format, material that has already been produced to Defendant/Counterclaimant. *See* Federal Rule of Civil Procedure 33(d). Subject to and without waiving these objections and the General Objections, Defendant/ Counterclaimant is referred to the Asset Purchase Agreement dated March 21, 2019, between Yellowcake and Jesus Chavez, Sr.

16
17
18

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff/Counterdefendant reserves the right to supplement, amend, or correct these responses and any documents or responses produced as part of theses disclosures.

19

Dated:  February 11, 2022

20

**ABRAMS FENSTERMAN, LLP**

21
22

By: */s/ Seth L. Berman*

23
24

Seth L. Berman, Esq. (*pro hac vice*)
***Attorneys for Plaintiff/Counterdefendant
Yellowcake, Inc.***

25
26
27
28

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

6

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

## VERIFICATION OF INTERROGATORY ANSWERS

State of California,

County of Stanislaus        , ss:

Kevin Berger, being first duly sworn, states that I am a shareholder and the Chief Executive Officer of Plaintiff/Counterdefendant Yellowcake, Inc. I have read the above document and knows the contents of it, and that all of the statements contained in that document are true and correct, to the best of my knowledge and belief.

_____

Kevin Berger

Sworn to and subscribed before me

this ____ day of February, 2022.


_See attached_____

Notary Public

7

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of <u>STANISLAUS</u>

Subscribed and sworn to (or affirmed) before me on this <u>10TH</u> day of <u>FEBRUARY</u>, 20 <u>22</u>, by <u>KEVIN BERGER</u>
_____,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

JENNIFER MURRY
Notary Public - California
Stanislaus County
Commission # 2258800
My Comm. Expires Oct 16, 2022

(Seal)                         Signature _____

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.** has been served upon the Attorneys for Defendant/Counterclaimant via Electronic Mail addressed to:

ALTVIEW LAW GROUP, LLP

John M. Begakis, Esq.

john@altviewlawgroup.com

12100 Wilshire Blvd., Suite 800

Los Angeles, California 90025

Telephone: (310) 230-5580

Facsimile: (562) 275-8954

on February 11, 2022.

_____

Seth L. Berman

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF/COUNTERDEFENDANT YELLOWCAKE, INC.**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

# EXHIBIT "E"

**HEFNER, STARK & MAROIS, LLP**
Thomas P. Griffin, Jr., Esq. (SBN 155133)
    tgriffin@hsmlaw.com
2150 River Plaza Drive, Suite 450
Sacramento, CA  95833
Telephone: 916.925.6620
Facsimile: 916.925.1127

**ABRAMS FENSTERMAN, LLP**
Seth L. Berman, Esq. (*admitted pro hac vice*)
    sberman@abramslaw.com
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Telephone: 516.328.2300
Facsimile: 516.328.6638

Attorneys for Plaintiff YELLOWCAKE, INC.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YELLOWCAKE, INC., a California corporation,<br><br>                    Plaintiff,<br><br>      v.<br><br>HYPHY MUSIC, INC.,<br><br>                    Defendant. | Case No.: **1:20-CV-00988-DAD-BAM**<br><br>**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/ COUNTERCLAIMANT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

1

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

| | |
|---|---|
| HYPHY MUSIC, INC., | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| YELLOWCAKE, INC., COLONIZE | ) |
| MEDIA, INC., JOSE DAVID | ) |
| HERNANDEZ, JESUS CHAVES, SR., | ) |
| | |
| Counterdefendants. | |

Pursuant to the provisions of Rule 34 of the Federal Rules of Civil Procedure, Plaintiff/Counterdefendant Yellowcake, Inc. ("Plaintiff/Counterdefendant"), through its attorneys Abrams Fensterman, LLP, and local counsel, Hefner Stark & Marois, LLP, responds to the First Set of Requests for Production of Documents to Plaintiff/Counterdefendant Yellowcake, Inc., propounded by Defendant/ Counterclaimant Hyphy Music, Inc. ("Defendant\Counterclaimant"). Plaintiff/ Counterdefendant reserves the right to supplement, amend, or correct these responses and any documents or responses produced as part of these disclosures.

## **GENERAL OBJECTIONS**

Plaintiff/Counterdefendant asserts and incorporates by reference the following general objections to Defendant\Counterclaimant's request for production of documents as though they were set forth in full in each response:

1. Plaintiff/Counterdefendant objects to Defendant\Counterclaimant's request for production of documents to the extent that the requests are overly broad and unduly burdensome, and to the extent that Defendant\Counterclaimant seeks documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, deliberative process privilege, and other applicable privileges. Any inadvertent disclosure of privileged information is not intended to be, and may not be construed as, a waiver of any applicable privilege.

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

2. Plaintiff/Counterdefendant objects to Defendant\Counterclaimant's request for production of documents to the extent that Defendant\Counterclaimant seeks the discovery of information, which is beyond the scope of this lawsuit, and therefore irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.

3. This response is made without waiver of, and with express reservation of, all objections and/or questions as to competency, relevancy, materiality, and admissibility of the responses to document requests as evidence for any purpose in any further proceedings in this action (including the trial of this action) or in any other action.

4. Likewise, Plaintiff/Counterdefendant's objections to Defendant\Counterclaimant's request for production of documents are based upon the information presently known by the Plaintiff/Counterdefendant, and are made without prejudice to the Plaintiff/Counterdefendant's right to assert additional objections in the event that additional grounds for objections should be discovered by the Plaintiff/Counterdefendant subsequent to this response. Without waiving the above objections, Plaintiff/Counterdefendant will provide responses to relevant, non-privileged matters based on information currently available to it, subject only to the requirements for supplementation of responses contained in Fed. R. Civ. P. 26(e).

5. Plaintiff/Counterdefendant objects to the requests to the extent they attempt to impose obligations that are inconsistent with, or beyond the scope of, those imposed by or authorized under the Federal Rules of Civil Procedure or other applicable law.

6. Plaintiff/Counterdefendant objects to the requests to the extent they seek documents or information in the possession, custody, or control of entities or persons other than Plaintiff/Counterdefendant.

7. Plaintiff/Counterdefendant objects to the requests to the extent they seek documents or information that no longer exists or has otherwise been lost, misplaced, or destroyed.

/ / /

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

8. Plaintiff/Counterdefendant objects to the requests as unduly burdensome to the extent that they seek documents previously produced to the Defendant\Counterclaimant and its attorneys and/or are publicly available on the Internet. Responding to such requests would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests is substantially the same or less for the Defendant\Counterclaimant as for the Plaintiff/Counterdefendant.

Subject to and without waiving the foregoing objections, Plaintiff/Counterdefendant provides the following responses:

**SPECIFIC OBJECTIONS AND RESPONSES TO
DEFENDANT\COUNTERCLAIMANT'S
FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST NO. 1**:

All DOCUMENTS evidencing YOUR exclusive ownership of all right, title, and interest in and to the COPYRIGHTED WORKS.

**RESPONSE TO REQUEST NO. 1**:

Plaintiff/Counterdefendant objects to this request on the ground that such documents are publicly available to the Defendant/Counterclaimant. Notwithstanding Plaintiff/Counterdefendant's general and specific objections, all relevant documents in Plaintiff/Counterdefendant's possession, custody and control are annexed hereto and Bates stamped PLF000001-PLF000051.

**REQUEST NO. 2**:

All DOCUMENTS evidencing YOUR purported acquisition of all right, title, and interest in and to the COPYRIGHTED WORKS from CHAVEZ.

**RESPONSE TO REQUEST NO. 2**:

Notwithstanding Plaintiff/Counterdefendant's general objections, all relevant documents in Plaintiff/Counterdefendant's possession, custody and control are annexed hereto and Bates stamped PLF000001-PLF000051.

/ / /

4

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE
TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR
PRODUCTION OF DOCUMENTS**

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

**REQUEST NO. 3**:

All COMMUNICATIONS between CHAVEZ and anyone for YOU regarding YOUR purported acquisition of all right, title and interest in and to the COPYRIGHTED WORKS.

**RESPONSE TO REQUEST NO. 3**:

Plaintiff/Counterdefendant specifically objects to this demand on the grounds that the request calls for the production of documents that are not relevant to any parties' claims or defenses, the request is not reasonably calculated to lead to the discovery of admissible evidence, the request seeks the production of documents that constitute settlement communications, and the request seeks documents that are confidential, and subject to attorney-client privilege. Notwithstanding the foregoing, Plaintiff/ Counterdefendant upon a reasonable search is not in possession of responsive documents to this request.

**REQUEST NO. 4**:

All COMMUNICATIONS between or among anyone who works for YOU regarding YOUR purported acquisition of all right, title, and interest in and to the COPYRIGHTED WORKS.

**RESPONSE TO REQUEST NO. 4**:

Plaintiff/Counterdefendant specifically objects to this demand on the grounds that the request calls for the production of documents that are not relevant to any parties' claims or defenses, the request is not reasonably calculated to lead to the discovery of admissible evidence, the request seeks the production of documents that constitute settlement communications, and the request seeks documents that are confidential, and subject to attorney-client privilege. Notwithstanding the foregoing, Plaintiff/ Counterdefendant upon a reasonable search is not in possession of responsive documents to this request.

**REQUEST NO. 5**:

All DOCUMENTS that support YOUR claims in the COMPLAINT.

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

**RESPONSE TO REQUEST NO. 5**:

      Notwithstanding Plaintiff/Counterdefendant's general objections, all relevant documents in Plaintiff/Counterdefendant's possession, custody and control are annexed hereto and Bates stamped PLF000001-PLF000059.

      Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff/Counterdefendant reserves the right to supplement, amend, or correct these responses and any documents or responses produced as part of theses disclosures.

Dated: February 11, 2022

**ABRAMS FENSTERMAN, LLP**

By: */s/ Seth L. Berman* _____
     Seth L. Berman, Esq. (*pro hac vice*)
***Attorneys for Plaintiff/Counterdefendant***
***Yellowcake, Inc.***

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS** has been served upon the Attorneys for Defendant/Counterclaimant via Electronic Mail addressed to:

ALTVIEW LAW GROUP, LLP

John M. Begakis, Esq.

john@altviewlawgroup.com

12100 Wilshire Blvd., Suite 800

Los Angeles, California 90025

Telephone: (310) 230-5580

Facsimile: (562) 275-8954

on February 11, 2022.

_____

Seth L. Berman

ABRAMS FENSTERMAN, LLP
3 Dakota Drive, Suite 300
Lake Success, NY 11042
Phone: (516) 328-2300 / Fax: (516) 328-6638

---

7

**PLAINTIFF/COUNTER DEFENDANT YELLOWCAKE, INC.'S RESPONSE TO DEFENDANT/COUNTERCLAIMANT'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS**

Certificate of Registration





This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## SR 864-335

**Effective Date of Registration:**
February 07, 2020
**Registration Decision Date:**
March 26, 2020

---

## Title

| | |
|---|---|
| **Title of Work:** | Album Title: 15 Corridos Inmortales |
| **Content Title:** | Los Principios |
| | Santos Cantu |
| | El Regio Traficante |
| | Se les Pelo Baltazar |
| | Juan Martha |
| | El Rayo De Sinaloa |
| | El Cabo De Michoacan |
| | El Corrido De Los Perez |
| | El Malvado |
| | La Raza Contenta |
| | Charlando Con La Muerte |
| | Gallo De Raza Fina |
| | El Preso De Nuevo Leon |
| | Juan Perez |
| | El Corrido De Joselo |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2014 |
| **Date of 1st Publication:** | September 02, 2014 |
| **Nation of 1st Publication:** | United States |

Page 1 of 2

PLF000001

## Author

- **Author:** Jesus Chaves Sr.
- **Author Created:** sound recording
- **Work made for hire:** No
- **Citizen of:** United States
- **Domiciled in:** United States
- **Pseudonymous:** No

## Copyright Claimant

**Copyright Claimant:** YELLOWCAKE, INC.
701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:** By contract

## Rights and Permissions

**Organization Name:** YELLOWCAKE, INC.
**Name:** Kevin Berger
**Email:** yellowcakecorp@gmail.com
**Telephone:** (209)632-9938
**Address:** 701 E Canal Drive
Turlock, CA 95380 United States

## Certification

**Name:** DAVID HERNADEZ
**Date:** February 07, 2020

**Correspondence:** Yes
**Copyright Office notes:** Basis for Registration: Collective work.



Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

**SR 863-320**

**Effective Date of Registration:**
February 07, 2020
**Registration Decision Date:**
March 27, 2020

## Title
_____

| | |
|---|---|
| **Title of Work:** | Album Title: Amigos Y Contrarios [performed by] Los Originales De San Juan |
| **Content Title:** | Amigos y Contrarios feat. Los Inquietos Del Norte |
| | El Tucan |
| | El Buchon |
| | El Puma de Tlazazaca |
| | Custodio Alvarez |
| | Dos Perros Malnacidos |
| | Rolando Junior |
| | Javier Guerrero |
| | Hugo Salazar |
| | Hoy Que Mis Hijos Se Fueron |
| | Jesus Herrera |
| | Corrido Del Mochis |
| | Hartate Mugroso |
| | La Carera |

## Completion/Publication
_____

| | |
|---|---|
| **Year of Completion:** | 2013 |
| **Date of 1st Publication:** | February 21, 2013 |
| **Nation of 1st Publication:** | United States |

## Author
_____

Page 1 of 2

PLF000003

- **Author:** Jesus Chavez, Sr.
**Author Created:** sound recording
**Work made for hire:** No
**Citizen of:** United States
**Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** YELLOWCAKE, INC.
701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:** By written contract

## Rights and Permissions

**Organization Name:** YELLOWCAKE, INC.
**Email:** yellowcakecorp@gmail.com
**Telephone:** (209)632-9938
**Alt. Telephone:** (415)735-8236
**Address:** 701 E Canal Drive
Turlock, CA 95380 United States

## Certification

**Name:** David Hernandez
**Date:** February 07, 2020

**Correspondence:** Yes
**Copyright Office notes:** Basis for Registration: Collective work.

Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

# SR 863-476

**Effective Date of Registration:**
February 06, 2020
**Registration Decision Date:**
March 30, 2020

## Title _____

| | |
|---|---|
| **Title of Work:** | Album Title: Celebrando 39 [performed by] Los Originales de San Juan |
| **Content Title:** | El Dia Que Me Dejaste |
| | Tragos Amargos |
| | Los Consejos feat. Chuy Jr |
| | Tomando Licores |
| | Mujer Bonita |
| | Ensename a Olvidar |
| | Vaciando Botellas |
| | La Palomita |
| | Te Llevaste |
| | Corazones Rotos |
| | El Sinaloense |
| | Celebrando |

## Completion/Publication _____

**Year of Completion:** 2015
**Date of 1st Publication:** March 05, 2015
**Nation of 1st Publication:** United States

## Author _____

- **Author:** Jesus Chavez, Sr.

**Author Created:** sound recording
**Work made for hire:** No

Page 1 of 2

|  |  |
|---|---|
| **Citizen of:** | United States |
| **Domiciled in:** | United States |
| **Pseudonymous:** | No |

## Copyright Claimant

|  |  |
|---|---|
| **Copyright Claimant:** | YELLOWCAKE, INC.<br>701 E Canal Drive, Turlock, CA, 95380, United States |
| **Transfer statement:** | By written Contract |

## Rights and Permissions

|  |  |
|---|---|
| **Organization Name:** | YELLOWCAKE, INC. |
| **Name:** | Kevin Berger |
| **Email:** | yellowcakecorp@gmail.com |
| **Telephone:** | (209)632-9938 |
| **Address:** | 701 E Canal Drive<br>Turlock, CA 95380 United States |

## Certification

|  |  |
|---|---|
| **Name:** | David Hernandez |
| **Date:** | February 06, 2020 |

|  |  |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Basis for Registration: Collective work.<br><br>Regarding deposit: Special Relief granted under 37 CFR 202.20(d) of Copyright Office regulations. |

PLF000006

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

# SR 863-319

**Effective Date of Registration:**
February 07, 2020
**Registration Decision Date:**
March 26, 2020

## Title

| | |
|---|---|
| **Title of Work:** | Album Title: Corridos de Poca M [performed by] Los Originales de San Juan |
| **Content Title:** | El Carlichi |
| | Sin Fortuna |
| | El Fantasma |
| | Javier Fernandez |
| | El Original |
| | Manuel Gonzalez |
| | Amanda Varela |
| | Cuando Se Nace Rico |
| | Mi Viejo |
| | Tan Solo Penas |

## Completion/Publication

**Year of Completion:** 2015
**Date of 1st Publication:** February 24, 2015
**Nation of 1st Publication:** United States

## Author

- **Author:** Jesus Chavez, Sr.
  **Author Created:** sound recording
  **Work made for hire:** No
  **Citizen of:** United States
  **Domiciled in:** United States
  **Pseudonymous:** No

Page 1 of 2

PLF000007

## Copyright Claimant

|  |  |
|---|---|
| **Copyright Claimant:** | YELLOWCAKE, INC. |
| | 701 E Canal Drive, Turlock, CA, 95380, United States |
| **Transfer statement:** | By written contract |

## Rights and Permissions

|  |  |
|---|---|
| **Organization Name:** | YELLOWCAKE, INC. |
| **Email:** | yellowcakecorp@gmail.com |
| **Telephone:** | (209)632-9938 |
| **Alt. Telephone:** | (415)735-8236 |
| **Address:** | 701 E Canal Drive |
| | Turlock, CA 95380 United States |

## Certification

|  |  |
|---|---|
| **Name:** | David Hernandez |
| **Date:** | February 07, 2020 |

|  |  |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Basis for Registration: Collective work. |





Certificate of Registration

This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

# SR 866-471

**Effective Date of Registration:**
February 11, 2020
**Registration Decision Date:**
March 31, 2020

---

## Title

**Title of Work:** Album Title: Desde La Cantina De Mi Barrio [performed by] Los Originales De
San Juan

**Content Title:** 1. Mi Ultimo Deseo (En Vivo);
2. La Peda (En Vivo);
3. Paloma En Su Nido (En Vivo);
4. El Morralito (En Vivo);
5. Lineas de a Metro (En Vivo);
6. Naci Con Suerte De Rey (En Vivo);
7. El Tequilero (En Vivo);
8. El Clavo (En Vivo);
9. El Jabali (En Vivo);
10. Con Una Copa En Mi Mano (En Vivo);
11. La Cantina De Mi Barrio (En Vivo);
12. El Carlichi (En Vivo);
13. La Vida Prestada (En Vivo);
14. Fuiste Todo Para Mi (En Vivo);
15. Eladio Mora (En Vivo)

## Completion/Publication

**Year of Completion:** 2017
**Date of 1st Publication:** March 24, 2017
**Nation of 1st Publication:** United States

## Author

- **Author:** Jesus Chavez, Sr.
  **Author Created:** a sound recording of entire concert
  **Work made for hire:** No
  **Citizen of:** United States
  **Domiciled in:** United States

## Copyright Claimant

Page 1 of 2

PLF000009

**Copyright Claimant:** YELLOWCAKE, INC.
701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:** By written contract

## Rights and Permissions

**Organization Name:** YELLOWCAKE, INC.
**Email:** yellowcakecorp@gmail.com
**Telephone:** (209)632-9938
**Alt. Telephone:** (415)735-8236
**Address:** 701 E Canal Drive
Turlock, CA 95380 United States

## Certification

**Name:** David Hernandez
**Date:** February 11, 2020

**Correspondence:** Yes
**Copyright Office notes:** Regarding deposit: Special Relief granted under 37 CFR 202.20(d) of Copyright Office regulations.

PLF000010

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## SR 863-321

**Effective Date of Registration:**
February 07, 2020
**Registration Decision Date:**
March 20, 2020

## Title

| | |
|---|---|
| **Title of Work:** | Album Title: El Campesino [performed by] Los Originales De San Juan) |
| **Content Title:** | El Campesino |
| | Solo Dios |
| | El Arbol |
| | El Paniqueado |
| | Dinero Manchado |
| | Corrido del Cach |
| | El Corrido De Camilo |
| | El Martelito |
| | Chicano Jalicience |
| | Miguel Fuentes |
| | En Una Cajita De Oro |
| | Mis Hijos Son Mi Tesoro |
| | Marili |
| | Suplica De Un Padre |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2016 |
| **Date of 1st Publication:** | May 31, 2016 |
| **Nation of 1st Publication:** | United States |

## Author

Page 1 of 2

PLF000011

- **Author:** Jesus Chavez, Sr.
- **Author Created:** sound recording
- **Work made for hire:** No
- **Citizen of:** United States
- **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** YELLOWCAKE, INC.
701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:** By written contracts

## Rights and Permissions

**Organization Name:** YELLOWCAKE, INC.
**Email:** yellowcakecorp@gmail.com
**Telephone:** (209)632-9938
**Alt. Telephone:** (415)735-8236
**Address:** 701 E Canal Drive
Turlock, CA 95380 United States

## Certification

**Name:** David Hernandez
**Date:** February 07, 2020

**Correspondence:** Yes
**Copyright Office notes:** Basis for Registration: collective work

PLF000012

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

# SR 864-338

**Effective Date of Registration:**
February 28, 2020
**Registration Decision Date:**
March 05, 2020

---

## Title

| | |
|---|---|
| **Title of Work:** | Chuy Chavez y Sus Amigos |
| **Previous or Alternate Title:** | Album Tittle: Mariachi [performed by] Los Originales De San Juan |
| **Content Title:** | Me Voy |
| | Amigo Martin |
| | Segundo Lugar |
| | El Huerfanito feat. Tonito Barela |
| | Nube Viajera |
| | No Te Puedes Ir feat. Oliver Moya |
| | Padre |
| | Que Bueno |
| | Que Te Vaya Bonito |
| | Tu Camino Y El Mio |
| | Ya Es Por Demas |
| | Cuando Dos Almas feat. Chuy Jr |
| | El Fierros |
| | Mi Padre Querido feat. Omar Alvarez |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2013 |
| **Date of 1st Publication:** | March 04, 2013 |
| **Nation of 1st Publication:** | United States |

Page 1 of 2

PLF000013

## Author

- **Author:** Jesus Chavez, Sr.
- **Author Created:** sound recording
- **Work made for hire:** No
- **Citizen of:** United States
- **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** YELLOWCAKE, INC.
701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:** By written contract

## Rights and Permissions

**Organization Name:** YELLOWCAKE, INC.
**Email:** yellowcakecorp@gmail.com
**Telephone:** (209)632-9938
**Alt. Telephone:** (415)735-8236
**Address:** 701 E Canal Drive
Turlock, CA 95380 United States

## Certification

**Name:** David Hernandez
**Date:** February 11, 2020

**Correspondence:** Yes
**Copyright Office notes:** Basis for Registration: Collective work.

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director



**Registration Number**

## SR 864-340

**Effective Date of Registration:**
February 11, 2020
**Registration Decision Date:**
March 30, 2020

---

## Title

| | |
|---|---|
| **Title of Work:** | Album Title: Naci Con Suerte de Rey [performed by] Los Originales De San Juan |
| **Content Title:** | Naci Con Suerte de Rey |
| | Don Miguel Herrera |
| | Volver a Vivir |
| | Fiesta en Mi Rancho |
| | Que Bonito |
| | Que Vuelva Conmigo |
| | Padre |
| | Sin Llorar y Como Amigos |
| | Devuelveme El Corazon |
| | Que De Raro Tiene |
| | Tarde feat. Paty Alvizo |
| | Miraron Llorar a Este Hombre |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2013 |
| **Date of 1st Publication:** | August 26, 2013 |
| **Nation of 1st Publication:** | United States |

## Author

| | | |
|---|---|---|
| • | **Author:** | Jesus Chavez, Sr. |
| | **Author Created:** | sound recording |

Page 1 of 2

**Work made for hire:** No
**Citizen of:** United States
**Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** YELLOWCAKE, INC.
701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:** By written contract

## Rights and Permissions

**Organization Name:** YELLOWCAKE, INC.
**Email:** yellowcakecorp@gmail.com
**Telephone:** (209)632-9938
**Alt. Telephone:** (415)735-8236
**Address:** 701 E Canal Drive
Turlock, CA 95380 United States

## Certification

**Name:** David Hernandez
**Date:** February 11, 2020

**Correspondence:** Yes
**Copyright Office notes:** Basis for Registration: Collective work.

Regarding deposit: Special Relief granted under 37 CFR 202.20(d) of Copyright Office regulations.

PLF000016

Certificate of Registration





This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

**SR 864-336**

**Effective Date of Registration:**
February 11, 2020
**Registration Decision Date:**
March 20, 2020

## Title

**Title of Work:**   Album Title: Nuestra Historia En Vivo [performed by] Los Originales De San Juan

**Content Title:**   El Rey Del Cristal (En Vivo)

El Aguacatero (En Vivo)

El Patas de Diablo (En Vivo)

El Cara De Chango (En Vivo)

La Raza De Michoacan (En Vivo)

La Caspa Del Diablo (En Vivo)

La Troca Del Mono Negro (En Vivo)

Deje De Engordar Marranos (En Vivo)

El Jadrinero (En Vivo)

El Grande Michoacan (En Vivo)

Rey De Reyes (En Vivo)

Pakas De A Kilo (En Vivo)

La Muerte De Manuelon (En Vivo)

El Corrido Del Charapo (En Vivo)

Los Cuatro Amigos (En Vivo)

El Numero Gratis (En Vivo)

## Completion/Publication

**Year of Completion:**   2017
**Date of 1st Publication:**   March 31, 2017

Page 1 of 2

PLF000017

Nation of 1st Publication:    United States

## Author

- **Author:**    Jesus Chavez, Sr.
  **Author Created:**    a sound recording of entire concert
  **Work made for hire:**    No
  **Citizen of:**    United States
  **Domiciled in:**    United States

## Copyright Claimant

**Copyright Claimant:**    YELLOWCAKE, INC.
          701 E Canal Drive, Turlock, CA, 95380, United States
**Transfer statement:**    By written contract

## Rights and Permissions

**Organization Name:**    YELLOWCAKE, INC.
**Email:**    yellowcakecorp@gmail.com
**Telephone:**    (209)632-9938
**Alt. Telephone:**    (415)735-8236
**Address:**    701 E Canal Drive
          Turlock, CA 95380 United States

## Certification

**Name:**    David Hernandez
**Date:**    February 11, 2020

**Correspondence:**    Yes

YellowCake, Inc.
Attn: Kevin Berger
701 E. Canal Drive
Turlock, CA 95380

PLF000019

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

*Marie Strong*

Acting United States Register of Copyrights and Director

February 24, 2020
_____

Date of Recordation

9970                              519
_____

Volume                          Doc. No.

PLF000020

# ASSET PURCHASE AND ASSIGNMENT AGREEMENT

This Asset Purchase and Assignment Agreement ("Agreement"), effective March 21, 2019 ("Effective Date"), is entered into by and between Yellowcake, Inc., a California corporation ("Buyer"), and Jesus Chavez, Sr., dba Enoch Records ("Seller"). Buyer and Seller are referred to herein jointly as "Parties" and individually as "Party."

## RECITALS

A.     Seller is the sole owner of, and holds exclusive title to, the masters of the compositions identified on Exhibit A hereto ("Catalog").

B.     Pursuant to the terms and conditions of this Agreement, Seller desires to sell, assign, transfer, convey and deliver to Buyer the entirety of the ownership in the rights, title and interests in the Catalog, free and clear of all Claims (defined below). The sale described in this Agreement does not include the publishing rights associated with the Catalog.

C.     Buyer desires to purchase and acquire the Catalog, pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the covenants and mutual agreements herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.     <u>Recitals</u>. The Recitals are true and correct and are incorporated into this Agreement.

2.     <u>Exhibits and Definitions</u>. The Exhibits hereto are incorporated into, and made a part of, this Agreement. The defined terms identified in the Exhibits shall have the same meanings in this Agreement, unless specifically stated otherwise.

3.     <u>Purchase and Sale</u>.

a.     Pursuant to the terms and conditions of this Agreement, as of the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, and accept the assignment, transfer and conveyance of, the entirety of the ownership in the rights, title and interests in Catalog, free and clear of all Claims. The sale described in this Agreement does not include the publishing rights associated with the Catalog.

b.     Following the Closing, Buyer may make any and all adaptations, changes, dramatizations, translations, edits and arrangements (collectively, "Adaptations") to the Catalog and the titles thereof, or any part thereof, Buyer shall have the exclusive right to copyright the Catalog and any Adaptations and retain all rights therein, whether now known or hereafter devised, throughout the universe, for the full term of copyright protection therein (and the right to renew and extend and restore any such copyright thereon), and Buyer shall have the right to use the Catalog and Adaptations for any commercial purpose. As referred to herein, the term "Catalog" shall include the Adaptations.

c.     Seller understands and agrees that, after the Closing, if Buyer discovers additional Works and any other items that are part of the Catalog, the additional Works or other

1

items shall immediately be deemed part of the Catalog without any further action by either Party, the discovering Party shall provide notice thereof to the other Party, and the Parties shall amend or replace Exhibit A to include the additional Works or other items in the Catalog.

d.    Seller understands and agrees that, after the Closing, Buyer shall be solely entitled to collect and receive any and all royalties and all other sources of income revenue from any party or source, generated by, or derived from, the Catalog, whether uncollected prior to the Closing or accruing on or after the Closing ("Catalog Revenue").

4.    <u>Assumption of Liabilities</u>. Buyer is not assuming, and Seller shall retain, satisfy and discharge, all liabilities arising out of or relating to Seller's ownership of the Catalog prior to and including the Closing, which liabilities shall remain the sole responsibility of Seller.

5.    <u>Closing</u>. Provided the terms and conditions of this Agreement have been satisfied (or waived in writing by the appropriate Party), the closing ("Closing") of the sale of the Assets shall take place on March 21, 2019, or on such other date as agreed upon by the Parties in writing.

6.    <u>Review Period</u>.    Buyer hereby waives any due diligence period regarding the Catalog.

7.    <u>Purchase Price</u>. The purchase price for the Catalog shall be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ("Purchase Price").

8.    <u>Payments</u>.  Buyer shall pay the Purchase Price to Seller as follows:

a.    Buyer shall deliver ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to Seller at the Closing; and

b.    Buyer shall deliver ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮) to Seller commencing on May 1, 2019, and continuing on the first day of each month thereafter until paid in full, provided Seller has delivered to Buyer the items identified in Section 11, has complied with the obligations set forth in Section 16, and has satisfied Seller's other obligations as set forth herein.

9.    <u>Assignment of Catalog Revenue</u>. As of the Closing, Seller shall be deemed to have assigned to Buyer, fully, finally, and absolutely, all of Seller's rights, title and interests in and to the Catalog Revenue.  Following the Closing, Seller shall turn over and deliver to Buyer any and all Catalog Revenue within five (5) calendar days after Seller's receipt thereof for as long as Seller continues to receive Catalog Revenue. Seller shall execute the General Assignment and Bill of Sale of Catalog (attached hereto as Exhibit B) and the General Assignment and Bill of Sale of Catalog Revenue (attached hereto as Exhibit D) to confirm Seller's assignment of the Catalog Revenue to Buyer.

10.    <u>Further Assurances and Post-Closing Cooperation</u>. At any time or from time to time after the Closing, at Buyer's request, at no cost to Buyer and without further consideration, Seller shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Buyer may deem necessary or desirable in order effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, the Catalog and, to the fullest extent permitted by law, to put Buyer in actual possession and control of the Catalog, and, in accordance with this Agreement, to assist Buyer in exercising all rights with respect thereto and otherwise to cause Seller to fulfill Seller's obligations under this Agreement. Upon Seller's failure promptly to

2

do so within ten (10) business days of Buyer's written request, Seller hereby appoints Buyer as Seller's attorney-in-fact for such purposes (Seller acknowledges that such appointment is irrevocable and shall be deemed to be a power coupled with an interest), with full power of substitution and delegation, concerning all matters relating to the Catalog. Without limiting the foregoing, Seller hereby agrees to execute and deliver to Buyer any Letters of Direction regarding the Catalog as requested by Buyer.

11.    Deliveries of Seller. At the Closing, Seller shall, in the manner and form reasonably specified by Buyer, deliver or cause to be delivered to Buyer:

a.    The Catalog, free and clear of all liens, encumbrances, claims, clouds, charges, equities, attachments, security interests, pledges, leasehold interests, encumbrances, distribution interests or rights, licensing interests or rights, or any other rights or claims of others or imperfections of title of any kind relating to all or any portion of the Catalog (collectively, "Claims").

b.    (i) This Agreement duly executed; (ii) the duly-executed General Assignment and Bill of Sale of Catalog, in the form attached as Exhibit B hereto ("General Assignment of Catalog"); (iii) the duly-executed Copyright/Trademark Assignment Agreement for the Catalog, which may be recorded with the United States Copyright Office and/or the United States Patent and Trademark Office, in the form attached as Exhibit C hereto ("Copyright/Trademark Assignment"); (iv) the duly executed Assignment of Catalog Revenue, in the form attached as Exhibit D hereto ("Catalog Revenue Assignment"); and (v) if necessary, such other good and sufficient instruments of conveyance, assignment and transfer, in form and substance reasonably acceptable to Buyer's counsel, as shall be effective to vest in Buyer, good and valid title in and to the Catalog as stated above. The General Assignment of Catalog, the Copyright/Trademark Assignment, the Catalog Revenue Assignment, and the other instruments referred to in clause (v) are collectively referred to herein as the "Collateral Agreements."

c.    The Letter of Direction in the form attached hereto as Exhibit E hereto.

d.    All such other assignments and other instruments as, in the reasonable opinion of Buyer's counsel, are necessary to vest in Buyer good, valid and marketable title to the Catalog as described herein.

12.    Deliveries of Buyer. At the Closing, Buyer shall deliver to Seller (a) the Purchase Price, (b) this Agreement duly executed, and (c) the Collateral Agreements duly executed. The Purchase Price shall be paid by check or wire transfer as directed by Seller.

13.    Representations and Warranties of Seller. Seller hereby represents, covenants and warrants to Buyer, as of the Closing, as follows:

a.    Authority. Seller is authorized to enter into this Agreement, has all requisite power and authority to enter into this Agreement and the Collateral Agreements and, subject to satisfaction or waiver by Buyer of any conditions set forth herein, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Collateral Agreements and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Seller, and no further action is required on the part of Seller to authorize the execution of the Agreement and the Collateral Agreements and the transactions contemplated hereby. This Agreement has been duly executed and delivered by Seller, and constitutes the valid and binding obligations of Seller enforceable against Seller in accordance with its terms.

3

PLF000023

b.    No Violation. Neither the execution and delivery of this Agreement, nor the consummation by Seller of the transactions contemplated by this Agreement and the Collateral Agreements: (i) violate any law, judgment, order, decree, rule or regulation applicable to Seller, (ii) violate the provisions of Seller's formation or governance documents; (iii) require any authorization, consent, approval, exemption or other action by any Governmental Entity (defined below) or other third party, or (iv) violate or conflict with, or constitutes a default under, any contract, commitment, or agreement or restriction of any kind or character to which Seller is a party or by which Seller or any of Seller's assets may be bound which could adversely affect the transactions contemplated by this Agreement and the Collateral Agreements.

c.    Governmental Consents. No consent, waiver, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or other federal, state, county, local or foreign governmental authority, instrumentality, agency or commission (each, a "Governmental Entity") is required by or with respect to Seller in connection with the execution and delivery of this Agreement and the Collateral Agreements by Seller or the consummation by Seller of the transactions contemplated hereby.

d.    Restrictions on Transaction. There is no agreement, commitment, judgment, injunction, order or decree to which Seller is a party binding upon the Catalog which has or may have the effect of prohibiting the consummation of the transactions contemplated hereby or impairing Buyer's use or ownership of the Assets after the Closing.

e.    Title to Catalog and Encumbrances. Immediately prior to the Closing, Seller shall be the only owner of, and shall have good and marketable title to, the entirety of the Catalog defined in Exhibit A hereto, free and clear of all Claims and, upon the Closing, Buyer shall receive good and marketable title to the entirety of the ownership in the Catalog, free and clear of all Claims, subject only to the publishing rights associated with the Catalog. Prior to the Closing, Seller has and shall have, at Seller's expense, terminated any licensing or distribution rights or agreements regarding the Catalog, and Seller has and shall satisfied all payments based on guild or union agreements, including without limitation, the American Federation of Musicians and the American Federation of Television and Radio Artists, and any other party relating to the Catalog through the Closing. Moreover, Seller has and shall have fully, absolutely and timely paid all recording costs and expenses in connection with the Catalog through the Closing. After the Closing, Seller shall be able to own and use its rights, title and interests in, and to, the Catalog pursuant to this Agreement and in the same manner the Seller did prior to the Closing.

f.    Hyphy Distribution. On or about August 20, 2013, Seller entered into a verbal agreement with Hyphy Music Inc. ("Hyphy"), a California corporation, to monetize one album, named "NACI CON SUERTE DE REY," for a period of three (3) years. Hyphy paid Seller an advance of Twenty Thousand Dollars ($20,000) and Hyphy was entitled to retain thirty-five percent (25%) of the revenue generated from this album after it recovered its advance to Seller. Hyphy was obligated to turn over the balance of the income generated by this album to Seller and provide Seller with reports of the income generated by this album and the payments made therefrom. Seller represents that this right granted to Hyphy expired in or about August of 2016 and Hyphy has no other claims, past or present, in any portion of the Catalog.

g.    Taxes. There is no requirement under applicable law (applicable to Seller or the Catalog) that any taxes be withheld on the Purchase Price payable to Seller hereunder, and Seller shall be solely responsible for all taxes payable in connection with its receipt of the Purchase Price.

4

PLF000024

h.    <u>Litigation</u>. There is no action, suit, claim or proceeding of any nature pending or threatened against Seller which relates to the Catalog, nor is there any basis for any such action, claim, suit or proceeding, including any claim by any copyright proprietor that relates or may relate to any so-called "sampled" material contained in the Works.

i.    <u>Compliance with Laws</u>. Seller has complied with, is not in violation of, and has not received any notices of violation with respect to, any applicable laws in any jurisdiction, U.S. or foreign, with respect to its ownership of the Catalog.

j.    <u>Originality of Works</u>. The Works are and shall be new and original and shall not be an imitation or copy of any other material, the Works are and shall be capable of copyright protection throughout the universe, and the Works do not and shall not violate or infringe upon any common law or statutory right, U.S. or foreign, of any party, including, without limitation, contractual rights, trademarks, copyrights and rights of privacy, or constitute unfair competition. Furthermore, Seller has obtained and will obtain all necessary consents and permissions for Buyer to release, distribute and exploit the Catalog, including any and all Works by any means, in any manner or media now known or hereafter devised, including all rights to mechanically record the Works.

k.    <u>Representations Complete</u>. None of the representations or warranties made by Seller, nor any statement made in any Exhibit or certificate furnished by Seller pursuant to this Agreement, contains, or will contain at the Closing, any untrue statement of a material fact, or omits or will omit at the Closing to state any material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which made, not misleading.

14.    <u>Representations and Warranties of Buyer</u>. Buyer hereby represents, covenants and warrants to Seller as of the Effective Date and as of the Closing, as follows:

a.    <u>Organization, Good Standing and Qualification</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California. Buyer has all necessary powers to own its properties and to carry on its business as now owned and operated, and is duly qualified to transact business and is in good standing in all jurisdictions in which the nature of its business or the character or location of its properties make such qualification necessary.

b.    <u>Authority</u>. Buyer is authorized to enter into this Agreement, has all requisite power and authority to enter into this Agreement and the Collateral Agreements and, subject to satisfaction or waiver of any conditions set forth herein, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

c.    <u>No Violation</u>. Neither the execution and delivery of this Agreement, nor the consummation by Buyer of the transactions contemplated by this Agreement and the Collateral Agreements: (i) violate any law, judgment, order, decree, rule or regulation applicable to Buyer, (ii) violate the provisions of Buyer's formation or governance documents, (iii) require any authorization, consent, approval, exemption or other action by any Governmental Entity or other third party, or (iv) violate or conflict with, or constitutes a default under, any contract, commitment, or agreement or restriction of any kind or character to which Buyer is a party or by

5

PLF000025

which Buyer or any of its assets may be bound which could adversely affect the transactions contemplated by this Agreement and the Collateral Agreements.

15.    <u>Covenants of Seller</u>.

a.    <u>No Transfer or Material Adverse Change</u>. Between the Effective Date and the Closing, Seller shall not: (i) assign, sell, license or transfer any Work or other item comprising the Catalog; (ii) fail to notify the Buyer promptly in the event of any material adverse change in the Catalog or of an event which would render untrue or incomplete any of Seller's representations and warranties herein; or (iii) do or agree to do, or fail to do, anything which would cause a material adverse change in the Catalog.

b.    <u>No Negotiations with Others</u>. Between the Effective Date and the Closing, Seller shall not initiate, solicit or participate in any inquiries or making any proposals with respect to, or engaging in negotiations concerning, or providing any confidential information or data to, or having any discussions with any other person or entity relating to, any acquisition or purchase of all or any portion of the Catalog. Upon the Effective Date, Seller will immediately cease, and cause to be terminated, any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any of the foregoing.

c.    <u>Remedies</u>. In the event of any breach by Buyer of this Agreement, Seller will be limited to Seller's remedies at law for damages (if any) and will not have the right to terminate or rescind this Agreement or to enjoin the distribution, licensing, publishing, exploitation or advertising of all or any portion of the Catalog or any materials in connection therewith by Buyer or its assignees or licensees.

d.    <u>Post-Closing</u>. After the Closing, Buyer shall be able to exercise all rights associated with the Catalog pursuant to the terms and conditions of this Agreement in the same manner as Seller did prior to the Closing.

16.    <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer hereunder to consummate and effect the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions by Seller (all or any of which may be waived in whole or in part by Buyer in its sole and absolute discretion):

a.    <u>Representations and Warranties</u>. Each of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing.

b.    <u>Performance</u>. Seller shall have performed and complied with, in all material respects, each agreement, covenant and obligation required by this Agreement and the Collateral Agreements to be so performed or complied with by Seller at or before the Closing.

c.    <u>No Material Adverse Change</u>. No material adverse change shall have occurred subsequent to the Effective Date with respect to the Catalog, nor shall any event or circumstance have occurred which would result in a material adverse change to the Catalog.

d.    <u>Orders and Laws</u>. There shall not be in effect on the Closing any order or law restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

6

PLF000026

e.    Actions and Proceedings. There shall be no action or proceeding of any nature pending or threatened against Seller or the Catalog arising out of, or in any way connected with, the transactions contemplated hereby.

f.    Deliveries. Seller shall have duly and validly executed this Agreement and all Collateral Agreements, and delivered the same to Buyer.

17.    Conditions to Obligations of Seller. The obligations of Seller hereunder to consummate and effect the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by Seller's in its absolute discretion):

a.    Representations and Warranties. Each of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects as of the Closing.

b.    Performance. Buyer shall have performed and complied with, in all material respects, each agreement, covenant and obligation required by this Agreement to be so performed or complied with by Buyer at or before the Closing.

c.    Deliveries.  Buyer shall have duly and validly executed this Agreement and all Collateral Agreements, and delivered the same to Seller.

18.    Indemnification.

a.    Indemnification by Seller. Seller shall indemnify, defend and hold Buyer and its employees, officers, shareholders, directors, agents, representatives, licensees, assignees and/or affiliates ("Buyer Indemnified Parties") harmless against all claims, losses, liabilities, damages, deficiencies, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses of investigation and defense (hereinafter individually a "Loss" and collectively "Losses"), paid, sustained, incurred or accrued by any Buyer Indemnified Party, or any of them, directly or indirectly, based upon third party claims or actions relating to, or arising out of, (i) any breach or inaccuracy of any representation or warranty of Seller contained in this Agreement, any Collateral Agreement or any document, certificate or instrument delivered in connection herewith or therewith, (ii) the assertion by any third party on or after the Effective Date that it has any interest of Claim in the Catalog (including, but not limited to, any ownership interest or licensing, distribution or publishing rights in the Catalog or any portion thereof), (iii) any failure by Seller to perform or comply with any covenant contained in this Agreement, any Collateral Agreement or any document, certificate or instrument delivered in connection herewith or therewith, (iv) any and all liabilities and obligations of any kind whatsoever, whether accrued, absolute, contingent, liquidated or unliquidated, matured or unmatured, known or unknown, relating to, or arising out of the ownership or use of the Catalog, and (v) any and all liabilities and obligations of any kind whatsoever, whether accrued, absolute, contingent, liquidated or unliquidated, matured or unmatured, known or unknown, relating to, or arising out of any acts or omissions of Seller regarding the Catalog, whether accruing before or after the Closing.

b.    Indemnification by Buyer. Buyer shall indemnify, defend and hold Seller and his successors, heirs and permitted assigns ("Seller's Indemnified Parties") harmless against all Losses paid, sustained, incurred or accrued by any Seller's Indemnified Party, or any of them, directly or indirectly, based upon third party claims or actions relating to or arising out of the following, except to the extent such Losses arise from or are related to the matters set forth in Seller's representations, warranties, covenants and/or agreements made under this

7

PLF000027

Agreement: (i) any breach or inaccuracy of any representation or warranty of Buyer contained in this Agreement, any Collateral Agreement or any other document, certificate or instrument delivered in connection herewith or therewith; (ii) any failure by Buyer to perform or comply with any covenant contained in this Agreement, any Collateral Agreement or any document, certificate or instrument delivered in connection herewith or therewith; (iii) Buyer's ownership or use of the Catalog following the Closing, and (iv) any and all liabilities and obligations of any kind whatsoever, whether accrued, absolute, contingent, liquidated or unliquidated, matured or unmatured, known or unknown, relating to, or arising out of any acts or omissions of Buyer regarding the Catalog, accruing after the Closing.

19.    General.

a.    No Third Party Beneficiaries. Nothing contained in this Agreement shall be construed to confer upon or give to any person or entity other than the Parties hereto and their successors and assigns, any rights or remedies under or by reason of this Agreement.

b.    Notices.  Any notice, demand, request, consent, approval, or other communication that either Party desires or is required to give to the other Party or any other person shall be in writing and served personally or sent by facsimile, by electronic mail, by prepaid first-class mail, provided a return receipt is requested and received, or by overnight delivery courier. Any notice given pursuant to this Section 19.b shall be deemed given when personally delivered, three (3) days after deposit with the United States Postal Service, postage prepaid, return receipt requested, upon confirmation of the successful facsimile or electronic mail transmission thereof (except that if such confirmation indicates the transmission was received after 5:00 p.m., it shall be deemed received the next business day) or when delivery is confirmed according to the overnight delivery courier's tracking system. Any notice, demand, request, consent, approval, or other communication that either Party desires or is required to give to the other Party shall be addressed to the other Party at the address set forth in the signature block below or at such other address as a Party subsequently identifies in writing.

c.    Entire Agreement, Modification and Waiver.  This Agreement (including all Exhibits attached to this Agreement, which are incorporated herein by this reference) sets forth the entire agreement of the Parties hereto with respect to the matters contained herein, and no prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective for any purpose. No supplement, modification or amendment to this Agreement shall be binding unless it is in writing and executed by all of the Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, any waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless it is in writing and executed by the Party making the waiver.

d.    Expenses. Whether or not the transactions contemplated hereby are consummated, Parties shall pay their own costs and expenses incurred, or to be incurred, in negotiating and preparing this Agreement and in consummating the transactions contemplated hereby.

e.    Governing Law and Venue. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without regard to principles of conflicts of law. The Parties agree that the Stanislaus County Superior Court ("Court") shall be the exclusive venue for any and all lawsuits, proceedings or actions arising out of or relating to this Agreement. The Parties agree to submit themselves to the exclusive jurisdiction of the Court with respect to any lawsuit, proceeding or action.

8

PLF000028

   f. <u>Binding Effect and Assignment</u>. All of the terms, provisions and obligations of this Agreement shall be binding on and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Seller hereby consents to Buyer assigning this Agreement and any and all rights thereunder to any party that Buyer determines in Buyer's sole and absolute discretion.

   g. <u>Relationship</u>. The relationship of the Parties to this Agreement is determined solely by the provisions of this Agreement. This Agreement does not create any agency, partnership, joint venture or trust.

   h. <u>Severability</u>. If any provision of the Agreement is held to be invalid or unenforceable at law, that provision will be reformed as a valid provision to reflect as closely as possible the original provision giving maximum effect to the intent of the Parties, or, if that cannot be done, that provision will be severed from the Agreement without affecting the validity or enforceability of the remaining provisions.

   i. <u>Binding Effect and Assignment</u>. All of the terms, provisions and obligations of this Agreement shall be binding on and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Seller hereby consents to Buyer assigning this Agreement and any and all rights thereunder to any party that Buyer determines in Buyer's sole and absolute discretion.

   j. <u>Attorneys' Fees and Costs</u>. In the event it shall become necessary to consult with an attorney or to commence a suit or arbitration or bring a motion or proceeding, whether judicial or administrative, in connection with the enforcement of any provision of this Agreement, or any right granted herein, the prevailing Party or Parties shall be entitled, in addition to such other relief as may be granted, to recover the actual costs and reasonable attorneys' fees incurred therein from the other Party or Parties.

   k. <u>Extension and Waiver</u>. At any time prior to the Closing, Buyer or Seller may (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, or (iii) waive compliance with any of the agreements or conditions for the benefit thereof contained herein, except that the Closing and any extensions or changes thereto shall be governed by the provisions of Section 5 above. Any agreement on the part of a Party hereto to any such extension or waiver under this Section 17.k shall be valid only if set forth in an instrument in writing signed by all of the Parties hereto.

   l. <u>Construction</u>. The Parties hereto have each participated in the negotiation and preparation of this Agreement and all Collateral Agreements. Accordingly, each Party hereby waives the protection or benefit of any law, judicial precedent or other legal principle which provides that contractual ambiguities are to be construed against the Party who drafted the provision in question.

   m. <u>Counterparts and Signatures</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any signed counterpart may be delivered by any Party by facsimile, pdf, electronic mail or any other electronic means, and any such counterpart shall be deemed an original thereof.

(Signatures appear on the next page.)

9

PLF000029

V9970 D519 P10

IN WITNESS WHEREOF, this Agreement was executed by the Parties as of the Effective Date.

BUYER                                          SELLER

YELLOWCAKE, INC.,
a California corporation

By: _____          _____
    Kevin Berger, President                   Jesus Chavez, Sr., dba
                                               Enoch Records

    Address:    701 East Canal Drive
                Turlock, CA  95380           Address:    5196 E. Drummond Ave
    Email:      yellowcakecorp@gmail.com                 Fresno, CA  93725
    Facsimile:  (209) 667-5717              Telephone:  (559) 720-3291

10

PLF000030

V9970 D519 P11

## Exhibit A
### to
## Asset Purchase and Assignment Agreement

### Catalog

### List of Masters

11

PLF000031

Mariachi – Los Originales De San Juan.zip

Naci Con Suerte de Rey – Los Originales De San Juan.zip

Desde la Cantina de Mi Barrio – Los Originales De San Juan.zip

Nuestra Historia (En Vivo) – Los Originales De San Juan.zip

Corridos de Poca M – Los Originales De San Juan.zip

Celebrando 39 – Los Originales De San Juan.zip

El Campesino – Los Originales De San Juan.zip

15 Corridos Inmortales – Los Originales De San Juan.zip

50 Mentadas [Explicit] – Los Originales De San Juan.zip

Amigos Y Contrarios – Los Originales De San Juan.zip

PLF000032

| Label | Catalog Number | Album Title | Track Number | Track Title | ISRC | Display Artist |
|---|---|---|---|---|---|---|
| JC | JC71369 | 15 Corridos Inmortales | 1 | Los Principios | QM-6DC-19-98934 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 2 | Santos Cantul | QM-6DC-19-98935 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 3 | El Regio Traficante | QM-6DC-19-98936 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 4 | Se Les Pelol Baltazar | QM-6DC-19-98937 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 5 | Juan Martha | QM-6DC-19-98938 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 6 | El Rayo de Sinaloa | QM-6DC-19-98939 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 7 | El Cabo de Michoacaln | QM-6DC-19-98940 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 8 | El Corrido de los Perez | QM-6DC-19-98941 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 9 | El Malvado | QM-6DC-19-98942 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 10 | La Raza Contenta | QM-6DC-19-98943 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 11 | Charlando Con la Muerte | QM-6DC-19-98944 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 12 | Gallo de Raza Fina | QM-6DC-19-98945 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 13 | El Preso de Nuevo Leon | QM-6DC-19-98946 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 14 | Juan Perez | QM-6DC-19-98947 | Los Originales De San Juan |
| JC | JC71369 | 15 Corridos Inmortales | 15 | El Corrido de Joselo | QM-6DC-19-98948 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 1 | 50 Mentadas | QM-6DC-19-98949 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 2 | El Costal Lleno de Piedras | QM-6DC-19-98950 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 3 | Ni por Todo el Dinero del Mundo | QM-6DC-19-98951 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 4 | Volver a Vivir | QM-6DC-19-98952 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 5 | El Ahijado de la Muerte | QM-6DC-19-98953 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 6 | El Fierros | QM-6DC-19-98954 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 7 | Don Miguel Maganlfa | QM-6DC-19-98955 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 8 | Maldito Compadre | QM-6DC-19-98956 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 9 | Maldito Vicio | QM-6DC-19-98957 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 10 | Por Alguien | QM-6DC-19-98958 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 11 | El Tartanero | QM-6DC-19-98959 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 12 | Corre y Olle | QM-6DC-19-98960 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 13 | La Muerte de Manuelon | QM-6DC-19-98961 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 14 | Falsa y Mentirosa | QM-6DC-19-98962 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 15 | Fiesta en Mi Rancho | QM-6DC-19-98963 | Los Originales De San Juan |
| JC | JC71376 | 50 Mentadas | 16 | Regalo Equivocado | QM-6DC-19-98964 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 1 | Amigos Y Contrarios | QM-6DC-19-98965 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 2 | El Tucan | QM-6DC-19-98966 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 3 | El Buchon | QM-6DC-19-98967 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 4 | El Puma De Tlarazaca | QM-6DC-19-98968 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 5 | Custodlo Alvarez | QM-6DC-19-98969 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 6 | Dos Perros Malnacidos | QM-6DC-19-98970 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 7 | Rolando Junior | QM-6DC-19-98971 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 8 | Javier Guerrero | QM-6DC-19-98972 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 9 | Hugo Salazar | QM-6DC-19-98973 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 10 | Hoy Que Mis Hijos Se Fueron | QM-6DC-19-98974 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 11 | Jesus Herrera | QM-6DC-19-98975 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 12 | Corrido Del Mochis | QM-6DC-19-98976 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 13 | Hartata Mugroso | QM-6DC-19-98977 | Los Originales De San Juan |
| JC | JC71383 | Amigos Y Contrarios | 14 | La Carera | QM-6DC-19-98978 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 1 | El Dia Que Me Dejaste | QM-6DC-19-98979 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 2 | Tragos Amargos | QM-6DC-19-98980 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 3 | Los Consejos | QM-6DC-19-98981 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 4 | Tomando Licores | QM-6DC-19-98982 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 5 | Mujer Bonita | QM-6DC-19-98983 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 6 | Ensenjfame a Olvidar | QM-6DC-19-98984 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 7 | Vaciando Botellas | QM-6DC-19-98985 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 8 | La Palomita | QM-6DC-19-98986 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 9 | Te Llevaste | QM-6DC-19-98987 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 10 | Corazones Rotos | QM-6DC-19-98988 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 11 | El Sinaloense | QM-6DC-19-98989 | Los Originales De San Juan |
| JC | JC71390 | Celebrando 39 | 12 | Celebrando | QM-6DC-19-98990 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 1 | El Carlichi | QM-6DC-19-98991 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 2 | Sin Fortuna | QM-6DC-19-98992 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 3 | El Fantasma | QM-6DC-19-98993 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 4 | Javier Fernandez | QM-6DC-19-98994 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 5 | El Original | QM-6DC-19-98995 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 6 | Manuel Gonzalez | QM-6DC-19-98996 | Los Originales De San Juan |

PLF000033

| | | | | | | |
|---|---|---|---|---|---|---|
| JC | JC71406 | Corridos de Poca M | 7 | Amanda Varela | QM-6DC-19-98997 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 8 | Cuando Se Nace Rico | QM-6DC-19-98998 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 9 | Mi Viejo | QM-6DC-19-98999 | Los Originales De San Juan |
| JC | JC71406 | Corridos de Poca M | 10 | Tan Solo Penas | QM-6DC-19-99000 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 1 | Mi Ultimo Deseo (En Vivo) | QM-6DC-19-99001 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 2 | La Peda (En Vivo) | QM-6DC-19-99002 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 3 | Paloma en Su Nido (En Vivo) | QM-6DC-19-99003 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 4 | El Morralito (En Vivo) | QM-6DC-19-99004 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 5 | Lineas de a Metro (En Vivo) | QM-6DC-19-99005 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 6 | Naci Con Suerte de Rey (En Vivo) | QM-6DC-19-99006 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 7 | El Tequilero (En Vivo) | QM-6DC-19-99007 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 8 | El Clavo (En Vivo) | QM-6DC-19-99008 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 9 | El Jabali (En Vivo) | QM-6DC-19-99009 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 10 | Con una Copa en Mi Mano (En Vivo) | QM-6DC-19-99010 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 11 | La Cantina de Mi Barrio (En Vivo) | QM-6DC-19-99011 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 12 | El Carlichi (En Vivo) | QM-6DC-19-99012 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 13 | La Vida Prestada (En Vivo) | QM-6DC-19-99013 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 14 | Fuiste Todo para Mi (En Vivo) | QM-6DC-19-99014 | Los Originales De San Juan |
| JC | JC71413 | Desde la Cantina de Mi Ba | 15 | Eliado Mora (En Vivo) | QM-6DC-19-99015 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 1 | El Campesino | QM-6DC-19-99016 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 2 | Solo Dios | QM-6DC-19-99017 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 3 | El Arbol | QM-6DC-19-99018 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 4 | El Paniqueado | QM-6DC-19-99019 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 5 | Dinero Manchado | QM-6DC-19-99020 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 6 | Corrido del Cach | QM-6DC-19-99021 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 7 | El Corrido de Camilo | QM-6DC-19-99022 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 8 | El Martelito | QM-6DC-19-99023 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 9 | Chicano Jalidience | QM-6DC-19-99024 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 10 | Miguel Fuentes | QM-6DC-19-99025 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 11 | En una Cajita de Oro | QM-6DC-19-99026 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 12 | Mis Hijos Son Mi Tesoro | QM-6DC-19-99027 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 13 | Marili | QM-6DC-19-99028 | Los Originales De San Juan |
| JC | JC71420 | El Campesino | 14 | Suplica de un Padre | QM-6DC-19-99029 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 1 | Me Voy | QM-6DC-19-99030 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 2 | Amigo Martin | QM-6DC-19-99031 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 3 | Segundo Lugar | QM-6DC-19-99032 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 4 | El Huerfanito | QM-6DC-19-99033 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 5 | Nube Viajera | QM-6DC-19-99034 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 6 | No Te Puedes Ir | QM-6DC-19-99035 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 7 | Padre | QM-6DC-19-99036 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 8 | Que Bueno | QM-6DC-19-99037 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 9 | Que Te Vaya Bonito | QM-6DC-19-99038 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 10 | Tu Camino y El Mio | QM-6DC-19-99039 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 11 | Ya Es Por Demas | QM-6DC-19-99040 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 12 | Cuando Dos Almas | QM-6DC-19-99041 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 13 | El Fierros | QM-6DC-19-99042 | Los Originales De San Juan |
| JC | JC71437 | Mariachi | 14 | Mi Padre Querido | QM-6DC-19-99043 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 1 | Naci Con Suerte de Rey | QM-6DC-19-99044 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 2 | Don Miguel Herrera | QM-6DC-19-99045 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 3 | Volver a Vivir | QM-6DC-19-99046 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 4 | Fiesta en Mi Rancho | QM-6DC-19-99047 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 5 | Que Bonito | QM-6DC-19-99048 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 6 | Que Vuelva Conmigo | QM-6DC-19-99049 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 7 | Padre | QM-6DC-19-99050 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 8 | Sin Llorar y Como Amigos | QM-6DC-19-99051 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 9 | Devuelve el Corazon | QM-6DC-19-99052 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 10 | Que de Raro Tiene | QM-6DC-19-99053 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 11 | Tarde | QM-6DC-19-99054 | Los Originales De San Juan |
| JC | JC71444 | Naci Con Suerte de Rey | 12 | Miraron Llorar a Este Hombre | QM-6DC-19-99055 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 1 | El Rey del Crystal (En Vivo) | QM-6DC-19-99056 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 2 | El Aguacatero (En Vivo) | QM-6DC-19-99057 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 3 | El Patas de Diablo (En Vivo) | QM-6DC-19-99058 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 4 | El Cara de Chango (En Vivo) | QM-6DC-19-99059 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 5 | La Raza de Michoacan (En Vivo) | QM-6DC-19-99060 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 6 | La Caspa del Diablo (En Vivo) | QM-6DC-19-99061 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 7 | La Troca del Mono Negro (En Vivo) | QM-6DC-19-99062 | Los Originales De San Juan |

PLF000034

| JC | JC71451 | Nuestra Historia En Vivo | 8 | Deje de Engordar Maranos (En Vivo) | QM-6DC-19-99063 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 9 | El Jardinero (En Vivo) | QM-6DC-19-99064 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 10 | El Grande de Michoacan (En Vivo) | QM-6DC-19-99065 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 11 | Rey de Reyes (En Vivo) | QM-6DC-19-99066 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 12 | Pacas de a Kilo (En Vivo) | QM-6DC-19-99067 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 13 | La Muerte de Manuelon (En Vivo) | QM-6DC-19-99068 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 14 | El Corrido del Charapo (En Vivo) | QM-6DC-19-99069 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 15 | Los Cuatro Amigos (En Vivo) | QM-6DC-19-99070 | Los Originales De San Juan |
| JC | JC71451 | Nuestra Historia En Vivo | 16 | El Numero Gratis (En Vivo) | QM-6DC-19-99071 | Los Originales De San Juan |

PLF000035

# Exhibit B
## to
## Asset Purchase and Assignment Agreement

### General Assignment and Bill of Sale of Catalog

Jesus Chavez, Sr., dba Enoch Records ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, convey, assign and deliver fully, finally and absolutely, to Yellowcake, Inc., a California corporation ("Buyer"), the entirety of the ownership in the rights, title and interests in, and to, the Catalog defined in Exhibit A to that certain Asset Purchase and Assignment Agreement, effective March 21, 2019 ("Asset Purchase Agreement"), by and between Buyer and Seller. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement.

This General Assignment and Bill of Sale of Catalog is being delivered in connection with the Asset Purchase Agreement and is subject to, and is entitled to the benefits with respect to, the Asset Purchase Agreement. This General Assignment and Bill of Sale of Catalog shall be binding upon and inure to the benefit of Buyer and its respective successors and assigns.

This Assignment may be executed in one or more counterparts. The signatures hereto may be transmitted by facsimile, pdf, electronic mail or other electronic means, each of which shall be deemed an original of this Assignment, and all of which taken together shall be deemed to constitute one and the same document.

IN WITNESS WHEREOF, this General Assignment and Bill of Sale of Catalog is effective as of March 21, 2019.

**BUYER**                                          **SELLER**

YELLOWCAKE, INC.,
a California corporation

By: _____              _____
Kevin Berger, President                     Jesus Chavez, Sr., dba
                                            Enoch Records

Address:  701 East Canal Drive
          Turlock, CA  95380               Address:   5196 E. Drummond Ave
Email:    yellowcakecorp@gmail.com                    Fresno, CA  93725
Facsimile: (209) 667-5717                  Telephone: (559) 720-3291

12

PLF000036

**Exhibit C**
**to**
**Asset Purchase and Assignment Agreement**

**Copyright / Trademark Assignment of Catalog**

This Copyright/Trademark Assignment of Catalog ("Assignment") is entered into by and between Jesus Chavez, Sr., dba Enoch Records ("Seller"), and Yellowcake, Inc., a California corporation ("Buyer"), effective March 21, 2019. In consideration of the payments set forth in the Asset Purchase Agreement (defined below), and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller and Seller's respective successors, licensees and assigns hereby irrevocably sell, assign, transfer, and convey fully, finally and absolutely, to Buyer and its respective successors, licensees and assigns, the entirety of the ownership in the rights, title and interests in the Catalog defined in Exhibit A to the Asset Purchase Agreement.

This Assignment may be filed in the U.S. Copyright Office and/or the U.S. Patent and Trademark Office.

The Parties have entered into that certain Asset Purchase and Assignment Agreement, effective March 21, 2019 ("Asset Purchase Agreement"), by and between Buyer and Seller, relating to the sale, transfer and assignment of the foregoing rights, which are more fully described in the Asset Purchase Agreement, and this Assignment is expressly made subject to all the terms, conditions, and provisions of the Asset Purchase Agreement. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement.

This Assignment may be executed in one or more counterparts. The signatures hereto may be transmitted by facsimile, pdf, electronic mail or other electronic means, each of which shall be deemed an original of this Assignment, and all of which taken together shall be deemed to constitute one and the same document.

IN WITNESS WHEREOF, this Assignment is effective as of March 21, 2019.

**BUYER**                                      **SELLER**

YELLOWCAKE, INC.,
a California corporation

By: _____              _____
Kevin Berger, President                        Jesus Chavez, Sr., dba
                                               Enoch Records

Address:    701 East Canal Drive
            Turlock, CA  95380                 Address:    5196 E. Drummond Ave
Email:      yellowcakecorp@gmail.com                       Fresno, CA  93725
Facsimile:  (209) 667-5717                     Telephone:  (559) 720-3291

13

PLF000037

**Exhibit D**
**to**
**Asset Purchase and Assignment Agreement**

**General Assignment and Bill of Sale of Catalog Revenue**

Jesus Chavez, Sr., dba Enoch Records ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, convey, assign and deliver fully, finally and absolutely, to Yellowcake, Inc., a California corporation ("Buyer"), the entirety of the ownership in the rights, title and interests in and to all of the revenue generated by the Catalog defined in Exhibit A to the Asset Purchase Agreement (defined below).

The Parties have entered into that certain Asset Purchase and Assignment Agreement, effective March 21, 2019 ("Asset Purchase Agreement"), by and between Buyer and Seller, relating to the sale, transfer and assignment of the foregoing rights, which are more fully described in the Asset Purchase Agreement, and this Assignment is expressly made subject to all the terms, conditions, and provisions of the Asset Purchase Agreement. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement.

This Assignment may be executed in one or more counterparts. The signatures hereto may be transmitted by facsimile, pdf, electronic mail or other electronic means, each of which shall be deemed an original of this Assignment, and all of which taken together shall be deemed to constitute one and the same document.

IN WITNESS WHEREOF, this General Assignment and Bill of Sale is effective as of March 21, 2019.

**BUYER**                                      **SELLER**

YELLOWCAKE, INC.,
a California corporation

By: _____          _____
Kevin Berger, President                 Jesus Chavez, Sr., dba
                                        Enoch Records

Address:  701 East Canal Drive
          Turlock, CA  95380            Address:    5196 E. Drummond Ave
Email:    yellowcakecorp@gmail.com                  Fresno, CA  93725
Facsimile: (209) 667-5717               Telephone:  (559) 720-3291

14

PLF000038

**Exhibit E**
**to**
**Asset Purchase and Assignment Agreement**

**Letter of Direction**

March 21, 2019

To Whom It May Concern:

Pursuant to that certain written Asset Purchase and Assignment Agreement ("Agreement"), effective March 21, 2019, ("Effective Date") between Jesus Chavez, Sr., dba Enoch Records ("Seller"), and Yellowcake, Inc., a California corporation ("Yellowcake"), Buyer is solely entitled to collect and receive any and all royalties and all other sources of revenue from any party or source, generated by, or derived from, the Catalog (as defined in the Agreement), whether uncollected prior to the Effective Date or accruing on or after the Effective Date ("Catalog Revenue"), and Seller hereby disclaims any and all interests in all such Catalog Revenue.

Pursuant to this letter of direction ("LOD"), all Catalog Revenue shall be delivered to Yellowcake at the following address:

Yellowcake, Inc.
Attn:  Kevin Berger, President
701 East Canal Drive
Turlock, CA  95380

Additionally, Seller hereby requests that any and all claims asserted by any distributor and/or any party other than Yellowcake, in the Catalog shall be stricken and released, effective March 21, 2019.

Also, as the owner of the Catalog, effective March 21, 2019, Yellowcake is entitled to any and all information, data and records relating to the publication, distribution, license, broadcast or any other use or exploitation of the Catalog or any portion thereof by any means or method and in any format whatsoever, whether any such use occurred before or after the Effective Date. Without limiting the foregoing, effective March 21, 2019, Yellowcake is additionally entitled to any and all information, data and records relating to the royalties and all other sources of income generated by, or derived from, the Catalog or any portion thereof, from any source and in any form whatsoever, whether such information, data or records were generated before or after the Effective Date.

Very truly yours,

Jesus Chavez, Sr., dba
Enoch Records

Address:     5196 E. Drummond Ave
             Fresno, CA  93725
Telephone: (559) 720-3291

15



**Form DCS** (Document Cover Sheet)
**For Recordation of Documents under 17 U.S.C. §205**

UNITED STATES COPYRIGHT OFFICE

**Privacy Act Notice:** Sections 205 and 705 of title 17 of the *United States Code* authorize the Copyright Office to collect the personally identifying information (PII) requested on this form. PII is any personal information that can be used to identify, contact, or trace an individual, such as names, addresses, and telephone numbers. By providing this information, you are agreeing to the routine use of it to establish and maintain a public record, which includes appearing in the Office's paper and online public records and indexes, including the Office's online catalog, and in search reports prepared for the public. If you do not provide the information requested, recordation may be refused or delayed, and you may not be entitled to certain relief, remedies, and benefits under the copyright law.

| Electronic Title List Enclosed | ☒ |
|---|---|

**Declaration of Ownership in a Musical Work (DOMW)** ☐
*If DOMW is checked, an electronic title list must be enclosed and "Electronic Title List Enclosed" must also be checked.*

**DO NOT WRITE IN THIS BOX**
Volume 9970     Document 519
SR# 1-8592316338
Date of recordation M 2 D 24 Y 2020
[ASSIGNED BY THE COPYRIGHT OFFICE]

Copyright Office fees are subject to change. For current fees, check the Copyright Office website at
*www.copyright.gov*, write the Copyright Office, or call (202) 707-3000 or 1-877-476-0778 (toll free).

**Send to:** *Library of Congress, Copyright Office–DOC, LM 433, 101 Independence Avenue SE, Washington, DC 20559-6000*

*If submitting a DOMW, send to: Copyright Office–DOMW, P.O. Box 71537, Washington, DC 20024-1537*

To the Register of Copyrights: *Please record the accompanying document.*

**IMPORTANT:** *Please read all instructions for completing this form. If you have enclosed an electronic title list or if your document is a Declaration of Ownership in a Musical Work (DOMW), check the appropriate box(es) on the top of this page.*

**1** Title of first work provided in document

Los Principios  (Album: 15 Corridos Inmortales)

**2** Total number of titles in document

138

**3** Page number(s) in document where titles information can be located

11

**4** Amount of fee calculated

$ 330     *(Fees are to be calculated in accordance with 37 C.F.R. § 201.3(c))*

**5** Fee enclosed

☒ Check     ☐ Money Order
☐ Fee authorized to be charged to Copyright Office deposit account
Deposit account number _____
Deposit account name _____

**6** Return receipt requested

☒ If checked, please enclose a second completed copy of this form and a self-addressed postage-paid envelope

**7** Redacted document

☒ Check if document is redacted
☐ Check if a written justification for redacted material not enumerated in 37 C.F.R. § 201.4(d)(4)(i) is enclosed

**8** English translation

☐ Check if an English translation of non-English material is enclosed     PLF000040

FORM DCS

LC COPYRIGHT
0 050 203 431 5

**9** Document type

*(Check the one that best describes the document.)*

[X] Assignment  [ ] Exclusive License  [ ] Non-Exclusive License
[ ] Change of Address  [ ] Mortgage or Security Agreement
[ ] Affidavit/Declaration/Certification  [ ] Court Order  [ ] Will
[ ] Change of Name (*e.g., via merger agreement, amendment to articles of incorporation*)
[ ] Other _____

**10** Document's Date of Execution

March 21, 2019

**11** Party Information

*(Provide the names of all parties to the document and the nature of their respective relationships to the document, including which party, if any, is the current copyright owner of the works to which the document pertains. A mailing address must also be provided if submitting a DOMW and may be voluntarily provided for all other documents. If more space is needed, attach an additional sheet.)*

Name    KEVIN BERGER
Relationship    Assignee
Number/Street    701 E Canal Drive    Apt/Suite _____
City    Turlock    State    CA    Zip    95380

Name    Jesus Chavez, Sr.
Relationship    Assignor
Number/Street    5196 E. Drummond Ave    Apt/Suite _____
City    Fresno    State    CA    Zip    93725

[X] List continued on an attached additional sheet

**12** Remitter Information and Certifications

*(You, the individual actually submitting this form and the attached document to the Copyright Office, provide your contact information and make the required remitter certifications by signing your name. The Office may use this information to contact you about the submission and will send the certificate of recordation to the provided address if the document is successfully recorded.)*

*I certify under penalty of perjury under the laws of the United States of America that I have been given appropriate authority to submit this cover sheet, accompanying document, and any other enclosed materials to the U.S. Copyright Office for recordation, and all information I have submitted is true, accurate, and complete to the best of my knowledge.*

*I understand that any falsification or misrepresentation may subject me to civil or criminal liability. By signing my name below, I acknowledge that I have read and agree to these conditions.*

Signature _____    Date    02-20-2020

Name    Kevin Berger
Title/Organization    YELLOWCAKE, INC.
Number/Street    701 E Canal Drive    Apt/Suite _____
City    Turlock    State    CA    Zip    95380
Phone number    209-667-5717    Fax number _____
Email    yellowcakecorp@gmail.com

If you are not a party to the document, describe your relationship to the document or the original parties to the document (*e.g., duly authorized agent of a party, successor-in-interest to a party, duly authorized agent of a successor-in-interest to a party*).

_____
_____
_____

PLF000041

**13** Document Certifications

*(These certifications can be made either by the remitter identified on the previous page or another individual.)*

☐ Original document enclosed    ☐ Official certification enclosed

*I certify under penalty of perjury under the laws of the United States of America that the following is true and correct: (Check the box next to each certification being made. The first is always required. The second is required if an original document or official certification is not enclosed. If a different individual is making each one, complete and attach an additional copy of this page.)*

☒ *The accompanying document being submitted to the U.S. Copyright Office for recordation satisfies, to the best of my knowledge, the signature, completeness, legibility, and, if redacted, redaction requirements for recordation as specified in 37 C.F.R. § 201.4.*

☒ *The accompanying document being submitted to the U.S. Copyright Office for recordation is, to the best of my knowledge, a true and correct copy of the original, signed document.*

*I understand that any falsification or misrepresentation may subject me to civil or criminal liability. By signing my name below, I acknowledge that I have read and agree to these conditions.*

Signature _____    Date 02-20-2020

Certifier Information

*(This information is only required if an individual other than the remitter identified on the previous page is making the above certifications.)*

Name _____

Title/Organization _____

If the certifier is not a party to the document, describe the certifier's relationship to the document or the original parties to the document (*e.g.*, duly authorized agent of a party, successor-in-interest to a party, duly authorized agent of a successor-in-interest to a party).

_____

_____

_____

PLF000042

| Artist | Album | Tracks | SR NUMBER | INFRINGING UPC |
|--------|-------|--------|-----------|----------------|
| Los Originales de San Juan | Amigos y Contrarios | 14 | SR0000863320 | 8.88003E+11 |
| Los Originales de San Juan | Corridos de Poca M | 10 | SR0000863319 | 8.89177E+11 |
| Los Originales de San Juan | Desde La Cantina de Mi Barrio (En Vivo) | 15 | SR0000866471 | 1.91019E+11 |
| Los Originales de San Juan | El Campesino (Album) | 14 | SR0000863321 | 1.90375E+11 |
| Los Originales de San Juan | El Campesino (Single) | 1 | SR0000863321 | 1.90375E+11 |
| Los Originales de San Juan | Chuy Chavez y Sus Amigos | 14 | SR0000864338 | 89269600237 |
| Los Originales de San Juan | Naci Con Suerte de Rey (Mariachi) | 12 | SR0000864340 | 7.58381E+11 |
| Los Originales de San Juan | Nuestra Historia (En Vivo) | 16 | SR0000864336 | 7.58381E+11 |

PLF000043



# Amigos y Contrarios
## Los Originales de San Juan
MÚSICA MEXICANA · 2013

▶ Play    ⤨ Shuffle

| 1 | Amigos y Contrarios<br>Los Originales de San Juan & Los Inquietos del Norte | 3:02 |
| 2 | El Tucan<br>Los Originales de San Juan | 2:54 |
| 3 | El Buchon<br>Los Originales de San Juan | 2:54 |
| 4 | El Puma de Tlazazaca<br>Los Originales de San Juan | 3:01 |
| 5 | Custodio Alvarez<br>Los Originales de San Juan | 3:23 |
| 6 | Dos Perros Malnacidos<br>Los Originales de San Juan | 2:20 |
| 7 | Rolando Junior<br>Los Originales de San Juan | 3:16 |
| 8 | Javier Guerrero<br>Los Originales de San Juan | 2:53 |
| 9 | Hugo Salazar<br>Los Originales de San Juan | 3:55 |
| 10 | Hoy Que Mis Hijos Se Fueron<br>Los Originales de San Juan | 4:51 |
| 11 | Jesús Herrera<br>Los Originales de San Juan | 2:45 |
| 12 | Corrido del Mochis<br>Los Originales de San Juan | 3:49 |
| 13 | Hartate Mugroso<br>Los Originales de San Juan | 2:43 |
| 14 | La Carera<br>Los Originales de San Juan | 3:26 |

14 SONGS, 45 MINUTES
RELEASED FEBRUARY 21, 2013
℗ 2013 HYPHY MUSIC

PLF000044



# Corridos de Poca M

## Los Originales de San Juan

LATINO · 2015

**▶ Play**    **⤭ Shuffle**    •••

| | | |
|---|---|---|
| 1 | El Carlichi<br>Los Originales de San Juan | 2:49 |
| 2 | Sin Fortuna<br>Los Originales de San Juan | 3:40 |
| 3 | El Fantasma<br>Los Originales de San Juan | 2:14 |
| 4 | Javier Fernandez<br>Los Originales de San Juan | 2:59 |
| 5 | El Original<br>Los Originales de San Juan | 2:37 |
| 6 | Manuel Gonzalez<br>Los Originales de San Juan | 3:22 |
| 7 | Amanda Varela<br>Los Originales de San Juan | 5:06 |
| 8 | Cuando Se Nace Rico<br>Los Originales de San Juan | 3:44 |
| 9 | Mi Viejo<br>Los Originales de San Juan | 4:58 |
| 10 | Tan Solo Penas<br>Los Originales de San Juan | 2:36 |

10 SONGS, 34 MINUTES
RELEASED  FEBRUARY 24, 2015
℗ 2015 HYPHY MUSIC

PLF000045



# Desde la Cantina de Mi Barrio
## Los Originales de San Juan

LATINO · 2017

▶ Play    ⤬ Shuffle    •••

| 1 | Mi Último Deseo (En Vivo)<br>Los Originales de San Juan | 3:19 |
|---|---|---|
| 2 | La Peda (En Vivo)<br>Los Originales de San Juan | 2:23 |
| 3 | Paloma en Su Nido (En Vivo)<br>Los Originales de San Juan | 2:55 |
| 4 | El Morralito (En Vivo)<br>Los Originales de San Juan | 2:55 |
| 5 | Lineas de a Metro (En Vivo)<br>Los Originales de San Juan | 4:03 |
| 6 | Naci Con Suerte de Rey (En Vivo)<br>Los Originales de San Juan | 3:00 |
| 7 | El Tequilero (En Vivo)<br>Los Originales de San Juan | 3:05 |
| 8 | El Clavo (En Vivo)<br>Los Originales de San Juan | 3:49 |
| 9 | El Jabali (En Vivo)<br>Los Originales de San Juan | 3:16 |
| 10 | Con una Copa en Mi Mano (En Vivo)<br>Los Originales de San Juan | 2:56 |
| 11 | La Cantina de Mi Barrio (En Vivo)<br>Los Originales de San Juan | 3:17 |
| 12 | El Carlichi (En Vivo)<br>Los Originales de San Juan | 3:08 |
| 13 | La Vida Prestada (En Vivo)<br>Los Originales de San Juan | 3:23 |
| 14 | Fuiste Todo para Mi (En Vivo)<br>Los Originales de San Juan | 3:30 |
| 15 | Eliado Mora (En Vivo)<br>Los Originales de San Juan | 4:15 |

**15 SONGS, 49 MINUTES**
RELEASED MARCH 24, 2017
© 2017 HYPHY MUSIC INC.

# Music

Listen to Los Originales de San Juan and 60 million more songs.

**START YOUR TRIAL**

Music > Latino > Los Originales de San Juan



**$9.99 Buy**

Released May 31, 2016
℗ 2016 Hyphy Music

# El Campesino

Los Originales de San Juan >

**Songs**    Ratings and Reviews    Related

| ▲ | NAME | ARTIST | TIME | POPULARITY | PRICE |
|---|------|--------|------|------------|-------|
| 1. | El Campesino | Los Ori... | 3:47 | | $0.99 ⌄ |
| 2. | Solo Dios | Los Ori... | 4:07 | | $0.99 ⌄ |
| 3. | El Árbol | Los Ori... | 3:09 | | $0.99 ⌄ |
| 4. | El Paniqueado | Los Ori... | 2:41 | | $0.99 ⌄ |
| 5. | Dinero Manch... | Los Ori... | 3:54 | | $0.99 ⌄ |
| 6. | Corrido del C... | Los Ori... | 2:38 | | $0.99 ⌄ |
| 7. | El Corrido de ... | Los Ori... | 2:43 | | $0.99 ⌄ |
| 8. | El Martelito | Los Ori... | 3:12 | | $0.99 ⌄ |
| 9. | Chicano Jalici... | Los Ori... | 3:05 | | $0.99 ⌄ |
| 10. | Miguel Fuentes | Los Ori... | 3:21 | | $0.99 ⌄ |
| 11. | En una Cajita ... | Los Ori... | 3:25 | | $0.99 ⌄ |
| 12. | Mis Hijos Son ... | Los Ori... | 3:35 | | $0.99 ⌄ |
| 13. | Marili | Los Ori... | 3:35 | | $0.99 ⌄ |
| 14. | Suplica de un ... | Los Ori... | 2:42 | | $0.99 ⌄ |

▶ Preview All          TOTAL: 14 ITEMS

PLF000047

# Music

Listen to Los Originales de San Juan and 60 million more songs.

START YOUR TRIAL

Music > Latino > Los Originales de San Juan



## El Campesino - Single

Los Originales de San Juan >

Songs    Ratings and Reviews    Related

| | NAME | ARTIST | TIME | POPULARITY | PRICE |
|---|---|---|---|---|---|
| 1. | El Campesino | Los Ori... | 3:16 | ▍▍▍▍▍▍ | $0.99 ⌄ |

TOTAL: 1 ITEM

$0.99 Buy  ⌄

Released Feb 2, 2016

℗ 2016 Hyphy Music Inc

PLF000048



# Mariachi
## Los Originales de San Juan
LATINO · 2002

▶ Play    ⤬ Shuffle

| # | Title | Artist | Duration |
|---|---|---|---|
| 1 | Me Voy | Los Originales de San Juan | 2:09 |
| 2 | Amigo Martin | Los Originales de San Juan | 2:34 |
| 3 | Segundo Lugar | Los Originales de San Juan | 2:39 |
| 4 | El Huerfanito | Los Originales de San Juan & Tonito Barela | 2:54 |
| 5 | Nube Viajera | Los Originales de San Juan | 3:47 |
| 6 | No Te Puedes Ir | Oliver Moya | 3:32 |
| 7 | Padre | Los Originales de San Juan | 2:47 |
| 8 | Que Bueno | Los Originales de San Juan | 3:03 |
| 9 | Que Te Vaya Bonito | Los Originales de San Juan | 2:34 |
| 10 | Tu Camino y El Mio | Los Originales de San Juan | 2:49 |
| 11 | Ya Es Por Demas | Los Originales de San Juan | 2:46 |
| 12 | Cuando Dos Almas | Chuy Chavez Jr. | 3:04 |
| 13 | El Fierros | Los Originales de San Juan | 3:34 |
| 14 | Mi Padre Querido | Omar Alvarez | 3:31 |

14 SONGS, 42 MINUTES
RELEASED: JULY 16, 2002
℗ 2013 JC RECORDS

PLF000049

# Naci Con Suerte de Rey
## Los Originales de San Juan

LATINO · 1999

▶ Play    ⤨ Shuffle    •••



| 1 | Naci Con Suerte de Rey<br>Los Originales de San Juan | 2:28 |
|---|---|---|
| 2 | Don Miguel Herrera<br>Los Originales de San Juan | 5:05 |
| 3 | Volver a Vivir<br>Los Originales de San Juan | 2:52 |
| 4 | Fiesta en Mi Rancho<br>Los Originales de San Juan | 2:21 |
| 5 | Que Bonito<br>Los Originales de San Juan | 3:14 |
| 6 | Que Vuelva Conmigo<br>Los Originales de San Juan | 2:44 |
| 7 | Padre<br>Los Originales de San Juan | 3:14 |
| 8 | Sin Llorar y Como Amigos<br>Los Originales de San Juan | 3:19 |
| 9 | Devuélveme el Corazón<br>Los Originales de San Juan | 3:13 |
| 10 | Que de Raro Tiene<br>Los Originales de San Juan | 3:19 |
| 11 | Tarde<br>Los Originales de San Juan | 3:20 |
| 12 | Miraron Llorar a Este Hombre<br>Los Originales de San Juan | 3:07 |

12 SONGS, 38 MINUTES
RELEASED  APRIL 6, 1999
℗ 2013 HYPHY MUSIC

PLF000050

 Music
Listen to Los Originales de San Juan and 60 million more songs.

Case 1:20-cv-00988-JLT-BAM    Document 87-2    Filed 08/15/23    Page 76 of 137

**START YOUR TRIAL**

Music > Latino > Los Originales de San Juan



## Nuestra Historia (En Vivo)

Los Originales de San Juan >

**Songs**    Ratings and Reviews    Related

| ▲ | NAME | ARTIST | TIME | POPULARITY | PRICE |
|---|------|--------|------|------------|-------|
| 1. | El Rey del Cry... | Los Ori... | 2:46 | | $0.99 |
| 2. | El Aguacatero... | Los Ori... | 3:27 | | $0.99 |
| 3. | El Patas de Di... | Los Ori... | 3:15 | | $0.99 |
| 4. | El Cara de Ch... | Los Ori... | 3:32 | | $0.99 |
| 5. | La Raza de Mi... | Los Ori... | 2:38 | | $0.99 |
| 6. | La Caspa del ... | Los Ori... | 2:48 | | $0.99 |
| 7. | La Troca del ... | Los Ori... | 3:12 | | $0.99 |
| 8. | Deje de Engor... | Los Ori... | 3:39 | | $0.99 |
| 9. | El Jardinero (... | Los Ori... | 3:25 | | $0.99 |
| 10. | El Grande de ... | Los Ori... | 4:06 | | $0.99 |
| 11. | Rey de Reyes ... | Los Ori... | 2:40 | | $0.99 |
| 12. | Pacas de a Kil... | Los Ori... | 3:23 | | $0.99 |
| 13. | La Muerte de ... | Los Ori... | 6:05 | | $0.99 |
| 14. | El Corrido del ... | Los Ori... | 3:01 | | $0.99 |
| 15. | Los Cuatro A... | Los Ori... | 2:38 | | $0.99 |
| 16. | El Numero Gr... | Los Ori... | 3:30 | | $0.99 |

$9.99 Buy

Released Mar 31, 2017
℗ 2017 Hyphy Music Inc.

▶ Preview All          TOTAL: 16 ITEMS

PLF000051

| | |
|---|---|
| **From:** | David Hernandez |
| **To:** | Seth L. Berman |
| **Subject:** | Fwd: Yellowcake, Inc, / Los Originales de San Juan / Hyphy and Morena Music, et al |
| **Date:** | Wednesday, July 15, 2020 3:35:29 PM |
| **Attachments:** | The Orchard - Los Originales de San Juan - Sheet1.pdf |
| | Los Originales de San Juan - The Orchard.docx |

## Forwarded Conversation
## Subject: Yellowcake, Inc, / Los Originales de San Juan / Hyphy and Morena Music, et al
-----------------------

From: **Kevin** <kevin@bergerco.com>
Date: Mon, Jun 29, 2020 at 1:49 PM
To: bwexler@theorchard.com <bwexler@theorchard.com>
Cc: David Hernandez <davidh@colonizemedia.com>


Good afternoon Ben,


Long time no talk to. I own the attached  assets, and of course, Hyphy is infringing upon them. It appears that others have joined the infringement party as well.  Still amused by Mr. Martinez's last minute disavowance of our Mar International, Inc. settlement agreement he signed earlier in the year. His time is coming, should be fun. Anyway, please see the attached copyright information with the  SR registration and UPC numbers.  Please take down the assets from YouTube and any and all other platforms Immediately. Thank you very much for your prompt attention to this matter.



Sincerely,



Kevin Berger

YELLOWCAKE, INC.



----------
From: **Ben Wexler** <bwexler@theorchard.com>
Date: Mon, Jun 29, 2020 at 2:09 PM
To: Kevin <kevin@bergerco.com>
Cc: David Hernandez <davidh@colonizemedia.com>, Claims Admin <claimsadmin@theorchard.com>, conflicts <conflicts@theorchard.com>


Hi Kevin:

Hope you are well.

I need a word doc of the attachment so I can search in our system for the status of these products. Also, send me the list of YT conflicts relating to the content in the attachment.

Best,
Ben
--
**Benjamin Wexler** • *Head Of Claims Administration, Legal*

bwexler@theorchard.com • **office** 212.300.2861 • **fax** 1.866.625.7384



TheOrchard

23 E 4th St Fl 3, New York, NY 10003

www.theorchard.com

**Have you checked out the OrchardGo mobile app yet?**
**Find it here: iOs / Android**

**Follow us:** The Daily Rind • Instagram • Facebook • Twitter • YouTube • LinkedIn

**Privileged And Confidential Communication.** This electronic transmission, and any documents attached hereto, (a) are protected by the Electronic Communications Privacy Act (18 USC §§ 2510-2521), (b) may contain confidential and/or legally privileged information, and (c) are for the sole use of the intended recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of the information received in error is strictly prohibited.

----------
From: **David Hernandez** <davidh@colonizemedia.com>
Date: Mon, Jun 29, 2020 at 2:12 PM
To: Kevin <kevin@bergerco.com>

Here is the word Doc
--
David Hernandez | CEO | COLONIZE MEDIA, INC | 415-735-8236 | DavidH@ColonizeMedia.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

--

**David Hernandez** | CEO | COLONIZE MEDIA, INC | 415-735-8236 | DavidH@ColonizeMedia.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

PLF000054

| | | | | |
|---|---|---|---|---|
| Los Originales de San Juan | Celebrando 39 | Los Play Music | SR0000863476 | 821691353127 |
| Los Originales de San Juan | 50 Mentadas | Los Play Music | SR0000863553 | 821691350324 |
| Los Originales de San Juan | 50 Mentadas | Recop Music | SR0000863553 | 821691922620 |
| Los Originales de San Juan | El Campesino | Hyphy Music | SR0000863321 | 190374798310 |
| Los Originales de San Juan | Corridos De Poca M | Hyphy Music | SR0000863319 | 190374772488 |
| Los Originales de San Juan | Corridos De Poca M | Hyphy Music | SR0000863319 | 889176663055 |
| Los Originales de San Juan | Amigos y Contrarios | Hyphy Music | SR0000863320 | 18736107528 |
| Los Originales de San Juan | 15 Corridos Inmortales | Los Play Music | SR0000864335 | 821691351628 |
| Los Originales de San Juan | Naci Con Suerte De Rey | Hyphy Music | SR0000864340 | 888003162808 |
| Los Originales de San Juan | Nuestra Historia En Vivo | Hyphy Music | SR0000864336 | 191018998745 |
| Los Originales de San Juan | Mariachi | JC RECORDS | SR0000864338 | 89269600237 |
| Los Originales de San Juan | Desde la Cantina de Mi Barrio | Hyphy Music | SR0000866471 | 191018998417 |
| | | | | |

PLF000055

| Artist | Album | Imprint | SR Registration | UPC |
|---|---|---|---|---|
| Los Originales de San Juan | Celebrando 39 | Los Play Music | SR0000863476 | 821691353127 |
| Los Originales de San Juan | 50 Mentadas | Los Play Music | SR0000863553 | 821691350324 |
| Los Originales de San Juan | 50 Mentadas | Recop Music | SR0000863553 | 821691922620 |
| Los Originales de San Juan | El Campesino | Hyphy Music | SR0000863321 | 190374798310 |
| Los Originales de San Juan | Corridos De Poca M | Hyphy Music | SR0000863319 | 190374772488 |
| Los Originales de San Juan | Corridos De Poca M | Hyphy Music | SR0000863319 | 889176663055 |
| Los Originales de San Juan | Amigos y Contrarios | Hyphy Music | SR0000863320 | 18736107528 |
| Los Originales de San Juan | 15 Corridos Inmortales | Los Play Music | SR0000864335 | 821691351628 |
| Los Originales de San Juan | Naci Con Suerte De Rey | Hyphy Music | SR0000864340 | 888003162808 |
| Los Originales de San Juan | Nuestra Historia En Vivo | Hyphy Music | SR0000864336 | 191018998745 |
| Los Originales de San Juan | Mariachi | JC RECORDS | SR0000864338 | 89269600237 |
| Los Originales de San Juan | Desde la Cantina de Mi Barrio | Hyphy Music | SR0000866471 | 191018998417 |

PLF000056

Los Originales de San Music Cover Art





Desde la Cantina de Mi Barrio (En Vivo)
Los Originales de San Juan

YELLOWCAKE, INC.

Desde la Cantina de Mi Barrio
Los Originales de San Juan

HYPHY MUSIC, INC.

2. El Campesino





El Campesino
Los Originales de San Juan

HYPHY MUSIC, INC.

El Campesino
Los Originales de San Juan

YELLOWCAKE, INC.

PLF000057



Corridos de Poca M
Los Originales de San Juan

HYPHY MUSIC, INC.



Corridos de Poca M
Los Originales de San Juan

YELLOWCAKE, INC.



Amigos y Contrarios
Los Originales de San Juan



Amigos Y Contrarios
Los Originales de San Juan

PLF000058





Naci Con Suerte de Rey
Los Originales de San Juan

Naci Con Suerte de Rey
Los Originales de San Juan

HYPHY MUSIC, INC.

YELLOWCAKE, INC.

# EXHIBIT "F"

## Column 1 (Page 13)

1  Q   And did you review any documents in

2  preparation for your deposition today?

3  A   Yes.  I did.  The claim filed by Hyphy Music

4  against Yellowcake and also the notice of the

5  deposition.

6  Q   And can you describe to me the nature of --

7  and for purposes of this deposition, I'm going to refer

8  to typing Hyphy Music, Inc., as Hyphy.  Just, could you

9  describe to me generally the nature of Hyphy's business?

10          MR. BEGAKIS:  Objection.  Vague as to

11  nature.

12          MR. BERMAN:  If you understand my

13  question, you can answer, Mr. Martinez.

14          THE WITNESS:  Okay.  The Hyphy Music,

15  Inc., incorporation focuses on primarily acquiring music

16  rights, both sound recordings and compositions, mostly

17  purchase rights, but in some instances we do produce our

18  own rights.  We provide a consideration, in other words,

19  we exchange money for the services rendered, and so that

20  is essentially the -- the scope of our work.  We are in

21  the business of acquiring rights.

22  BY MR. BERMAN:

23  Q   Okay.  And then once you acquire those rights,

24  do you exploit those rights in any way, such as selling

25  copies of the sound recordings or synchronization,

## Column 2 (Page 14)

1  things like that?

2  A   We physically record it and manufactured CD's

3  up until, roughly, 2016.  And beginning in 2010, we also

4  started engaging in the digital era.  So yes, we do

5  exploit our copyrights, and prior in the physical

6  distribution, now in digital distribution.

7  Q   All right.  Just to be clear, so you testified

8  that Hyphy was incorporated in 2014; is that correct?

9  A   Correct.  It was a sole proprietorship

10  beginning in 2010 up to 2014.

11  Q   And can you just give me a brief synopsis of

12  your education?

13  A   I graduated from University of Fresno State or

14  Cal State Fresno, went into teaching; so my background

15  is an educator.

16  Q   Okay.  And when did you graduate from college?

17  A   1998.

18  Q   And your first job out of college was teaching

19  related?

20  A   Somewhat, because I did work at a school

21  campus, but it was primarily as a -- as a soccer coach,

22  then I entered the classroom.

23  Q   When was your first involvement in the music

24  industry?

25          MR. BEGAKIS:  Objection.  Vague as to



## Column 3 (Page 15)

1  involvement.

2          MR. BERMAN:  If you understand, you can

3  answer.

4          THE WITNESS:  Selling music, roughly

5  since 1991, recording music because I used to be part of

6  a band, roughly in 2000.  And as far as getting into the

7  business side of things where you actually own the

8  copyrights, 2010.

9  BY MR. BERMAN:

10  Q   And so just to clarify, so in or about 2010,

11  you as a sole proprietor, started Hyphy Music and

12  started to acquire music copyrights; is that accurate?

13  A   Correct.

14  Q   Okay.  What prompted you to start doing that

15  kind of business in 2010?

16  A   I have been part of a music band roughly from

17  2000 to 2006, and I continued to also retail music on

18  the side at local flea markets.  Seeing the fact that

19  there was a great deal of business opportunity, not only

20  in retail but also on actually becoming the copyright

21  holder, four years after we disbanded the 2006 band, we

22  -- we, meaning myself and another colleague, began

23  looking into the possibility of recording artists and

24  acquiring rights.

25  Q   Was there ever any other shareholders of Hyphy



## Column 4 (Page 16)

1  other than yourself?

2  A   Not at this time.

3  Q   In the past, was there ever any other

4  shareholders at Hyphy?

5  A   No.

6  Q   And approximately how many releases has Hyphy

7  released between 2010 and the present?

8          MR. BEGAKIS:  Objection.  Vague as to

9  releases.

10  BY MR. BERMAN:

11  Q   Do you know what I mean by releases, Mr.

12  Martinez?

13  A   Yes.  It's -- I can answer -- I can best

14  answer it in this way.  We currently hold roughly about

15  6000 copyrights, productions, albums.  So at minimum,

16  6000 releases.

17  Q   And just to clarify from the record, some of

18  those releases, you as Hyphy recorded those releases,

19  and some you acquired after they were recorded; is that

20  accurate?

21  A   Correct.  Correct.

22  Q   Okay.  And are you familiar with the -- with

23  the terminology A&R or artists and repertoire, as

24  commonly used in the music industry?

25  A   Somewhat.

1  particular case, no needed agreement was -- well, no

2  written agreement was needed.

3  BY MR. BERMAN:

4      Q   Thank you.  We'll come back to that.  We're

5  definitely going to explore those issues.  Thank you,

6  Mr. Martinez.

7          There's -- I'm sorry.  Throughout its history,

8  has Hyphy used any third-party music distributors in

9  connection with its business?

10     A   The whole time since we've been in the digital

11 distribution era, yes, we have.

12     Q   And what are the names of the distributors

13 that Hyphy has worked with in the digital distribution

14 realm?

15     A   The one that pertains to this particular

16 matter is The Orchard Enterprises.

17     Q   And other than in this particular matter, and

18 just generally in Hyphy's history, has Hyphy ever had

19 any sort of agreement with any other digital

20 distributor?

21     A   Yes.  Dashco (phonetic).

22     Q   Anybody -- any other companies other than

23 Dashco and The Orchard?

24     A   When we first started, I guess you can call it

25 a service provider, TuneCore, but it was extremely



---

1  minimal.

2      Q   And can you, just, give me a, then, a brief

3  history of Hyphy's relationship with the three

4  distributors, starting with who was the first

5  distributor and -- to the current distributor?

6      A   If you actually want to pinpoint the first

7  distributor, it was one of the defendants, David

8  Hernandez.  At that time, we started a distribution deal

9  in which he took our content and distribute it.  At that

10 time, we dismissed him because of inaccurate record

11 keeping and also the fact that he was definitely not a

12 trustworthy individual.

13         We moved on to TuneCore, after that we moved

14 on to Dashco, where Mr. Hernandez had also left a very

15 bad taste with Mr. Vanpatterson (phonetic), which had

16 some content that was still ours and still being

17 distributed by David Hernandez.

18         We since then moved into The Orchard

19 Enterprises.

20     Q   Okay.  So when did you terminate your

21 relationship with Mr. Hernandez?  By you, I'm referring

22 to Hyphy.

23     A   2010.

24     Q   And then when did Hyphy terminate its

25 relationship with TuneCore?



---

1      A   I believe there's still some content still

2  being distributed.  It might have -- it might have been,

3  like, six albums that were initially distributed, which

4  I don't think we ever removed.

5      Q   And when did Hyphy terminate its relationship

6  with Dashco?

7      A   We didn't.  We initially engaged in a global

8  settlement per se, in which we simply asked that

9  anything that Mr. David Hernandez was still exploiting

10 that belonged to us be transferred over to us, and we

11 will remain working with Dashco on a separate account.

12     Q   So is Hyphy still working with Dashco as you

13 just testified?

14     A   Yes.  But we are not giving them any new

15 productions.  They essentially have kept an old catalog

16 that we acquired and purchased, and it was already being

17 distributed by them.  So, yes.  The relationship is

18 still ongoing.

19     Q   And then -- and then -- and when did Hyphy

20 start its relationship with The Orchard?

21     A   2012.  And they've been our primary

22 distributor since then.

23     Q   Does Hyphy enter into any contractual

24 relationships with any artist whereby the artist

25 receives an artist royalty of any sort?



---

1      A   They do when they entered into a 360

2  agreement.  Most of the time we offer them a complete

3  buyout, including artistic royalties.

4      Q   And when you say 360, you're referring to the

5  common music industry practice of an agreement that

6  includes not just sound recordings, but any music

7  publishing rights; is that accurate?

8      A   That is accurate, and that is the agreement

9  that we typically include artistic royalties payable to

10 the artist.

11     Q   And does Hyphy use any royalty accounting

12 software to determine how much artist royalties are due

13 to an artist under any particular agreement?

14     A   We have not had any agreements that have

15 termed out in terms of us owing artistic royalties.  So

16 we have the accounting set up, but we have not used it.

17     Q   Does Hyphy have an in-house bookkeeper?

18     A   Yes.  We do.

19     Q   And what is the bookkeeper's name?

20     A   Jason Tarvin.

21     Q   Can you spell the last name for the record,

22 please?

23     A   T-A-R-V, as in Victor, I-N.

24     Q   And how long has Mr. Tarvin been employed by

25 Hyphy?



1   Q   Understood.  I just want to be -- just to be
2   clear for the record, other than allegedly recording --
3   sound recordings on behalf of Hyphy, none of the band
4   members were expected to perform any other services for
5   Hyphy, correct?
6        MR. BEGAKIS:  Objection.  Vague as to
7   services.  Objection to the extent it misstates the
8   witnesses prior testimony.  Objection to the extent it
9   calls for legal conclusion.
10       MR. BERMAN:  Over your counsel's
11  objection, you could answer.
12       THE WITNESS:  They were expected to
13  provide the services under a recording agreement under a
14  record label.  Again, we were the official record label
15  at the time, so some of those services did include
16  recording.  At the same time, we did ask them to provide
17  themselves -- or become available for pictures so that
18  we can provide -- publish images.
19  BY MR. BERMAN:
20  Q   Okay.  So you expected them to participate in
21  helping promote the albums; is that accurate?
22  A   Yes.  Because we invested a considerable
23  amount of money and time on promotional campaigns.
24  Q   So other than promoting the albums, none of
25  the band members were expected to perform any other



1   services for Hyphy, correct?
2   A   No.  We are not an agent of Iack performances,
3   so no.
4   Q   And they weren't supposed to do anything
5   related to calling distributors regarding sales or doing
6   creative development for other artists or any other
7   services related to the business of Hyphy, correct?
8   A   Not obligated or expected.  From time to time
9   we did ask them if they would be available for a feature
10  with some of the other artists, and they had every right
11  to decline or accept.
12  Q   Okay.  But generally what you're talking about
13  is creative services, correct?
14  A   Correct --
15       MR. BEGAKIS:  Object.  Vague as to
16  creative services.
17  BY MR. BERMAN:
18  Q   So when you discussed potentially entering
19  into a business arrangement with the band in the summer
20  of 2013, other than yourself and the band members -- or
21  withdrawn.
22       When you had the conversation with Mr. Chavez
23  in the summer of 2013 at his home regarding potentially
24  the band releasing albums through Hyphy, who was present
25  during that conversation?

1   A   It was his family.  I know for sure it was his
2   wife or ex-wife, Myrna, I don't know the status of their
3   marriage.  Chuy Chavez was in the premises, Junior, and
4   there was another individual that was either a roommate
5   or a friend that was just hanging out, but there was
6   another male individual that kept coming in and out of
7   the room.
8   Q   Do you recall that person's name?
9   A   No.  It might have -- it might -- I mean, by
10  the looks of his age, it might have been his dad.
11  Q   And just to be clear, for the record, when you
12  say Chuy Chavez, you're referring to Jesus Chavez,
13  correct?  It's a nickname.
14  A   Junior.  They were both present.  Senior and
15  Junior were both present.
16  Q   I'm just -- I'm just trying to clarify for the
17  record.  When you use the name Chuy, Chuy is a nickname
18  for Jose Chavez, correct?
19  A   I don't know if his first name is Jose or not,
20  but it's Jesus Chavez, Jr.
21  Q   You're referring to a Chuy.
22  A   Yeah.  Chuy is Jesus Chavez, Jr.
23  Q   Okay.  So it's -- just to be clear then, it's
24  a nickname for Jose Chavez, Jr.?
25  A   Yes, sir.

1   Q   Okay.  That's all.  Just want to make sure.
2   Now Hyphy eventually released seven albums by the band,
3   correct?
4   A   It was -- to my knowledge it was five that
5   were turning to six because the last one, which was the
6   live recording, was split into two.
7   Q   Okay.  So just to be clear for the record,
8   Hyphy released an album by the band called Amigos y
9   Contrarios, correct?
10  A   Correct.  That was the first album.
11  Q   And then there was this another album called -
12  - again, my Apologies with my Spanish -- Corridos de
13  Poca M?
14  A   Yes.
15  Q   All right.  And then there was another album,
16  Des de la Cantina de Mi Barrio?
17  A   Yes.
18  Q   And that was a live album, correct?
19  A   Correct.  It was one of the split albums.
20  Yes.
21  Q   And then Hyphy released an album by the band
22  called El Campesino?
23  A   Yes.
24  Q   Okay.  And then Hyphy released an album called
25  Chuy Chavez y Sus Amigos?

1    A    That was an over -- I guess an overlap from

2    the distribution we have with Chuy Chavez, Jr. prior to

3    the 2013 agreement.

4    Q    Nonetheless, that was an album that was being

5    sold and distributed by Hyphy, correct?

6    A    But it was not an official album under this

7    particular term.  It was an album that was issued by

8    Chuy Chavez, Jr. under a prior agreement, distribution

9    not only in Walmart but also digital distribution.

10   Q    And was that agreement in writing or oral?

11   A    It was oral, and your colleague, Mr. Griffin,

12   is well aware of the fact that he tried to sue us on the

13   fact that we didn't have a written agreement.  And we

14   did show him that there was still a huge outstanding

15   debt, and so they chose to drop the case.

16   Q    Do you have any documents or correspondence

17   regarding the terms of Hyphy's release of this album

18   with Mr. Chavez, Jr.?

19        MR. BEGAKIS:  Objection.  Vague.

20        THE WITNESS:  I'm sorry.  Can you

21   rephrase the question?

22   BY MR. BERMAN:

23   Q    Do you have any documents in writing that

24   reflect the nature of the terms of Hyphy's release of

25   the Chuy Chavez y Sus Amigo release with Chuy Chavez,



1    Jr.?

2         MR. BEGAKIS:  Same objections.

3         THE WITNESS:  The documents that existed

4    are the payouts to Mr. Chavez, Jr.  And the fact that we

5    didn't have a written agreement, it transferred into a

6    verbal license, which, again, the complaint was

7    withdrawn due to the fact there was still a huge

8    outstanding debt.  And I want to believe that that's the

9    reason why we're here today.

10   BY MR. BERMAN:

11   Q    When you say complaint, what are you

12   referring?

13   A    Say that again.

14   Q    You just testified that there was a complaint

15   that was withdrawn; what exactly are you referring to?

16   A    It was a complaint filed by Mr. Thomas Griffin

17   on behalf of Chuy Chavez, Jr. alleging that we had,

18   without consent or authorization, release his works.

19   Which again, you can't possibly be infringing if you do

20   have consent and authorization on a huge payout.  So it

21   was -- it was essentially withdrawn to a verbal license.

22   When we showed them that we there were still a huge

23   outstanding debt that we had not been recouped, the case

24   was dropped.

25   Q    When you said it -- was the case withdrawn or



1    was the case settled?

2    A    I want to say withdrawn.  Maybe that's not a

3    legal term, but I know that essentially everybody shook

4    hands and walked away.

5    Q    Was there any written agreement connection

6    with the ending of the lawsuit?

7    A    Mr. Thomas Griffin would be able to answer

8    that.

9    Q    Well, I'm asking you if you have any

10   independent recollection as to whether or not any sort

11   of settlement agreement was entered into in connection

12   with that lawsuit?

13        MR. BEGAKIS:  Objection.  Objection.

14   Argumentative and to the extent it calls for

15   speculation.

16        MR. BERMAN:  Over your counsel's

17   objection, you can answer.

18        THE WITNESS:  What I can verify for a

19   fact is that there's still an outstanding balance that

20   has not been recouped.

21   BY MR. BERMAN:

22   Q    That's not my question.  My question is

23   whether or not there was a written settlement agreement

24   entered into in connection with the lawsuit that you

25   were referring to previously.

1    A    I don't remember signing anything.  Whether

2    the attorneys took action on that course, I'm unaware of

3    it.

4    Q    And when you say that there was an advanced

5    recoup, is it your belief that an outstanding unrecouped

6    advance would be a prohibition on the transfer of title

7    to a sound recording?

8         MR. BEGAKIS:  Objection.  Calls for a

9    legal conclusion.

10        MR. BERMAN:  I'm asking for his

11   understanding.  And over your client's objection, you

12   could answer.

13        MR. BEGAKIS:  Same objection.  Regardless

14   of whether you want the understanding, I'm objecting on

15   the fact that it's calling for legal conclusion.

16        MR. BERMAN:  You can answer, Mr.

17   Martinez.

18        THE WITNESS:  My understanding is that a

19   verbal license may not be revoked if it hasn't been

20   fully recouped, and that is the circumstances with Mr.

21   Chuy Chavez, Jr.

22   BY MR. BERMAN:

23   Q    Okay.  And what is the basis for your

24   understanding that that's --

25   A    What is the what?  I'm sorry.

1  Q   What's your basis for your understanding that
2  a license cannot be revoked because of unrecouped
3  advance?
4       MR. BEGAKIS:  Objection.  Vague as to
5  basis.  Same objection to the extent it continues to
6  seek a legal conclusion, and object to the extent that
7  it calls for attorney-client privilege information.  If
8  the client -- if the witness can respond without
9  disclosing the contents of conversations with attorneys
10 regarding this matter, then the witness can so respond.
11      MR. BERMAN:  Over your client's --  your
12 counsel's objection, you could answer.
13      THE WITNESS:  The basis of my
14 understanding is the fact that Mr. Griffin withdrew the
15 complaint when he realized he had to pay us in order to
16 regain those rights.
17 BY MR. BERMAN:
18 Q   Okay.  What's your basis for believing that
19 Hyphy had to be paid to regain those rights as you just
20 testified?
21      MR. BEGAKIS:  Objection.  Asked and
22 answered.
23      MR. BERMAN:  Over your counsel's
24 objection, you can answer.
25      THE WITNESS:  We purchased something that



---

1  wasn't purchased back, and so if it hasn't been paid
2  back, we still technically can hold on to it.
3  BY MR. BERMAN:
4  Q   What's the basis for that belief, Mr.
5  Martinez?
6       MR. BEGAKIS:  Objection.  Asked and
7  answered and calls for a legal conclusion.
8       THE WITNESS:  I'm using -- I mean, I'm
9  using again the basis that Mr. Griffin again withdrew
10 that based on the fact that there was a debt that needed
11 to be paid before Mr. Chavez, Jr. could regain control
12 of his rights.
13 BY MR. BERMAN:
14 Q   Okay.  I'll ask one more time.  And what's
15 your basis for that understanding?  Is it based on
16 advice from counsel or something else?
17      MR. BEGAKIS:  Objection.  Argumentative,
18 vague, asked and answered.  If the witness -- and the
19 witness has provided an answer.  So the witness can
20 provide that answer again to a question that's been
21 asked and answered.
22      MR. BERMAN:  You can answer.
23      THE WITNESS:  My answer remains the same.
24      MR. BERMAN:  Move to strike as non-
25 responsive.



---

1  BY MR. BERMAN:
2  Q   Do you have any documents in your possession
3  or in Hyphy's possession whatsoever that reflect the
4  terms of Hyphy's alleged acquisition of the album Chuy
5  Chavez y Sus Amigos?
6  A   Check stubs that were paid out to Mr. Chavez,
7  Jr.
8  Q   Anything other than check stubs?
9  A   No.
10      MR. BERMAN:  Okay.  I'm going to call for
11 the preservation and production of the check stubs that
12 Mr. Martinez was just referring to.
13      MR. BEGAKIS:  You can propound them in a
14 separate document request, and we'll respond to that
15 request timely.
16      MR. BERMAN:  Okay.
17 BY MR. BERMAN:
18 Q   And Hyphy also released an album by the band
19 titled Naci Con Suerte de Rey, otherwise, I believe
20 called Mariachi; is that correct?
21 A   Correct.  Yeah.  That's correct.
22 Q   And lastly, Hyphy also released an album by
23 the band called Nuestra Historia, which was also a live
24 album, correct?
25 A   Correct.  So you should sum up to six.



---

1  Q   My understanding is that it's seven.  There
2  was a recording of a live performance that was then
3  split into two albums; is that what you're trying to
4  explain to me?
5  A   It was five productions.  The fifth one was
6  split into two, so it became number six.
7  Q   Well we have Amigos -- well, okay.  Are you --
8  you're not -- you're not including the Chuy Chavez y Sus
9  Amigos; is that right?
10 A   That was not part of this term, it was part of
11 the prior deal with Chuy Chavez, Jr.
12 Q   Okay.  But nonetheless, that was still an
13 album that was being distributed at some point by Hyphy,
14 correct?
15      MR. BEGAKIS:  Objection.  Outside of the
16 scope of this deposition.
17      MR. BERMAN:  Or your client's objection,
18 you can answer.
19      THE WITNESS:  Through the consent of Chuy
20 Chavez, Jr.
21 BY MR. BERMAN:
22 Q   Okay.  So the answer is yes, Hyphy was, at
23 some point, distributing the Chuy Chavez y Sus Amigos
24 album, correct?
25      MR. BEGAKIS:  Objection.  Outside of the





1  MR. BEGAKIS:  What category are we
2  talking about?
3  MR. BERMAN:  John, are you directing him
4  -- what you're doing is wholly inappropriate, and it's
5  on the record.
6  Are you directing your client not to
7  answer my question?
8  MR. BEGAKIS:  On the record, Counsel, my
9  understanding is (indiscernible - simultaneous speech) -
10 -
11 MR. BERMAN:  Are you directing your
12 client not to answer my question as to whether or not
13 Hyphy Music has ever distributed the album Chuy Chavez y
14 Sus Amigos?
15 MR. BEGAKIS:  On the -- on the record --
16 on the record, my understanding is that question is not
17 covered under a category of Exhibit A.  If you can point
18 to me where it is, then I will allow my client to
19 answer.  If you cannot, then is outside the scope of
20 this deposition; I'm instructing my client not to
21 answer.
22 MR. BERMAN:  Okay --
23 MR. BEGAKIS:  So point it out to me.
24 MR. BERMAN:  We'll move on you.  You just
25 -- okay.

1  MR. BEGAKIS:  You have every opportunity
2  to point out --
3  MR. BERMAN:  You're completely
4  interfering with my deposition.  We're going to be back
5  (indiscernible - simultaneous speech) --
6  MR. BEGAKIS:  You have every right to
7  point out to me how this is a category of this
8  deposition.
9  MR. BERMAN:  It's your license, John.
10 MR. BEGAKIS:  That sounded to me like a
11 threat of a bar action in -- as a way of gaining
12 leverage in litigation, which sounds to me like an
13 actionable bar action --
14 MR. BERMAN:  The record speaks for
15 itself.  We'll be back in front of the magistrate.
16 MR. BEGAKIS:  Okay.  You can -- you've
17 got all the time in the world.  You've got -- you've got
18 six hours and -- you've got 5 hours and 55 minutes to
19 point out for me how that's a category of this
20 deposition.  Point it out to me.
21 MR. BERMAN:  No.  I'm not going to.  You
22 can hang yourself.  That's fine.
23 MR. BEGAKIS:  Okay.
24 (Pause.)
25 MR. BERMAN:  Now --

1  MR. BEGAKIS:  Hold on.  I'm looking at
2  category 10, and I see that the album is listed there,
3  so I've done your job for you, Counsel.  And I will --
4  and I will allow my client to answer because it's within
5  the categories, which I've objected to any questions
6  outside of those categories.
7  So Mr. Martinez, you can answer as to
8  Chuy Chavez y Sus Amigos because it's identified in
9  category number 10.
10 Mr. Berman, that's the category that I
11 was asking you to point out to me as a courtesy, which
12 you wouldn't do.
13 MR. BERMAN:  No.  Nice backtrack.
14 You could answer.
15 THE WITNESS:  The album was distributed
16 with consent of Chuy Chavez, Jr.
17 BY MR. BERMAN:
18 Q.  Okay.  So the answer is, yes, Hyphy Music has
19 distributed the album Chuy Chavez y Sus Amigos, correct?
20 A.  With the consent of Chuy Chavez, Jr.
21 Q.  So now, with the exception of that album and
22 the two live -- I'm going to refer to them as the live
23 albums, which is Desde La Cantina de Mi Barrio and
24 Nuestra Historia.  The other remaining albums we just
25 discussed were all recorded in a recording studio,





1  correct?
2  A.  Correct.  Correct.
3  Q.  Okay.  And Mr. Hector Rosales was the
4  recording engineer for those albums, correct?
5  A.  For Corridos de Poca M, for El Campesino, and
6  part of Amigos y Contrarios.  The ones he did not record
7  Naci Con Suerte de Rey with mariachi.
8  Q.  Who was the recording engineer on that album
9  according to you?
10 A.  Chuy Chavez brought it from Mexico.  He said
11 it was his longtime dream to be able to release a full
12 mariachi album with some of his greatest hits, which
13 included Naci Con Suerte de Rey.  And he put the price
14 and he said, "Give me the money, and I'll go take care
15 of it, and I'll bring you the album."
16 Q.  So the answer is you don't know who the
17 recording engineer was?
18 A.  It was recorded in Mexico --
19 MR. BEGAKIS:  Objection.  Objection.
20 Objection.  Argumentative.  Misstates the witnesses
21 prior testimony.
22 BY MR. BERMAN:
23 Q.  Mr. Martinez, do you know who the recording
24 engineer was for the album Naci Con Suerte de Rey,
25 Mariachi?



1   A    No.  I don't.  It was delivered to us already

2   recorded.

3        MR. BEGAKIS:  Mr. Martinez, it's been

4   about an hour.  How are you feeling about a break?

5        THE WITNESS:  Oh, I'm good.

6        MR. BEGAKIS:  You're good?

7        THE WITNESS:  I'm good.

8        MR. BEGAKIS:  Okay.

9   BY MR. BERMAN:

10   Q    Now, is it your testimony that Hyphy had paid

11   -- withdrawn.

12        With recording the albums recorded by Mr.

13   Rosales, is it your testimony that Hyphy had paid Mr.

14   Rosales directly for his services or did Hyphy pay the

15   band who then paid Mr. Rosales?

16   A    Both.

17   Q    Okay.  So for the album Amigos y Contrarios,

18   did Hyphy pay Rosales directly or did the band pay?

19   A    I don't recall specific albums, specific

20   payments, but you will -- you should have the documents

21   that were submitted in prior documents request.  You

22   will see check stubs, and there is check stubs -- if not

23   one, there's several checks made out to Hector Rosales,

24   that was the money paid directly to him.

25   Q    And would you agree with me, sir, that it's



1   common practice for a record label to pay the recording

2   cost for artists that it has contractual relationships

3   with?

4        MR. BEGAKIS:  Objection to the extent it

5   seeks an expert opinion and calls for speculation.

6        MR. BERMAN:  Over your client -- your

7   counsel's objection, you can answer.

8        THE WITNESS:  I don't know the common

9   practice, but I can tell you our practice.  Our practice

10   is a complete buyout.  When Chuy Chavez, Jr., says, "I

11   want $30,000 for this production," on a complete buyout,

12   that is all inclusive.  Sound recording expenses,

13   pictures, promotion, everything.  Artistic growth is our

14   way; it's a complete buyout.

15   BY MR. BERMAN:

16   Q    Was Amigos y Contrarios distributed -- or

17   withdrawn.

18        What distributors -- withdrawn.

19        What third-party distributors distributed the

20   album Amigos y Contrarios for Hyphy?

21   A    All of the albums in question were distributed

22   by The Orchard Enterprises.

23   Q    Were physical CD's for any of these albums

24   ever sold by Hyphy?

25   A    Yes.  For Amigos y Contrarios.  Actually, for



1   all of them at the request of Mr. Chavez, because again,

2   he needed them for his shows.

3   Q    How many copies -- how many physical copies of

4   each album did Hyphy sell?

5   A    Printed about 2000 of each copy, issued about

6   1000 of those copies to the band, kept about 1000 in

7   inventory.

8   Q    How does Hyphy distribute physical copies of

9   the albums that are releasing?

10   A    We don't anymore, but at that time it was

11   essentially flea markets.

12   Q    Did Hyphy use a third-party distributor to

13   distribute the physical CD's?

14   A    Morena music and Disco's Linda or Discoteca

15   Linda.

16   Q    Other than distribution of physical CD's, has

17   Hyphy had any other sort of business dealings with

18   Morena Music?

19   A    No.

20   Q    Approximately how many albums has Morena

21   distributed physical CD's through Morena Music?

22        MR. BEGAKIS:  Objection.  Outside the

23   scope of this deposition.

24        MR. BERMAN:  Over your client -- your

25   counsel's objection, you can answer.



1        THE WITNESS:  The six albums from Los

2   Originales de San Juan and roughly about another 49 to

3   50 albums of a Hyphy product.

4   BY MR. BERMAN:

5   Q    Does Hyphy still have any sort of business

6   relationship with Morena Music?

7   A    No --

8        MR. BEGAKIS:  Objection.  Vague as to

9   business -- objection.  Vague as to business

10   relationship.  Outside of the scope of this deposition.

11        MR. BERMAN:  Over your client's

12   objection, you can answer.

13        MR. BEGAKIS:  You mean your attorney's

14   objection, Counsel.

15        MR. BERMAN:  Sorry.  Thank you.  Thank

16   you for correcting me.

17        THE WITNESS:  No.  The only relationship

18   we had was the physical distribution in which we swapped

19   and sell to each other.

20   BY MR. BERMAN:

21   Q    And when's the last time Hyphy had any sort of

22   business dealings with Morena Music?

23   A    Roughly --

24        MR. BEGAKIS:  Objection.  Vague as to

25   business -- objection.  Vague as to business dealings



**Page 65**

JOSE MARTINEZ - JULY 26, 2022          65

1   and outside the scope of this deposition.

2          MR. BERMAN:  Over your client's

3   objection, you could answer.

4          MR. BEGAKIS:  You mean your attorney's

5   objection, Counsel.

6          MR. BERMAN:  Thank you.  I was up very

7   late.  I apologize.

8          Over your attorney's objection, you can -

9   -

10          THE WITNESS:  Roughly about 2019.

11  BY MR. BERMAN:

12     Q    How much did Hyphy earn from the sale of the

13  physical copies of each of the albums?

14     A    We took a net loss.  Because again, we issue

15  50 percent of our inventory to the band.

16     Q    How much did you sell each copy wholesale for?

17     A    $2.00.

18     Q    What was your -- withdrawn.

19          Why did you determine to sell the CD's for

20  $2.00 a piece?

21     A    Physical CD Market Has crashed.  At that

22  point, it was hard to sell CD.

23     Q    And you claim that the album El Campesino was

24  released by Hyphy on May 31, 2016, correct?

25     A    I don't have my notes in front of me, but on



**Page 66**

JOSE MARTINEZ - JULY 26, 2022          66

1   or about.  Correct.

2          (Pause.)

3          MR. BERMAN:  Ms. Reporter, we could

4   please mark this document as Plaintiff's Exhibit A?

5          (Exhibit A marked for identification.)

6          THE DIGITAL REPORTER:  Okay.  Exhibit A

7   is marked.

8          MR. BERMAN:  Mr. Martinez, I'm just going

9   to ask you to take a look at the document that's been

10  marked as Plaintiff's Exhibit A.  And just scroll

11  through it, and just let me know if you've seen this

12  document before.

13          THE WITNESS:  Yes.  I have.

14  BY MR. BERMAN:

15     Q    And this is your signature on page 15 of 16?

16     A    Yes.  It is.

17     Q    And do you recall reading these responses

18  prior to signing the verification?

19     A    Yes.

20     Q    And do you believe the responses contained

21  therein to be true and correct?

22     A    Yes.

23     Q    So I'm just going to direct your attention.

24  Interrogatory Number 2.  I'm just going to read it into

25  the record.  "If the answer --



**Page 67**

JOSE MARTINEZ - JULY 26, 2022          67

1          MR. BEGAKIS:  Objection.  The document --

2   objection.  The document speaks for itself.

3          MR. BERMAN:  It does, but it's related to

4   my question, so I'm going to.

5          MR. BEGAKIS:  I'm still -- I'm still

6   permitted to object on the basis that the document

7   speaks for itself.

8          MR. BERMAN:  Okay.

9          "If the answer to the foregoing

10  interrogatory is in the affirmative, identify: (i) the

11  name of the artist in each sound recording exploited;

12  (ii) the title of each sound recording exploited; (iii)

13  the date of each exploitation; (iv) the nature of such

14  exploitation; (v) the identity of any third parties

15  involved in each such exploitation, (including, but not

16  limited to, any digital service providers such as Amazon

17  Music, Spotify, Apple Music, iTunes, and YouTube.com,

18  and in parentheses YouTube; (vi) the gross amount of

19  revenue generated from each such exploitation; (vii) the

20  name of every party that received any revenue generated

21  by each such exploitation; and (viii) the amount of

22  revenue received by each such party."

23  BY MR. BERMAN:

24     Q    So referring to respond -- your response

25  Number 4 regarding the dates of release.  So it says El



**Page 68**

JOSE MARTINEZ - JULY 26, 2022          68

1   Campesino, 5/31/16.  So it's your belief that this was

2   the release date of the El Campesino album?

3      A    Yes.

4      Q    And then next to it, it says Des de la Cantina

5   de Mi Barrio; and you believe the release date was March

6   24, 2017; is that correct?

7      A    Correct.

8      Q    And then the next album released on Nuestra --

9   released by Hyphy, Nuestra Historia en Vivo on March 31,

10  2017, correct?

11     A    Correct.

12     Q    And then the album Corridos de Poca M was

13  released by Hyphy on February 24, 2015, correct?

14     A    Correct.

15     Q    And then Amigos y Contrarios was released by

16  Hyphy on February 21, 2013, correct?

17     A    Correct.

18     Q    And in response to Number 5 it says, "El

19  Campesino via CD and digital transmission through all

20  available Digital Service Providers, DSP's."  Was El

21  Campesino distributed by The Orchard to the best of your

22  recollection?

23     A    Yes.  All of these albums have been

24  distributed by The Orchard.

25     Q    Were they distributed through any other retail



**Page 69**

1  channels other than through The Orchard?

2      A   The order covers all retail DSP's.

3      Q   Okay.  What about YouTube?  Did The Orchard

4  collect all YouTube revenue on behalf of Hyphy?

5      A   Yes.  It's all inclusive.

6      Q   So referring to Subsection 7 of the answer to

7  Interrogatory Number 2 which asks the gross amount of

8  revenue generated from each such exploitation.  And so

9  you responded, "Approximately $15,000 to $20,000 per

10  album for each of the three studio album."

11  So which of the three studio albums are you referring

12  to?

13      A   Amigos y Contrarios, Corridos de Poca M, and

14  El Campesino.

15      Q   Okay.  And "$15,000 to $20,000 for --

16  collectively for both live albums."  And which albums

17  are referring to when you say the live albums.

18      A   Nuestra Historia and Des de la Cantina de Mi

19  Barrio.

20      Q   And how did you determine this $15,000 to

21  $20,000 number for the albums referred to in in Answer

22  7?

23      A   Taking a rough estimate from the accounting

24  that we receive.  Those accounting reports were

25  eventually verified through your subpoena of The



**Page 70**

1  Orchard.  So you should have actual numbers.

2      Q   Okay.  So just to be clear for the record,

3  what you looked at were accounting reports that Hyphy

4  received from The Orchard?

5      A   Correct.  And we estimated far more than what

6  we actually received.

7          MR. BERMAN:  I'm going to call for the

8  preservation and production of the documents that you

9  had looked at the time that you determined the number

10  set forth in the answer to this interrogatory.

11          MR. BEGAKIS:  You can propound those

12  requests as an independent request for production, and

13  will respond to them per code.

14          THE WITNESS:  They were actually already

15  provided.  They were provided on a prior request, and

16  then you were not happy with them, so you subpoenaed The

17  Orchard and you got actuals.

18          MR. BERMAN:  So to the extent that --

19          MR. BEGAKIS:  So to the extent that you

20  serve us a request for production of document and it has

21  not already been responded to with documents provided

22  already, we will respond to it per code.

23          MR. BERMAN:  Okay.  Great.

24  BY MR. BERMAN:

25      Q   And did Hyphy ever receive any sort of



**Page 71**

1  accounting statements from Morena regarding the sale of

2  physical CD's?

3      A   No.

4      Q   Did Hyphy does -- withdrawn.

5          Does Hyphy have any documentation in its

6  possession whatsoever that memorializes the sale of

7  physical CD's of the band albums to Morena?

8      A   No.  Because they were primarily in exchange

9  for product on a $2.00 credit basis.

10      Q   Okay.  So is cash ever exchanged for the sale

11  of any of the band CD's to Morena?

12      A   We paid in cash and we paid it by check.  We

13  were issued invoices because we were always upside down.

14  Their product was $4.25, our product was $2.00.

15          MR. BERMAN:  All right.  I call for the

16  preservation and production of any of the invoices that

17  you're referring to.

18          MR. BEGAKIS:  And to the extent that you

19  want to serve a discovery request for production, we

20  will respond to it per code.

21          (Pause.)

22              Just want to go through some documents

23  that I'm going to mark.  So why don't we just break for,

24  like, 5 minutes?

25          THE DIGITAL REPORTER:  Okay.  Do you want

**Page 72**

1  me to close this exhibit out?

2          MR. BERMAN:  I'll do it.

3          THE DIGITAL REPORTER:  Okay.  Is everyone

4  okay with going off the record for five minutes?

5          MR. BEGAKIS:  Sure.

6          THE DIGITAL REPORTER:  All right.  It is

7  2:28 p.m. Eastern Time, and we are going off the record.

8          (Off the record.)

9          THE DIGITAL REPORTER:  It is 2:34 p.m.

10  and we are back on the record.

11  BY MR. BERMAN:

12      Q   Mr. Martinez, do you know an individual named

13  Jesus Ramirez?

14      A   Yes.

15      Q   And how do you know Mr. Ramirez?

16      A   He's an independent contractor for us.  He

17  does sound recording, sound engineering, sound

18  production.

19      Q   Okay.  And he never performed on any of the

20  band albums; is that correct?

21      A   No.  He did not.

22      Q   And is it accurate to say that you claim that

23  he performed some recording services in connection with

24  the two live albums, Des de la Cantina de Mi Barrio and

25  Nuestra Historia?

1    A   He was the Omar Rosales of those two live
2    albums.  He was the recording and production engineer.
3    Q   Okay.  Now, is it accurate to say that you're
4    claiming that Hyphy Music is a co-author on those two
5    live albums by virtue of a work for hire relationship
6    between Hyphy and Mr. Ramirez?
7    A   Before I answer that question, how can I get
8    where I can see you?  I feel like I'm talking to myself.
9         MR. BERMAN:  Do you -- do you not see me?
10        THE WITNESS:  No.  I don't --
11        MR. BEGAKIS:  It's possible that it's
12   because of the exhibit arrangement.
13        THE WITNESS:  Yeah.
14        THE DIGITAL REPORTER:  Oh, do you see the
15   exhibit, Mr. Martinez?
16        THE WITNESS:  Yeah.  Please.  I can see
17   your faces.
18        THE DIGITAL REPORTER:  So what are you
19   seeing right now?
20        THE WITNESS:  Just myself.
21        THE DIGITAL REPORTER:  Oh.  You don't see
22   the exhibit or anything?
23        THE WITNESS:  I see the exhibit on the
24   left side, but I see myself on most of the screen.
25        THE DIGITAL REPORTER:  Okay.  Try to --



1    on the bottom of your screen, there's an exhibits tab.
2    I think you might have it open, so click on that and it
3    should go away --
4         THE WITNESS:  Okay.  There we go.  Okay.
5    Thank you.  Okay.
6         THE DIGITAL REPORTER:  You're welcome.
7         THE WITNESS:  Sorry.  Can you ask the
8    question again?
9         MR. BERMAN:  Could you please read back
10   the question, Ms. Reporter?
11        THE DIGITAL REPORTER:  Yes.  Let me pull
12   it up.  One second.
13        (Pause.)
14        THE DIGITAL REPORTER:  Sorry.  One moment
15   I'm just finding it.
16        (Pause.)
17        THE DIGITAL REPORTER:  I'm so sorry one
18   moment.
19        (Playback as requested.)
20        THE WITNESS:  It's hard to understand the
21   question.  It'd be best if you re-ask it, Counsel.
22   BY MR. BERMAN:
23        Q   Okay.  Hyphy's claiming to be a co-author on
24   four of the albums by the band that we discussed,
25   correct?

1    A   Yes.
2    Q   That would be Corridos De Poca M, Des de la
3    Cantina de Mi Barrio, El Campesino, and Nuestra
4    Historia, correct?
5    A   Correct.
6    Q   In your own words, what is the basis for
7    Hyphy's claim to co-ownership of those albums?
8         MR. BEGAKIS:  Objection to the extent it
9    seeks legal conclusion.  Vague as to basis.  Objection
10   to the extent it seeks expert testimony and to the
11   extent it requires the witness to disclose attorney-
12   client privilege communications.
13        MR. BERMAN:  Over those objections, you
14   can answer.
15        THE WITNESS:  Let's talk about the live
16   recordings.  On that particular aspect, Jesus Ramirez,
17   the sound engineer, assigned as an independent
18   contractor all rights and the production thereof that
19   live recording.  As a matter of fact, after speaking to
20   Mr. Omar Rosales, he made the statement that someone
21   from Yellowcake attempted to harass him into signing a
22   false affidavit with credit for that recording.
23        Mr. Rosales never touched that recording.
24   That recording was done on site, and it was done at
25   Aldo's Nightclub under the direction of Jesus Ramirez.



1    Further, then his input, after the raw files were
2    delivered to the studio for mixing, we found out that
3    most of the drunk band members did not perform well
4    because there was obviously a live recording and a very
5    festive atmosphere in which Hyphy Music had proposed the
6    celebration of their anniversary -- from the very
7    beginnings of their, I guess, music history, which
8    started in Fresno, California at that precise nightclub.
9         So we arranged for cameras, we arranged
10   for specific songs, we arranged for an MC, we arranged
11   for a specific dialogue to be stated at a specific time.
12   There was essentially a script of the production.  It
13   was a short film, in essence.  The characters that were
14   invited -- and I say characters were -- because some of
15   those characters are sung about and some of these
16   corridos.  So some of these are these superheroes that
17   are made out by these corridos that Originales de San
18   Juan had performed through the years.
19        And when we took the files, we realized
20   that everybody had too much fun and none of the
21   recordings were actually clean enough to release out to
22   the public.  So we had Javier Lisandro redo the whole
23   baseline, because at that time it was performed by a
24   deceased musician now, who was definitely not on his
25   game.





1  Q   Okay.  So the answer is there are no
2  documents, correct?
3        MR. BEGAKIS:  Objection.  Misstates the
4  witnesses prior testimony.
5        MR. BERMAN:  Over your client -- your
6  counsel's objection, you could answer.
7        THE WITNESS:  Misleading question.  I
8  can't answer.
9        MR. BERMAN:  Okay.  Move the strike as
10 nonresponsive.
11 BY MR. BERMAN:
12 Q   Does Hyphy have any documents in its
13 possession.  To reflect any understanding between the
14 band members and Hyphy Music that Hyphy Music would be a
15 co-author of the two live albums?
16       MR. BEGAKIS:  Objection.  Vague.
17       MR. BERMAN:  Over your counsel's
18 objection, you can answer.
19       THE WITNESS:  The receipt of purchases --
20 the checks received by Mr. Chavez on behalf of the band
21 members; those are the documents I can provide you with.
22 BY MR. BERMAN:
23 Q   Okay.  So other than the checks that you just
24 referred to, to the best of your knowledge, Hyphy is not
25 in possession of any other documents that reflects any

1  understanding between any of the band members and Hyphy
2  Music that the band members and Hyphy Music would be co-
3  authors of the live albums, correct?
4        MR. BEGAKIS:  Objection.  Vague,
5  argumentative, counsel should lower his voice and calm
6  down a little bit when he's asking these questions.  And
7  to the extent that it hasn't been asked and answered,
8  the witness can answer.
9        MR. BERMAN:  Over your counsel's
10 misleading objection, you could answer.
11       THE WITNESS:  The mutual understanding
12 was not put in writing.  I suspect you are asking me to
13 fabricate an answer that is not true and correct.
14 BY MR. BERMAN:
15 Q   So as we sit here today, Hyphy is not in
16 possession of any documents that specifically refer to
17 any understanding between the band and Hyphy Music that
18 Hyphy would be a co-author of the live albums, correct?
19       MR. BEGAKIS:  Objection.  Asked like five
20 times, and answered like five times, and argumentative.
21       MR. BERMAN:  Over your counsel's
22 objection, you could answer.
23       MR. BEGAKIS:  To the extent that you've
24 got a new answer to provide, Mr. Martinez.
25       THE WITNESS:  I don't.

1  BY MR. BERMAN:
2  Q   Okay.  So now with regards to the remaining
3  two albums --
4  A   There should be three.
5  Q   Well, I'm talking about now -- well,
6  specifically regarding the remaining two albums for
7  which Hyphy has claimed -- or registered a copyright
8  registration and connection with, and that would be
9  Corridos de Poca and El campesino, correct?
10 A   Yes.  Correct.
11 Q   Okay.  Now, is it your position that Hyphy is
12 it co-author of Corridos de Poco M and El Campesino?
13 A   Yes.
14 Q   What is the basis for your belief?
15       MR. BEGAKIS:  Objection.  Vague as to
16 basis.  Calls for a legal conclusion.  Calls for expert
17 testimony.
18       MR. BERMAN:  Over your counsel's
19 objection, you can answer.
20       THE WITNESS:  Corridos de Poca M was a
21 mutual arrange production in which we allowed Chuy
22 Chavez, Sr. to record roughly about seven corridos in
23 which he got paid for roughly about $10,000 per each
24 song.  We objected to the recording of that.  In
25 exchange for that, he said, "You get to choose three



1  songs of your liking."
2        I said, "One of them needs to be a hit or
3  somewhat of a radio pitch that we can promote."  So we
4  took it upon ourselves, specifically me, to work in
5  conjunction with Domingo Torres to come up with
6  something that would be commercial so that we can
7  exploit the album to the best of our ability and not
8  just have a bunch of junk personalized corridos that Mr.
9  Chavez wanted to record.  He provided a list of roughly
10 17 tracks that he wanted to record.  We minimized that
11 to 7.  And if you listen to it or any expert can listen
12 to them, they are just a piece of crap.
13       The rest of the album was essentially
14 produced by us in conjunction with Domingo Torres and
15 Omar Rosales.  One key point that everyone needs to
16 understand here is Mr. Chavez, Sr. only shows up to the
17 recording when all the music production has already been
18 done to lay down his vocals.  He does not direct the
19 ban.  He does not direct any musical arrangements.  That
20 is all done by Domingo Torres.  And in this instance, it
21 was done by Domingo Torres in conjunction with Omar
22 Rosales and myself.
23 BY MR. BERMAN:
24 Q   Mr. Martinez, isn't it a record label's job to
25 help choose and decide what songs are going to go on an



1  album?
2            MR. BEGAKIS:  Objection.  Calls for
3  expert opinion, seeks and calls for testimony that --
4  calls for speculation.
5            MR. BERMAN:  Over your counsel's
6  objection, you can answer.
7            THE WITNESS:  We do far more than just
8  that, counselor.
9            MR. BERMAN:  I'm sorry.  Could you repeat
10  your answer?
11            THE WITNESS:  We do far more than just
12  that.
13  BY MR. BERMAN:
14      Q   Is it part of -- in your experience, Mr.
15  Martinez, isn't it a record label's job to choose what
16  songs go on an album?
17            MR. BEGAKIS:  Objection.  Calls for
18  speculation.  Calls for expert testimony, and you can
19  answer.
20            Mr. Berman, you don't need to say, "Over
21  counsel's objection," every single time.  The witness
22  knows to answer at this point.  We've been going for two
23  hours.
24            MR. BERMAN:  As long as he understands,
25  it's fine by me.



1            You can answer.
2            THE WITNESS:  I would accept the fact
3  that it is -- it is a minimum minimal responsibility or
4  expectation of a record label to choose and decide which
5  songs are going to be released and recorded.  But it is
6  not the minimal or expectation -- responsibility or
7  expectation of a record company to be engaged in the
8  actual production, which is again what we did.  Because
9  Mr. Chavez is not a musician, he is simply a lead vocal
10  that goes in at the end of the finished product and lays
11  out his vocals.  So we can't get from point A to point B
12  without Hyphy Music's involvement, Mr. Torres's
13  involvement, and Mr. Omar Rosales' involvement.
14            And that is not the responsibility of a
15  record label.  In this case, we became engaged, which is
16  why I answered we did far more than what you're asking.
17  BY MR. BERMAN:
18      Q   Mr. Domingo Torres did not play any
19  instruments on the recording of Corridos de Poca M or El
20  Campesino, correct?
21      A   He has always recorded every live -- every
22  studio album.  As a matter of fact, one of the fallouts
23  we had with Jesus Chavez, Sr. was that in the absence of
24  Domingo Torres, because he had open heart surgery, we
25  would not be recording, and he wanted to continue to



1  record with a substitute, and I objected to that.
2  Therefore, none of the albums ever were released under
3  our term without Domingo Torres being present.
4            MR. BERMAN:  Okay.  Move to strike as
5  non-responsive.
6  BY MR. BERMAN:
7      Q   Again, isn't it true that Mr. Torres did not
8  play or perform on the recording of either Corridos de
9  Poca M or El Campesino?
10            MR. BEGAKIS:  Objection.  Vague.
11  Objection.  Vague as to perform and asked and answered,
12  argumentative.
13            MR. BERMAN:  You can answer.
14            THE WITNESS:  I believe your statement to
15  be false.
16  BY MR. BERMAN:
17      Q   Okay.  What's false about my statement?
18      A   You're saying that he did not play, and I
19  believe that to be false.
20      Q   Okay.  What exactly did Mr. Torres play on
21  what album, and what did he play?
22            MR. BEGAKIS:  Objection.  Vague as to
23  play.
24            THE WITNESS:  He performed the accordion
25  on all studio albums during our term.



1  BY MR. BERMAN:
2      Q   Okay.  Now, do you have any documents in your
3  possession that would evidence any understanding between
4  any of the band members and Hyphy Music that Hyphy Music
5  would be a co-author of the albums Corridos de Poca M or
6  El Campesino?
7            MR. BEGAKIS:  Objection.  Vague.  Calls
8  for legal conclusion.
9            MR. BERMAN:  You could answer.
10            THE WITNESS:  The true story that I
11  recited over and over to you, in which there was a
12  mutual understanding of the arrangement in which they
13  were conceding their rights in exchange for a complete
14  buyout was not put in writing.
15  BY MR. BERMAN:
16      Q   Has Hyphy Music ever filed copyright
17  registrations for sound recordings that it believes it's
18  owned in the U.S. Copyright Office?
19      A   Yes.
20      Q   Approximately how many copyright registrations
21  has Hyphy Music registered over the years?
22      A   Registered on our behalf, roughly about 129;
23  transferred or recorded as an assignment of rights from
24  previous copyrights, roughly about 4400.
25      Q   So when you talk about previously assigned --



1  you the honest truth.
2       Q   Okay.  And do you have any evidence in your
3  possession to reflect that this conversation between Mr.
4  Chavez and Mr. Hernandez occurred in April of 2019?
5       A   He showed me a picture, which I'm assuming if
6  you dig into it, you can probably still find it.  He
7  showed me a picture of them hanging out together in
8  Mexico, and he said that's where the whole conversation
9  occurred initially, and then they followed up with the
10 conversation here in the United States.
11      Q   So other than what Mr. Chavez allegedly told
12 you, do you have any documents that reflect that there
13 was a conversation with, essentially, this substance
14 between Mr. Chavez and Mr. Hernandez in April 2009?
15      A   I don't have any -- I don't have any --
16          MR. BEGAKIS:  Objection.  Objection.
17 Objection.  Vague and asked and answered.
18          MR. BERMAN:  You can answer.
19          THE WITNESS:  I would like to add that I
20 don't have any documents for this conversation, but I do
21 have witnesses to this conversation, and they were the
22 individuals at the office that day.  And I also have
23 their hand testimony they had also heard about this
24 particular conversation.
25 BY MR. BERMAN:



---

1       Q   Okay.  Now, I'm not asking about the
2  conversation that you had with Mr. Chavez.  I'm now
3  asking you about the conversation allegedly between Mr.
4  Chavez and Mr. Hernandez reference in paragraph 21 of
5  the amended counterclaim, okay?
6       A   Yes.  There's -- there's third-party witnesses
7  that have advised us that they were aware of that
8  alleged conversation.
9       Q   Okay.  Who are those alleged witnesses?  Who?
10      A   Pedro Chavez, which is his brother of Jesus
11 Chavez, and then Jorge Garcia, which is either a
12 relative or someone that grew up as a relative with
13 them.
14      Q   Do you have the contact information for these
15 two individuals?
16      A   I want to say I provided that in our witness
17 list.  If not, I'm sure that our attorney can provide
18 that to you.
19          MR. BERMAN:  I'm going to leave a blank
20 in the transcript and to the extent not already
21 provided, I'm going to ask that be provided.
22 BY MR. BERMAN:
23      Q   Now, these individuals told you that they were
24 present at this April 2019 conversation between Mr.
25 Chavez and Mr. Hernandez?



---

1       A   What they told me was that they were aware of
2  the conversation.  Whether or not they were present,
3  that I do not know.  Pedro Chavez, for example, here in
4  my office he said, like, "I talked to Chuy and he said,
5  yeah, this is all David's bullshit.  He induced him
6  into basically taking additional money knowing that he
7  had already sold these rights.  That was the
8  conversation stated by Pedro Chavez.
9          Jorge Garcia on the same situation here in my
10 office stated the same thing, "Jesus Chavez, Sr. does
11 not have an issue with you.  This whole thing got out of
12 hand.  He was misled and misadvised by David Hernandez
13 who told him that he would take care of any bullshit
14 that would arise from this action," which is reselling
15 rights, which by the way, Jesus Chavez, Sr. is not the
16 only rights holder of the masters in question.  He's
17 just a mere contributor. He's only a vocalist, he
18 doesn't execute any instruments.  He doesn't do anything
19 else other than just sing.
20          MR. BERMAN:  That's quite a statement
21 there.
22          Move to strike as nonresponsive.
23          MR. BEGAKIS:  Move to strike.
24          MR. BERMAN:  He just sings.
25          THE WITNESS:  He stopped playing the bajo



---

1  sexto years ago because he can't play an instrument;
2  he's a singer.  He brings no contribution whatsoever to
3  the musical production of things.
4  BY MR. BERMAN:
5       Q   On paragraph 22 of the document in front of
6  you, the first amended counterclaim, it states,
7  "Counter-defendant Hernandez intentionally and willfully
8  misled Counter-defendant Chavez when he wrongfully and
9  mistakenly told him that Counterclaimant had no rights
10 to the Los Originales albums and was free to sell the
11 subject works to Hernandez's companies, Yellowcake and
12 Colonize, and offered Chavez a significant sum of money
13 to purportedly purchased the rights in the Los
14 Originales albums.  Counter-defendant further induced
15 counter-defendant Chavez to ignore his contractual
16 obligations to Counterclaimant by promising to indemnify
17 Chavez in the event Counterclaimant sought legal redress
18 from Chavez.  Counter-defendant Hernandez engaged in
19 this conduct, both individually and in his capacity as a
20 principal of Counter-defendants Yellowcake and Colonize,
21 in an effort to disrupt the contractual relations
22 between Counterclaimant and Counter-defendant Chavez."
23          See where it says that?
24      A   Yes, sir.
25      Q   Now, how do you know that David Hernandez

JOSE MARTINEZ - JULY 26, 2022                125

1    A    Yes.

2    Q    And would you say that you have some knowledge

3    of the sound recording process?

4    A    Yes.

5    Q    Okay.  So then would you agree with me, sir,

6    based on your prior experience, that a digital sound

7    recording could basically be copied an infinite amount

8    of times without suffering any degradation and sound

9    quality?

10          MR. BEGAKIS:  Same objections.

11          THE WITNESS:  I believe that the most

12    important piece of the sound recording is the actual

13    master, which holds all the stamps, all the individual

14    tracks.  From there, you can -- you can modify that,

15    and, yes, create endless numbers of copies off of the

16    mother master.

17    BY MR. BERMAN:

18    Q    Do you have any documents or any -- withdrawn.

19        Do you have any documents in writing that

20    would memorialize any agreement or understanding between

21    Hyphy and the band that Hyphy would own any master

22    recordings as you just described them of the albums?

23          MR. BEGAKIS:  Objection.  Objection.

24    Asked and answered.

25          MR. BERMAN:  Definitely not.  But you



REMOTE LEGAL
COURT REPORTING
646-461-3400

---

JOSE MARTINEZ - JULY 26, 2022                126

1    could answer.

2          THE WITNESS:  I have a general and

3    precise understanding of everyone involved as a

4    contributor, that that was the situation.  It was not

5    written, however, the agreement still exists.  That was

6    everyone's mutual understanding that Hyphy was to be the

7    owner under a buyout clause, which the band demanded a

8    certain amount of money in exchange for their rights.

9        And we have the check stubs to support

10    it.  Every single dollar was issued to the band in

11    exchange for the rights.

12    BY MR. BERMAN:

13    Q    Did you ever send any sort of correspondence

14    to Yellowcake demanding the return of any alleged master

15    recordings of the album?

16    A    No.  But we'd like them back.

17    Q    Well, you don't own them, so you're not

18    entitled to them.

19          MR. BEGAKIS:  Objection.  Argumentative,

20    badgering the witness.  Stick with your BS move to

21    strike statements that mean absolutely nothing, Counsel.

22    BY MR. BERMAN:

23    Q    Who created the artwork for the four albums

24    that were -- or for the albums that were -- withdrawn.

25    A    Marcelino Mendoza.



REMOTE LEGAL
COURT REPORTING
646-461-3400

---

JOSE MARTINEZ - JULY 26, 2022                127

1    Q    Sorry.  I'll come back.  I'm going to show you

2    a document that was previously marked as Plaintiff's

3    Exhibit A.

4    A    Yes.

5    Q    Sorry.  Here.  And ask you to take a look at

6    interrogatory Number 16 and your response.  Let me know

7    when you're finished.

8    A    My response, correct?

9    Q    You done looking at it?  You've read

10    interrogatory Number 16 and your response?

11    A    Yes.  I'm done.

12    Q    Okay.  So is it accurate to say that in your

13    response you identify a Marcelino Mendoza as an

14    independent contractor who created the cover art for the

15    five albums?

16    A    Correct.

17    Q    Okay.  And then he was an employee from 2017

18    to 2018?

19    A    Yeah.  He was an employee.  He was also a

20    contractor.  I want to say it's stated there.  Yeah.  It

21    is.

22    Q    When was he -- was Mr. Mendoza last

23    employed by Hyphy?

24    A    Towards the end of, I want to say, 2019.

25    Q    And what were the circumstances of the

REMOTE LEGAL
COURT REPORTING
646-461-3400

---

JOSE MARTINEZ - JULY 26, 2022                128

1    termination of his employment?

2    A    He was asked to -- I don't know the best way

3    to phrase it, but he was asked to deliver an artist we

4    were selling to Dell Records, another record label.  And

5    during the transfer of ownership of the artist's rights,

6    he had a conversation with the record label CEO in which

7    the record label assumed that he was the owner of Hyphy

8    Music and offered him employment on the condition that

9    he would bring all Hyphy Music assets over to Dell.

10        Obviously, that didn't pan out for either

11    side, so that was the end of his employment here.

12    Q    Okay.  And did you pay Mr. Mendoza a salary or

13    hourly when he was an employee?

14    A    Both.  He had hourly rates during the time he

15    was an employee, and he had a contractor fee during the

16    time he was an independent contractor.

17    Q    What was his hourly wage when he was an

18    employee?

19    A    I want to say somewhere between 21 and 24

20    hours -- $24.00 an hour, and I'm estimating.

21    Q    What was Mr. Mendoza ever issued a W2 by

22    Hyphy?

23    A    That would be something Christopher can

24    answer.

25          MR. BERMAN:  To the extent that there

REMOTE LEGAL
COURT REPORTING
646-461-3400

JOSE MARTINEZ – JULY 26, 2022                    133

```
 1   marked as Defendant's (sic) Exhibit D, and I'm just
 2   going to identify for the record that this is
 3   Defendant's document production; it's been Bates stamped
 4   -- at least the first -- page Hyphy000001 and
 5   sequentially thereafter.  And I'm asking you to look at
 6   the first page.
 7              THE WITNESS:  I see it.
 8   BY MR. BERMAN:
 9        Q    And have you seen this document before?
10        A    Yes.
11        Q    And what do you understand it to be?
12        A    Registration of our cover art.
13        Q    And that would be for the album most Los
14   Originales de San Juan, En Vivo Desde La Cantina,
15   correct?
16        A    That is correct.
17        Q    And I'm asking you to look at the top left
18   where it says date, and it says May 1, 2020.
19        A    Yes.
20        Q    You see that?
21        A    Yes.
22        Q    And is -- do you believe that to be the
23   registration date?
24        A    Correct.
25        Q    Okay.  And then I'm going to ask you to look
```



JOSE MARTINEZ – JULY 26, 2022                    134

```
 1   at the next page Bates stamped Hyphy2.  And it says Los
 2   Originales de San Juan, El Campesino album cover; you
 3   see that?
 4        A    Yes.
 5        Q    And have you seen this document before?
 6        A    Yes.
 7        Q    And what do you understand it to be?
 8        A    Registration of our cover art for El
 9   Campesino.
10        Q    And this cover art was registered on May 4,
11   2020, correct?
12        A    Correct.
13        Q    And moving to the next page marked Hyphy3.  It
14   says Los Originales de San Juan, Corridos de Poca M
15   album cover.  Have you seen this document before?
16        A    Yes.
17        Q    And what do you understand it to be?
18        A    Registration over cover art for Corridos de
19   Poca M.
20        Q    And see where it says registration date at the
21   top, it says May 3, 2020, correct?
22        A    Correct.
23        Q    And you believe that date to be accurate?
24        A    Yes.
25        Q    And moving to the next document, Hyphy4, says
```





JOSE MARTINEZ – JULY 26, 2022                    135

```
 1   Los Originales de San Juan, Amigos y Contrarios album
 2   cover.  Do you see that?
 3        A    Yes.
 4        Q    And have you seen this document before?
 5        A    Correct.
 6        Q    And what do you understand it to be?
 7        A    Registration for Los Amigos y Contrarios cover
 8   art.
 9        Q    You see the top where it says registration
10   date?
11        A    Yes.
12        Q    It says May 4, 2020.
13        A    Yes.
14        Q    Do you believe that date to be accurate?
15        A    Yes.
16        Q    I'm moving to the next page marked Hyphy5.  It
17   says Chuy Chavez, Naci Con Suerte de Rey album cover.
18        A    Correct.
19        Q    See that?
20        A    Yes.
21        Q    And have you seen this document before?
22        A    Yes.
23        Q    And what do you understand it to be?
24        A    Registration for the cover art for Naci Con
25   Suerte de Rey.
```



JOSE MARTINEZ – JULY 26, 2022                    136

```
 1        Q    And you see where it says registration date
 2   May 4?
 3        A    Correct.
 4        Q    Do you believe that date to be accurate?
 5        A    Yes.
 6        Q    Moving on to Defendants -- I'm sorry -- the
 7   document marked as Hyphy6 and 7 -- actually 6, 7, and 8.
 8        A    Yes.
 9        Q    Have you seen this document before?
10        A    It looks like something I've seen.  Yes.
11        Q    And what do you understand it to be?
12        A    Let me glance at it.  It looks like we are
13   omitting to the fact that we own the logo on Los
14   Originales artwork.
15        Q    Sorry.  At the bottom it says, "Material
16   excluded from this claim:  Hyphy Music does not own the
17   "Los Originales de San Juan" logo," correct?
18        A    Correct.
19        Q    To the best of your knowledge, who owns that
20   logo?
21        A    The band.
22        Q    Does Hyphy have any written authorization or
23   license from the band to use or continue to use the Los
24   Originales de San Juan logo in connection with the sale
25   of any of the albums?
```



1    Q   You testified that during prior litigation

2  regarding the Chuy Chavez y Sus Amigos album.

3    A   No.  Chuy Chavez, Jr. --

4        MR. BEGAKIS:  Objection.  Objection.

5  Objection (indiscernible - simultaneous speech) --

6        MR. BERMAN:  Mr. Begakis, stop testifying

7  for your client --

8        MR. BEGAKIS:  Mr. Martinez, let me get my

9  objection --

10       MR. BERMAN:  Stop testifying for your

11  client --

12       MR. BEGAKIS:  Mr. Martinez -- Mr.

13  Martinez --

14       MR. BERMAN:  Stop interfering with my

15  deposition (indiscernible - simultaneous speech) --

16       MR. BEGAKIS:  Let me get my objections.

17  He keeps -- he keeps asking unrelated questions, so let

18  me get my objection on the record, Mr. Martinez, please.

19       Before you answer, just give it a minute,

20  let me -- let me assert my proper objections to this --

21  these nonsensical unrelated questions, and then I'll

22  either instruct you to answer if it's within the scope

23  of this deposition, or not answer because it's not

24  within the scope of this deposition.

25       So now, Mr. Berman, ask your question



---

1  again.

2  BY MR. BERMAN:

3    Q   Mr. Martinez, isn't it true that the Chuy

4  Chavez y Sus Amigos album was not part of this

5  settlement agreement marked as Exhibit E?

6       MR. BEGAKIS:  You could answer that.

7       THE WITNESS:  Nobody ever alleged that,

8  and you just said that I testified to such thing, and I

9  did not.

10  BY MR. BERMAN:

11    Q   Did you not testify that that album, Chuy

12  Chavez y Sus Amigos was subject to a prior litigation?

13    Q   No.  I -- no --

14       MR. BEGAKIS:  Objection.  Objection.

15  Objection.  Misstates the witnesses prior testimony --

16       MR. BERMAN:  State your objection, and

17  then let your client answer.

18       MR. BERMAN:  Now you could answer --

19       MR. BEGAKIS:  Objection.  Misstates the

20  witnesses prior testimony.  You can answer, Mr.

21  Martinez.

22       THE WITNESS:  My testimony was that this

23  particular litigation that we are reviewing right now

24  encompassed Chuy Chavez, Jr., nothing to do with Chuy

25  Chavez y Sus Amigos.  They are totally different works.



---

1  Chuy Chavez, Jr. filed this motion on behalf -- or

2  Yellowcake filed this motion on behalf of Chuy Chavez,

3  Jr. alleging that we didn't have any rights when we

4  provided every piece of evidence showing that we have

5  purchased these rights from Chuy, Jr.  In the absence of

6  a written agreement, it transfer into a verbal license

7  in which Yellowcake and Chuy Chavez, Jr. were still in

8  debt because we have not recouped.

9       That is what I testified.  Nothing to do

10  with Chuy Chavez y Sus Amigos.  Chuy Chavez y Sus Amigos

11  was an album that was issued by Chuy Chavez, Jr., under

12  which he never filed a complaint, under which he never

13  had any issue with us exploiting that content because,

14  frankly, it was a piece of crap work because it was a

15  bunch of little kids singing songs trying to impress

16  Chuy Chavez, Sr., that's why it's Chuy Chavez y Sus

17  Amigos and his friends.

18       So you're misinterpreting my statement,

19  counselor.  What I said was Chuy Chavez, Jr. entered

20  into a settlement under which he could not explain or

21  justify how he did not give us permission -- how -- how

22  in the hell we ever infringed on his rights.  This is

23  what the settlement is all about.  Nothing to do with

24  this other album you're discussing.

25       MR. BERMAN:  I don't understand your



---

1  answer, but that's fine.  I'll move on.

2  BY MR. BERMAN:

3    Q   Mr. Martinez --

4       MR. BEGAKIS:  Unbelievable.

5  BY MR. BERMAN:

6    Q   So just to be clear, so it's your position

7  that Mr. Chavez, Sr. had no right to transfer ownership

8  of the album Chuy Chavez y Sus Amigos because it's your

9  position that Hyphy Music had not recouped alleged

10  advances and expenses related to that album?  Is that

11  what you're trying to say?

12    A   That's what I'm asserting, and that is the

13  truth.

14    Q   Okay.  Now, do you have -- what -- okay.  What

15  -- again, what's your basis for that -- for your belief

16  that that's true?

17       MR. BEGAKIS:  Objection.  Vague, calls

18  for legal conclusion, calls for an expert opinion.

19       MR. BERMAN:  I asked the basis of his

20  belief --

21       MR. BEGAKIS:  Yeah.  And to the extent --

22       MR. BERMAN:  That doesn't require an

23  expert --

24       MR. BEGAKIS:  -- that you can answer a

25  vague question that's clearly trying to extract a legal



# EXHIBIT "G"

Page 90

1   restricted to only YouTube and not other services.  That
2   sort of thing.
3       Q   I see.
4       A   So I say, "unrestricted."  It just -- I didn't
5   put the any restrictions on the monetization.
6       Q   That makes sense.  That makes sense.  I see
7   that.
8           Is it an exclusive agreement?
9       A   Yes.
10      Q   And you mentioned that it's not for a term,
11  it's terminable at will by the parties?
12          MR. BERMAN:  Objection.  Misstates --
13          THE WITNESS:  I -- I believe it has -- sorry.
14          MR. BERMAN:  Objection.  Mischaracterization of
15  testimony, but you can answer.
16          THE WITNESS:  I -- no, it's for a term, with an
17  auto-renew clause, but I believe it can be terminated by
18  either side within 30 days notice, but it is still for a
19  term.
20  BY MR. BEGAKIS:
21      Q   I see.
22          Um, under that agreement, does Colonize
23  distribute all of Yellowcake's rights in all sound
24  recordings?
25      A   In connection with these albums or --

Page 91

1       Q   In general.
2       A   No.
3       Q   Okay.  So Yellowcake has -- so you said it's an
4   exclusive agreement, but Yellowcake distributes rights
5   through other administrators as well?
6       A   Correct.
7       Q   So it's just inclusive to the extent that
8   you -- that Yellowcake decides to distribute rights
9   through Colonize?
10      A   No.
11      Q   Then how is it exclusive if you are not -- if
12  you are distributing rights through other
13  administrators, as well as Colonize?
14      A   Because sometimes I buy catalogs that are
15  currently under contract with other distributors, so
16  I --
17      Q   Ah --
18      A   -- inherit that contract.
19      Q   -- got it.
20          So when you have full right to distribute sound
21  recordings however Yellowcake pleases, those rights are
22  distributed through Colonize; correct?
23      A   I prefer that, yes.
24      Q   Well, I'm not asking what you prefer.
25          I'm asking:  What are the terms of the

Page 92

1   arrangement?
2           Is it an exclusive arrangement you are
3   obligated to?
4           MR. BERMAN:  Objection.  Argumentative.  Asked
5   and answered.
6           THE WITNESS:  I believe that -- that is asking
7   for a legal conclusion.
8           I'm not sure if I'm obligated to, but for
9   practical purposes, I certainly would.
10  BY MR. BEGAKIS:
11      Q   Would or do?  We're not talking in
12  hypotheticals here.
13      A   Okay.
14      Q   If you distribute all rights that Yellowcake
15  owns through Colonize, that you're contractually
16  permitted to distribute?
17          MR. BERMAN:  Objection.  Asked and answered.
18  Argumentative.
19          THE WITNESS:  I do, because they're the best
20  distributor on the planet.
21  BY MR. BEGAKIS:
22      Q   Yeah, says a co-owner.
23          MR. BERMAN:  Objection.  Argumentative.
24          Stop making comments to my client, Mr. Begakis.
25  ///

Page 93

1   BY MR. BEGAKIS:
2       Q   What percentage of revenue from distribution
3   does Colonize take when it distributes Yellowcake-owned
4   works?
5           MR. BERMAN:  Objection.  Relevancy.
6           THE WITNESS:  Well, that's a --
7   BY MR. BEGAKIS:
8       Q   What are the splits in the agreement?
9       A   Okay.
10          MR. BERMAN:  Objection.  Asked and answered.
11          THE WITNESS:  Let me answer -- I'll answer.
12          Well, strictly speaking, it's -- it's zero.
13          However, there's tradeoffs with that that
14  aren't in writing in terms of who bears the cost of
15  certain operating expenses that -- in our business
16  relationship.
17  BY MR. BEGAKIS:
18      Q   You just testified that there are no oral
19  agreements between the company, but it sounds like there
20  are oral agreements with the company to the extent you
21  also just testified that whatever financial arrangement
22  there is is not necessarily in writing in that
23  Administration Agreement; correct?
24          MR. BERMAN:  Objection.  Irrelevant.
25          THE WITNESS:  Well, I'd like to clarify.  As I

# EXHIBIT "H"

Page 50

BY MR. BEGAKIS:
1
2    Q    Mr. Hernandez, you do know that you are under
3  oath, correct?
4    A    Absolutely.
5        MR. BERMAN:  Objection.  Argumentative.  Asked
6  and answered.
7  BY MR. BEGAKIS:
8    Q    When did you start Colonize Media?
9    A    I believe around 2016.
10   Q    I've actually got one more question about
11  La Sema and Yellowcake.
12        You never told Jose Hernandez (sic) that you
13  thought the artists that Yellowcake -- or that Hyphy
14  represented were dumb and wouldn't understand the
15  royalty numbers?
16        MR. BERMAN:  Objection.  Irrelevant.  Lacks
17  foundation.  Assumes a fact not in evidence.
18  Mischaracterization.  Vague.  Misleading.
19        And you can answer.
20        THE WITNESS:  Jose Hernandez?
21        Hold on.  I'm confused.  So I would tell myself
22  that?
23  BY MR. BEGAKIS:
24   Q    I apologize.
25        You never told Jose Martinez that artists

Page 51

1  represented by Hyphy Music were dumb and wouldn't
2  understand the royalty numbers?
3        MR. BERMAN:  Objection.
4        Please note my prior objections, Ms. Reporter.
5  Same objection.
6        THE WITNESS:  That is absolutely not true.  I
7  would never stoop myself to the level of Mr. Martinez.
8  BY MR. BEGAKIS:
9    Q    When you started Colonize Media, did you have
10  any partners?
11   A    Mr. Berger.
12   Q    Okay.  So when you formed the company from the
13  beginning, Mr. Berger was your partner?
14   A    I think so.
15   Q    How did that -- what did -- what kind of
16  conversation did you have with Mr. Berger about starting
17  a company with him?
18        MR. BERMAN:  Objection.  Vague.  And also
19  assumes a fact not in evidence and lack of foundation.
20        THE WITNESS:  I can't recall exactly details.
21  But at the time, Mr. Berger and I had created a really
22  good rapport and he helped a lot.  I -- so it just came
23  natural, I guess.
24        He -- he was helping me way too much, and I
25  needed more help.  So he was a natural person and -- to

Page 52

1  be my partner.  And he -- I'm glad that he also has been
2  helping me, and I'm glad I picked him as a partner.
3  BY MR. BEGAKIS:
4    Q    Where did the name Colonize Media come from?
5        MR. BERMAN:  Objection.  Irrelevant.
6        You can answer.
7        THE WITNESS:  So I was trying to trademark
8  DH1 Media.  And we hired a law firm out of San Francisco
9  to help us create the trademark.
10        However, when we did the global due diligence
11  for the trademark, it turned out that there was another
12  company with a similar name and similar classifications
13  as the trademark that we wanted to create.  So I got the
14  bad news that we had to change the name from DH1 Media
15  to any other name.
16        So after tons of research, days of looking for
17  thousands of names, just looking and looking -- at the
18  time, Mr. Berger, again, me was involved and we were
19  friends, and we just looked for thousands of names.
20  Nothing was available.
21        And then one day, I was watching a -- I believe
22  it was either a YouTube video or documentary about Elon
23  Musk.  And I believe this is when Falcon 9, I think, was
24  being created or was already created.  And he was
25  talking about colonizing Mars and colonizing space.  And

Page 53

1  I thought, wow, Colonize Media, colonizing your digital
2  space, Colonize, you know.
3        So I thought that could be a good name, but,
4  for sure, it must be taken.  But I went to GoDaddy.  I
5  checked if Colonize Media.com was taken, and it wasn't.
6        I purchased it right away.  I messaged Mr. -- I
7  think I messaged or called Mr. Berger, told him about
8  the name, and we pushed it on to our legal counsel, and
9  they did the research.
10        It turns out that nobody had the name and we
11  could trade-market it with it just so.  And that's how
12  it became Colonize Media.
13   Q    Did you have any investors when you started
14  Colonize Media?
15   A    No.
16   Q    What was your initial cap -- initial capital
17  contribution to the company?
18        MR. BERMAN:  Objection.  Lacks of foundation.
19  Assumes a fact not in evidence.  Irrelevant.
20        THE WITNESS:  I can't recall.  I don't
21  remember.
22  BY MR. BEGAKIS:
23   Q    You don't remember how much money you put into
24  the company bank account?
25   A    No, I don't.

Page 74

1        MR. BERMAN:  Objection.  Assumes a fact not in
2   evidence.  Misleading.  Vague.
3        THE WITNESS:  Not that I recall.
4   BY MR. BEGAKIS:
5   Q    Who is Isaias Gonzalez; and Isaias is spelled
6   I-s-a-i-a-s?
7   A    The only Isaias Gonzalez I know of, it's a
8   gentleman who owns a record label.  I think it's called
9   Discos Arpeggio.
10  Q    Did you do any business with Discos Arpeggio?
11  A    No.
12  Q    Did you do any business with Mr. Gonzalez
13  individually?
14  A    No.
15  Q    Do you owe Mr. Gonzalez any money?
16  A    No.
17       MR. BERMAN:  Objection.  Irrelevant.  Asked and
18  answered.  Misleading.  Mischaracterization.  Assumes a
19  fact not in evidence.  Lack of foundation.
20  BY MR. BEGAKIS:
21  Q    Has Mr. Gonzalez made any complaint, formal or
22  informal, that you owe him money?
23       MR. BERMAN:  Objection.  Vague.  Irrelevant.
24  Lack of foundation.  Assumes a fact not in evidence.
25  Mischaracterization.  Misleading.  Asked and answered.

Page 75

1   Argumentative.
2        You can answer.
3        THE WITNESS:  Not that I know.
4   BY MR. BEGAKIS:
5   Q    Are you aware that all these individuals I just
6   listed are prepared to testify under oath that you owe
7   them money?
8        MR. BERMAN:  Objection.  Argumentative.  Lack
9   of foundation.  Assumes a fact not in evidence.
10  Mischaracterization.  Misleading.  Speculative.
11  Argumentative.  Asked and answered.  Compound question.
12       You can answer.
13       THE WITNESS:  I absolutely do not know that,
14  and I don't believe that they would.
15  BY MR. BEGAKIS:
16  Q    Okay.  Well, we'll see about that.
17       MR. BERMAN:  Objection.  Argumentative.
18       I'm going to ask you, Mr. Begakis, to stop
19  making comments to my client.  You're clearly trying to
20  intimidate him on the record, and it's inappropriate.
21  BY MR. BEGAKIS:
22  Q    Do you consider Mr. Berger a friend?
23  A    Absolutely.
24  Q    Is he a good business partner?
25  A    He's a great --

Page 76

1        MR. BERMAN:  Objection to form.
2        But you can answer.
3        THE WITNESS:  He's a very good business
4   partner.
5   BY MR. BEGAKIS:
6   Q    How often would you say you and Mr. Berger talk
7   about Yellowcake business?
8        MR. BERMAN:  Objection to form.  Relevancy.
9        But you can answer.
10       THE WITNESS:  Whenever it's relevant, not --
11  BY MR. BEGAKIS:
12  Q    Say, once a week, twice a week, five times a
13  week?
14  A    Depending on what we're doing at the time.  I
15  wouldn't be able to tell you.
16  Q    How often do you talk about Colonize business
17  with him?
18  A    Every now and then, whenever it's relevant.
19  Q    What's Yellowcake's contractual relationship
20  with Colonize?
21  A    We have a distribution agreement.
22  Q    Okay.  What are the terms of that distribution
23  agreement, generally?
24       MR. BERMAN:  Objection.  Note my objection.
25  Vague and lacks foundation and irrelevant.

Page 77

1        THE WITNESS:  There's a term, I know that.  And
2   we do distribution and monetization.  We distribute to
3   all platforms on behalf of Yellowcake.
4   BY MR. BEGAKIS:
5   Q    Okay.  For purposes of this deposition, would
6   you understand if I refer to this as an
7   administration -- administrator agreement?
8   A    Yes.
9   Q    Or an admin agreement?
10  A    An admin agreement, yeah, I think you could
11  call it that.
12  Q    Is that an accurate description of what it is,
13  essentially an admin agreement?
14       MR. BERMAN:  Objection to form.  Vague.
15       THE WITNESS:  Did you say adamant or admin?
16  BY MR. BEGAKIS:
17  Q    Admin.
18  A    I believe so, yes.
19  Q    So Colonize is basically the admin company for
20  Yellowcake, right?
21  A    The distributor, yes.
22  Q    Okay.  What type of royalty does Colonize
23  receive to distribute Yellowcake's music?
24       MR. BERMAN:  Objection.  Relevancy.  Lacks
25  foundation.  Assumes a fact not in evidence.

Page 78

1    Irrelevant.  Misleading and a compound question.
2           But you can answer.
3           THE WITNESS:  I think it's a zero.  Like, you
4    mean, like, how much money Colonize makes from
5    Yellowcake?
6    BY MR. BEGAKIS:
7       Q    How much money does Colonize receive to
8    distribute -- when Colonize distributes music and
9    receives funds from the distribution of that music, what
10   percentage does Colonize take?
11          MR. BERMAN:  Objection.  Vague.  Lack of
12   foundation.  Assumes a fact not in evidence.
13   Misleading.  Asked and answered.
14          But you can answer.
15          THE WITNESS:  Zero, I think.
16   BY MR. BEGAKIS:
17      Q    Does Colonize Media receive any funds at all
18   under that agreement?
19      A    Under that agreement?
20          MR. BERMAN:  Objection to form.  Vague.  Asked
21   and answered.
22          But you can answer.
23          THE WITNESS:  Under that agreement?
24          I think, no.
25   ///

Page 79

1    BY MR. BEGAKIS:
2       Q    Does it receive funds under any other agreement
3    from Yellowcake?
4           MR. BERMAN:  Objection.  Relevancy.
5           THE WITNESS:  No, I don't think so.
6    BY MR. BEGAKIS:
7       Q    Does Colonize receive any funds at all
8    whatsoever from Yellowcake?
9           MR. BERMAN:  Objection.  Asked and answered.
10   Relevancy.
11          THE WITNESS:  I don't think so, no.
12   BY MR. BEGAKIS:
13      Q    So you -- so Colonize distributes Yellowcake's
14   music for free?
15          MR. BERMAN:  Objection.  Asked and answered.
16   Argumentative and -- sorry -- irrelevant.
17          THE WITNESS:  As I mentioned before, yeah, zero
18   percent.
19   BY MR. BEGAKIS:
20      Q    Okay.  Does it receive anything of value, money
21   or otherwise, to distribute Yellowcake's music?
22          MR. BERMAN:  Objection.  Vague.  Compound
23   question.  Irrelevant.  Asked and answered.
24          But you can answer.
25          THE WITNESS:  Can you define what would be

Page 80

1    considered, "anything of value"?
2    BY MR. BEGAKIS:
3       Q    Anything of value, like, say, a gardener, or
4    office rent, or paper in the copier, anything of value?
5           MR. BERMAN:  Relevant -- relevancy.  Vague.
6    Asked and answered.
7           You can answer.
8           THE WITNESS:  Yeah, I think so.
9    BY MR. BEGAKIS:
10      Q    What does it receive?
11          MR. BERMAN:  Objection.  Relevancy.
12          THE WITNESS:  I don't think we receive anything
13   of value.  I think we get some stuff of value, like,
14   Yellowcake bears, like, HR and certain other things.
15   BY MR. BEGAKIS:
16      Q    What other things?
17      A    I think, like, gardener, building; I think
18   those are some of the things.  I'm not absolutely sure.
19   I'm not -- I don't pay those bills.  I don't take care
20   of that.
21      Q    So Mr. Berger lets you use his office that he
22   owns, in exchange for distributing his music for free?
23          MR. BERMAN:  Objection.  Relevancy.  Lack of
24   foundation.  Assumes a fact not in evidence.
25   Mischaracterization.  Misleading.  Asked and answered.

Page 81

1           THE WITNESS:  That is not what I said, and I'm
2    not sure how to even answer that.
3           I don't understand the question.
4    BY MR. BEGAKIS:
5       Q    Do you think it's a good deal for Colonize to
6    distribute Yellowcake music for free and not receive
7    anything else of value, other than an HR person and
8    gardener?
9           MR. BERMAN:  Objection.  Argumentative.
10   Irrelevant.  Asked and answered.
11          THE WITNESS:  Is that a question, or you're
12   making comments?
13   BY MR. BEGAKIS:
14      Q    No, it's a question.
15          Do you think it's a good deal?
16          MR. BERMAN:  Objection.  Argumentative.  Vague.
17   Asked and answered.
18          THE WITNESS:  Yeah, it is a great deal.
19   BY MR. BEGAKIS:
20      Q    Why?
21          MR. BERMAN:  Objection.  Irrelevant.
22   Argumentative.  Asked and answered.
23          THE WITNESS:  I think it is a great deal.
24   BY MR. BEGAKIS:
25      Q    Why?

Page 106

1  remember exactly how I got these particular assets.
2  BY MR. BEGAKIS:
3      Q   What type of metadata does the software you use
4  track?
5      A   Um...
6          MR. BERMAN:  Objection.  Well, lack of
7  foundation.  Assumes a fact not in evidence.
8          You can answer.
9          THE WITNESS:  Whatever we input into the
10  software.  So if we input the name -- the album name,
11  artist name, ISRC, UPC, so it tracks analytics, once
12  they come back from the DSP.
13  BY MR. BEGAKIS:
14      Q   Okay.  Does the software track information,
15  like, who logs on to the software every day?
16      A   Um, at an account level, yes.
17      Q   Okay.  So if I wanted to look at the software's
18  metadata and see who logged onto it on the day that the
19  music at issue in this case was uploaded, I would be
20  able to find that out?
21      A   I'm not sure in this particular -- I'm not
22  sure, because the software -- I think we were still in
23  beta.
24          So I think who logged in and who logged out was
25  added later on.  I wouldn't be able to tell you.  I

Page 107

1  would have to circle back on that.
2      Q   Okay.  We'll leave a space open in the
3  deposition for you to provide that information.
4  Requested Information:
5  _____
6  _____
7  _____
8  _____.
9  BY MR. BEGAKIS:
10      Q   Under the version of the software now -- I'm
11  not talking about the beta version, but under the
12  version of the software now -- would it track a sound
13  recording asset that's been uploaded to the software but
14  is still pending before it's been distributed to the
15  DSPs?
16          MR. BERMAN:  Objection to the form.  Vague.
17          You can answer, if you understand.
18          THE WITNESS:  The version, as it stands today,
19  on August 17, 2022, I believe, yes, as it stands today,
20  going forward.
21  BY MR. BEGAKIS:
22      Q   When did that version come into existence and
23  begin to be used by Colonize?
24      A   I don't have the exact date.
25      Q   Who were the individuals in your office who

Page 108

1  developed the software?
2      A   So between Matt Davis in the office -- yeah,
3  Matt Davis, Jeremy Paulson.  I did some work on it as
4  well.
5      Q   But who did the coding?  Who wrote the coding?
6          MR. BERMAN:  Objection to form.  Vague.
7          THE WITNESS:  It was either between Josh and
8  Matt, I believe.
9  BY MR. BEGAKIS:
10      Q   Okay.  What other sort of user behavior does
11  the software now track?
12      A   Well, just those basics we mentioned, like,
13  log-in; who logged in, who logged out.  Yeah, uploads.
14      Q   When files have been uploaded, when they've
15  been distributed?
16      A   That, we can track IP address, et cetera.
17      Q   Okay.  Is there a name for the software?
18      A   No, no, there isn't.
19      Q   Has it been licensed to anybody else?
20      A   No.
21      Q   Has it been sold to anybody else?
22      A   No, not that I remember, at least.
23      Q   Okay.  Who paid for the software to be
24  developed?
25      A   Colonize did.

Page 109

1      Q   How many employees does Colonize Media have?
2      A   I don't know.  I think around -- could be
3  around 15, I believe, at this point, at this moment.
4  I'm not sure.
5      Q   When you testified earlier that Yellowcake
6  handles HR, that's what they handle, the employment of
7  these individuals who work for Colonize?
8      A   Yes.
9          MR. BERMAN:  Objection to form.
10          THE WITNESS:  I believe so.
11  BY MR. BEGAKIS:
12      Q   Okay.  What type of due diligence do you do
13  generally, before you upload an asset and distribute it?
14          MR. BERMAN:  Objection to form.  Lacks of
15  foundation.  Assumes a fact not in evidence.
16  Mischaracterization.  Misleading.  Vague.  Speculative
17  and argumentative.
18          THE WITNESS:  Um, can you please be more
19  specific as to either me, the individual, or Colonize,
20  or what -- who -- what due diligence?
21  BY MR. BEGAKIS:
22      Q   Well, okay, you're here in your capacity as the
23  person most knowledgeable for Colonize, so that's the
24  specificity there.  I'll be more specific with the due
25  diligence.

Page 114

1    So are you aware of what Mr. Berger testified
2  yesterday?
3        You were in the deposition yesterday.  You
4  testified that you viewed that deposition.  So I'm
5  asking you, are you aware that Mr. Berger testified
6  yesterday that he directed you to review copyright
7  records of works that Yellowcake owned?
8        MR. BERMAN:  Objection.  Vague, as the witness
9  testified he does not understand the question.  It's a
10 compound question.  Mischaracterizes prior testimony
11 from another deposition, to which this individual is not
12 the deponent.  Lacks of foundation.  Assumes a fact not
13 in evidence.
14 BY MR. BEGAKIS:
15   Q    And by the way -- and by the way,
16 Mr. Hernandez, we can bring you back for your individual
17 deposition, too.  You can play this game with me, but
18 I'm just asking you a question, which you are free to
19 answer.  And I'm going to stay on it until I get an
20 answer to it, as to what you were directed to do to
21 research copyright records.  So I'm just asking a
22 question about what you viewed yesterday.
23       Are you aware that Mr. Berger directed --
24 testified yesterday that he would direct you to conduct
25 a search of copyright records for any Yellowcake works?

Page 115

1        MR. BERMAN:  Once again, I'm going to ask you
2  not to make threatening statements directly to the
3  witness, my client.  I'm going to ask you to stop.
4        And once again, your question has been asked
5  and answered.  It's vague.  It's a compound question.
6  It mischaracterizes prior testimony in another
7  deposition.  It lacks foundation and assumes facts not
8  in evidence.
9  BY MR. BEGAKIS:
10   Q    You can answer, Mr. Hernandez.
11   A    I'll answer to the best of my ability, based on
12 this question.  I feel like it's a mixed-up question.
13       In general, for Yellowcake, when there is some
14 sort of due diligence for any acquisitions having
15 nothing to do with Colonize Media, and depending on the
16 context and in the situation, we, myself, am asked to go
17 to the -- to do some research on the copyrights, yes.
18   Q    Okay.  And I see where this is going, so I'm
19 going to break this down for you.
20       Are you an employee of Yellowcake?
21   A    No.
22   Q    Are you an employee of Colonize Media?
23   A    Yes.
24   Q    Are you an employee of any other companies that
25 Mr. Berger owns?

Page 116

1    A    No.
2    Q    So any work that you did to research artists on
3  behalf of Yellowcake would be rendered by you
4  individually?
5    A    No.
6    Q    Who would it be rendered by?
7    A    I don't -- I don't understand your question.
8    Q    Would you be rendering -- if Yellowcake asked
9  you to do research on an artist, would you be rendering
10 those services as an employee, in your capacity as an
11 employee for Colonize?
12       MR. BERMAN:  Objection.  Vague.  Compound
13 question.  Lacks foundation.  Assumes a fact not in
14 evidence.
15       But you can answer, if you understand.
16       THE WITNESS:  I believe -- I think so.
17 BY MR. BEGAKIS:
18   Q    Okay.  Great.
19       So then everything that I ask today, with
20 respect to anything that you have done to research
21 artists on behalf of Yellowcake, was done as an employee
22 of Colonize.
23       And so you are here today as a PMK for
24 Colonize, and you can answer those questions, correct?
25       MR. BERMAN:  No, no.  Objection.  Okay.

Page 117

1  Mischaracterizes testimony.  Argumentative.  Lacks
2  foundation.  Assumes a fact not in evidence.
3  Misleading.  And asked and answered.
4        You can clarify your answer, Mr. Hernandez.  Go
5  ahead.
6        THE WITNESS:  You're definitely
7  mischaracterizing what I'm saying, because at the time
8  when this happened, I was a co-owner of Yellowcake.  So
9  your question is confusing as to where I was, what
10 capacity I was, at the time.
11       At the time, I was a co-owner of Yellowcake.
12 So for this particular case, we're talking about this
13 sound recording.  I did it under the capacity of a
14 co-owner of Yellowcake.
15 BY MR. BEGAKIS:
16   Q    Are you -- are you expecting that today you are
17 going to testify that you are not prepared to answer any
18 questions regarding anything that you did in your
19 capacity as a co-owner of Yellowcake?  Is that the plan?
20       MR. BERMAN:  Objection.  Argumentative.
21       MR. BEGAKIS:  Because I'll just stop now and
22 we'll re-notice this deposition for another day, if
23 that's the spin.
24       MR. BERMAN:  You're testifying for him and
25 being argumentative and badgering him at this point.

Page 146

1    Q    Okay.  And you said, we're going -- how about
2  if we buy those rights from you?
3         MR. BERMAN:  Objection.  Mischaracterizes the
4  testimony.  Vague.
5         But you can answer.
6         THE WITNESS:  Not only just in conversation.
7  As the relationship developed, and we were very
8  satisfied with the work, you know, just in conversation,
9  said, hey -- I might have said, hey, would you like to
10 sell your assets.
11        And they -- obviously, they were, like, yeah,
12 we would like to.
13        And we came to terms and we did it.
14 BY MR. BEGAKIS:
15   Q    What were the terms?
16   A    That we would buy the initial albums for X
17 amount of money.  I can't remember.
18   Q    If I said 400,000, would that refresh your
19 recollection?
20   A    No, not at all.
21        MR. BERMAN:  Objection.  Lacks foundation.
22 Assumes a fact not in evidence.  There's no document in
23 front of the witness.
24        THE WITNESS:  No, those initial albums were
25 definitely not purchased for that amount.

Page 147

1         I can't recall, but it seems like a really high
2  amount.
3  BY MR. BEGAKIS:
4    Q    More than a hundred thousand?
5    A    Could have been.  I'm not a hundred percent
6  sure.
7    Q    More than 200,000?
8    A    I'm not sure.
9    Q    So possibly between a hundred thousand and
10 400,000?
11        MR. BERMAN:  Objection.  Asked and answered.
12 Lacks foundation.  Assuming a fact not in evidence.
13 Misleading.
14        THE WITNESS:  I'm honestly not sure.  I
15 don't -- I haven't seen the document in forever, but I
16 don't know.
17 BY MR. BEGAKIS:
18   Q    Okay.  So you purchased those initial albums.
19        When did you then have a conversation, in your
20 capacity as a co-owner of Yellowcake, about purchasing
21 the album at issue in this case?
22   A    So to my understanding Chavez, Sr., just like
23 Chavez, Jr., did, had an oral agreement with -- but in
24 this case, Mr. Chavez, Sr., had an oral agreement with
25 other parties in the distribution of his albums, with

Page 148

1  the main intent of selling physical copies in WalMarts
2  and swap meets.
3    Q    That doesn't answer my question.  That's not
4  the question I asked.
5         I asked, when did you have a conversation,
6  first have a conversation, with Chavez, Sr., about
7  distributing the rights at issue in this case?
8         MR. BERMAN:  Objection.
9         Hold on.
10        Objection to form.
11        And can you please read back the question,
12 actually.
13        (The question was read as follows:)
14        "Q  I asked, when did you have a
15             conversation, first have a conversation,
16             with Chavez, Sr., about distributing the
17             rights at issue in this case?"
18        MR. BERMAN:  I'm just trying to clarify for the
19 record, when you say "distributing," are you asking in
20 context of Colonize or --
21        MR. BEGAKIS:  I'll withdraw the question.  I'll
22 withdraw the question.
23 BY MR. BEGAKIS:
24   Q    In your capacity as a co-owner of Yellowcake at
25 the time, when did you first discuss with Chavez, Sr.,

Page 149

1  about purchasing the rights and the works at issue in
2  this case?
3    A    I don't remember the exact date.
4    Q    Year?
5    A    It could have been 2018.
6    Q    Okay.  How many conversations with Chavez, Sr.,
7  did you have about purchasing the rights to the works at
8  issue in this case?
9    A    I'm not sure how many conversations we had.
10   Q    An approximate?
11   A    I couldn't tell --
12        MR. BERMAN:  Asked and answered.  Calls for
13 speculation.
14        THE WITNESS:  I couldn't tell you, because we
15 were also friends.  So I -- I was -- we hung out a few
16 times.
17 BY MR. BEGAKIS:
18   Q    Okay.  Can you estimate?  Less than 10
19 conversations?
20   A    Possibly, possibly less than 10.
21        Specifically about acquiring the assets?
22   Q    Yeah, specifically about acquiring the assets
23 and potentially discussing the terms of that
24 arrangement, less than five conversations?
25   A    Probably be safer if it's less than 10, I

Page 210

1   past hour?
2       A    No.
3       Q    There's nobody in the room?
4       A    No.
5       Q    Are you capable of moving your camera so you
6   can confirm that for me?
7       A    Sure.
8            Want me to do a 360?
9       Q    Please.
10      A    Okay.  If my computer gets disconnected, I
11  apologize.
12           All right.  If I keep turning right, I might
13  disconnect something.
14           Is that fine?
15      Q    That's fine.
16      A    How about here, spin it the other way around.
17      Q    Has that been the case for the last hour that
18  we've been talking?
19      A    Yes.
20      Q    Okay.
21           MR. BERMAN:  I just want to clarify for the
22  record that Mr. Hernandez actually turned his computer
23  around, 360 around the room, and there's nobody in the
24  room with him.
25  ///

Page 211

1   BY MR. BEGAKIS:
2       Q    All right.  So when you received the stems from
3   Mr. Rosales and/or some other place, who uploaded them
4   into the software?
5       A    We don't upload stems.  We upload final .wav
6   files.
7       Q    Okay.  If Mr. Rosales sent you stems, how would
8   you get from stems to a final .wav file?
9       A    You wouldn't, unless it was in there.  I don't
10  recall if we got final .wav files from a thumb drive or
11  hard drive or from CDs, yeah.
12      Q    So you had -- so you would have had to have
13  received the final .wav file from somebody via a hard
14  drive, a thumb drive, or a CD, in order to upload these
15  works into your system, correct?
16      A    Yes.
17      Q    When that happened, assuming that it did, who
18  was the one who would have uploaded those final .wav
19  files into the software?
20      A    I think the final ones were me.  If I didn't
21  upload everything, it could have been somebody else
22  under my instruction in the office.  But I think I
23  uploaded those as .wav files.
24      Q    Did you have images for those albums at the
25  time that you uploaded the .wav files?

Page 212

1       A    At the time, there were images.  But if I
2   recall, Mr. Berger didn't want anything to do with Hyphy
3   Music's artwork or anything, because there was some
4   recordings or some artworks with the Hyphy Music logo.
5   And he specifically requested that we created brand-new
6   artworks for those.
7       Q    So did you upload the .wav files and the new
8   artwork at the same time?
9       A    I don't recall.  The .wav files might have been
10  sitting in our system for a while.  We could have
11  sent -- we could have done some -- a number of things.
12  But as I recall right now, they could have just been
13  sitting there.
14      Q    Do you know if the version of the software at
15  the time this happened would tell me how long the .wav
16  files were sitting in the system before you provided
17  artwork?
18      A    No.
19      Q    That's convenient.
20           MR. BERMAN:  Objection.  Improper statement to
21  the witness.
22  BY MR. BEGAKIS:
23      Q    All right.  So when you uploaded these .wav
24  files through your software, did you receive a strike
25  from any of the DSPs?

Page 213

1       A    No, we have not received any strikes in
2   connection -- in connection with any of these works.
3       Q    I apologize.  I'm probably using the wrong
4   term.
5            Did you receive any notification from the DSP
6   that these works were already in existence on their
7   platform?
8       A    I believe we got something from YouTube.
9       Q    And that would be what you would call a
10  conflict, right?
11      A    A conflict, yes.
12      Q    Okay.  So you received a conflict from YouTube?
13      A    Yes.
14      Q    Okay.  And that would have been because the
15  works were already on YouTube, correct?
16      A    Because there were probably duplicate sound
17  recordings on YouTube.
18      Q    Okay.  But it wasn't -- I'm trying to make sure
19  it wasn't the other way around.
20           It was, you guys uploaded these works and then
21  received a conflict because those works already were
22  online?
23      A    It's not that we received -- like, us
24  receiving.  They just popped.  Like, there's a
25  notification that there's conflicts.

# EXHIBIT "I"

Page 17

EASTERN DISTRICT OF CALIFORNIA
1    Q   Well, where, if anywhere, are you currently
2  employed?
3    A   What was that?
4    Q   I said where, if anywhere, are you currently
5  employed?
6    A   Where am I currently employed?
7    Q   Yes.
8    A   I'm working for myself. I'm working in the --
9  in the band right now. I'm still with the Los
10  Originales de San Juan.
11    Q   Sir, would you describe yourself as a
12  professional musician, currently?
13    A   Yeah, yes.
14    Q   And what instrument do you play?
15    A   Drums.
16    Q   And you just testified that you're currently
17  the drummer for a band, the Los Originales de San Juan;
18  is that correct?
19    A   Yes.
20    Q   And for purposes of this deposition, you'll
21  understand, if I refer to Los Originales de San Juan as
22  "the band"; do you understand that?
23    A   Yeah, yes.
24    Q   Okay. And how long have you been the drummer
25  for the band?

Page 18

EASTERN DISTRICT OF CALIFORNIA
1    A   Well, I'm not real good with math right now,
2  but since 1992.
3    Q   All right. I'm going to come back to this
4  later. Did you review any documents in preparation for
5  your deposition today?
6    A   No.
7    Q   What, if anything, did you do to prepare for
8  your deposition today?
9    A   Well, I went to the bathroom.
10    Q   Other than going to the bathroom, did you do
11  anything specifically to prepare to testify today?
12    A   I had breakfast.
13    Q   You didn't review any doc --
14        MR. BEGAKIS: I'll just object on the
15  basis that's vague, as to prepare.
16  BY MR. BERMAN:
17    Q   Okay. Did you speak to anybody, specifically,
18  about your deposition today?
19    A   No.
20    Q   And you understand that you're under oath in
21  the course of this deposition?
22    A   Yes.
23    Q   And you understand that you're under the
24  potential penalty of perjury for lying under oath? Do
25  you understand that?

Page 19

EASTERN DISTRICT OF CALIFORNIA
1    A   Yes.
2        MR. BEGAKIS: Objection, argumentative.
3        MR. BERMAN: Also, so I'm just going
4  to -- from time to time counsel for the defendant may
5  interpose an objection. So I just ask that you pause
6  for just a moment before answering questions in the
7  event that he wants to interpose an objection so then
8  you can answer. So I just want to make sure we have a
9  clean record.
10        MR. BEGAKIS: Defendant and counter
11  defendant -- counterclaim.
12        MR. BERMAN: Thank you. Okay.
13  BY MR. BERMAN:
14    Q   So just to clarify for the record, you're
15  currently sitting in a conference room in the offices of
16  defendant counterclaim, plaintiff Hyphy Music. Is that
17  correct?
18    A   Yes.
19    Q   Okay. For the purposes of this deposition,
20  I'm going to refer to Hyphy Music as Hyphy.
21        And who asked you to come to Hyphy's offices
22  today?
23    A   Well, we got emails -- we got phone calls from
24  the people here in Hyphy. And yesterday we spoke with
25  the counsel regarding today and you know, just to let us

Page 20

EASTERN DISTRICT OF CALIFORNIA
1  know more or less how it's going to be.
2    Q   Okay. Who is the counsel that you're
3  referring to?
4    A   I don't remember the name.
5    Q   Is it Mr. Begakis?
6    A   I don't remember the name.
7    Q   Who did you receive an email from regarding
8  the deposition?
9    A   I would have to look to tell you that
10  correctly, but I don't remember.
11    Q   Okay. What -- what are you just looking at?
12  Is there a document in front of you right now?
13    A   No. The email comes in the phone.
14    Q   Okay. So you could look at your phone right
15  now and review and you'll see who the email is from?
16    A   Yeah.
17    Q   Would you please take a look at your phone and
18  tell me who the email came from? And I'm going to call
19  for the preservation and production of that email.
20        MR. BEGAKIS: We'll take it under
21  advisement.
22        MR. BERMAN: You don't represent Mr.
23  Vargas.
24        THE WITNESS: It just says the Remote
25  Legal something.

Page 25

EASTERN DISTRICT OF CALIFORNIA

1       Yeah.  Just general information on how it's
2   going to be.
3       Q   Did these attorneys ask you questions and ask
4   you what your response might be?
5       A   No.  They just ask -- well, they give us
6   examples of questions that might be brought up.
7       Q   Did they ask you your understanding of the
8   litigation between Hyphy music and Yellowcake, Inc.?
9       A   I don't remember if they asked me that
10  question.
11      Q   How did you first learn that you were to
12  appear for a deposition today?
13      A   Well, the -- from here.  From the Hyphy
14  office.  They told us that we're supposed to have this
15  deposition -- well, a month ago, but we've been working.
16  So you know, we finally got some time off to do it.
17      Q   Okay.  And Mr. Martinez is the one who told
18  you about your deposition?
19      A   Yes.
20      Q   Okay.  And where were you when you first
21  learned about the deposition?
22      A   Where was I?  I don't remember.  We've been
23  traveling a lot.
24      Q   Did you speak to Mr. Martinez over the phone
25  about your -- when you first learned about your

Page 26

EASTERN DISTRICT OF CALIFORNIA

1   deposition?
2       A   No.  I believe we came into the office to talk
3   about some other business or recordings that we want to
4   do.  And that's when they told us.
5       Q   Okay.  And Mr. Torres was with you at the time
6   you first learned of your deposition from Mr. Martinez?
7       A   Yes.
8       Q   And that's Mr. Domingo Torres that you're
9   referring to, correct?
10      A   Yes.
11      Q   And are you being paid anything by Mr.
12  Martinez for appearing at your deposition today?
13      A   No.  Nope.
14      Q   Have you received anything of value from
15  either Mr. Martinez or Hyphy Music, Inc. in exchange for
16  your appearance at your deposition today?
17      A   No.  Have you ever received any money from
18  Hyphy Music, Inc.?
19      A   No.
20      Q   All right.  Have you ever received any money
21  from Mr. Martinez?
22      A   No.
23      Q   Have you ever received anything of value from
24  Hyphy Music, Inc.?
25      A   No.

Page 27

EASTERN DISTRICT OF CALIFORNIA

1       Q   Have you ever received anything of value from
2   Mr. Martinez?
3       A   No.
4       Q   Other than Mr. Martinez, did you discuss the
5   deposition with Mr. Torres?
6       A   Yeah.  We talked about it, obviously.
7       Q   And what did you discuss with Mr. Torres?
8       A   What potential questions that might be brought
9   up.
10      Q   And what are the some of the potential
11  questions you thought might be brought up?
12      A   Well, like, you know, if they ask you if
13  you're a employee or a business owner and obviously,
14  we're business partners.
15      Q   Who are business partners?
16      A   Me, Domingo, Jesus Chavez.
17      Q   Is there a written partnership agreement
18  between you, Mr. Dominguez, and Jesus Chavez?
19      A   Yeah.  We had a verbal agreement and -- since
20  the beginning, since the get go, since the band started.
21  I mean -- and ever since we started filing taxes, that's
22  how we filed them, as a partnership.
23      Q   Okay.  My question to you, sir, was have you
24  ever -- was there ever a written partnership agreement
25  between yourself, Mr. Torres and Mr. Chavez that you

Page 28

EASTERN DISTRICT OF CALIFORNIA

1   just referred to?
2       A   No.
3       Q   So what's your Social Security number?
4       A   XXX-XX-8018.
5       Q   You testified just a moment ago that you
6   believe you're a partner with Jesus Chavez, Sr.  Is that
7   correct?
8       A   That I believe?
9           MR. BEGAKIS:  Objection -- objection to
10  the extent it misstates the witness's prior testimony.
11          MR. BERMAN:  Over his objection, you can
12  answer.
13          THE WITNESS:  Well, I don't believe that
14  we're partners.  I know we are partners, because that's
15  how we always been working.  That's how it's always
16  been.  That's how we filed taxes.  And taxes get signed
17  by each of us.
18  BY MR. BERMAN:
19      Q   Okay.  How do you -- when did you first come
20  to meet Jesus Chavez, Sr.?
21      A   1992.
22      Q   And what were the circumstances surrounding
23  that first meeting?
24      A   Well, at first he asked -- they didn't have
25  a -- they needed a drummer.  And he asked me if I could

Page 141

EASTERN DISTRICT OF CALIFORNIA

1 answered.
2         MR. LITTLEWOOD: That hasn't been asked,
3 John.
4         MR. BEGAKIS: The question was who
5 prepared his taxes? And he said Mr. Mendoza.
6         MR. LITTLEWOOD: Now he's asking
7 specifically about which years.
8         MR. BEGAKIS: Well it's presumed from
9 asking -- that he -- who his preparer -- that he's
10 asking about all the years --
11         MR. BERMAN: Over your objection, he can
12 answer. So what's the answer?
13         THE WITNESS: Yes.
14 BY MR. BERMAN:
15    Q    And is he -- are you intending for him to
16 prepare your 2021/2022 tax -- personal taxes?
17    A    Is he? Did he -- is he doing them? Yes. He
18 did them already.
19    Q    Okay. I'm going to call for the preservation
20 and production of your personal tax returns from the
21 years 2020 -- I'm sorry, to the present. And did you
22 ever receive any K1s?
23    A    I'm not a CPA, so I don't know what K1 means.
24    Q    All right. I'm going to call for the
25 preservation and production of any schedules related to

Page 142

EASTERN DISTRICT OF CALIFORNIA

1 those tax returns, including any K1s.
2         MR. BERMAN: And with that, Mr. Begakis,
3 I'm finished and you can ask all the questions that you
4 want.
5         MR. BEGAKIS: Wow, that's amazing.
6         THE WITNESS: So you're saying that you
7 require my taxes?
8         MR. BERMAN: Yep. I'm calling for the
9 preservation and production of your tax returns that I
10 asked for. And I'm going to be serving you with a
11 follow-up subpoena.
12         THE WITNESS: So --
13         MR. BEGAKIS: Mr. Vargas. Mr. Vargas,
14 I've got about fifteen minutes --
15         MR. BERMAN: Do not direct the witness.
16         THE WITNESS: Why do I -- why do I need
17 to show my taxes when Trump didn't? So I don't get it.
18 Does he have special rights?
19         MR. BERMAN: You put -- you've testified
20 to facts that have put your tax returns into play and
21 made them relevant to this litigation.
22              EXAMINATION
23 BY MR. BEGAKIS:
24    Q    Okay. Mr. Vargas, was the band established as
25 a legal entity?

Page 143

EASTERN DISTRICT OF CALIFORNIA

1    A    As a what?
2    Q    As a legal entity?
3         MR. LITTLEWOOD: Objection. Calls for
4 legal conclusion. Vague and ambiguous.
5         THE WITNESS: Can you explain that?
6 BY MR. BEGAKIS:
7    Q    You stated that it was a partnership, was it
8 an unincorporated partnership, or was it some other type
9 of legal entity?
10    A    It's unincorporated, it was all --
11         MR. LITTLEWOOD: Calls for legal
12 conclusion.
13 BY MR. BEGAKIS:
14    Q    Did you consider yourself a co-owner in the
15 band?
16    A    Yes.
17    Q    As a co-owner, do you believe you co-owned all
18 of the works that the band created when they -- when
19 they initially created those works?
20    A    Yes.
21    Q    Did you ever sign anything in writing saying
22 that you didn't jointly own any of the works that the
23 band created?
24    A    No, I did not.
25    Q    As a co-owner, do you believe you were

Page 144

EASTERN DISTRICT OF CALIFORNIA

1 entitled to an equal share of any profits that the band
2 generated?
3    A    Yes.
4    Q    How were band decisions supposed to be made?
5    A    Band decisions is supposed to be made with all
6 of the members included. You know, especially major
7 decisions of selling albums out.
8    Q    Did you all agree, all of the members of the
9 band, to enter into an agreement with Hyphy for Hyphy to
10 acquire the works at issue in this case?
11    A    Yes.
12    Q    At the time Hyphy entered into an agreement
13 with the band to acquire works at -- the works at issue
14 in this case, were you aware of the terms of that
15 agreement?
16    A    Yes.
17    Q    Did you understand Hyphys ownership of the
18 works to be exclusive?
19    A    Yeah. Yes.
20    Q    So if you later became unhappy with the deal
21 that you did as a band with Hyphy, do you believe you
22 could have renegotiated that deal?
23    A    Well, the deal was done. I mean, if I didn't
24 like it, well, then I wouldn't negotiate anymore albums
25 with them.

# EXHIBIT "J"

DOMINGO TORRES FLORES - DECEMBER 7, 2022        47

1    speak to any attorneys on Monday about your deposition

2    today?

3        A    No.  I didn't.  No.

4        Q    Did your son talk to any attorneys on Monday

5    about your deposition today?

6                MR. BEGAKIS:  Objection.  To the extent

7    it calls for speculation.  Mr. Reporter, just give me --

8    just wait a beat if you could so I can get my objections

9    in before.  I appreciate it.

10                THE COURT REPORTER:  Okay.

11                THE WITNESS:  I don't know that.  You're

12    going to have to ask him.  My focus is music and that's

13    it.

14    BY MR. BERMAN:

15        Q    What is your relationship, if any, to the band

16    Los Originales de San Juan?

17                MR. BEGAKIS:  Objection.  Vague as to

18    relationship.

19                THE WITNESS:  An own -- there's no

20    relationship.

21                THE INTERPRETER:  Sorry.

22                THE WITNESS:  I'm an owner, I'm a

23    partner.  I'm a stylist and I designed the style of Los

24    Originales de San Juan.  I'm an owner and no one is

25    going to take the ownership from me.

DOMINGO TORRES FLORES - DECEMBER 7, 2022        48

1    BY MR. BERMAN:

2        Q    Okay.  Is he -- is he claiming to be a member

3    of the band?

4                MR. BEGAKIS:  Objection.  Vague.

5                THE WITNESS:  What's that?  I'm the

6    owner.

7    BY MR. BERMAN:

8        Q    Okay.  On what basis -- okay.  Does he have

9    any written documents to support his claim that he is

10   the owner of the band?

11       A    Well, just look at the pictures.  I mean no

12   one has recorded, just me, the accordionist, only me.

13       Q    So the answer is no?

14                MR. BEGAKIS:  Objection.  To the extent

15   it misstates the witness' prior testimony.

16                THE WITNESS:  It's in the taxes and

17   everything.  Right.

18   BY MR. BERMAN:

19       Q    Does he play an instrument -- okay.  Does he

20   play an instrument in the band?

21       A    I play the -- I play the accordion, and I was

22   the person in charge of the design, the style.  I made

23   the style.  I created the style.

24       Q    Okay.  When did he first join, and for the

25   purpose of this deposition, I'm going to refer to Los

DOMINGO TORRES FLORES - DECEMBER 7, 2022    82

1        THE COURT REPORTER:  The time is now 4:35

2  p.m. and we're off the record.  You may proceed.

3        MR. BEGAKIS:  I believe Mr. Court

4  Reporter meant on the record.

5        THE COURT REPORTER:  On the record.  I'm

6  sorry.  I keep doing that today.

7        MR. BEGAKIS:  It's okay.  It's all good.

8  It's all good.

9                    EXAMINATION

10  BY MR. BEGAKIS:

11        Q    Good afternoon, Mr. Torres.

12        A    Good afternoon.

13        Q    Mr. Torres, do you consider yourself to be a

14  co=owner in the band?

15        A    Yes.

16        MR. BERMAN:  Please note my objection to

17  form and Ms. Interpreter, I'm also going to ask likewise

18  that you just pause for a second after -- before

19  translating the question so I can interpose an

20  objection.

21  BY MR. BEGAKIS:

22        Q    I'm going to ask the question again just for a

23  clean record.  Mr. Torres, do you consider yourself a

24  co-owner of the band.

25        MR. BERMAN:  Objection to form.

DOMINGO TORRES FLORES - DECEMBER 7, 2022       83

1          MR. LITTLEWOOD:  Joined.

2          THE WITNESS:  I'm the owner of the group.

3    BY MR. BEGAKIS:

4      Q    As an owner of the group, do you believe you

5    co-owned all of the works that the band created when

6    they -- when those works were initially created?

7          MR. BERMAN:  Objection.  Misstates

8    previous testimony and assumes a fact not in evidence.

9          MR. LITTLEWOOD:  Joined.

10          THE WITNESS:  Since the very beginning, I

11    have owned.  I've done the arrangement.  I own the style

12    of the band and the productions have been done by me,

13    all of them.

14    BY MR. BEGAKIS:

15      Q    Did you ever sign anything in writing saying

16    that you didn't own any of the works the band has ever

17    created?

18          MR. BERMAN:  Objection to form.

19          MR. LITTLEWOOD:  Joined.

20          MR. BEGAKIS:  Sounds like a parrot to me.

21          MR. LITTLEWOOD:  John, you know what, you

22    can stop it.  You are the most unprofessional attorney

23    I've ever run across.  You can just stop it.  I can't

24    believe you even made a comment like that in front of

25    the Judge.  You should be embarrassed.  She takes notes

DOMINGO TORRES FLORES - DECEMBER 7, 2022        85

1                    MR. BEGAKIS:  Okay, Counsel.

2                    THE WITNESS:  No, never.

3                    THE INTERPRETER:  Sorry, I couldn't

4    understand the last part.  I'm going to ask.

5                    THE WITNESS:  Ask me again?

6    BY MR. BEGAKIS:

7        Q    Did you ever sign anything in writing saying

8    that you didn't jointly own any of the works the band

9    has ever created?

10                   MR. BERMAN:  Objection.

11                   MR. LITTLEWOOD:  Objection.  Lacks

12   foundation.  Calls for speculation.  Vague and

13   ambiguous.  Irrelevant.  Not reasonably calculated to

14   lead the discovery of admissible evidence.

15                   MR. BEGAKIS:  Irrelevant?  Okay.

16                   MR. BERMAN:  Joined.

17                   MR. LITTLEWOOD:  Signing something that

18   he didn't give away, that he never had?  Okay.  Good

19   luck (indiscernible - simultaneous speech) on that,

20   buddy.

21                   MR. BEGAKIS:  Okay.  Okay.  Mr.

22   Littlewood.

23                   THE INTERPRETER:  The answer is no.

24   BY MR. BEGAKIS:

25       Q    As a co-owner, do you believe you were

DOMINGO TORRES FLORES - DECEMBER 7, 2022        86

1    entitled to an equal share of any profits that the band

2    generated?

3                    MR. BERMAN:  Objection.  Sorry.

4    Objection based on mischaracterization of testimony and

5    based on facts not in evidence.

6                    MR. LITTLEWOOD:  Lacks foundation.  Calls

7    for speculation.

8                    MR. BERMAN:  I join those objections as

9    well.

10                   THE WITNESS:  Yes.  I'm a partner.  I'm

11   an owner.

12   BY MR. BEGAKIS:

13        Q    As a partner and an owner, how were band

14   decisions supposed to be made?

15                   MR. LITTLEWOOD:  Objection.  Lacks

16   foundation.  Calls for speculation.  Assumes facts not

17   in evidence.

18                   MR. BERMAN:  Joined.

19                   MR. LITTLEWOOD:  Calls for legal

20   conclusion.  Also compound.

21                   THE WITNESS:  We make them together.

22   BY MR. BEGAKIS:

23        Q    Did all of the members of the band agree to

24   enter into an agreement with Hyphy Music for Hyphy Music

25   to acquire the works at issue in this case?

# EXHIBIT "K"

Page 18

1   repeat that.
2          Looks like they're frozen.
3          (Zoom connection interruption.)
4          MR. BEGAKIS:  Can you ask the question again,
5   Ms. Interpreter?
6          (Interpreter complies.)
7          THE WITNESS:  I believe it was around
8   33 years ago.
9   BY MR. BEGAKIS:
10      Q.   So what year would that have been?
11      A.   I don't recall.
12      Q.   Mr. Chavez, I'm going to refer to Los
13  Originales de San Juan as "the band," and if I do so,
14  do you understand what I'm saying?
15      A.   Yes.
16      Q.   Mr. Chavez, who -- when the band was formed,
17  was it formed as a business entity?
18          MR. BERMAN:  Objection to form, vague, and
19  compound question.
20          MR. LITTLEWOOD:  Join.
21          THE WITNESS:  Yes.
22  BY MR. BEGAKIS:
23      Q.   What kind of business entity was it?
24          MR. BERMAN:  Objection to form, vague.
25          MR. LITTLEWOOD:  Also calls for legal

Page 19

1   conclusion.
2          THE WITNESS:  We did a partnership, three
3   people.
4   BY MR. BEGAKIS:
5      Q.   Did you understand that partnership to be a,
6   quote, unincorporated partnership?
7          MR. BERMAN:  Objection to form, vague.
8   BY MR. BEGAKIS:
9      Q.   You can answer, Mr. Chavez.
10      A.   Could you ask that question again?
11      Q.   Did you understand that partnership to be an
12  unincorporated partnership?
13          MR. BERMAN:  Same objections.
14  BY MR. BEGAKIS:
15      Q.   You can answer, Mr. Chavez.
16          MR. LITTLEWOOD:  You broke up.  You broke up,
17  John.
18          MR. BEGAKIS:  Oh.
19          MR. LITTLEWOOD:  I'm sorry, I'll have to ask
20  you to repeat it again.
21          MR. BEGAKIS:  No problem.
22  BY MR. BEGAKIS:
23      Q.   Did you understand the partnership to be an
24  unincorporated partnership, Mr. Chavez?
25          MR. BERMAN:  Same objections.

Page 20

1          THE WITNESS:  No.
2   BY MR. BEGAKIS:
3      Q.   In what state was the partnership registered
4   with?
5          MR. BERMAN:  Objection to form, vague.
6          THE WITNESS:  Here in Fresno.
7   BY MR. BEGAKIS:
8      Q.   Okay.  Was there a written agreement for the
9   partnership?
10      A.   Yes, but --
11          THE INTERPRETER:  This is the interpreter
12  speaking, I just need to ask him what the last part of
13  his answer was because it cut out.
14          THE WITNESS:  Yes.  But then it was broken
15  because the person that played the accordion left, and
16  all that was left was Alfonso Vargas and myself.
17  BY MR. BEGAKIS:
18      Q.   Do you have a copy of that written agreement?
19      A.   I think it's at home.
20      Q.   Do you know if it's been produced in this
21  lawsuit?
22      A.   No.
23      Q.   Why not?
24          MR. BERMAN:  Objection.  Calls for
25  speculation.

Page 21

1   BY MR. BEGAKIS:
2      Q.   You can answer, Mr. Chavez.
3      A.   No.  Well, I did not know.
4      Q.   Who were the original founding members of the
5   band, Mr. Chavez?
6      A.   I did.  So it was Jesus, Domingo, Alfonso and
7   Jose Torres.
8          No, pardon me.  It was Jesus, Domingo and
9   Jose Torres.
10      Q.   And this written agreement that you referred
11  to was an agreement between the four of you?
12          MR. BERMAN:  Please note my objection to form
13  and vague and mischaracterizing prior testimony.
14          THE WITNESS:  Yes.
15  BY MR. BEGAKIS:
16      Q.   What were the percentages of ownership for
17  the partnership?
18          You can answer, Mr. Chavez.
19      A.   All four of us had the same share.
20      Q.   Mr. Chavez, how were band decisions made
21  amongst four members?
22          MR. BERMAN:  Objection to form and vague.
23          THE INTERPRETER:  This is the interpreter
24  speaking.
25          I believe there was an objection, so I might

Page 22

1  have missed part of his answer, so I'm going to ask
2  him to repeat that.
3        THE WITNESS:  I would make the decisions.
4  BY MR. BEGAKIS:
5     Q.   Did all four members agree to that?
6     A.   Yes.
7     Q.   Is that agreement reflected in the
8  partnership agreement that you state you have?
9        MR. BERMAN:  Objection to form, vague.
10       THE WITNESS:  Yes.
11 BY MR. BEGAKIS:
12       MR. BERMAN:  Also, Ms. Reporter [sic], I'm
13 going to ask you -- to remind you that after
14 Mr. Begakis asks his questions, will you allow me to
15 interject my objections before translating?
16       THE INTERPRETER:  You mean the interpreter?
17 Yes.
18       MR. BERMAN:  Thank you.
19 BY MR. BEGAKIS:
20    Q.   Mr. Chavez, are there any other documents
21 that reflect your understanding with the members
22 regarding what you are stating today, that you were
23 the one who made the decisions for the band?
24       MR. BERMAN:  Objection, vague.
25       THE WITNESS:  No.  Only the bank account at

Page 23

1  the bank.
2  BY MR. BEGAKIS:
3     Q.   What do you mean by that?
4     A.   So every weekend we would do the math, and we
5  would divide the profits.
6     Q.   Well, Mr. Chavez, you made a reference to the
7  bank account, so I'm asking, what did you mean when
8  you responded to my last question by referring to the
9  bank account?
10       MR. BERMAN:  Objection to form, vague.
11       THE WITNESS:  I don't have any other
12 documents.  I just have their names.
13 BY MR. BEGAKIS:
14    Q.   Okay.  So to be clear, Mr. Chavez, there are
15 no other documents, other than the purported
16 partnership agreement, which set forth how band
17 decisions were made, correct?
18    A.   That is correct.
19    Q.   Are there any other documents between you and
20 each of the band members regarding each band member's
21 role in the band?
22       MR. BERMAN:  Objection to form, vague.
23       MR. LITTLEWOOD:  Can you repeat the question,
24 please?  We froze.
25 BY MR. BEGAKIS:

Page 24

1     Q.   Are there any other written agreements
2  between you and the other band members regarding each
3  band member's role in the band?
4     A.   No.
5     Q.   What instrument do each of the band members
6  play, Mr. Chavez?
7        MR. BERMAN:  Objection to form, vague.
8        MR. LITTLEWOOD:  Vague as to time.
9  BY MR. BEGAKIS:
10    Q.   When the band was formed -- strike -- I'll
11 withdraw the question.
12       When the band was formed, what instruments
13 did each of the band members play?
14       THE INTERPRETER:  This is the interpreter
15 speaking.
16       I'm just going to inquire to make sure I
17 heard everything.
18       MR. BEGAKIS:  Ms. Interpreter, are we waiting
19 on you for a response?
20       Sorry.
21       THE WITNESS:  It was the accordion.  It was
22 the bass, electric bass, the six bass and the drums.
23 BY MR. BEGAKIS:
24    Q.   Who played what?
25       THE INTERPRETER:  The interpreter speaking,

Page 25

1  he cut out.
2        THE WITNESS:  So Simon Saucedo, he has now
3  passed away, and he would play the electric bass.
4  BY MR. BEGAKIS:
5     Q.   What did the other band members play?
6     A.   Domingo Torres would play the accordion,
7  Alfonso Vargas would play the drums.
8        THE INTERPRETER:  This is the interpreter
9  speaking.
10       I'm going to ask him to repeat that.
11       THE WITNESS:  And I would play the six bass.
12 BY MR. BEGAKIS:
13    Q.   Were you also the lead vocalist?
14    A.   Yes.
15    Q.   Did you write any of the songs?
16    A.   Several.
17    Q.   Did you create -- did you contribute anything
18 else creatively to the band other than the instrument
19 that you play and as a lead vocalist?
20       MR. LITTLEWOOD:  Objection.  Misstates his
21 testimony and vague.
22       THE WITNESS:  Yes.  I would write my own
23 songs.
24 BY MR. BEGAKIS:
25    Q.   Okay.  With respect to the partnership

Page 34

1   the band at that time?
2          MR. BERMAN:  Objection to form, vague, lacks
3   foundation, mischaracterizes testimony.
4          MR. LITTLEWOOD:  Join.  Assumes facts.
5          THE WITNESS:  No.
6   BY MR. BEGAKIS:
7      Q.   Okay.  Mr. Chavez, did you record five albums
8   with Hyphy Music from 2013 to 2017?
9          MR. BERMAN:  Objection to form, vague.  Also,
10  assumes a fact not in evidence.
11         THE WITNESS:  Yes.
12  BY MR. BEGAKIS:
13     Q.   Mr. Chavez, can you state the names of those
14  five albums for me, please?
15     A.   I don't recall the names of the albums.
16     Q.   Was Amigos y Contrarios one of those albums?
17     A.   Yes.
18     Q.   When did you record Amigos y Contrarios?
19     A.   I don't remember.
20     Q.   Who were the other band members at the time
21  that you recorded Amigos y Contrarios?
22     A.   The Inquietos del Norte.
23         MR. BEGAKIS:  I'm sorry, was that supposed to
24  be his answer in English?
25         THE INTERPRETER:  This is the interpreter

Page 35

1   speaking.  I believe he mentioned the name of a band,
2   Los Inquietos del Norte.
3          MR. BEGAKIS:  Oh, okay.
4   BY MR. BEGAKIS:
5      Q.   So, Mr. Chavez, it is your testimony that you
6   recorded Amigos y Contrarios through this other band?
7      A.   So this singer was only the second singer for
8   me, but it was only the singer.
9      Q.   Did any of the other original band members
10  record Amigos y Contrarios with the band?
11         MR. LITTLEWOOD:  Objection.  Lacks
12  foundation, vague.
13         THE WITNESS:  No.
14  BY MR. BEGAKIS:
15     Q.   Where did the band record Amigos y
16  Contrarios?
17         MR. LITTLEWOOD:  Objection.  Lacks
18  foundation, misstates testimony.
19         THE WITNESS:  In a studio in Selma.
20  BY MR. BEGAKIS:
21     Q.   You recall the name of the studio?
22         THE INTERPRETER:  This is the interpreter
23  speaking.
24         I'm just going to ask him to repeat that
25  again.

Page 36

1          THE WITNESS:  Morillo Studio.
2   BY MR. BEGAKIS:
3      Q.   Who paid for the recording studio?
4      A.   I did.
5      Q.   Who was the recording engineer at the studio?
6      A.   Omar Rosales.
7      Q.   So it is your testimony that only you and one
8   other singer recorded Amigos y Contrarios?
9          MR. BERMAN:  Objection to form, vague and
10  assumes a fact not in evidence.
11         THE WITNESS:  That's right.
12  BY MR. BEGAKIS:
13     Q.   Did you have a written agreement with this
14  singer for her contribution or for this singer's
15  contribution to the work?
16     A.   No.
17     Q.   Why not?
18     A.   Because we're friends.
19     Q.   How much did you pay this singer?
20         MR. LITTLEWOOD:  Objection.  Assumes facts.
21         THE WITNESS:  The singer did not charge me
22  anything.
23  BY MR. BEGAKIS:
24     Q.   Did the singer obtain anything of value for
25  recording Amigos y Contrarios?

Page 37

1      A.   No.
2      Q.   How much did Hyphy Music pay you to record
3   Amigos y Contrarios?
4          MR. LITTLEWOOD:  Objection.  Assumes facts,
5   lacks foundation.
6          THE WITNESS:  We made an agreement, but they
7   never -- they never carried out the agreement.
8   BY MR. BEGAKIS:
9      Q.   That's not what I asked you, Mr. Chavez.
10         How much did Hyphy Music pay you to record
11  Amigos y Contrarios?
12         MR. LITTLEWOOD:  Same objections.
13         MR. BERMAN:  Please note my objection.
14  Objection to form, vague, misleading question,
15  misstates his testimony.
16         THE WITNESS:  I was not paid anything.
17  BY MR. BEGAKIS:
18     Q.   What were the terms of your agreement with
19  Hyphy Music to record Amigos y Contrarios?
20         MR. BERMAN:  Objection to form.
21         MR. LITTLEWOOD:  Objection.  Assumes facts,
22  lacks foundation, calls for speculation.
23         MR. BERMAN:  Join.
24         THE INTERPRETER:  This is the interpreter
25  speaking.

# EXHIBIT "L"

Page 14

1    conclusion and lacks foundation.
2         MR. BERMAN:  Joining Mr. Littlewood's
3    objection.  Also assumes facts not in evidence.
4         THE WITNESS:  No, it's mine.  The name of
5    Los Originales.
6    BY MR. BEGAKIS:
7         Q.  How many members were there in the band when the
8    band was formed?
9         A.  Five.
10        Q.  Who were they?
11        A.  Jose Torres, Jose Humberto Castro, Domingo
12   Torres, and Jesus Chavez.
13        Q.  Was there a written agreement between you and the
14   other band members when you formed the band?
15        A.  No.
16        MR. BERMAN:  Objection. Lacks foundation.
17   Calls for a legal conclusion and vague.
18   BY MR. BEGAKIS:
19        Q.  Did you have any written agreement with any of
20   the band members at the time the band was formed?
21        MR. BERMAN:  Same objections.
22        MR. LITTLEWOOD:  Join.
23        THE WITNESS:  No.
24   BY MR. BEGAKIS:
25        Q.  Why not?

Page 15

1         MR. BERMAN:  Objection.  Calls for
2    speculation.  Maybe, Ms. Translator, if you can instruct
3    the witness maybe pause for a moment before answering
4    because counsel may interpose objections.  Thank you.
5         THE INTERPRETER:  Interpreter will ask the
6    witness to repeat his answer.
7         MR. LITTLEWOOD:  Before he testifies, I'm
8    objecting on the grounds of lacks foundation.  Calls for
9    speculation.  Assumes facts not in evidence.
10        THE WITNESS:  All right.
11        MR. BEGAKIS:  I didn't get his original
12   answer.
13        MR. LITTLEWOOD:  It may be helpful if you
14   restate the question with the understanding the
15   objection stands.
16        MR. BEGAKIS:  I wanted the original answer
17   but there was a lot of crosstalk so I'll ask it again.
18   BY MR. BEGAKIS:
19        Q.  Why did you not have written agreements with any
20   of the band members at the time the band was formed?
21        MR. BERMAN:  Objection.  Calls for
22   speculation.  Legal conclusion and vague.
23        THE WITNESS:  We were friends.  There was
24   trust.
25   ///

Page 16

1    BY MR. BEGAKIS:
2         Q.  When the band was formed how were band decisions
3    made?
4         MR. BERMAN:  Objection.  Vague.
5         THE WITNESS:  I was the one who gave it the
6    name.
7    BY MR. BEGAKIS:
8         Q.  And how were all other band decisions made
9    between the members?
10        MR. BERMAN:  Objection.  Vague.
11        THE WITNESS:  I made all of the decisions
12   myself.
13   BY MR. BEGAKIS:
14        Q.  Mr. Chavez, do you play an instrument in the
15   band?
16        THE INTERPRETER:  Interpreter needs a moment
17   to search for a term.
18        THE WITNESS:  The bajo sexto.
19        THE INTERPRETER:  The interpreter's
20   spelling.  B-a-j-o s-e-x-t-o.
21   BY MR. BEGAKIS:
22        Q.  Mr. Chavez, are you the lead vocalist of the
23   band?
24        MR. LITTLEWOOD:  Objection.  Vague as to
25   time.

Page 17

1         MR. BEGAKIS:  I'll withdraw the question.
2    BY MR. BEGAKIS:
3         Q.  When the band was first formed, were you the lead
4    vocalist?
5         A.  Yes.
6         Q.  When the band was formed -- withdraw.  Please
7    identify the instruments played by each of the band
8    members when the band was formed, Mr. Chavez.
9         A.  Jose Torres, percussion.  Jose Humberto,
10   electronic bass.  Domingo Torres, accordion.  And Jesus
11   Chavez, the bajo sexto.
12        Q.  Mr. Chavez, did the band record -- withdraw.
13   Mr. Chavez, do you know what Hyphy Music is?
14        MR. BERMAN:  Objection.  Vague.
15        THE WITNESS:  It's a music production
16   company.
17   BY MR. BEGAKIS:
18        Q.  Have you recorded albums at the direction of
19   Hyphy Music?
20        MR. BERMAN:  Objection --
21        MR. LITTLEWOOD:  Objection.  Vague.
22   Ambiguous.  Lacks foundation.
23        MR. BERMAN:  Objection.  Also vague.  Calls
24   for a legal conclusion.
25        THE WITNESS:  Not under its direction.

Page 18

1  BY MR. BEGAKIS:
2      Q.  What have you recorded -- what albums have you
3  recorded that Hyphy Music has been involved with?
4          MR. BERMAN:  Objection.  Form.  Phrase
5  involved with also lacks foundation.
6          MR. LITTLEWOOD:  Join.
7          THE INTERPRETER:  Interpreter needs to
8  inquire for clarification of the witness.
9          THE WITNESS:  Poca M Corridos.
10         THE INTERPRETER:  Interpreter's spelling,
11  P-o-c-a letter M.  Corridos.  Interpreter's spelling,
12  Corridos.
13         THE WITNESS:  And some others.
14  BY MR. BEGAKIS:
15      Q.  Did Hyphy Music pay you to record Corridos de
16  Poca M and these other albums you're referring to?
17         MR. BERMAN:  Objection.  Vague.  Misleading.
18  Mischaracterization.  Lack of foundation.
19         THE WITNESS:  No.
20  BY MR. BEGAKIS:
21      Q.  Just to get clarification is it correct,
22  Mr. Chavez, that you recorded the following works with
23  Hyphy Music; Amigos y Contreros, Corrido de Poca M,
24  Desde la Cantina de Mi Barrio en vivo, El Campesino,
25  Chuy Chavez Y Sus Amigos --

Page 19

1          THE INTERPRETER:  Mr. Begakis, could I have
2  that slower, please.  I have Desde la Cantina.  That's
3  where I left off.
4          MR. BEGAKIS:  Desde la Cantina de Mi Barrio,
5  en vivo, El Campesino, Chuy Chavez y sus Amigos, Naci
6  Con Suerte De Rey, Mariachi and Nuestra Historia.
7          MR. LITTLEWOOD:  I'll object on the grounds
8  this is compound and the language could be confusing.
9          MR. BERMAN:  Lack of foundation.  Assumes
10  facts not in evidence.
11         MR. BEGAKIS:  I'll withdraw then.  We'll go
12  one by one.
13  BY MR. BEGAKIS:
14      Q.  Mr. Chavez, did you record Amigos y Contreros
15  with Hyphy Music?
16         MR. BERMAN:  Objection.  Vague.
17         THE WITNESS:  Yes.
18  BY MR. BEGAKIS:
19      Q.  When did you record Amigos y Contreros with Hyphy
20  Music?
21         MR. BERMAN:  Objection to form.  And vague.
22         THE WITNESS:  I don't remember.  Some four
23  years already.
24  BY MR. BEGAKIS:
25      Q.  Who were the band members that participated in

Page 20

1  the recording of Amigos y Contreros?
2      A.  The original ones.
3      Q.  Yes.  You can answer, Mr. Chavez.
4      A.  Jose Los Inquieeos del Norte.
5          THE INTERPRETER:  Interpreter's spelling;
6  Los, L-o-s I-n-q-u-i-e-e-o-s, del, d-e-l N-o-r-t-e.
7  BY MR. BEGAKIS:
8      Q.  Where did you record Amigos y Contreros?
9      A.  At the Los Rios Studio.
10         THE INTERPRETER:  Interpreter's spelling;
11  L-o-s R-i-o-s Studio.
12  BY MR. BEGAKIS:
13      Q.  Who was the recording engineer when Amigos y
14  Contreros was recorded?
15      A.  Omar Rosales.
16      Q.  Did you pay Mr. Rosales to record the album?
17      A.  Yes.
18      Q.  How much?
19      A.  I don't remember exactly.
20      Q.  Did you pay each of the band members to record
21  the album?
22         MR. BERMAN:  Objection.  Vague.
23         THE WITNESS:  Yes.
24  BY MR. BEGAKIS:
25      Q.  How much did you pay each of the band members to

Page 21

1  record Amigos y Contreros?
2          MR. BERMAN:  Objection.  Vague.
3          THE WITNESS:  There was an agreement within
4  the group --
5          THE INTERPRETER:  Interpreter needs to
6  request a repetition.
7          THE WITNESS:  There was an agreement that it
8  was going to be included within the weekly salary.
9  BY MR. BEGAKIS:
10      Q.  So the cost of the performance by each performer
11  was included in each performer's weekly salary; is that
12  what you're --
13         MR. BERMAN:  Objection.  Vague.  Misleading.
14  Mischaracterization of testimony and speculation.
15         MR. LITTLEWOOD:  Join.
16         THE WITNESS:  That's right.
17  BY MR. BEGAKIS:
18      Q.  How much did each of the band members receive as
19  a weekly salary in 2013?
20         MR. BERMAN:  Objection.  Vague.
21  Mischaracterization of testimony and form.
22         MR. LITTLEWOOD:  Join.
23         THE WITNESS:  It depended on what we made
24  per night.
25  ///

Page 26

```
 1   Poca M was recorded?
 2       A.  Alfonso Vargas, percussion.  Romeo Pena, bajo
 3   sexto -- electric base.  Domingo Torres at the
 4   accordion.
 5       Q.  Did you pay any of these band members for their
 6   contributions to the recording of Corrido de Poca M?
 7           MR. LITTLEWOOD:  Objection.  Vague and
 8   ambiguous.  Lacks foundation.  Assumes facts not in
 9   evidence.
10           MR. BERMAN:  Join.
11           THE WITNESS:  No.
12   BY MR. BEGAKIS:
13       Q.  Were they compensated by way of a weekly salary
14   as you testified you compensated the band members for
15   the recording of Amigos y Contreros?
16           MR. LITTLEWOOD:  Objection.  Assumes facts.
17   Lacks foundation.  Misstates testimony.  Vague and
18   ambiguous.
19           MR. BERMAN:  Compound question.  Join.
20           THE WITNESS:  That's right.
21   BY MR. BEGAKIS:
22       Q.  Where did you -- where did the band record
23   Corrido de Poca M?
24       A.  At Moreo Studio.
25       Q.  Who was the recording engineer when Corrido de
```

Page 27

```
 1   Poca M was recorded?
 2       A.  Omar Rosales.
 3       Q.  Did you pay Omar Rosales for his work as the
 4   recording engineer?
 5       A.  Yes.
 6       Q.  How much?
 7       A.  I don't remember what he charged back then.  It
 8   would vary.
 9       Q.  Did you have a written agreement with Omar
10   Rosales regarding his work as the recording engineer on
11   the recording of Corrido de Poca M?
12       A.  No.
13       Q.  Did you have a written agreement with any of the
14   band members regarding their contribution with the
15   recordings of Corrido de Poca M?
16           MR. LITTLEWOOD:  Objection.  Assumes facts
17   not in evidence.  Lacks foundation.  Vague and
18   ambiguous.
19           MR. BERMAN:  Join.
20           THE WITNESS:  No.
21   BY MR. BEGAKIS:
22       Q.  Did Hyphy Music pay you anything for the
23   recording of Corrido de Poca M?
24       A.  No.
25       Q.  Did Hyphy Music ultimately distribute Corrido de
```

Page 28

```
 1   Poca M?
 2       A.  Yes.
 3       Q.  How did Hyphy Music acquire the ability or the
 4   rights to distribute Corrido de Poca M?
 5           MR. BERMAN:  Objection to form.  Vague and
 6   ambiguous.
 7           MR. LITTLEWOOD:  Join.
 8           THE WITNESS:  I gave them the right.
 9   BY MR. BEGAKIS:
10       Q.  Did they pay you anything of value or give you
11   anything of value in exchange for you giving them the
12   rights to distribute Corrido de Poca M?
13       A.  No.  They were going to give me a percentage of
14   the sales.
15       Q.  Did Hyphy Music contribute anything to the
16   recording of Corrido de Poca M?
17           MR. LITTLEWOOD:  Objection.  Vague and
18   ambiguous.  Lacks foundation.  Calls for legal
19   conclusion.
20           MR. BERMAN:  Join.
21           THE WITNESS:  No.
22   BY MR. BEGAKIS:
23       Q.  Did Hyphy Music contribute anything to the
24   creation of Amigos y Contreros?
25           MR. LITTLEWOOD:  Objection.  Lacks
```

Page 29

```
 1   foundation.  Calls for a legal conclusion.  Assumes
 2   facts not in evidence.
 3           MR. BERMAN:  Join.
 4           THE WITNESS:  No.
 5   BY MR. BEGAKIS:
 6       Q.  Did the band record the album El Campesino with
 7   Hyphy Music?
 8           MR. BERMAN:  Objection.  Form.  Vague.
 9   Misleading.  Lacks foundation.
10           THE WITNESS:  No.
11   BY MR. BEGAKIS:
12       Q.  When did the band record El Campesino?
13       A.  I don't remember.
14       Q.  Who were the members of the band at the time --
15   withdraw.  Who were the members in the band involved in
16   recording the album El Campesino?
17       A.  Alfonso Vargas for percussion.  Romeo Pena, bajo
18   sexto.  Antonio Rios, electric base.  And Domingo
19   Torres, the accordion.
20       Q.  Did you have written agreements -- withdraw.  Did
21   you have written agreements with any of these band
22   members for their contributions for the recording of El
23   Campesino?
24           MR. LITTLEWOOD:  Objection.  Vague and
25   ambiguous.  Lacks foundation.  Calls for a legal
```

Page 30

1  conclusion.  Assumes facts not in evidence.
2         THE WITNESS:  No.
3  BY MR. BEGAKIS:
4     Q.  Where did the band record El Campesino?
5     A.  In Selma.
6     Q.  Is that in California?
7     A.  Yes.
8     Q.  Do you remember the name of the recording studio?
9     A.  Morios Studio.
10    Q.  Who was the recording engineer when El Campesino
11  was recorded?
12    A.  Omar Rosales.
13    Q.  Did you pay Omar Rosales for his work as the
14  recording engineer on the recording of El Campesino?
15    A.  Yes.
16    Q.  How much?
17    A.  I don't remember.
18    Q.  Do you have anything in writing with Mr. Rosales
19  regarding his work as the recording engineer on El
20  Campesino?
21         MR. BERMAN:  Objection to form.  Vague and
22  ambiguous.
23         THE WITNESS:  No.
24  BY MR. BEGAKIS:
25    Q.  Did you pay any of the band members for their

Page 31

1  contributions for the recording of El Campesino?
2         MR. LITTLEWOOD:  Objection.  Vague and
3  ambiguous.  Lacks foundation.  Assumes facts not in
4  evidence.
5         MR. BERMAN:  Join.
6         THE WITNESS:  No.
7  BY MR. BEGAKIS:
8     Q.  Were the band members paid by way of a weekly
9  salary, which you testified was how they were
10  compensated for the recording of Corrido de Poca M and
11  Amigos y Contreros?
12         MR. LITTLEWOOD:  Objection.  Vague and
13  ambiguous.  Compound.  Misstates prior testimony.
14  Assumes facts not in evidence.  Lacks foundation.
15         MR. BERMAN:  Vague.  Form.  And join.
16         THE WITNESS:  Yes, that's right.
17  BY MR. BEGAKIS:
18    Q.  Did Hyphy Music pay you to record El Campesino?
19    A.  No.
20    Q.  Did Hyphy Music distribute El Campesino?
21    A.  Yes.
22    Q.  How did Hyphy Music obtain the rights to
23  distribute El Campesino?
24    A.  I gave them the rights.
25    Q.  In exchange for what?

Page 32

1         MR. LITTLEWOOD:  Objection.  Assumes facts.
2         THE WITNESS:  In exchange for a percentage
3  of the profit.
4  BY MR. BEGAKIS:
5     Q.  Was this agreement with Hyphy Music in writing?
6     A.  No.
7     Q.  Did Hyphy Music contribute anything to the
8  creation of El Campesino?
9         MR. LITTLEWOOD:  Objection.  Vague and
10  ambiguous.  Lacks foundation.  Calls for a legal
11  conclusion.  Assumes facts.
12         MR. BERMAN:  Calls for speculation and form
13  as well.
14         THE WITNESS:  No.
15  BY MR. BEGAKIS:
16    Q.  Did you record Desde la Cantina de Mi Barrio with
17  Hyphy Music?
18         MR. LITTLEWOOD:  Assumes facts.  Lacks
19  foundation.  Calls for speculation.
20         THE WITNESS:  Yes.
21  BY MR. BEGAKIS:
22    Q.  When did the band record Desde la Cantina de Mi
23  Barrio?
24    A.  I don't remember.
25    Q.  Who were the band members involved in the

Page 33

1  recording of Desde la Cantina de Mi Barrio?
2     A.  Alfonso Vargas, Romero Pena, Antonio Rios and
3  Jesus Chavez.
4     Q.  Did you have written agreements with any of the
5  band members regarding their contributions to Desde la
6  Cantina de Mi Barrio?
7         MR. LITTLEWOOD:  Objection.  Vague and
8  ambiguous.  Lacks foundation.  Assumes facts not in
9  evidence.  Calls for a legal conclusion.
10         THE WITNESS:  No.
11  BY MR. BEGAKIS:
12    Q.  Did you pay the band members anything for their
13  contributions of the recording for Desde la Cantina de
14  Mi Barrio?
15         MR. LITTLEWOOD:  Same objections.
16         THE WITNESS:  No.
17  BY MR. BEGAKIS:
18    Q.  Were the band members compensated by way of a
19  weekly salary the same way you testified that the band
20  members were compensated for their contributions to El
21  Campesino, Corrido de Poca M and Amigos y Contreros?
22         MR. LITTLEWOOD:  Objection.  Vague and
23  ambiguous.  Lacks foundation.  Calls for speculation.
24  Calls for a legal conclusion.
25         MR. BERMAN:  Join.

Page 34

1          THE WITNESS:  That's right.
2    BY MR. BEGAKIS:
3    Q.  Where did you record -- where did the band record
4    Desde la Cantina de Mi Barrio?
5          THE INTERPRETER:  The interpreter needs to
6    request a repetition.
7          THE WITNESS:  At Altos here in Fresno.
8    BY MR. BEGAKIS:
9    Q.  Is that a recording studio?
10   A.  No.  It's a nightclub.
11   Q.  Who was the recording engineer?
12   A.  Joaquim Pereira.
13   Q.  Did you pay Mr. Pereira for his capacity as
14   the recording engineer for the recording of Desde la
15   Cantina de Mi Barrio?
16   A.  Yes.
17   Q.  How much did you pay him?
18   A.  $500.
19   Q.  Did you pay him in cash or by check?
20   A.  In cash.
21   Q.  Is there any written agreement evidencing his
22   involvement as the recording engineer for the recording
23   of Desde la Cantina de Mi Barrio?
24        MR. LITTLEWOOD:  Objection.  Vague and ambiguous.
25        MR. BERMAN:  Join.

Page 35

1          THE WITNESS:  No.
2    BY MR. BEGAKIS:
3    Q.  Is it true that there was an individual named
4    Jesus Ramirez, who was also operating as a recording
5    engineer or was operating as a recording engineer for
6    the recording of Desde la Cantina de Mi Barrio?
7          MR. LITTLEWOOD:  Objection.  Compound.
8    Assumes facts not in evidence.  Argumentative.
9          MR. BERMAN:  Join.
10         THE WITNESS:  I don't know him.
11   BY MR. BEGAKIS:
12   Q.  Did Hyphy Music pay you anything for the
13   recording of Desde la Cantina de Mi Barrio?
14         MR. BERMAN:  Objection.  Vague.
15         THE WITNESS:  My group was paid, Los
16   Originales for playing that night at the nightclub.
17   BY MR. BEGAKIS:
18   Q.  By Hyphy Music?
19         MR. BERMAN:  Objection.  Vague.  Confusing.
20   Assumes facts not in evidence.
21         THE WITNESS:  Yes.
22   BY MR. BEGAKIS:
23   Q.  Who paid the venue?
24         MR. LITTLEWOOD:  Objection.  Calls for
25   speculation.

Page 36

1          MR. BERMAN:  Relevancy.  Please add
2    relevancy to the objection.
3          THE WITNESS:  No one.
4    BY MR. BEGAKIS:
5    Q.  Venue was not paid to have Desde la Cantina de Mi
6    Barrio recorded there?
7          MR. BERMAN:  Objection.  Asked and answered.
8          THE INTERPRETER:  Interpreter will ask for
9    repetition.
10         THE WITNESS:  I did not pay them.
11   BY MR. BEGAKIS:
12   Q.  Do you know if anybody paid them?
13         MR. BERMAN:  Objection.  Relevancy.
14         MR. LITTLEWOOD:  Objection.  Vague.
15         THE WITNESS:  I don't know.
16   BY MR. BEGAKIS:
17   Q.  Did Hyphy Music ultimately distribute Desde la
18   Cantina de Mi Barrio?
19   A.  Yes.
20   Q.  How did Hyphy Music acquire the right to
21   distribute Desde la Cantina de Mi Barrio?
22   A.  I gave them the rights.
23   Q.  In exchange for what?
24   A.  A percentage after sales.
25   Q.  What percent?

Page 37

1    A.  75 percent.
2    Q.  Was this agreement with Hyphy Music in writing?
3    A.  No.
4    Q.  Did you record Nuestra Historia with Hyphy Music?
5          MR. LITTLEWOOD:  Objection.  Vague and
6    ambiguous.  Lacks foundation.
7          MR. BERMAN:  Join.
8          THE WITNESS:  No.
9    BY MR. BEGAKIS:
10   Q.  When did you record Nuestra Historia?
11   A.  I don't remember.
12   Q.  Who were the band members involved in the
13   recording of Nuestra Historia?
14   A.  Alfonso Vargas for percussion.  Jose Humberto
15   Castro, electric base.  Romero Pena, bajo sexto.  And
16   Domingo Torres, accordion.
17   Q.  Did you have written agreements with any of the
18   band members regarding their contribution with the
19   recording of Nuestra Historia?
20         MR. LITTLEWOOD:  Objection.  Vague and
21   ambiguous.  Lacks foundation.  Calls for legal
22   conclusion.
23         MR. BERMAN:  Join.
24         THE WITNESS:  No.
25   ///

Page 38

```
1   BY MR. BEGAKIS:
2       Q.  Did you pay the band members for their
3   contributions to the recording of Nuestra Historia?
4           MR. LITTLEWOOD:  Same objections.
5           MR. BERMAN:  Join.
6           THE WITNESS:  No.
7   BY MR. BEGAKIS:
8       Q.  Were the band members compensated for their
9   contributions to Nuestra Historia in the same way you
10  testified the band members were compensated for their
11  recording for their contributions to Desde la Cantina de
12  Mi Barrio, El Campesino, Corrido de Poca M, and Amigos y
13  Contreros being by way of a weekly salary?
14          MR. LITTLEWOOD:  Objection.  Vague and
15  ambiguous.  Lacks foundation.  Misstates prior
16  testimony.  Calls for a legal conclusion.
17          MR. BERMAN:  Join.
18          THE WITNESS:  Yes.  That's right.
19  BY MR. BEGAKIS:
20      Q.  Where was Nuestra Historia recorded?
21      A.  Morios Sound.  Morios Studio.
22      Q.  That's a recording studio, not a nightclub?
23      A.  It's a recording studio.
24      Q.  Who was the recording engineer when -- at this
25  recording studio when Nuestra Historia was recorded?
```

Page 39

```
1       A.  Omar Rosales.
2       Q.  Was Mr. Rosales paid for his work as a recording
3   engineer in the recording of Nuestra Historia?
4       A.  Yes.
5       Q.  How much?
6       A.  I don't remember.
7       Q.  Was there a written agreement between you and
8   Mr. Rosales for his work as the recording engineer in
9   the recording of Nuestra Historia?
10      A.  No.
11      Q.  Did Hyphy Music pay you to record Nuestra
12  Historia?
13          MR. BERMAN:  Objection.  Vague.
14          MR. LITTLEWOOD:  Join.
15          THE WITNESS:  No.
16  BY MR. BEGAKIS:
17      Q.  Did Hyphy Music ultimately distribute Nuestra
18  Historia?
19      A.  Yes.
20      Q.  How did Hyphy Music acquire the rights to
21  distribute Nuestra Historia?
22      A.  I gave them the rights.
23      Q.  In exchange for what?
24      A.  In exchange for a percentage after sales.
25      Q.  What percentage?
```

Page 40

```
1       A.  75 percent.
2       Q.  Was this agreement in writing?
3       A.  No.
4       Q.  Did Hyphy Music contribute anything else --
5   withdraw.  Did Hyphy Music contribute anything to the
6   creation of Nuestra Historia.
7           MR. LITTLEWOOD:  Objection.  Vague and
8   ambiguous.  Calls for legal conclusion.
9           THE WITNESS:  No.
10          MR. BEGAKIS:  I just need a five-minute
11  break.  Off the record.
12          (Recess)
13          MR. BEGAKIS:  Back on.
14  BY MR. BEGAKIS:
15      Q.  Mr. Chavez, were all of the band members paid a
16  weekly salary?
17          MR. LITTLEWOOD:  Objection.  Vague as to
18  time.  Lacks foundation.  Assumes facts not in evidence.
19          MR. BERMAN:  Join.
20          MR. BEGAKIS:  Madam Interpreter, can you
21  please instruct him to put his phone away.
22          THE WITNESS:  I'm going to turn it off.
23          MR. BEGAKIS:  Off the record until he turns
24  it off.
25          (Recess)
```

Page 41

```
1           MR. BEGAKIS:  Let's try that again.
2   BY MR. BEGAKIS:
3       Q.  Were all of the band members paid a salary?
4           MR. LITTLEWOOD:  Objection.  Vague and
5   ambiguous as to time.
6           MR. BERMAN:  Join.  Again relevancy.
7           THE WITNESS:  What they were paid per week.
8           MR. BEGAKIS:  I'm sorry, Ms. Interpreter.  I
9   didn't hear what you said.  Can you repeat that.
10          THE INTERPRETER:  Interpreter repeating.
11  What they were paid per week.
12  BY MR. BEGAKIS:
13      Q.  Okay.  So when the band was formed at that time
14  were all band members paid a salary?
15          MR. BERMAN:  Objection.  Relevancy.
16          MR. LITTLEWOOD:  Same objection.
17          THE WITNESS:  Yes.  Depending on how much we
18  earned per week.
19  BY MR. BEGAKIS:
20      Q.  Okay.  And was that salary for each band member
21  inclusive of their services for live performances and
22  recordings?
23          MR. BERMAN:  Objection.  Form.  Vague and
24  ambiguous.  Misstates testimony.  Lacks foundation and
25  relevancy.
```

Page 42

1          MR. LITTLEWOOD:  Join.  Also compound.
2          THE WITNESS:  Yes.
3  BY MR. BEGAKIS:
4      Q.  How was the amount calculated?
5          MR. BERMAN: Objection.  Form.  Vague and
6  ambiguous.
7          MR. LITTLEWOOD:  Join.
8          MR. BEGAKIS:  I'll withdraw.
9  BY MR. BEGAKIS:
10     Q.  How was the weekly amount to each band member
11 calculated?
12         MR. BERMAN:  Objection.  Asked and answered.
13 Vague.
14         MR. LITTLEWOOD:  Join.
15         THE WITNESS:  Money was put in from what we
16 got.  Money was taken out for the costs and then that
17 was what the calculation was derived from.  Depending on
18 each band member, that would be their wage.
19 BY MR. BEGAKIS:
20     Q.  Okay.  What was the percentage of money earned
21 that was paid to each band member as their wage under
22 this purported salary?
23         MR. BERMAN:  Objection.  Form.  Vague and
24 ambiguous.  Relevancy.
25         MR. LITTLEWOOD:  Join.

Page 43

1          THE WITNESS:  Like I said, it depends on
2  each band member.  900.  1,000.  800.  500.  It varied.
3  BY MR. BEGAKIS:
4      Q.  Let's start with Alfonso Vargas.  What percentage
5  of band revenues was paid to Alfonso Vargas as a salary
6  when the band was formed?
7          MR. LITTLEWOOD:  Objection.  Assumes facts
8  --
9          MR. BERMAN:  Relevancy and mischaracterizes
10 testimony.
11         THE WITNESS:  900 a week.
12 BY MR. BEGAKIS:
13     Q.  How did you come to the decision to pay $900 a
14 week?
15     A.  Because the income was good.
16     Q.  Was that number based off of a particular
17 percentage of band revenue collected at any given time?
18         MR. BERMAN:  Objection.  Vague.  Misleading.
19 Assumes facts not in evidence and relevance.
20         MR. LITTLEWOOD:  Join.
21         THE WITNESS:  Yes.
22 BY MR. BEGAKIS:
23     Q.  What was the percentage that was used that was
24 determined that Alfonso Vargas would make $900 a week?
25         MR. BERMAN:  Objection.  Form.

Page 44

1  Mischaracterizes prior testimony and asked and answered.
2          MR. LITTLEWOOD:  Join.
3          THE WITNESS:  It could be like a guarantee
4  after paying the people, the employees, between Alfonso,
5  Jesus and Domingo.
6  BY MR. BEGAKIS:
7      Q.  So you just decided the amount of money on your
8  own?
9      A.  Yes, I made the decision.
10     Q.  And it wasn't based on anything other than I
11 think $900 is what you should be paid a week?
12         MR. BERMAN:  Objection.  Argumentative.
13 Lacks foundation.  Misstates testimony.
14         MR. BERMAN:  I'm going to add relevancy.
15         THE WITNESS:  We shared in three equal
16 portions at the end.
17 BY MR. BEGAKIS:
18     Q.  Okay.  So when the band was first formed how were
19 monies shared?
20         MR. BERMAN:  Objection to form.  Vague and
21 ambiguous.
22         MR. LITTLEWOOD:  Join.
23         THE WITNESS:  The same.
24 BY MR. BEGAKIS:
25     Q.  Okay.  Got it.  So Alfonso Vargas and Domingo

Page 45

1  Torres shared in the revenue of the band with --
2  withdraw.  At the formation of the band, you, Alfonso
3  Vargas and Domingo Torres shared equally in the revenue
4  derived from the band; correct?
5          MR. BERMAN:  Objection.  Calls for a
6  legal conclusion.  Lacks foundation.  Assumes facts not
7  in evidence.
8          MR. BERMAN:  Also mischaracterizes
9  testimony.  Join.
10         THE WITNESS:  That's right.
11 BY MR. BEGAKIS:
12     Q.  In 2013 is it true that you, Alfonso Vargas and
13 Domingo Torres shared equally in the revenue derived
14 from the band?
15         MR. BERMAN:  Objection.  Form.  Vague and
16 ambiguous.
17         MR. LITTLEWOOD:  Same objection.
18         THE WITNESS:  Yes, that's right.
19 BY MR. BEGAKIS:
20     Q.  In 2014 is it true that you, Alfonso Vargas and
21 Domingo Torres shared equally in the revenue derived in
22 the band?
23         MR. LITTLEWOOD:  Same objections.  Vague.
24         THE WITNESS:  Yes, that's correct.
25 ///

Page 74

1  -- no, we're not.  I'll pose my objection on the record
2  --
3          MR. BEGAKIS:  Do it.  Do it.  Do it.
4          MR. BERMAN:  You can ask again and clarify
5  and we can resolve this issue very quickly.
6          MR. BEGAKIS:  I'm getting everything I need,
7  so you do whatever you want to do.
8          MR. BERMAN:  I know you think you do.  You
9  can ask again or we can have an ambiguity that is going
10 to cause a problem.
11         MR. SHERMAN:  You're allowed to ask
12 questions.  So you can clean it up on your cross.
13         MR. BEGAKIS:  Exactly.  He just likes to
14 interrupt me.
15         MR. BERMAN:  I haven't interrupted at all
16 for this entire deposition except to the extent that we
17 have an issue with the translation.  Trying to resolve
18 it without any further dispute.  That's on you if you
19 want to move forward or leave the ambiguity.
20         MR. SHERMAN:  No issue with the
21 translation.  It's how he answered the question.  He
22 said he.  It's not up to the interpreter to try to
23 figure out who he was.
24         MR. BERMAN:  Okay.  Fine, leave the
25 ambiguity.  That's fine.

Page 75

1          MR. SHERMAN:  Until you fix it, I'm sure.
2          MR. BERMAN:  Okay.
3  BY MR. BEGAKIS:
4      Q.  Okay.  So I'm going to ask it again because it
5  hasn't been answered.  Mr. Chavez, how do you know that
6  Hyphy Music owes you money if you have never conducted
7  an accounting?
8          MR. BERMAN:  Objection to form.
9  Mischaracterizes testimony and it's a misleading
10 question.
11         MR. LITTLEWOOD:  Join.
12         THE WITNESS:  Okay.  It's logical.  My group
13 sells every day.
14 BY MR. BEGAKIS:
15     Q.  Got it.  Because -- so because you think your
16 group sells music every day then you believe that Hyphy
17 Music owes you money?
18         MR. BERMAN:  Objection.  Asked and answered.
19 Argumentative.
20         MR. LITTLEWOOD:  Join.
21         THE WITNESS:  Yes.
22 BY MR. BEGAKIS:
23     Q.  Is that why you did a deal to sell the same
24 rights to Yellowcake that you sold to Hyphy Music?
25         MR. LITTLEWOOD:  Objection.

Page 76

1  Mischaracterizes testimony.  Lacks foundation.  I don't
2  believe there is any distribution agreement between my
3  client and Yellowcake.
4          THE WITNESS:  Yes.
5  BY MR. BEGAKIS:
6      Q.  Did you approach Yellowcake about selling rights
7  in the relevant works to them?
8      A.  Could you repeat the question for me.
9      Q.  Did you approach Yellowcake about selling rights
10 in the relevant works to them or did they approach you?
11         MR. BERMAN:  Objection to form.  Vague.
12         MR. LITTLEWOOD:  Join.
13         THE WITNESS:  They searched me out.
14 BY MR. BEGAKIS:
15     Q.  Who searched you out?
16     A.  David Garcia.  David Hernandez.
17     Q.  Okay.  So did David Hernandez approach you first
18 or did he approach your son -- withdraw.  You have a
19 son; correct?
20     A.  Yes, that is right.
21     Q.  What is a your son's name?
22     A.  He's named the same as me.
23     Q.  So would you understand what I mean if I refer to
24 your son as Chavez junior?
25     A.  Yes.

Page 77

1      Q.  Okay.  So is Chavez junior involved in your
2  business?
3          MR. LITTLEWOOD:  Objection.  Vague.
4          THE WITNESS:  No.
5  BY MR. BEGAKIS:
6      Q.  Your son does not help you negotiate deals with
7  distributors?
8          MR. BERMAN:  Objection.  Vague.
9  Argumentative.
10         MR. LITTLEWOOD:  Join.
11         THE WITNESS:  No.
12 BY MR. BEGAKIS:
13     Q.  Okay.  Did Mr. Hernandez approach your son first
14 or you?
15         MR. LITTLEWOOD:  Objection.  Compound.
16 Assumes facts.
17         THE WITNESS:  Me.
18 BY MR. BEGAKIS:
19     Q.  Okay.  Was your son part of the negotiations
20 between you and Yellowcake?
21         MR. BERMAN:  Objection to form.
22         MR. LITTLEWOOD:  Join.
23         THE WITNESS:  No.
24 BY MR. BEGAKIS:
25     Q.  So he was not present for any negotiations

Page 78

1  between you and David Hernandez?
2          MR. BERMAN:  Note my objection to form.
3  Vague and ambiguous.
4          THE INTERPRETER:  The interpreter asked the
5  witness to repeat the answer.  She was not able to hear
6  it.
7          THE WITNESS:  No.
8  BY MR. BEGAKIS:
9      Q.  Approximately when did Mr. Hernandez initially
10  approach you about selling rights in the works at issue
11  in this case to Yellowcake?
12          MR. BERMAN:  Objection to form.  Vague and
13  ambiguous.
14          THE WITNESS:  I don't remember but it's been
15  some time already.
16  BY MR. BEGAKIS:
17      Q.  What year was it?
18          MR. BERMAN:  Objection.  Asked and answered.
19          THE WITNESS:  In '20.
20  BY MR. BEGAKIS:
21      Q.  I'm sorry, is it your testimony that he
22  approached you in 2020?
23          MR. BERMAN:  Objection.  Asked and answered.
24  Argumentative.
25          THE WITNESS:  Yes.

Page 79

1  BY MR. BEGAKIS:
2      Q.  Okay.  Was that meeting in person or over the
3  phone?
4      A.  By phone.
5      Q.  Okay.  Was anybody else on that call?
6      A.  No.
7      Q.  What did Mr. Hernandez say?
8      A.  That he would buy from me the albums that Hyphy
9  Music had.
10      Q.  How did he know that Hyphy Music had the rights
11  in those albums?
12          MR. LITTLEWOOD:  Objection.  Assumes facts.
13  Lacks foundation.  It's vague.
14          MR. BERMAN:  Mischaracterizes.
15          MR. BEGAKIS:  Withdraw.
16  BY MR. BEGAKIS:
17      Q.  To the best of your knowledge how did
18  Mr. Hernandez know that Hyphy Music had rights in the
19  works at issue at that point?
20          MR. LITTLEWOOD:  Objection.  Lacks
21  foundation.  Vague and ambiguous.  Calls for a legal
22  conclusion.
23          MR. BERMAN:  Also speculative and
24  mischaracterizes prior testimony and if it wasn't
25  already said, assuming facts not in evidence.

Page 80

1          THE WITNESS:  I believe he worked for Hyphy.
2  BY MR. BEGAKIS:
3      Q.  Did he tell you he worked for Hyphy?
4      A.  No.
5      Q.  How much did he offer to pay you for the works
6  that Hyphy already had rights to?
7          MR. LITTLEWOOD:  Objection.  Lacks
8  foundation.  Assumes facts not in evidence.
9  Argumentative.  Vague.
10          MR. BERMAN:  Also states a legal confusion
11  -- legal conclusion.
12          MR. LITTLEWOOD:  Join.
13          THE WITNESS:  $500,000.
14  BY MR. BEGAKIS:
15      Q.  Did he offer anything else of value in exchange
16  for rights in the works that Hyphy already had the right
17  to distribute?
18          MR. LITTLEWOOD:  Objection.  Lacks
19  foundation.  Calls for speculation.  Assumes facts not
20  no evidence.
21          MR. BERMAN:  I want to add vague and
22  ambiguous.
23          THE WITNESS:  No.
24  BY MR. BEGAKIS:
25      Q.  So Yellowcake didn't offer to pay for your legal

Page 81

1  fees in defense of any action that would arise from your
2  sale of rights in the relevant works to Yellowcake?
3      A.  No.
4      Q.  Is Yellowcake presently paying for the cost of
5  your defense in this dispute?
6      A.  No.
7      Q.  When Mr. Hernandez approached you and said that
8  he wanted to buy rights in the works that Hyphy was
9  already distributing, did you tell him that Hyphy was
10  already distributing those rights?
11          MR. LITTLEWOOD:  Objection.  Vague as to
12  time.  Lacks foundation.  Mischaracterizes testimony.
13  Assumes facts not in evidence.
14          MR. BERMAN:  Also based on which one?  I
15  join in counsel's prior objections.
16          THE WITNESS:  Yes.
17  BY MR. BEGAKIS:
18      Q.  What was his response to that?
19      A.  He didn't care.
20      Q.  Did you care that you were about to do a deal to
21  sell rights to a third party that you had already sold
22  to Hyphy Music?
23          MR. LITTLEWOOD:  Objection.  Argumentative.
24  Lacks foundation.  Calls for speculation.  Assumes facts
25  not in evidence.

Page 86

```
1       A.  The day following the first.
2       Q.  Did Yellowcake ask for any documentation at all
3   to evidence that you owned all the rights in the works
4   that you sold to them?
5       A.  No.  I am the owner of Los Originales de San
6   Juan.
7           MR. BERMAN:  Before you ask the next
8   question.  We are getting close to the three hours, I
9   know we're not there yet but we've been going for quite
10  a while now without a break.  I don't need much of a
11  break but a short one and then could we figure out how
12  much time on the record is left.
13          MR. BEGAKIS:  Sure.  Let's go off the
14  record.
15          (Recess)
16          MR. BEGAKIS:  Back on.
17  BY MR. BEGAKIS:
18      Q.  Mr. Chavez, you testified that you paid
19  Mr. Vargas 30,000 in a check and 50,000 in cash; is that
20  correct?
21      A.  Yes.
22      Q.  Was that check written from the Wells Fargo bank
23  account that you testified the check to Domingo was
24  written from?
25      A.  Yes.
```

Page 87

```
1       Q.  You also testified a few moments ago that your
2   son does not assist you with any band business; is that
3   correct?
4           MR. LITTLEWOOD:  Objection.  Misstates
5   testimony.
6           THE WITNESS:  Yes.
7   BY MR. BEGAKIS:
8       Q.  Does anybody else assist you with band business
9   today?
10      A.  My daughter.
11      Q.  What's your daughter's name?
12      A.  Diana Chavez.
13      Q.  Did she assist you -- withdraw.  Does anybody
14  else other than your daughter assist you with band
15  business today?
16      A.  No.
17      Q.  Did your daughter assist you with band business
18  at the time that Yellowcake approached you regarding
19  selling rights to them?
20      A.  Yes.
21      Q.  Was she involved in any of the conversations
22  between you and Yellowcake regarding the sale of certain
23  rights to Yellowcake?
24      A.  No.
25      Q.  Other than your daughter did anybody else -- at
```

Page 88

```
1   the time that you entered into an agreement with
2   Yellowcake, other than your daughter, did anybody else
3   assist you with band business?
4       A.  No.
5       Q.  Does the band still perform?
6       A.  Yes.
7       Q.  Do you still perform with the band?
8       A.  No.  My son Chuie Chavez goes in my place.
9       Q.  So your son is now the lead vocalist is that what
10  you're testifying to today?
11      A.  Yes.
12      Q.  Who are the current members of the band?
13          THE INTERPRETER:  Interpreter needs to
14  inquire the witness for clarification.
15          THE WITNESS:  I don't know them very well.
16  My son -- they were co-workers of my son.
17  BY MR. BEGAKIS:
18      Q.  When did your son take over in your stead?
19          MR. BERMAN:  Objection to form.  Vague.
20          MR. LITTLEWOOD:  Join.
21          THE WITNESS:  In December.
22  BY MR. BEGAKIS:
23      Q.  December of 2022?
24      A.  Yes.
25      Q.  So up until December of 2022 you were performing
```

Page 89

```
1   with the band?
2       A.  No, I had already stopped for some months because
3   I was ill.
4       Q.  What were you ill with?
5       A.  I got a stroke.
6       Q.  I'm sorry to hear that.  When did that happen?
7       A.  It's going to be a year already.
8       Q.  Okay.  So about December of 2021.
9       A.  Yes.
10      Q.  Were you performing with the band up until
11  December of 2021?
12      A.  Yes.
13      Q.  When was your last performance with the band?
14      A.  I don't remember.
15      Q.  Was it in 2021?
16      A.  Yes.
17      Q.  Other than for purposes of this lawsuit has the
18  band ever retained an attorney?
19          MR. BERMAN:  Objection.  Vague.
20          MR. LITTLEWOOD:  Relevance.
21          THE WITNESS:  No.
22  BY MR. BEGAKIS:
23      Q.  The band has never used an attorney for any band
24  business?
25          MR. BERMAN:  Objection.  Asked and answered.
```